# COMMONWEALTH OF VIRGINIA



LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG  VA  20178-0550
(703) 777-0270

Summons

To: UNITED STATES POLO ASSOCIATION          Case No. 107CL21006897-00
208 SO LASALLE ST SUITE 814
CHICAGO IL 60604

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, December 17, 2021

Clerk of Court:  GARY M CLEMENS

by _____ *Denisy Beach* _____
(CLERK/DEPUTY CLERK )

Instructions: With Black Binder - Exhibit E

Hearing Official:

Attorney's name:     SPURLOCK-BROWN, JOHN
703-383-0100
10533 MAIN STREET
FAIRFAX VA 22030

# COVER SHEET FOR FILING CIVIL ACTIONS
COMMONWEALTH OF VIRGINIA

Case No. CL21-6897

(CLERK'S OFFICE USE ONLY)

LOUDOUN COUNTY ............................... Circuit Court

DARRELL GAEBEL ......................... v./In re: ........... UNITED STATES POLO ASSOCIATION
PLAINTIFF(S)                                                    DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

| GENERAL CIVIL | ADMINISTRATIVE LAW | PROBATE/WILLS AND TRUSTS |
|---|---|---|
| **Subsequent Actions** | [ ] Appeal/Judicial Review of Decision of | [ ] Accounting |
| [ ] Claim Impleading Third Party Defendant | (select one) | [ ] Aid and Guidance |
|    [ ] Monetary Damages |    [ ] ABC Board | [ ] Appointment (select one) |
|    [ ] No Monetary Damages |    [ ] Board of Zoning |    [ ] Guardian/Conservator |
| [ ] Counterclaim |    [ ] Compensation Board |    [ ] Standby Guardian/Conservator |
|    [ ] Monetary Damages |    [ ] DMV License Suspension |    [ ] Custodian/Successor Custodian (UTMA) |
|    [ ] No Monetary Damages |    [ ] Employee Grievance Decision | [ ] Trust (select one) |
| [ ] Cross Claim |    [ ] Employment Commission |    [ ] Impress/Declare/Create |
| [ ] Interpleader |    [ ] Local Government |    [ ] Reformation |
| [ ] Reinstatement (other than divorce or |    [ ] Marine Resources Commission | [ ] Will (select one) |
|    driving privileges) |    [ ] School Board |    [ ] Construe |
| [ ] Removal of Case to Federal Court |    [ ] Voter Registration |    [ ] Contested |
| **Business & Contract** |    [ ] Other Administrative Appeal | |
| [ ] Attachment | | **MISCELLANEOUS** |
| [ ] Confessed Judgment | **DOMESTIC/FAMILY** | [ ] Amend Death Certificate |
| [X] Contract Action | [ ] Adoption | [ ] Appointment (select one) |
| [ ] Contract Specific Performance |    [ ] Adoption – Foreign |    [ ] Church Trustee |
| [ ] Detinue | [ ] Adult Protection |    [ ] Conservator of Peace |
| [ ] Garnishment | [ ] Annulment |    [ ] Marriage Celebrant |
| **Property** |    [ ] Annulment – Counterclaim/Responsive | [ ] Approval of Transfer of Structured |
| [ ] Annexation |       Pleading |    Settlement |
| [ ] Condemnation | [ ] Child Abuse and Neglect – Unfounded | [ ] Bond Forfeiture Appeal |
| [ ] Ejectment |    Complaint | [ ] Declaratory Judgment |
| [ ] Encumber/Sell Real Estate | [ ] Civil Contempt | [ ] Declare Death |
| [ ] Enforce Vendor's Lien | [ ] Divorce (select one) | [ ] Driving Privileges (select one) |
| [ ] Escheatment |    [ ] Complaint – Contested* |    [ ] Reinstatement pursuant to § 46.2-427 |
| [ ] Establish Boundaries |    [ ] Complaint – Uncontested* |    [ ] Restoration – Habitual Offender or 3rd |
| [ ] Landlord/Tenant |    [ ] Counterclaim/Responsive Pleading |       Offense |
|    [ ] Unlawful Detainer |    [ ] Reinstatement – | [ ] Expungement |
| [ ] Mechanics Lien |       Custody/Visitation/Support/Equitable | [ ] Firearms Rights – Restoration |
| [ ] Partition |       Distribution | [ ] Forfeiture of Property or Money |
| [ ] Quiet Title | [ ] Separate Maintenance | [ ] Freedom of Information |
| [ ] Termination of Mineral Rights |    [ ] Separate Maintenance Counterclaim | [ ] Injunction |
| **Tort** | | [ ] Interdiction |
| [ ] Asbestos Litigation | **WRITS** | [ ] Interrogatory |
| [ ] Compromise Settlement | [ ] Certiorari | [ ] Judgment Lien-Bill to Enforce |
| [X] Intentional Tort | [ ] Habeas Corpus | [ ] Law Enforcement/Public Official Petition |
| [ ] Medical Malpractice | [ ] Mandamus | [ ] Name Change |
| [ ] Motor Vehicle Tort | [ ] Prohibition | [ ] Referendum Elections |
| [ ] Product Liability | [ ] Quo Warranto | [ ] Sever Order |
| [ ] Wrongful Death | | [ ] Taxes (select one) |
| [X] Other General Tort Liability | |    [ ] Correct Erroneous State/Local |
| | |    [ ] Delinquent |
| | | [ ] Vehicle Confiscation |
| | | [ ] Voting Rights – Restoration |
| | | [ ] Other (please specify) |

[X] Damages in the amount of $ 2,430,000.00 ............................ are claimed.

12/14/2021
DATE

[ ] PLAINTIFF    [ ] DEFENDANT    [X] ATTORNEY FOR    [ ] PLAINTIFF / [ ] DEFENDANT

John Spurlock-Brown, Dycio & Biggs
PRINT NAME

10533 Main Street, Fairfax, VA 22030
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

703-383-0100

jspurlockbrown@dyciolaw.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE 07/16

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

**VIRGINIA:**

FILED

2021 DEC 15 PM 12: 00

CLERKS COURT
LOUDOUN COUNTY, VA.
TESTE:_____ D.C

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

~~DARRELL GAEBEL,~~ )
)
Plaintiff, )
)
v. )   Civil Action No. 21-10897
)
**UNITED STATES POLO ASS'N,** )
208 SO LASALLE ST, SUITE 814 )
Chicago, IL 60604 )
)
*Serve: Secretary of the Commonwealth.* )
)
Defendant. )
)   **JURY TRIAL DEMANDED**

## COMPLAINT

Darrell Gaebel ("Plaintiff") by and through his counsel, petitions this Court to find that above-named Defendant United States Polo Ass'n ("Defendant" or "USPA") has committed any or all the Counts in this Complaint. The Plaintiff requests this Court to award the requested relief in this Complaint and states the following in support thereof:

## JURISDICTION AND VENUE

This Court has jurisdiction over this action as Plaintiff is a citizen of Virginia and all causes of action occurred in Virginia. This Court has personal jurisdiction over Defendant under VA Code Ann. § 8.01-328.1(A)(1) as the USPA transacts business within the Commonwealth of Virginia by accepting membership dues with Virginia polo players and operating polo clubs in the Commonwealth of Virginia.

Venue in Loudoun County is proper under VA Code Ann. § 8.01-262 (10) as that is where Plaintiff resides, and Defendant is a nonresident of the Commonwealth who does not have its principal place of business in the Commonwealth.

## PARTIES

Plaintiff, Darrell Gaebel, is a Registered Player member of the United States Polo Association ("USPA"). Plaintiff has been playing polo for over a decade and plays with the USPA registered club, Twilight Polo Club in Middleburg, Virginia. Plaintiff is a seventy-three-year-old retired Navy Commander and senior level federal government contractor employed by FTS International, LLC.

Defendant United States Polo Association ("USPA") is incorporated in Illinois with its principal place of business in Florida. Defendant USPA is a voluntary sports organization and a Recognized Sports Organization by the United States Olympic Committee. It is not, however, a National Governing Body under the Ted Stevens Amateur Sports Act, and as such is not subject to those statutory requirements such as binding arbitration. Defendant USPA is the primary and most popular voluntary sports organization for the sport of polo in the United States.

## FACTUAL ALLEGATIONS

### USPA RULES AND PROCEDURES

1.      Plaintiff is a Registered Player member of the USPA. As a dues-paying member, Plaintiff and the USPA mutually agreed to follow the USPA's Articles of Incorporation, the Constitution, By-laws, USPA rules, and all policies of the USPA.  *See* Exhibit A, USPA Constitution, Article IV, Section 7, "Membership Obligations."

2.      As a USPA member, Plaintiff is able to participate in USPA events, serve as an Officer, Governor, or Delegate of the USPA, vote, recommend player handicaps, have a handicap,

2

file a complaint, and participate in USPA business in general.  If Plaintiff, or any individual member of the USPA is suspended for longer than 90 days, he loses those privileges of membership. See Exhibit A, USPA Constitution, Article IV, Section 5.  Further, the USPA Board of Governors may discipline USPA members through suspension, revocation, or termination of membership, but must do so "in accordance with and subject to any disciplinary procedures of the Association approved by the Board of Governors and in effect from time to time, which procedures shall provide for the prompt and equitable resolution of grievances."  Exhibit A, USPA Constitution, Article IV, Section 10, "Termination of Membership." Termination of membership means that the terminated member would never again be able to compete in USPA tournaments.

3.      The USPA's Disciplinary Procedures Policy ("DPP") governs the conduct of members "relative to the sport of polo or at any Event, whether on or off the field." Exhibit B, Disciplinary Procedures Policy of the United States Polo Association, Part I, Introduction.

4.      Any USPA member may bring a complaint to the USPA regarding an incident they themself witnessed.  A complaint "may be made by any Registered Player Member, Affiliate Player Member, Officer, Governor, employee of the Association, or Official . . . of the Event who is a witness to an alleged Conduct Violation." *Id*. at Part I, Introduction, B.1.  Further a complaining party is a witness "if he or she observes [alleged Conduct Violation] in person or via video, livestream, or similar technology, either contemporaneously or after it occurs." *Id*.  The DPP further states that the USPA will not move forward with "alleged Conduct Violations in the absence of a Conduct Violation Complaint that complies in all material respects with the provisions set forth in the[] Sport-Related Conduct Violation Procedures." *Id*. at Part I, Introduction, B.1. a.

3

5.      Within 72 hours of a complaint being received by the USPA, the USPA will deliver a copy of the complaint to the Member or Delegate of the Member Club against whom the violation has been filed. *Id.* at Part I, B. 1. b.  The USPA Executive Committee then will investigate the matter and issue charges if it determines that such action is necessary.  If the USPA issues charges, it will then inform the complainant and accused in a notice and a hearing will be scheduled.  The DPP is silent as to the procedure for scheduling a hearing, however, any party requesting a continuance if an assigned date does not work must pay a $500 fine for the first request and $1,000 for subsequent requests. Exhibit B, I.F.3.  The DPP also allows for disciplinary hearings to occur without the accused party present to defend themself. *Id.* I.C.1. ("If a charged party fails to appear . . . at a properly noticed and scheduled hearing, the hearing will be held in absentia.").  The DPP is silent as to what qualifies as a "properly noticed and scheduled hearing."

***THE UNDERLYING INCIDENT***

6.      On the evening of July 10, 2021, Plaintiff played polo at Great Meadow in The Plains, Virginia, as he does most summer Saturday evenings.  The games he played were round robin arena games, meant to be exhibition matches and not organized under the USPA nor held at a USPA member club.  While the promoter of the event owns and runs a USPA member club, this event did not take place at, or under the auspices of the promoter's club.

7.      In one game, Plaintiff played against a team from another polo club (Battlefield) during which a minor, Aleem Siddiqui (the "Minor"), and his horse "T-boned" Plaintiff and his horse.  During the collision the Minor's horse's head hit Plaintiff in the back causing great pain. Plaintiff was in such pain that he doubled over and exclaimed "motherfucker" at the ground. The Minor received a dangerous riding foul for the T-bone hit into Plaintiff.

8.      After the match, Plaintiff learned that the Minor involved in the collision was accusing Plaintiff of calling him a "motherfucking nigger." Having not said such and finding the accusation shocking and highly offensive, Plaintiff vehemently denied the accusation and told the Minor and his family that he never uses that racial slur and that such is not even in his "lexicon."

## USPA INVOLVEMENT AND SUBSEQUENT HEARING

9.      Despite a lack of corroboration on behalf of the Minor's accusation, and despite Plaintiff's corroboration that he did not say such and his repeated denials of the same, on July 11, 2021, Delora Burner ( "Burner"), another USPA member and owner of the club whose team the Minor played for, Battlefield Polo Club, sent a complaint to the USPA, specifically Carlucho Arellano, USPA Executive Director of Services, and Chris Green ("Mr. Green" or "Green"), COO and in-house counsel, alleging that Plaintiff called the Minor a "motherfucking nigger" and bullied the Minor by pushing the Minor's shoulder. Burner admittedly was not a witness to the incident, and the Minor is her client

10.      Additionally, on July 11, 2021, Humera Rahman, the Minor's mother, sent a letter to the USPA, specifically Carlucho Arellano, Mr. Green, and Stewart Armstrong, alleging that Plaintiff called her son "motherfucker" and "the N-word" and that Plaintiff pushed her son's shoulder in an attempt to intimidate him. Rahman admittedly was not a witness to the incident either nor is she a USPA member.

11.      On information and belief, the USPA, through outside counsel, Craig Galle ("Mr. Galle"), then spoke to various witnesses to the event, all of whom informed Mr. Galle that the allegations were not true. On information and belief, the USPA, through Mr. Galle, knew when the complaint was received that the arena game at issue took place at a non-member club and was not an official USPA game and that several players at the exhibition matches are not USPA

5

members. Mr. Galle also spoke with John Hocheimer, Board member of the event site where the exhibition match was played, Great Meadow Foundation, who also informed Mr. Galle that Great Meadow was not a USPA club and the match and event was not a USPA match or event. The USPA, through its representatives, Galle and Green, knew on the face of the complaint that Burner was not a witness to the incident of which she complained.

12.     On July 23, 2021, Plaintiff received a Notice of Alleged Conduct Violations, Issuance of USPA Charges, and Notice of Hearing from Defendant (collectively, "the Notice") from Green, and an email concerning such. Exhibit C. Plaintiff was informed that he faced possible suspension and a $20,000 fine and more, and advised him to retain counsel. See *Id.* These documents identified Burner as the Complainant. Exhibit C, page 1. The alleged conduct violation was that Plaintiff uttered a racial epithet at Burner's player. Burner did not witness, this alleged conduct violation. The Notice informed Plaintiff that a Disciplinary Hearing would be held on August 6, 2021, via Zoom, at 10:00 am. No one from the USPA conferred with Plaintiff or Plaintiff's counsel about scheduling the hearing. Without any appropriate recourse to change the date or time of the hearing, Plaintiff was forced to rearrange his schedule to ensure his presence at the hearing. Specifically, Plaintiff ended up terminating a vacation early to get back in time to attend the hearing, unnecessarily costing him money, and hiring counsel as advised to do so.

13.     Leading up to the Disciplinary Hearing on August 6, 2021, Plaintiff, through undersigned counsel, attempted to learn the procedures and rules for the hearing by emailing USPA outside counsel, Craig Galle. On August 2, 2021, Mr. Galle emailed to counsel that "testifying witnesses are sequestered such that they do not hear how other witnesses testify," but that he didn't know if it would apply to the complainant, Burner. Exhibit D, Emails, page 10.

6

14.     When following up with Mr. Galle the next day, counsel sought answers regarding the extent of witness sequestration as the DPP were silent on that matter.  Counsel also copied USPA employees, Green, Carlucho Arellano, and Lindsey Eserbach on the email in an attempt to receive clarification on how the hearing would be conducted. Exhibit D at page 9.  Mr. Galle responded with another, identical copy of the DPP and relayed that witness sequestration would occur only partially as the Minor, his parents, and the complainant would be the only witnesses allowed to observe the entire hearing even though they would also be called as witnesses by the USPA. *Id.* at 7-8.  Counsel asked Mr. Galle where in the USPA rules and policies was the authority or other grounds to impose and allow a disparate lack of impartial sequestration to such an egregious extent whereby the USPA prohibited sequestration of complainant Burner, the Minor and his parents who were to be USPA witnesses, yet mandated that all other witnesses be sequestered.  Mr. Galle failed to cite to any USPA rule or similar policy, and replied merely that "Private sporting organizations (such as USPA) are not bound by, nor are they governed by, formal rules of evidence." *Id.* at 4.  Plaintiff nor his counsel were provided an explanation for egregious and disparate lack of fair and impartial witness sequestration of all witnesses.

15.     On August 6, 2021, the USPA held a disciplinary hearing regarding the Minor's false allegations of racism and bullying.  Before the hearing even began, Green asked Plaintiff, the Complainant, and the Minor and his parents if the matter could not just be settled with an apology from Plaintiff.  This inquiry indicates Green's immediate bias against Plaintiff as Plaintiff had already emailed a statement to Green, Galle, and Chrys Beal ("Ms. Beal" or "Beal"), Governor-at-Large for Defendant USPA, that he emphatically denied all the allegations.  Additionally, if Green, and by extension the USPA, were really interested in settling the matter, that question would have been broached before the day of the hearing and not after Plaintiff had already exerted

considerable energy and resources to retain counsel, prepare and gather his resulting 12 witnesses in preparation.

16.     Galle, acting as "prosecutor" stated that the hearing was taking place pursuant to "Part 1, Section C of the Disciplinary Procedures Policy as amended on April 17, 2021, of the Association." Exhibit E, USPA Hearing Transcript, page 7, lines 5-7.  The charges arose "under subparagraphs 2, 3, 8, 9, and 10 of the Association's code of conduct." *Id.* at page 7, lines 9-10. The hearing was recorded by a court reporter who swore in witnesses, however, there is no indicia that there is any penalty for lying during the hearing, making the court reporter nothing more than an attempt at legitimacy when the hearing could have just been recorded via Zoom or held in person in Virginia.

17.     At the beginning of the hearing, first Plaintiff, through counsel, raised the issue of whether the USPA had jurisdiction and presented arguments that there was no jurisdiction and offered witnesses who could attest first to the jurisdictional issue.  See *Id.* at page 9, lines 13-21; page 16, lines 18-25; page 17, line 1; page 285, lines 17-25; page 286, lines 1-8; page 293, lines 4-25; page 294, line 1.  However, rather than rule on the issue of jurisdiction, the hearing officers decided to proceed through an entire disciplinary hearing before later making a jurisdiction determination.  Further, the hearing officers attempted to prevent Plaintiff from presenting testimonial evidence regarding the question of jurisdiction.  Instead, Hearing Officers throughout the hearing thereafter proceeded to then question witnesses concerning jurisdictional issues.

18.     Throughout the hearing, the Minor from whom the allegations originally stemmed – but not the complainant – could remain present for the entirety of the hearing with his parents, despite the fact that his parents had neither witnessed the alleged utterance by Plaintiff, but were deemed witnesses by the USPA.  However, the Minor also left multiple times during the hearing

and at one point just never returned without any notice to the rest of the parties. During the hearing, the Minor and his parents remained in the same room together. There was no witness sequestration.

19.     During the hearing, the Minor testified as to his recollection of events. The direct examination by Galle occurred without interruption. During cross-examination, questioning was repeatedly interrupted by the Minor's father. Minor's father was allowed to testify on behalf of the Minor, and to disrupt Plaintiff's counsel without Galle, Green, or Beal intervening despite Plaintiff's counsel's objections and despite such being normally improper hearsay. *Id.* at page 54, lines 23-25; page 55, lines 1-25; page 56, lines 24-25; page 57, lines 1-25; page 58, lines 1-25. As such, counsel was unable to fully cross-examine the Minor even though the Minor was the sole witness to allegedly hear the Plaintiff call him a racial epithet. This illustrates how the USPA arbitrarily applied hearsay rules to its advantage when it was convenient for itself, but applied hearsay rules prejudicially to Plaintiff's counsel.

20.     After direct and cross examinations of the Minor, Beal, asked the Minor two leading questions, effectively supplying the Minor witness with answers to credibility questions asked on cross-examination. *Id.* at page 61, lines 9-25; page 62, lines 1-8 ("If somebody had called you a name that was offensive to you, do you think that you would shrivel away from it, or do you think that you would stand up straight and act like nothing happened?").

21.     Despite previous communications with the USPA that the rules of evidence would not apply in the hearing , as well as the continued allowance of violative evidence offered by Galle in the way of witness testimony, when Plaintiff presented his defense, the hearing officers, primarily Green, arbitrarily drew issue with the presentation of hearsay and similar evidence relevant to credibility and other normally allowable and relevant exceptions of evidence rules from

9

Plaintiff's character witnesses.  Throughout the hearing, Green also objected to almost every credibility question and attempt at impeachment even though such testimony was extremely relevant and offered no grounds or other rules or reasons as a basis for such objections and rulings. *Id.* at page 284, lines 13-16 ("…I th.ink your redirect is threatening to go beyond the scope of the examination by Mr. Galle."); page 286, lines 4-19 ("Are you finished, Ms. Taylor?...You're just commenting on the answer now, Ms. Taylor.").  This illustrates how the USPA arbitrarily applied hearsay rules to its advantage when it was convenient for itself, but applied hearsay rules prejudicially to Plaintiff's counsel.

22.    The virtual hearing lasted eight hours. Even though Plaintiff sent a list of twelve witness names in advance of the hearing, Green, Beal, and Galle did not consider, based on the length of the witness list, to protract the hearing.  Instead, Green attempted to bully Plaintiff into ending his presentation of character witnesses early and deny him a fulsome defense, despite Galle having advised Plaintiff prior to the hearing that he should call as many witnesses as possible in his defense.  Upon such demands Plaintiff was compelled to eliminate one witness and to shorten the testimony of other key witnesses.  This could have been avoided had the hearing been conducted in person (as it should have) because there are several USPA representatives in Virginia and all parties and witnesses were in Virginia at the time the hearing took place.

23.    On August 20, 2021, Green emailed Plaintiff a Final Order from the USPA regarding the allegations. Exhibit F.  The USPA ruled that there was insufficient evidence to sanction Plaintiff as the Minor had no corroborating evidence and all other witnesses present at the event testified in Plaintiff's favor.  However, the Final Order also stated that the USPA does not reject the allegations: "[i]n reaching this decision, the Hearing Officers [Beal and Green] do not reject Aleem's testimony. Rather, as the appointed representatives of the EC [Executive

Committee], they are obligated to apply the DPP's requirement" that the Executive Committee shall have the burden of proving any charge. Exhibit F, Final Order, page 4. The Final Order was signed by Green on behalf of the Executive Committee of the USPA.

24.     Even though Plaintiff was ultimately not sanctioned by the USPA, he was still greatly harmed by the USPA's actions.  The issuance of charges and subsequent hearing caused Plaintiff great emotional distress and mental anguish.  The lackluster disposition of the USPA contributed to and continues to perpetuate emotional stress for Plaintiff, as it did nothing to assuage any reputational harm against Plaintiff.  It also harmed his reputation as the allegations were patently false, and the news of the USPA Hearing gave credence to the rumors spread throughout the polo community in Northern Virginia.  The stress of an impending hearing caused Plaintiff sleeplessness, anxiety, and marital strife.  Further, the arbitrary manner in which the hearing was conducted, the intentional disparate treatment of Plaintiff and disparate application of vague and unclear rules and policies without proper notice, and the lack of clarity provided by Galle, Green, Beal and the DPP in general added to Plaintiff's stress, anxiety, and fear that Plaintiff would lose his job as a government contractor.  The actions of the USPA were made with malice, in bad faith, and with full prior knowledge that there was no jurisdiction for such a hearing and that no evidence existed to support that Plaintiff said any racial epithet, and such actions additionally furthered and encouraged the defamation committed by the Minor, his parents, and Burner, his coach.

## CAUSES OF ACTION

**Count I: Defendant Perpetuated Defamation *Per Se*, or in the Alternative, Defamation Under Virginia Law of Plaintiff**

25.     Plaintiff incorporates and realleges paragraphs 1 – 24 as if replead herein.

11

26.     Defendant perpetuated and contributed to the defamation of Plaintiff by conducting a disciplinary hearing without jurisdiction and with knowledge of the falsity of the allegations or with reckless disregard for their veracity.

27.     Defendant, acting through its agents, Beal, Green, and Galle, gave credence to defamatory statements and republished said defamatory statements by issuing charges against Plaintiff and then conducting a disciplinary hearing requiring Plaintiff to defend himself.

28.     Defendant, acting through its agents, Beal, Green, and Galle, also failed to impartially sequester all witnesses, which made the hearing public.  Additionally, Defendant, through Galle, required that Plaintiff call as many witnesses as possible at the disciplinary hearing to defend Plaintiff.  These actions of Defendant furthered Defendant's defamation of Plaintiff.

29.     The USPA wrote in the Final Order wherein it finds insufficient evidence to sanction Plaintiff that "[i]n reaching this decision, the Hearing Officers [Beal and Green] do not reject Aleem's testimony. Rather, as the appointed representatives of the EC [Executive Committee], they are obligated to apply the DPP's requirement" that the Executive Committee shall have the burden of proving any charge. Exhibit F, Final Order, page 4.  The Final Order was signed by Green on behalf of the Executive Committee of the USPA.  This statement implies that the USPA (through Green and Beal) did not consider the Minor to be lying and thereby perpetuates the defamation of Plaintiff while also finding insufficient evidence to support the Minor's accusation.  As such, the USPA effectively stated, that even though there was insufficient evidence to support a reasonable belief that Plaintiff called Minor a racial slur, the USPA still accepts and believes that assertion as true, it just cannot sanction Plaintiff for it.  The USPA's defamatory final order is a product of the USPA's irrational and disparate treatment of Plaintiff during the hearing.

12

30.    This implication and statement harmed Plaintiff's reputation and caused mental anguish, nervousness, and sleeplessness. Even though he has been found "not guilty," so as to the issuance of any USPA penalty because of a clear and stated lack of evidence, the USPA's weak assertion of such innocence allows others in his community to assume that he truly is a racist bully toward children despite the fact that Plaintiff denied again, at the hearing, any of the conduct alleged against him. Exhibit E, USPA Hearing Transcript, page 259, lines 17-18; pages 262-267; page 286, lines 6-12. Moreover,

31.    Defendant's defamation was perpetuated further by assertions that Plaintiff pushed, assaulted, and intimidated the Minor although testimony from the hearing confirmed that Plaintiff did not do so. *Id.* at page 16, lines 2-5; pages 27-28; page 161, lines 2-14; page 162, lines 4-10; page 177, lines 18-24.

32.    Plaintiff demands compensatory damages for mental anguish, reputational harm, and costs incurred to defend himself in front of the USPA due to this instance of defamation. Damages for mental anguish and reputational harm are requested at $2,000,000 in compensatory damages and $350,000 in punitive damages from Defendant as Defendant acted purposefully or willfully and with malice.

**Count II: Defendant Breached its Contractual Obligations to Plaintiff when It Conducted a Disciplinary Hearing Without Jurisdiction and in Contravention of Its Constitution, Bylaws, and Disciplinary Procedures Policy**

33.    Plaintiff incorporates and realleges paragraphs 1 – 32 as if replead herein.

34.    When Plaintiff annually renews his membership as a Registered Player with the USPA, he enters into a contract wherein, inter alia, he agrees to abide by the USPA Constitution, Bylaws, Rules and Procedures, Code of Conduct, and Membership Terms and Conditions.

13

35.     This contract not only binds Plaintiff to conduct himself in a manner in conformity with the USPA Constitution, Bylaws, Rules and Procedures, Code of Conduct, and Membership Terms and Conditions, but it also binds the conduct of the USPA.  The USPA developed a Disciplinary Procedures Policy ("DPP"), which, on information and belief, was rightfully enacted under the USPA Constitution and Bylaws.  The DPP describes mandatory procedures for the USPA Board of Governors and Executive Committee to follow when handling alleged conduct violations.

36.     The USPA may only charge a Member with conduct violations if a complaint is properly brought.  The USPA breached its contract with Plaintiff when it charged Plaintiff with conduct violations based upon an improperly brought complaint.

37.     The DPP requires that a complaint be brought by a USPA Member who witnessed the alleged conduct violation.  In Plaintiff's case, the complaint was not brought by a witness, but rather by a USPA Member who heard about the alleged conduct violation solely from Minor's parents.  Hearing about a violation is not the same as witnessing it which the DPP recognizes and delineates.  Further, the USPA may only follow up on a complaint if it has jurisdiction.  The events on Saturday, July 10, 2021, did not take place at a USPA match or at a USPA club.

38.     The USPA Board of Governors and Executive Committee selected Green and Beal as the Hearing Officers for Plaintiff's hearing.  Galle was the USPA's attorney during the hearing.  All three knew that a complaint was not properly lodged and that the USPA did not have jurisdiction, but, nevertheless, they commenced with a Disciplinary Hearing against Plaintiff.

39.     The breach of contract caused Plaintiff to incur attorneys' fees and costs for a hearing which should not have occurred as well as severe emotional distress in the way of sleeplessness, anxiety, depression, and marital problems, as well as fear for the loss of his job. As

14

such, Plaintiff demands $2,000,000 in compensatory damages from Defendant and $350,000 in punitive damages from Defendant as Defendant acted purposefully or willfully and with malice.

**Count III: The USPA Disciplinary Hearing Against Plaintiff Violated USPA's Own Constitution, Bylaws, and Disciplinary Procedures Policy as well as Common Law Due Process**

40.     Plaintiff incorporates and realleges paragraphs 1 – 39 as if replead herein.

41.     The USPA acted in contravention of its duly enacted internal rules by moving forward with an improperly brought complaint against Plaintiff and arbitrarily applying policies and procedures and without due notice.

42.     When the USPA attempted to provide a hearing, the USPA, through agents Beal, Green, and Galle, applied the policies and procedures in an arbitrary manner. This arbitrariness occurred in the following manner, as well as in additional practices (without limitation) not listed below but noted:

   a.  A court reporter swore in witnesses even though this was not a judicial or even quasi-judicial proceeding with no threat of perjury charges or repercussions for violating the oath.

   b.  Rules of evidence were applied randomly and prejudicially towards Plaintiff, particularly the use of hearsay. USPA witnesses, such as the complaining party and the Minor's parents, could testify to events which they did not witness and to statements they did not hear or make themselves. However, when Plaintiff presented testimony from witnesses involving hearsay as well as a parent testifying on behalf of the Minor, the USPA through its agent Green, objected to the testimony, and arbitrarily disregarded Plaintiff's objections to the disparate treatment and application of the rules.

15

c.  Plaintiff was unable to cross examine the Minor fully due to his parents' interference and testifying on the Minor's behalf.

d.  The USPA, through its agent, Beal, was permitted to ask inappropriate leading questions of the Minor.

e.  Plaintiff had been informed by Galle to bring forth as many witnesses as possible.  When Plaintiff then began to present his witnesses in his defense, Beal and Green took issue to the presentation of character witnesses and tried to cajole Plaintiff into ending his defense without presenting all his character witnesses or their full testimony.

f.  The hearing was scheduled without consultation with Plaintiff and was held over Zoom even though all necessary witnesses were in Virginia and an in-person hearing in Virginia would have provided more procedural safeguards such as witness sequestration and testimony without internet outages of key witnesses of Plaintiff's.

g.  When receiving Plaintiff's witness list of twelve witnesses, the USPA through its agents, did not raise the question of having a protracted hearing, instead opting for going forward with an eight-hour Zoom hearing.

h.  During the hearing, the USPA allowed the parents of the Minor to turn off their camera so that Plaintiff could not see who else may be in the room during the hearing.  The parents only turned on their camera when Plaintiff noticed it was off and requested that it be turned on.  And the Minor was allowed to be excused by his parents from the hearing at his leisure.

16

     i.   Prior to the hearing, the USPA failed to give due notice to the Plaintiff of the rules to be applied at the hearing, as such were not clear, nor clearly published for its members in the DPP or otherwise.

43.     The arbitrary nature of the procedures implemented during the hearing caused Plaintiff stress, embarrassment, anger, anxiety, and additional attorneys' fees.  It also impacted Plaintiff's ability to adequately and zealously defend himself as the USPA was "hiding the ball" as to the procedures for the hearing and applied in an ad hoc, disparate, capricious, and arbitrary manner rules that were different for the Plaintiff and his witnesses versus the USPA application of the rules and procedures.  Further, Plaintiff was required to miss a day of work since the hearing was scheduled without his input and the USPA inflicts steep monetary penalties for continuance requests.

44.    Plaintiff demands compensatory damages in the amount of $2,000,000 from Defendant and $350,000 in punitive damages from Defendant as Defendant acted purposefully or willfully and with malice.

**Count IV: Defendant Breached Good Faith and Fair Dealing in its Interpretation of the Vague Disciplinary Procedures Policies**

45.     Plaintiff affirms and realleges Paragraphs 1 – 44 as if replead herein.

46.     Per the Constitution and Bylaws of the USPA, the USPA may promulgate procedures and policies to discipline members and such disciplinary actions must be fair.  To do this, the USPA enacted the Disciplinary Procedures Policy ("DPP") which is meant to describe the method of handling complaints against members.  However, the DPP is thirteen pages long and is vague in describing the actual procedures of a disciplinary hearing, failing to give proper notice.

47.     The DPP is silent as to witness sequestration, recording, and evidentiary rules. Due to this silence, Plaintiff, through counsel, inquired as to the procedure of the disciplinary hearing

17

to USPA's outside counsel, Mr. Galle. Counsel was initially told that witness sequestration would be in effect, but then this was retracted and instead, the complaining party, the Minor, and the child's parents would not be sequestered despite being testifying witnesses of the USPA. When counsel inquired as to why this was so and where in the USPA DPP Galle was basing this decision so as to properly prepare, notify Plaintiff and witnesses, and object where necessary, counsel was simply told that voluntary social organizations are given discretion to manage their internal affairs. This decision was made with malice and was a bad faith interpretation of the DPP – a contract entered into between Plaintiff and the USPA when Plaintiff became a Registered Player and thus a paying member of the USPA.

48.    The DPP also is silent as to any evidence rules to be followed in a disciplinary hearing. After counsel was informed by Galle that the hearing would not abide by rules of evidence, counsel believed that hearsay evidence would be admissible. This belief was supported by the case put on by Galle which relied almost exclusively upon hearsay testimony. In fact, Galle, Green, and Beal allowed the Minor's parents to interrupt the cross examination of the Minor at a key moment when the child began to laugh and smile at certain questions relating to the physical pain experienced by Plaintiff during the "T-bone" collision and collisions in general in polo and testify on his behalf, and prevent all further cross examination of the Minor. However, when Plaintiff's case was presented, Green interrupted to confirm that everything presented by one witness was just hearsay. In fact, Green interrupted and commented multiple times that various aspects of Plaintiff's case violated evidentiary rules and objected to questions regarding the credibility of the USPA's witnesses and their impeachment. Thus, the rules of evidence did not apply to the case presented by Galle, but they did apply to Plaintiff's case. This is a clear breach of good faith and fair dealing by the USPA in interpreting the DPP. Moreover, this illustrates how

18

the USPA arbitrarily applied hearsay rules to its advantage when it was convenient for itself, but applied hearsay rules prejudicially to Plaintiff's counsel

49.     The USPA arbitrarily acted in its discretion to interpret the DPP and how to conduct disciplinary hearings.  Further, the USPA was dishonest as to how the DPP was interpreted and what rules and procedures applied to the disciplinary hearing.

50.     Plaintiff requests compensatory damages in the form of attorneys' fees and costs for his defense in the hearing, estimated at $80,000.  Plaintiff also requests punitive damages in the amount of $350,000, from Defendant as Defendant's actions were wanton, willful, malicious, and intentional violations of the USPA Constitution, Bylaws, and DPP.

### Count V: Intentional Infliction of Emotional Distress

51.     Plaintiff incorporates and realleges paragraphs 1 – 50 as if replead herein.

52.     By conducting a Disciplinary Hearing when the USPA knew or should have known that it did not have proper jurisdiction to move forward and that the allegations were false, the USPA through its agents, Beal, Green, and Galle, intentionally inflicted emotional distress upon Plaintiff.  Defendant knew or should have known that moving forward with improperly brought and false charges would cause severe emotional distress upon Plaintiff.  The accusation was offensive and of such a character that being forced to defend himself in a hearing wherein he could potentially be subject to fines, suspension, or expulsion, and the loss of employment and more caused Plaintiff severe anxiety, paranoia, marital stress, and sleeplessness.

53.     Plaintiff demands compensatory damages in the amount of $2,000,000, and punitive damages in the amount of $350,000 from Defendant as Defendant acted purposefully or willfully and with malice.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

19

1.  Compensatory damages from Defendant in the amount of $2,000,000;

2.  Punitive damages in the amount of $350,000;

3.  Attorneys' fees and costs relating to Plaintiff's defense in the USPA hearing in the amount of $80,000;

4.  ~~Attorneys' fees and costs relating to this litigation;~~

5.  An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

6.  Such other and further relief as this Court deems just and proper.

Dated: December 10, 2021

Respectfully Submitted,

Mark Dycio (VSB No. 32741)
*Attorney of Record* (local counsel)
mdycio@dyciolaw.com
Dycio & Biggs
10533 Main Street, Fairfax VA 22030
Tel: (703) 383-0100
Fax: (703) 383-0101

Quendale G. Simmons
*Pro Hac Vice Pending*
simmonsq@butzel.com
Butzel Long, P.C.
150 W. Jefferson Ave., Ste 100
Detroit, MI 48226
Tel: (313) 225-7000
Fax: (313) 225-7080

20

# EXHIBIT A

# CONSTITUTION

## PAGES 1 - 14

CONST.

ARTICLE I: NAME, MISSION, POWERS AND DUTIES ............................................................ 1
ARTICLE II: BOARD OF GOVERNORS ........................................................................................ 1
ARTICLE III: COMMITTEES ............................................................................................................ 2
ARTICLE IV: MEMBERSHIP AND DELEGATES ....................................................................... 3
ARTICLE V: CIRCUITS AND CIRCUIT GOVERNORS ............................................................ 6
ARTICLE VI: GOVERNORS-AT-LARGE ...................................................................................... 9
ARTICLE VII: ANNUAL MEMBER MEETING OF THE ASSOCIATION .............................. 11
ARTICLE VIII: AMENDMENTS ....................................................................................................... 12
ARTICLE IX: WRITINGS AND ELECTRONIC SIGNATURES ................................................ 12
ARTICLE X: WAIVER OF NOTICE ................................................................................................ 13
ARTICLE XI: USOC ........................................................................................................................... 13

UNITED STATES POLO ASSOCIATION®                                    2021

# CONSTITUTION of the
# UNITED STATES POLO ASSOCIATION

*As Amended and Restated on October 19, 2019*

## ARTICLE I
*Name, Mission, Powers and Duties*

**SECTION 1. Name.** The name of this organization is the United States Polo Association (the "**Association**").

**SECTION 2. Mission.** The Association has been organized and exists for the purposes of promoting the game of polo with an overarching goal of improving the sport, coordinating the activities of its Member Clubs and Registered Players (as defined below), arranging, allocating, and supervising polo tournaments, competitions, and games and providing rules, handicaps, and conditions for those tournaments, competitions, and games, including the safety and welfare of participants and mounts.

**SECTION 3. Powers and Duties.** The Association shall have such powers as are now or may hereafter be granted by the Illinois General Not for Profit Corporation Act of 1986, as amended (the "**Not for Profit Corporation Act**"), except as otherwise provided by the Articles of Incorporation, this Constitution, or the By-laws of the Association (the "**By-laws**").

## ARTICLE II
*Board of Governors*

**SECTION 1. Board of Governors.** There will be a Board of Governors of the Association (the "**Board**") consisting of the Circuit Governors, the Governors-at-Large, and the Officers, each of whom shall be Registered Player Members of the Association. Matters relating to the governance of the Association by the Board of Governors not addressed in this Constitution will be addressed in the By-laws or other Board-approved policies, or as set forth in the Not for Profit Corporation Act.

**SECTION 2. Elections.** Elections of Circuit Governors and Governors-at-Large shall be conducted according to the procedures set forth below. Elections of Officers shall be conducted according to the procedures set forth in the By-laws. All contested elections shall be by confidential vote.

**SECTION 3. Removal.** In accordance with the Not for Profit Corporation Act, (a) any Circuit Governor may be removed by the affirmative vote of two-thirds of the votes cast by the Delegates in that Circuit; provided, however, that at least a majority of the Delegates in that Circuit must cast votes in order for the vote to be valid, and (b) any

1

Governor-at-Large may be removed by the affirmative vote of two-thirds of the votes cast by the Registered Player Members; provided, however, that at least ten percent (10%) of the Registered Player Members must cast votes in order for the vote to be valid. Upon a motion made and approved by (i) the Board of Governors, (ii) with respect to the proposed removal of a Circuit Governor, a majority of the Delegates in that Circuit, or (iii) with respect to the proposed removal of a Governor-at-Large, at least ten percent (10%) of the Registered Player Members, the Board of Governors shall establish a process and timetable for submitting the proposed removal to a vote that are as closely aligned with the process and timetable set forth herein for the election of such Governors as the Board of Governors deems practicable. Any Officer serving *ex officio* as a member of the Board of Governors may be removed as provided in the By-laws, and any vacancy created by removal shall be filled as provided in the By-laws.

## ARTICLE III
*Committees*

**SECTION 1. Committees of the Association.** Matters relating to committees of the Association not addressed in this Constitution will be addressed in the By-laws or other Board-approved policies, or as set forth in the Not for Profit Corporation Act.

**SECTION 2. Executive Committee.** At any time when there is an Executive Committee of the Board, it shall be composed of nine (9) members consisting of the Chairman, three (3) Officers (other than the Chairman), two (2) Governors-at-Large, two (2) Circuit Governors, and either one (1) additional Governor-at-Large or Circuit Governor. The Chairman of the Association may make recommendations regarding individuals to serve as members of the Executive Committee, but such recommendations shall be subject to approval by the Board of Governors, which approval shall be by vote of the Board of Governors to approve or disapprove each individual candidate proposed by the Chairman for Executive Committee membership, and not by vote to approve or disapprove the full slate of candidates proposed by the Chairman. Unless otherwise determined by the Board of Governors, such votes shall be by closed ballot at a meeting of the Board of Governors, provided that records of the votes of each member of the Board of Governors shall be kept and any member of the Board of Governors may thereafter request to examine such records. The term of the members of the Executive Committee shall be one (1) year, unless otherwise specified at the time of approval by the Board of Governors.

**SECTION 3. Nominating Committee.** At the fall Regular Meeting of the Board of Governors in the year immediately prior to any year in which regular elections of Officers or Governors-at-Large will take place, a Nominating Committee of the Association will be formed. The Nominating Committee will consist of seven (7) voting members who shall be selected by the Board of Governors in the manner described below, and one of whom shall be selected by the Nominating Committee members themselves to serve as the Nominating Committee chairperson. Of the seven (7) voting members of the

UNITED STATES POLO ASSOCIATION®                                              2021

Nominating Committee, five (5) shall be selected from among the then-current members of the Board of Governors, and the remaining two (2) shall be selected from among the Registered Player Members that are at least 18 years of age and that are not then-current members of the Board of Governors but who may be prior members of the Board of Governors.  To select the five (5) current members of the Board, the Board of Governors shall nominate up to ten (10) individuals for the five (5) slots, and the Board shall elect the five (5) individuals from among the ten (10) nominated who receive the most votes cast by the Board of Governors.  To select the two (2) Registered Player Members, the Board of Governors shall nominate up to four (4) individuals for the two (2) slots, and the Board shall elect the two (2) individuals from among the four (4) nominated who receive the most votes cast by the Board of Governors. The Nominating Committee will have such responsibilities as are set forth herein and such additional responsibilities as may be determined by the Board of Governors from time to time. The term of each Nominating Committee member shall conclude immediately following the elections for which he or she was appointed to serve on the Nominating Committee. By accepting membership on the Nominating Committee, each individual is ineligible to be included on any slate prepared by the Nominating Committee on which he or she serves but may be independently nominated by the Delegates (as set forth in Article VI) with respect to Governor-at-Large elections or by the Board of Governors (as set forth in the By-laws) with respect to Officer elections.

## ARTICLE IV
### *Membership and Delegates*

**SECTION 1.   Membership**.   The Association is an association of Association-registered polo clubs, associations, and other entities engaged in or related to the sport of polo (collectively, the **"Member Clubs"**) and of the Association-registered individual members of such Member Clubs (the **"Individual Members"** and collectively, with the Member Clubs, the **"Members"**).  The Members of the Association shall be made up of the following categories of Member Clubs and Individual Members as well as any such additional categories as may from time to time be approved by the Board of Governors. The Member Clubs and Individual Members shall have such rights and responsibilities as are set forth in the By-laws and this Constitution and such additional rights and responsibilities as may be approved from time to time by the Board of Governors.

A.   Member Club Classifications:
(1)   "Active Member Clubs"
(2)   "Provisional Member Clubs"
(3)   "Affiliate Member Clubs"
(4)   "Associate Member Clubs"

3

B.      Individual Member Classifications:
   (1)      "Registered Player Members"
   (2)      "Affiliate Player Members"
   (3)      "Social Non-Playing Members"
   (4)      "Lifetime Members"
   (5)      "Player-Only Members"

**SECTION 2. Delegates.** Each Member Club shall select a Delegate, who is at least 18 years of age and who is not employed by the Association or any of its subsidiaries, according to the Member Club's own internal rules and procedures, to represent it in its dealings with the Association. Each Delegate shall be a Registered Player Member of the Association and shall be registered with the Member Club that he or she is selected to represent; provided, however, that with respect to any Affiliate Member Club, its Delegate may be an Affiliate Member of such Affiliate Member Club (and need not be a Registered Player Member). Whenever a new Delegate is selected to represent a Member Club, such Member Club shall provide written notice to the Association identifying the selected Delegate. No individual may serve as Delegate for more than one Member Club.

**SECTION 3. Dues.** The Board of Governors shall from time to time establish membership dues for the Member Clubs and Individual Members. All Member Club and Individual Member dues shall be due and payable by January 1 of each calendar year.

**SECTION 4. Member Voting Rights.**
   A. Delegates Representing Active Member Clubs. Delegates representing Active Member Clubs in good standing shall have the right to vote in the election of Circuit Governors in accordance with Article V and the right to vote on any proposed amendment to this Constitution in accordance with Article VIII hereof; provided, however, that with respect to the election of Circuit Governors, only Delegates of record as of June 1 of an election year shall be permitted to vote in such election. For the avoidance of doubt, if, in an election year, an Active Member Club changes its Delegate after June 1 but before the election, such Active Member Club will not have a Delegate eligible to vote in the election. Voting with respect to proposed amendments to the Constitution may be in person or by proxy, duly certified by an officer of the Active Member Club. Proxies must be at least 18 years of age and in good standing with the Association.
   B. Registered Player Members. Registered Player Members who are at least 18 years of age and are in good standing shall have the right to vote in the election of Governors-at-Large in accordance with Article VI.
   C. No Other Member Voting Rights. No other Members, whether Member Clubs or Individual Members, shall have any right to vote on any Association matter in their respective capacities as Member Clubs or Individual Members.

UNITED STATES POLO ASSOCIATION®                                    2021

D. Delegate Nomination of Governor-at-Large Candidate. Delegates of record as of June 1 of a Governor-at-Large election year shall be permitted to nominate a candidate for Governor-at-Large in accordance with Article VI. For the avoidance of doubt, if, in a Governor-at-Large election year, an Active Member Club changes its Delegate after June 1 but before the close of the period for Delegate nominations of Governor-at-Large candidates, such Active Member Club will not have a Delegate eligible to nominate a candidate for Governor-at-Large for such election.

**SECTION 5. Good Standing.** Member Clubs and Individual Members shall be in good standing if they have paid all dues owing to the Association and are not under suspension by the Association. Individual Members that are not in good standing, or that are registered through a Member Club that is not in good standing for a period exceeding 90 days, may not participate in any Association event, umpire any Association event, serve as Officers, Governors, or Delegates of the Association, vote on any Association matter, recommend handicaps, or be entitled to a handicap, file a complaint or protest, or otherwise participate in the affairs of the Association.

**SECTION 6. Applications for Membership.**
A. Member Club Membership. Application for membership by a Member Club will be made in writing to the Association, accompanied by such information as the Board of Governors of the Association may prescribe. Such application will be presented for action at the next meeting of the Board of Governors. The Board may from time to time adopt additional objective and nondiscriminatory criteria on which to evaluate, then approve or deny, membership applications. The Board of Governors may, by a majority vote of those present at a meeting, reject the application, elect the applicant a Provisional Member Club pending the receipt of additional information, or elect the applicant to full Active, Affiliate, or Associate Member Club membership. The name of a Provisional Member Club may be put forward at any subsequent meeting of the Board of Governors for election to full Active Member Club membership. Member Club membership shall have a term of one (1) year, expiring December 31 of each year and renewable annually at the option of the Board of Governors.
B. Individual Member Membership. Application for membership as an Individual Member will be made in writing to the Association, accompanied by such information as the Board of Governors of the Association may prescribe. The Board may from time to time adopt objective and nondiscriminatory criteria on which to evaluate, and then approve or deny, membership applications. Notwithstanding the foregoing, in the discretion of the Board of Governors, an application for membership as an Individual Member may be denied where the applicant previously was removed as an Individual Member by the Association pursuant to procedures approved by the Board of Governors. Following evaluation by the Board and upon payment of the annual dues to the Association, each Individual Member will be designated to one of several categories of membership. Other than Lifetime Members, Individual Members shall have a term of one (1) year, expiring December 31 of each year and

renewable annually at the option of the Board of Governors.

**SECTION 7. Membership Obligations.** Acceptance of membership in the Association will bind each Member to uphold the provisions of the Association's Articles of Incorporation, this Constitution, the By-laws, the Rules of the Association (as defined in the By-laws), and all policies and resolutions of the Association, including all terms and conditions set forth in any membership application, all as in effect from time to time, and to honor all Association decisions based upon those provisions. No Individual Member shall participate, either within or outside the United States, on a team alleging to represent the United States or the United States Polo Association, without the express written consent of the Association.

**SECTION 8. Membership Reclassifications.**
    A. Member Club Reclassifications. Member Club reclassifications shall be addressed in accordance with the procedures set forth in the By-laws.
    B. Individual Member Reclassifications. An Individual Member's specific class of membership may be converted to another classification in the event that the Individual Member no longer satisfies the requirements of his or her prior classification. An Individual Member in good standing shall be converted automatically to Player-Only Member status upon the filing by such Individual Member of a claim, complaint, notice, or other cause of action of any kind, whether filed in a court of law or submitted to any other body or agency, unless and until otherwise provided by the Board of Governors or a court of competent jurisdiction.

**SECTION 9. Transfer of Membership.** Members may not transfer their membership in the Association. Members shall have no ownership rights or beneficial interests of any kind in the property of the Association.

**SECTION 10. Termination of Membership.** The Board of Governors has the authority to discipline Association Members, including to suspend, revoke, or terminate membership of any Member Club or Individual Member, in accordance with and subject to any disciplinary procedures of the Association approved by the Board of Governors and in effect from time to time, which procedures shall provide for the prompt and equitable resolution of grievances, including the right to fair notice and a hearing prior to termination. The Association may retain jurisdiction over any Member who has pending financial obligations to the Association, or pending disciplinary actions against him or her, regardless of status of membership.

## ARTICLE V
### Circuits and Circuit Governors

**SECTION 1. Circuits.** The Board of Governors has established Circuits, the number of which shall be fixed from time to time by the Board of Governors and set forth in

the By-laws. The Board of Governors shall from time to time establish the geographic boundaries of each Circuit, and Member Clubs shall be allocated automatically among the fixed number of Circuits based on their respective locations within the geographically-defined Circuits.

**SECTION 2.  Circuit Governors, Term, Term Limitations**.  Each Circuit shall be represented by one (1) Circuit Governor who shall be elected in accordance with the procedures set forth herein. Beginning as of the regular meeting of the Board of Governors (the **"Regular Board Meeting"**) occurring in the fall of 2018, each Circuit Governor will hold office, for a three-year term and until his or her successor has been elected and qualified or until his or her earlier resignation, removal from office, or death.  A Circuit Governor completing the unexpired term of another will assume office immediately upon such appointment.  No individual shall serve as a Circuit Governor for more than three (3) consecutive three-year terms, except that a Circuit Governor completing the unexpired term of another may complete such term and also be eligible for three (3) consecutive three-year terms. Notwithstanding the foregoing, Circuit Governors completing their first or second terms as of the fall 2018 Regular Board Meeting shall be eligible to serve for up to two (2) additional three-year terms, Circuit Governors completing their third term as of the fall 2018 Regular Board Meeting shall be eligible to serve for up to one (1) additional three-year term, and Circuit Governors completing their fourth consecutive term as of the fall 2018 Regular Meeting shall be ineligible to be elected as Circuit Governors at the fall 2018 Regular Meeting.

**SECTION 3. Nomination and Election Procedure**. Not later than the second Tuesday of June in an election year, the Association will convey to the Delegates of each Active Member Club in good standing as of June 1, with a copy to the incumbent Circuit Governor: (a) a list of that Member Club's Registered Players who are at least 18 years of age and of record as of June 1; (b) a nominating form for the nomination of a candidate for Circuit Governor; and (c) a list of all Active Member Clubs in the Circuit as of June 1, including the name and address of each Delegate.  The Association shall communicate to each Delegate the following procedure:

A. Nominations must be in writing, on the form provided, and received by the Association no later than 5 p.m. EDT on the second Tuesday of July of each election year.  No Delegate may nominate more than one (1) individual.  Any individual receiving two (2) or more nominations will be considered a candidate for the office of Circuit Governor.  All candidates must be Registered Players who are at least 18 years of age and registered with an Active Member Club in the Circuit as of June 1 of the election year.

B. Not later than the third Tuesday of July of the election year, the Association will deliver ballots listing the names of each Circuit's candidates for Circuit Governor to the Delegate of each Active Member Club in such Circuit and will provide a copy of the same to the incumbent Circuit Governor and each candidate for Circuit Governor.

C. Completed ballots must be received at the Association office not later than 5 p.m.

EDT on the second Tuesday of August of each election year. Votes representing at least a majority of the total number of votes entitled to be cast by all Delegates within a Circuit shall be required to be received in order for that Circuit election to be valid. The risk of late or non-delivered ballots by the deadline is on the Delegate. All Delegates and candidates will be notified of the results of the election not later than August 30 of that year. If only one candidate is nominated pursuant to the procedures above, such candidate must still receive affirmative votes representing at least a majority of the total number of votes entitled to be cast by all Delegates in the relevant Circuit in order for that election to be valid. If no candidate is nominated in a particular Circuit or no candidate in a particular Circuit receives votes representing at least a majority of the total number of votes entitled to be cast by all Delegates in such Circuit, then the Chairman of the Association shall select an individual to serve as Circuit Governor of such Circuit, subject to approval of the Board of Governors.

D. Only Delegates representing Active Member Clubs in good standing which are in the Circuit and are of record on June 1 of each election year are entitled to nominate or vote for a candidate. No Delegate may assign or transfer the Active Member Club's vote(s) or the right to vote by proxy or otherwise. Each Delegate may cast one (1) vote for a candidate for Circuit Governor per ballot. Each Delegate will receive the number of ballots set forth below based on the number of Registered Player Members (including, for this purpose, any Lifetime Members that were Registered Player Members immediately prior to becoming Lifetime Members) in the Active Member Club that the Delegate represents:

| Number of Registered Player Members | Number of Ballots |
|---|---|
| 6-14 | 2 |
| 15-29 | 3 |
| 30-59 | 4 |
| 60 or more | 5 |

E. The candidate in each Circuit receiving the greatest number of votes shall be elected as Circuit Governor of that Circuit. In the event of a tie between two (2) or more candidates for Circuit Governor in any Circuit, the Chairman and two other Governors shall call a Special Board Meeting that shall be held as soon as reasonably practicable following the determination that the votes cast for Circuit Governor resulted in a tie and upon forty-eight (48) hours' advance notice to the Board of Governors in accordance with Article III, Section 3 of the By-laws, at which Special Board Meeting the Chairman shall recommend to the Board for its consideration, and upon the affirmative vote of at least a majority of the Board of Governors, such individual shall be deemed elected as the Circuit Governor of that Circuit.

F. Elected Circuit Governors will take office at the conclusion of the next Annual Member Meeting (as defined below). Their terms will expire at the third Annual Member Meeting following the beginning of their terms.

UNITED STATES POLO ASSOCIATION®                                     2021

C
O
N
S
T.

G. Any variation from the foregoing election procedure must be reported in writing to the Board of Governors prior to the Annual Member Meeting of the Association by letter to the Chairman. If the Board finds that the variation substantially affected the fairness or the outcome of an election or was inconsistent with the Not for Profit Corporation Act, the Board will declare said election void and hold a new election complying as closely as possible with the foregoing procedure; otherwise the said election will be deemed valid.

## ARTICLE VI
### *Governors-at-Large*

**SECTION 1. Governors-at-Large, Term, Term Limitations.** There shall be not less than eight (8) nor more than twelve (12) Governors-at-Large, with the precise number to be recommended by the Chairman and approved by the Board of Governors on or before the Spring Regular Board Meeting of each election year, or else the number shall remain the same as the prior year. Governors-at-Large shall be elected by the vote of the Registered Player Members in good standing as of June 1 of the election year. Beginning as of the fall 2019 Regular Board Meeting, each Governor-at-Large shall serve for a three-year term and until his or her successor shall have been elected and qualified or until his or her earlier resignation, removal from office, or death. A Governor-at-Large may not serve more than three (3) consecutive three-year terms, except that a Governor-at-Large elected to complete the unexpired term of another may complete such term and also be eligible for three (3) consecutive three-year terms. Notwithstanding the foregoing, Governors-at-Large completing their first or second terms as of the fall 2019 Regular Board Meeting shall be eligible to serve for up to two (2) additional three-year terms, and Governors-at-Large completing their third term as of the fall 2019 Regular Board Meeting shall be eligible to serve for up to one (1) additional three-year term, and Governors-at-Large completing their fourth consecutive term as of the fall 2019 Regular Meeting shall be ineligible to be elected as Governors-at-Large at the fall 2019 Regular Meeting.

**SECTION 2. Nomination and Election Procedure.** The candidates for Governor-at-Large will be presented by the Nominating Committee for election by the Registered Player Members according to the following procedure:

A. On or before the last Tuesday of May, the Nominating Committee will nominate not less than one (1) candidate for each available Governor-at-Large position to be filled. The Nominating Committee's list of candidates will be immediately forwarded to the Secretary of the Association. The Secretary will ascertain which of those recommended candidates are willing to be candidates and willing to serve if elected, and shall include the names of those individuals on the final ballot.

B. No later than the second Tuesday of June, the Secretary will distribute to the Delegates of Active Member Clubs in good standing as of June 1 of the election year the following:

i. The list of candidates prepared by the Nominating Committee;

ii. Nominating forms for candidates for Governor-at-Large; and

iii. The procedure by which Delegates may nominate additional candidates for Governor-at-Large.

C. A Delegate may nominate any Registered Player Member who is duly registered with the Association and at least 18 years of age as of June 1 as a candidate for Governor-at-Large by returning the completed nomination form to the office of the Association not later than 5 p.m. EDT on the first Tuesday of July. Any Registered Player Member timely receiving five (5) or more Delegate nominations will be considered a nominee and a potential candidate. No Delegate may make more than one (1) nomination in any given election.

D. At the close of the Governor-at-Large nominating period, the Secretary will ascertain which additional nominees are willing to be candidates and willing to serve if elected and submit them to the final ballot. If a candidate nominated by five (5) or more Delegates chooses not to run, such five (5) or more Delegates will be so advised immediately by the Secretary.

E. The Secretary will prepare a list of all of the nominated candidates for Governor-at-Large. The final list of candidates for balloting purposes will list alphabetically all nominated candidates who are willing to serve, with an asterisk or similar designation next to the names identifying those candidates nominated by the Nominating Committee. On or before the third Tuesday of July, the Secretary will send a written ballot to every Registered Player with each Registered Player's Association number printed thereon and directing the number of Governors-at-Large, as recommended by the Chairman and approved by the Board, to be elected.

F. Each election year, each Registered Player (as of the June 1 record date) may vote for one (1) candidate for each Governor-at-Large position to be filled up to the total number to be elected as recommended by the Chairman and approved by the Board.

G. Registered Players must sign their ballots, and ballots must be received at the office of the Association on or before 5 p.m. EDT on the third Tuesday of August of each election year. Risk of a late or non-delivered ballot by the deadline is on the Registered Player. Ballots representing at least one-tenth (1/10) of the total number of Registered Players as of the June 1 record date must be received by the Association in order for the election to be valid. In the absence of receipt by the Association of ballots representing at least one-tenth (1/10) of the total number of Registered Players by the deadline, the Association shall declare the election invalid and shall conduct another election for Governors-at-Large that complies as closely as reasonably practicable with the foregoing procedure, including its stated timeframes for various election-related actions.

H. All votes for each candidate will be tallied and candidates receiving the greatest number of votes will be elected as Governors-at-Large up to the total number of Governors to be elected. The results of the election will be announced not later than August 30 of that year.

UNITED STATES POLO ASSOCIATION® 2021

I. Elected Governors-at-Large will take office at the conclusion of the next Annual Member Meeting (as defined below). Their terms will expire at the third Annual Member Meeting following the beginning of their terms.

J. In the event of a tie between two (2) or more candidates for Governor-at-Large, the Chairman and two other Governors shall call a Special Board Meeting that shall be held as soon as reasonably practicable following the determination that the votes cast for Governor-at-Large resulted in a tie and upon forty-eight (48) hours' advance notice to the Board of Governors in accordance with Article III, Section 3 of the By-laws, at which Special Board Meeting the Chairman shall recommend to the Board for its consideration, and upon the affirmative vote of at least a majority of the Board of Governors, such individual shall be deemed elected as a Governor-at-Large.

K. Any variation from the foregoing election procedure must be reported in writing to the Board of Governors prior to the Annual Member Meeting. If the Board finds that the variation substantially affected the fairness or the outcome of an election or was inconsistent with the Not for Profit Corporation Act, the Board will declare said election void and hold a new election complying as closely as reasonably practicable with the foregoing procedure, including its stated timeframes for various election-related actions; otherwise the election will be deemed valid.

## ARTICLE VII
### *Annual Member Meeting of the Association*

**SECTION 1. Annual and Special Member Meetings**. The Annual Meeting of the Members of the Association **(the "Annual Member Meeting")** will be held between the 1st day of August and the 31st day of October in each year at such place and hour as the Chairman designates. Special meetings of the Members of the Association (each, a **"Special Member Meeting"**) may be called by the Chairman or by the Board of Governors.

**SECTION 2. Notice of Meetings**. Thirty (30) days' notice of the time and place of the Annual Member Meeting and two (2) weeks' notice of the time and place of any Special Member Meeting will be delivered by the Secretary in writing to all Member Clubs and Individual Members. A notice of any Special Member Meeting will state the objectives thereof and no other business will be transacted thereat.

**SECTION 3. Quorum**. A majority of the Active Member Clubs represented in person by Delegates, or represented by proxy, constitutes a quorum at any meeting of the Members.

11

## ARTICLE VIII
*Amendments*

**SECTION 1. Amendments.** This Constitution may be amended by the affirmative vote of two-thirds (2/3) of the total number of votes cast by the Delegates of the Active Member Clubs present and voting in person or by proxy at a meeting of the Members of the Association at which a quorum of the Active Member Clubs are represented by Delegates, provided that written notice of the proposed amendment is delivered to the Delegates of all Active Member Clubs at least thirty (30) days prior to the meeting. In any proposed action to amend this Constitution, each Delegate shall have the number of votes set forth below based on the number of Registered Player Members (including, for this purpose, any Lifetime Members that were Registered Player Members immediately prior to becoming Lifetime Members) in the Active Member Club that the Delegate represents:

| Number of Registered Player Members | Number of Votes |
|---|---|
| 6-14 | 2 |
| 15-29 | 3 |
| 30-59 | 4 |
| 60 or more | 5 |

**SECTION 2. Implied Amendments.** Any action taken or authorized by the Board of Governors, which would be inconsistent with this Constitution but which is taken in order to comply with changes to the Not for Profit Corporation Act, shall be given the same effect as though the Constitution had been amended by the Delegates of the Active Member Clubs, but only so far as is necessary to permit the action so taken or authorized and only until such time as the Delegates of the Active Member Clubs shall amend this Constitution to comply with the Not for Profit Corporation Act.

## ARTICLE IX
*Writings and Electronic Signatures*

Any action required in this Constitution to be "written," to be "in writing," to have "written consent," to have "written approval," and the like by or of Governors, Members, Delegates, Officers, or committee members shall include any communication transmitted or received by facsimile, electronic mail, or other means of electronic transmission. Any action required in this Constitution to be "signed" or to have a "signature by or of" a Governor, Member, Delegate, Officer, or committee member shall include an action signed with an electronic signature that is any symbol executed or adopted, or any security procedure employed or adopted, by or on behalf of a person with intent to authenticate a record and which is attached to or logically associated with the action in electronic form.

UNITED STATES POLO ASSOCIATION®                                        2021

## ARTICLE X
### *Waiver of Notice*

Whenever any notice is required to be given under the provisions of the Articles of Incorporation, the By-laws, this Constitution, or the Not for Profit Corporation Act, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. The presence at any meeting of a person or persons entitled to notice thereof shall be deemed a waiver of such notice by such person or persons unless the person at the meeting objects to the holding of the meeting because proper notice was not given.

## ARTICLE XI
### *USOC*

If, at any time, it becomes reasonably apparent that the sport of polo may be included on the program of the Olympic Games, then the Board of Governors of the Association shall undertake a determination as to whether it will seek recognition as a "National Governing Body" as that term is defined in the Ted Stevens Olympic and Amateur Sports Act (36 U.S.C. §§220501-220529) (the "Sports Act"). If the Board of Governors determines that it intends to seek recognition as a National Governing Body, then the Association shall use its reasonable best efforts to comply with the requirements for such recognition in accordance with the Sports Act and as mandated by the United States Olympic Committee, and, upon approval by a majority of the Board of Governors, any amendments to this Constitution that may be deemed necessary by the Board of Governors for such recognition shall be deemed automatically to have received the requisite approval of the Delegates in accordance with Article VIII.

<table>
<tr><td>C<br>O<br>N<br>S<br>T.</td><td>2021</td><td>UNITED STATES POLO ASSOCIATION®</td></tr>
</table>

# EXHIBIT B

### DISCIPLINARY PROCEDURES POLICY
### OF THE
### UNITED STATES POLO ASSOCIATION

*Adopted by the Board of Governors on October 19, 2019 and amended on April 17, 2021*

### INTRODUCTION

This Disciplinary Procedures Policy (this "Policy") sets forth the rules and procedures of the United States Polo Association (the "Association") relative to its authority to resolve protests and impose disciplinary measures against its Members or Member Clubs for misconduct as set forth herein. The procedures in this Policy are intended to provide for the prompt and equitable resolution of grievances, including, to the extent set forth herein, the right to fair notice and a hearing prior to termination of membership.

This Policy contains four (4) sets of procedures, each of which relates to a different type of Member conduct. These procedures are:

> I. Sport-Related Conduct Violation Procedures,
> II. Membership-Related Conduct Violation Procedures,
> III. Sport Protest Procedures, and
> IV. Equine Drugs and Medications Rules Violation Procedures.

### AMENDMENTS

This Policy may be amended only by the affirmative vote of a majority of the Board of Governors of the Association.

### PART I:
### SPORT-RELATED CONDUCT VIOLATION PROCEDURES

**Introduction**

These Sport-Related Conduct Violation Procedures are intended to provide a disciplinary procedures process through which the Association may regulate Member and Member Club conduct relative to the sport of polo or at any Event, whether on or off the field.

**A. Conduct Violations.**

Any Member Club or Individual Member will be deemed to have committed a "Conduct Violation" for a violation of the Association's Code of Conduct (whether on or off the polo field), Rules (as defined in the By-laws), Constitution, By-laws, Board-approved policies, directives or Terms and Conditions of Membership, or for a failure to obey a penalty imposed under the Rules or these Sport-Related Conduct Violation Procedures, to the extent such violation or failure relates to the Member Club's or Individual Member's conduct relative to the sport of polo, including, but not limited to, player or umpire conduct or any equine welfare issues.

**B. Complaints and Charges.**

1. Conduct Violation Complaints. A complaint of a Conduct Violation (each, a "Conduct Violation Complaint" may be made by any Registered Player Member, Affiliate Player Member, Officer, Governor, employee of the Association, or Official (*i.e.*, umpire, referee, timekeeper, scorekeeper, goal judge, or Host Tournament Committee member) of the Event who is a witness to an alleged Conduct Violation or by the Chairman or Chief Executive Officer of the Association. **For purposes of this provision, a complaining party will be considered to be a witness to an alleged Conduct Violation if he or she observes it in person or via video, livestream, or similar technology, either contemporaneously or after it occurs.**

1

a. Complaint Requirements. All Conduct Violation Complaints shall be: (i) in writing (**which, for purposes of this Policy, includes e-mail or other forms of electronic transmission**) describing the alleged Conduct Violation in reasonable detail, including, if applicable, the manner in which it was witnessed; (ii) signed by the complaining party; and (iii) delivered within seventy-two (72) hours of the alleged Conduct Violation to either the Chairman or Chief Executive Officer of the Association. Notwithstanding (iii) immediately above, Conduct Violation Complaints filed by the Chairman of the Association shall be delivered to the Chief Executive Officer of the Association and Conduct Violation Complaints filed by the Chief Executive Officer of the Association shall be delivered to the Chairman of the Association, each within thirty (30) days of the alleged Conduct Violation. The Association will not prosecute alleged Conduct Violations in the absence of a Conduct Violation Complaint that complies in all material respects with the provisions set forth in these Sport-Related Conduct Violation Procedures.

b. Notice of Complaints. Copies of all Conduct Violation Complaints will be delivered to the **Member or Delegate of the Member Club** against whom the Conduct Violation Complaint has been filed within seventy-two (72) hours of receipt by the Association. Copies of all Conduct Violation Complaints made to the Association will be forwarded to any host tournament committee and/or Member Club involved in any such Conduct Violation Complaint within seventy-two (72) hours of receipt by the Association.

c. Recordkeeping and Inspection. The Association will keep a record of all Conduct Violation Complaints. The Association will make available **upon request** for inspection by Registered Player Members the final decision of the Association regarding any Conduct Violation Complaint for which a decision is issued, including the nature of the violation and any penalty imposed.

d. Multiple Complaints. In the event that more than one Conduct Violation Complaint is filed, based on a single alleged Conduct Violation, or based on multiple alleged Conduct Violations occurring within a twenty-four (24) hour period, such Conduct Violation Complaints shall be considered collectively by the Executive Committee. Notwithstanding the foregoing, for purposes of determining whether to assess any fine under Section G.1.d. below, the Executive Committee may consider each Conduct Violation separately.

2. Issuance of Charges. If the **Executive Committee** elects not to issue charges based upon a Conduct Violation Complaint, the complaining party will be notified of such election within seventy-two (72) hours following the decision not to issue charges. The **Executive Committee** must decide whether to issue charges within fifteen (15) calendar days following receipt of a Conduct Violation Complaint.

3. Member Club Determinations. The imposition of penalties against any Individual Member by a Member Club will not automatically result in charges being brought or penalties being imposed against the Individual Member by the Association. Rather, the Executive Committee will be responsible for determining whether to issue charges based on any Conduct Violation Complaint brought in connection with the activity for which the Member Club imposed penalties and, if so, whether to assess any penalties against the Individual Member in accordance with the procedures set forth herein.

C. **Notice.**

1. Entitlement to Notice and a Hearing. Any person against whom a charge is issued is entitled to a hearing of the alleged Conduct Violation and to notice of the same. If a charged party fails to appear (**which, for purposes of this Policy, includes in person, by videoconference technology, or similar interactive technology that allows all parties to hear and communicate with one another contemporaneously**) at a properly noticed and scheduled hearing, the hearing will be held in absentia.

2. Notice of an Expedited Hearing. The Association may hold an expedited hearing within seven (7) calendar days of issuance of the charge, provided that the charged party is given written notice at least forty-eight (48) hours prior to the scheduled expedited hearing. The notice of hearing must: (a) contain a brief statement of the facts constituting the alleged Conduct Violation; (b) identify the specific provision of the Association Code of Conduct, Rules, Constitution, By-laws, Board-approved policies, directives or Terms and Conditions of Membership allegedly violated; (c) specify the time and place at which the hearing is to be held; and (d) include

2

a list identifying: (i) the evidence to be introduced at the hearing, **to the extent it is known**, (ii) the names of the witnesses, **to the extent they are known**, and (iii) the substance of their testimony. This notice-of-hearing requirement may be waived in writing by the charged party.

3. Notice in the Absence of an Expedited Hearing. In the absence of an expedited hearing, written notice to the charged party must be given within seven (7) calendar days from the date that the decision is made by the Association to issue charges. Such notice of hearing must: (a) contain a brief statement of the facts constituting the alleged Conduct Violation; (b) identify the specific provision of the Association Code of Conduct, Rules, Constitution, By-laws, Board-approved policies, directives or Terms and Conditions of Membership allegedly violated; (c) specify the time and place at which the hearing is to be held or state that the hearing date will be determined at a later time as soon as reasonably practicable; and (d) include a list identifying: (i) the evidence to be introduced at the hearing, **to the extent it is known**, (ii) the names of the witnesses, **to the extent they are known**, and (iii) the substance of their testimony.

4. Optional Response by the Charged Party. Prior to any scheduled hearing, the charged party may submit to the Executive Committee or Hearing Officer(s), if any, a written response to the charges and may include written and signed statements of others having knowledge of the facts. Alternatively, a charged party may agree to the disposition of the charges without the necessity of a hearing. **Any disposition of the charges without a hearing shall be set forth in an Agreed Final Order approved by the Executive Committee and executed by the Charged Party and a representative of the Association.**

**D. Temporary Suspensions.**

The Executive Committee may temporarily suspend any charged party from participating in any manner in the affairs and events of the Association so long as an expedited hearing is noticed and held within seven (7) calendar days of the time such suspension becomes effective. In a case where the charged party has been temporarily suspended prior to a hearing, a decision on the charge shall be made by the committee within twenty-four (24) hours of the conclusion of the expedited hearing.

**E. Hearings of Charges.**

1. Proceedings in English. All disciplinary proceedings, including, but not limited to, hearings of charges of alleged Conduct Violations, will be conducted in the English language and in the presence of the charged party, unless the charged party fails to appear, in which case the proceedings may be held in absentia. The failure to understand the charges or any proceedings in English shall not provide the basis for an appeal by any charged party. Interpreters, if required by the charged party, are the responsibility of the charged party.

2. Role of Executive Committee and Hearing Officers. Except as set forth in E.7. below, hearings shall be heard by the Executive Committee of the Association or by one or more individuals appointed by the Executive Committee (such individuals to be members of the Executive Committee, Governors, staff members of the Association, legal counsel for the Association, or such other agents of the Association deemed appropriate by the Executive Committee) (each, a "Hearing Officer" and collectively, the "Hearing Officers"). If one or more Hearing Officer(s) is appointed by the Executive Committee, such Hearing Officer(s) may, to the extent directed by the Executive Committee, collect all testimony proffered, report all findings of facts to the Executive Committee, and make a non-binding penalty recommendation to the Executive Committee.

3. Presentation of Evidence. A charged party may attend his or her hearing, with or without counsel, or may send a representative, and may defend against the charges by calling and cross examining witnesses, submitting signed statements, or presenting other evidence. **The Hearing Officer or Hearing Officers may make determination as to credibility and may, in their discretion, give more weight to direct testimony than they give to written statements or submissions.**

4. Burden of Proof. The Executive Committee shall have the burden of proving any charge. The burden of proof shall not be that as required in a court of law. The burden of proof necessary to sustain a charge against a charged party shall be met if the Executive Committee reasonably believes, after hearing the evidence presented, that a Conduct Violation has occurred.

3

5. <u>Authority to Impose Penalties</u>. The Executive Committee shall have the power and authority to impose any of the penalties described in these Sport-Related Conduct Violation Procedures; provided, however, that any proposal to expel, remove, or terminate a Member from the Association shall be subject to the approval of the Board of Governors. A non-binding penalty recommendation of the Hearing Officer(s), if any, may be accepted, modified, or rejected by the Executive Committee.

6. <u>Final Orders</u>. A final order setting forth the determination and the findings of facts on which it is based, as well as the penalty, if any, to be imposed on the charged party, will be entered by the **Executive Committee on behalf of the Association** within fifteen (15) calendar days following the conclusion of the hearing. **The Executive Committee shall provide notice to the Association's Board of Governors within three (3) business days of entering into such final order, including a summary of any charging document and settlement agreement, as applicable. In accordance with the Bylaws, any final order entered into by the Executive Committee shall be binding on the Association at the time the Executive Committee takes such action.**

7. <u>Executive Committee Conflict of Interest</u>. If, at any time, there are not at least five (5) Executive Committee members available to rule on a Conduct Violation Complaint, at least three (3) of whom it is determined do not have a conflict of interest with respect to the alleged Conduct Violation, then the Board of Governors will appoint one or more of its members who are determined not to have a conflict of interest with respect to the alleged Conduct Violation to join the Executive Committee members who are available and do not have a conflict so that there are at least three (3) Governors available to rule on the Conduct Violation Complaint that do not have a conflict of interest with respect to the alleged Conduct Violation. For the avoidance of doubt, any available Executive Committee members who it is determined to have a conflict of interest with respect to the alleged Conduct Violation shall abstain from participating.

**F. <u>Continuances</u>.**

1. <u>Continuance Applications</u>. All applications for continuance of any hearing shall (a) be made in writing to the Executive Committee at least five (5) calendar days prior to the scheduled hearing and (b) state the reasons the continuance is sought. Applications for a continuance of an expedited hearing made by a charged party will not be accepted.

2. <u>Approval or Denial of Continuance Applications</u>. The Executive Committee may, in its sole and reasonable discretion, approve or deny an application for a continuance; provided, however, that no continuances of expedited hearings will be granted to any charged party.

3. <u>Continuance Fees</u>. An application for a first continuance of a hearing must be accompanied by a non-refundable continuance fee of Five Hundred Dollars ($500.00) payable to the Association. Any second or subsequent application for continuance must be accompanied by a non-refundable continuance fee of One Thousand Dollars ($1,000.00) payable to the Association. In deciding whether to approve or deny an application for continuance, the Executive Committee also may consider whether the party requesting the continuance has agreed in writing to pay some or all of the expenses of the Association, Member Club, and/or witnesses that would result from approving the continuance.

**G. <u>Penalties</u>.**

1. <u>Penalty Examples</u>. If found guilty of any charge properly brought before the Executive Committee, the charged party will be subject to such penalty as the Executive Committee may determine, including, but not limited to:

a. <u>Censure</u>. A letter of censure may be listed in the Association's record of penalties. If found guilty of a subsequent Conduct Violation, the censured party may be subject to a more severe penalty than for a previous offense.

b. <u>Suspension</u>. Suspension for any period from participating in any Association events and activities.

4

c. Expulsion/Removal/Termination. Expulsion/removal/termination from the Association as a Member. Any proposed expulsion/removal/termination from membership shall be subject to the approval of the Board of Governors.

d. Fines. Fines may be assessed, provided that such fines shall not exceed the sum of **Twenty** Thousand Dollars (**$20,000.00**) for each Conduct Violation.

e. Probation. The Executive Committee may determine probationary conditions for a charged party found guilty of a charge. A violation of a probation condition may be treated as a Conduct Violation.

f. Costs. Actual reasonable costs and out-of-pocket expenses incurred by the Association, a Member Club, and/or witnesses may be assessed in addition to any penalty.

2. Effective Date of Penalty. The effective date of any suspension or probation, and the deadline for the payment of any fine or costs, will be set by the Executive Committee or the Board of Governors, as applicable.

3. Failure to Pay. Failure to pay any fine and/or costs within 30 days of notice of the deadline of the same will result in automatic suspension from the date the fine and/or costs became payable until the fine and/or costs are paid. Fines and/or costs are considered paid when receipt is acknowledged by the payee designated by the Association. Failure to timely pay any fine and/or costs shall be treated as a Conduct Violation.

**H. Appeal of Decisions.**

1. Notice of Appeal. A decision by the Association will be final unless a party to the proceeding files with the Association a written notice of appeal of the decision (a "Notice of Appeal") together with the requisite appeal fee within fourteen (14) calendar days of the issuance of a final order.

a. Appeal Fee. Any Notice of Appeal by a charged party must be accompanied by an appeal fee in the amount of One Thousand Dollars ($1,000.00) payable to the Association.

b. Forfeiture of Appeal Fee. In the event that a charged party does not complete the appeals process, the appeal fee will be forfeited.

c. Application or Return of Appeal Fee. Within thirty (30) calendar days following the conclusion of the appeal hearing, the appeal fee will be returned to the charged party unless the charged party is indebted to the Association for any fees, costs, or fines, in which event the amount of such items shall be deducted from the appeal fee prior to any refund.

2. Role of Board of Governors and Appeal Hearing Officers. On receipt of a Notice of Appeal, the Board of Governors **(but excluding any individual who was also a member of the Executive Committee or the Hearing Officer that oversaw the imposition of penalties prior to the appeal)** either will conduct an appeal hearing or will appoint one or more individuals (such individuals to be members of the Board of Governors, staff members of the Association, legal counsel for the Association, or such other agents of the Association deemed appropriate by the Board of Governors) (each an "Appeal Hearing Officer" and collectively, the "Appeal Hearing Officers") to conduct an appeal hearing. At the appeal hearing, all testimony previously given will be considered, as will all other evidence presented at the initial hearing. If one or more Appeal Hearing Officer(s) is appointed by the Board of Governors, such Appeal Hearing Officer(s) shall report its findings to the Board of Governors and may make a non-binding recommendation to the Board of Governors regarding whether to reduce, sustain, or increase any penalties initially imposed by the Executive Committee.

3. Appeal Hearing. In the event that the charged party timely files a Notice of Appeal, the Association will give the appellant at least ten (10) calendar days' written notice of the date, time, and place of the appeal hearing. Unless the Board of Governors decides otherwise for good cause, the appeal hearing shall be held in the State and County of the alleged Conduct Violation. Likewise, unless the Board of Governors decides otherwise for good cause, the appeal hearing shall be held within forty (40) calendar days following the Association's receipt of a properly filed Notice of Appeal. Upon request of the charged party, the Board of Governors will permit

the charged party to **appear** in person and/or represented by an attorney. The parties may file written memoranda with the Board of Governors objecting to or in support of the initial disciplinary action relating to a Conduct Violation, and the findings upon which it was based, in whole or in part.

4. Final Orders on Appeal. Within fifteen (15) calendar days after completing the appeal hearing, the Board of Governors will issue a final order setting forth its findings, its decision, and its reasons therefor. The Board of Governors may reduce, sustain, or increase any penalties initially imposed by the Executive Committee.

5. Stay of Penalty upon Appeal. If a penalty of any kind is appealed, the charged party may request, in writing, that such penalty be stayed until such time as the appeal has been heard by the Board of Governors. The Board of Governors will timely grant or deny the charged party's request for a stay as it deems appropriate. To the extent that a stay of the penalty is granted, and the charged party fails to prevail on the appeal, any time periods relating to the penalty shall be extended by a number of days equal to the stay.

I. Publication and Enforcement of Association Decisions.

1. Notice of Decisions. Notice of final determinations of the Executive Committee, or the Board of Governors, as the case may be, including the nature of the violation, the decision of the Executive Committee or Board of Governors, and any penalty imposed, shall be **provided in summary form** to the Member Clubs of the Association via email transmission from the Association to Member Club delegates, and may be provided to the Hurlingham Polo Association, the Association of Argentine Polo, or the Federation of International Polo, **if the Executive Committee or Board of Governors, as the case may be, determines that such provision is appropriate.**

2. Enforcement of Association Decisions by Member Clubs. On receipt of notice by Active Member Clubs or Affiliate Member Clubs from the Association that a disciplinary penalty has been imposed on an Individual Member by the Association for a Conduct Violation, the notice will be honored and enforced by Member Clubs receiving such notice.

## PART II:

### MEMBERSHIP-RELATED CONDUCT VIOLATION PROCEDURES

**Introduction**

These Membership-Related Conduct Violation Procedures are intended to provide a disciplinary procedures process through which the Association may regulate Member conduct relative to an individual's conduct as a Member of the Association, regardless of whether such conduct is directly related to the sport of polo.

A. Generally.

At any time when cause has been established, the Board of Governors may:

1) **suspend/expel/remove/terminate** a Member from the Association,
2) convert an Individual Member to Player-Only Member status, or
3) deny the membership application of any current or former Member.

Notwithstanding the foregoing, prior to **suspending/expelling/removing/terminating** a Member from the Association, the Board of Governors shall provide the Member with a minimum of seven (7) calendar days' written notice, during which time the Member may submit a written statement concerning the allegations under consideration by the Board or request an appearance before the Board, which request shall be granted by the Board within a reasonable time period thereafter. At any time where a Registered Player Member's membership status has been converted to Player-Only Member status, such Player-Only Member shall be given the opportunity to apply for reinstatement as a Registered Player Member at the end of the fiscal year in which his or her status was converted to Player-Only Member status.

**B. Cause.**

"Cause" shall be considered established at any time where:

1. a Member acts in a manner that is deemed, in the sole discretion of the Board of Governors, to violate or be inconsistent with the provisions or spirit of the Association's Articles of Incorporation, By-laws, Constitution, Code of Conduct, Terms and Conditions of Membership, or any policies adopted by the Board, not including any Conduct Violation described in the Sport Related Conduct Violation Procedures; or

2. a Member's conduct is disruptive to the purposes, activities, or operations of the Association, as determined in the sole discretion of the Board of Governors; and, as a result, the Board of Governors determines it to be in the Association's best interests to **suspend/expel/remove/terminate** the Member from the Association or to deny the membership application of any current or former Member.

For the avoidance of doubt, the conviction of a crime by any Individual Member, or determination that such Individual Member was found liable in a civil court proceeding involving claims of abuse, neglect, or mistreatment of a horse or other animal shall constitute "cause".

**C. Temporary Suspensions.**

If the Board determines it to be in the best interests of the Association, the Board of Governors may temporarily suspend any Member from participating in any manner in the affairs and events of the Association, provided that the Member is given an opportunity to respond and a determination by the Board of Governors regarding the imposition of a penalty is made within seven (7) calendar days of the time such temporary suspension becomes effective.

## PART III:

## SPORT PROTEST PROCEDURES

### Introduction

These Sport Protest Procedures are intended to provide a process by which disagreements with the non-discretionary decisions of a **Host** Tournament Committee or Officials of **any Event** (as defined in the Tournament Conditions) may be protested.

**A. Protests.**

Any disagreement with the non-discretionary decisions of the **Host** Tournament Committee and/or Officials conducting **an Event** may be protested, provided that notice of the disagreement is delivered verbally to any of the following within eight (8) hours after the disagreement arises: a member of the Tournament Committee, a Circuit Governor, the Chief Executive Officer, or the Chairman of the Association.

**B. Filing of Protests.**

1. A protest may be filed by (a) any aggrieved Individual Member who is also a participant in the Event, (b) an Official of the Event, or (c) an Officer or Governor of the Association.

2. All protests must be: (a) filed in writing, (b) received within twenty-four (24) hours of the Event in which the disagreement arose, (c) signed by the protesting party, (d) addressed to the Association, and (e) delivered to the Chairman or Chief Executive Officer.

3. A copy of the written protest shall be promptly provided to the Host Tournament Committee and/or Officials who made the non-discretionary decision(s) being protested and a representative of any team

7

directly affected by the outcome of the protest, and they shall be invited to submit in writing or orally any information they deem relevant to the investigation of the protest.

**C. Protest Investigations and Rulings.**

The Chief Executive Officer, or his or her designee, shall make an investigation of the protest and shall report findings to the Executive Committee. A ruling on the protest shall be issued by the Executive Committee within forty-eight (48) hours after receipt of such findings from the Chief Executive Officer; provided, however, that any proposal to expel/remove/terminate a Member from the Association shall be subject to the approval of the Board of Governors. The protesting party, **the Host Tournament Committee and/or Officials who made the non-discretionary decision(s) being protested, and a representative of any team directly affected by the outcome of the protest** will each be notified of the decision in writing within twenty-four (24) hours of the issuance of the Executive Committee's ruling.

## PART IV:

## EQUINE DRUGS AND MEDICATIONS RULES VIOLATION PROCEDURES

**Introduction**

These Equine Drugs and Medications Rules Procedures are intended to provide a disciplinary procedures process for violations of the Equine Drugs and Medications Rules.

**A. Application and Incorporation.**

These Equine Drug and Medications Rules Violation Procedures shall apply to all charges and proceedings arising out of alleged violations of the Equine Drugs and Medications Rules of the Association. The Equine Drugs and Medication Rules of the Association are incorporated herein by reference.

**B. Equine Drugs and Medications Rules Violation.**

Any Responsible Party(ies) (as defined in Rule 6.2 of the Association's Equine Drugs and Medications Rules) found, after hearing and appeal, if any appeal, to have violated the Equine Drugs and Medications Rules of the Association, or having failed to obey a penalty imposed hereunder, shall be deemed to have committed an Equine Drugs and Medications Rule Violation (each, an "EDM Violation").

**C. Initiation of Charges, Record.**

1. Initiation of Charges. Initiation of a charge by complaint under this Rule for an alleged violation of the Equine Drugs and Medications Rules (an "EDM Violation Complaint" or "EDM Charge") shall be made by the Chairman of the Association or his designee; provided, however that:
   a. If the EDM Violation Complaint is based upon equine blood sampling, that both of two samples taken from a horse which forms the basis for the alleged EDM Violation have tested positive for drugs or medications in violation of the Association's Equine Drugs and Medications Rules; and
   b. All EDM Violation Complaints shall be: (i) in writing, describing in reasonable detail the alleged EDM Violation; (ii) received by the Responsible Party(ies) within seventy-two (72) hours of the receipt of the Association of either (a) an EDM Violation Complaint (if the allegations are not based upon testing); or (b) the results of the sample test from the USPA designated laboratory which are the basis for the EDM Violation Complaint; and (iii) signed by the Association.

2. Record. The Association will keep a record of all EDM Violation Complaints available for inspection by Registered Players.

**D. Notice.**

1. Notice of Hearing Required. Any Responsible Party(ies) against whom an EDM Violation Complaint is issued is entitled to notice of a hearing of the alleged EDM Violation. Notwithstanding the above, should a Responsible Party fail to appear at a duly noticed hearing, the hearing shall be held in absentia. A corporate identity which is a Responsible Party charged hereunder must send an authorized representative to such hearing. The Association may hold an expedited hearing within seven (7) calendar days of issuance of the charge, provided that the Responsible Party(ies) is(are) given written notice at least forty-eight (48) hours prior to the scheduled expedited hearing.

The Notice of Hearing shall:
(a) contain a brief statement of the facts constituting the alleged EDM Violation; (b) identify the specific Association Equine Drugs and Medications Rule(s) allegedly violated;
(c) specify the time and place at which the hearing is to be held; and
(d) include a list identifying: (i) the evidence to be introduced at the hearing; (ii) the names of the witnesses; (iii) the substance of their testimony; and
(e) provide a copy of any testing report(s) from the laboratory that is(are) are to be introduced as evidence at the hearing.

This Notice of Hearing requirement may be waived in writing by the Responsible Party(ies). For purposes of this paragraph, written notice shall be deemed to have been properly given to a Responsible Party(ies) by the Association if the notice is sent via hand-delivery, facsimile, express mail, email or certified mail to the address of the Responsible Party(ies) listed in the Association's records. If sent by email, service is complete upon receipt by the Association of an acknowledgment by the Responsible Party(ies) of receipt of the Notice of Violation.

2. Notice to Responsible Party. In the absence of an expedited hearing, written notice to the Responsible Party(ies) must be given within seven (7) calendar days from the date that the decision is made to issue charges by the Association. Such notice shall:
(a) contain a brief statement of the facts constituting the alleged EDM Violation;
(b) identify the specific Association Equine Drugs and Medications Rule(s) allegedly violated;
(c) specify the time and place at which the hearing is to be held; and
(d) include a list identifying: (i) the evidence to be introduced at the hearing; (ii) the names of the witnesses; (iii) the substance of their testimony; and
(e) provide a copy of any testing report(s) from the laboratory that is (are) to be introduced as evidence at the hearing. For purposes of this paragraph, written notice shall be deemed to have been properly given to a Responsible Party(ies) by the Association if the notice is sent via hand-delivery, facsimile, express mail, email or certified mail to the address of the Responsible Party(ies) listed in the Association's records. If sent by email, service is complete upon receipt by the Association of an acknowledgment by the Responsible Party(ies) of receipt of the Notice of Violation.

3. Responsible Party Evidence and Information. At least twelve (12) hours before the scheduled hearing, the Responsible Party(ies):
a. may submit to the EDM Hearing Committee a written response to the charges, and include written and signed statements of others having knowledge of the facts at issue; and
b. may submit the name, resume and written report of any veterinary doctor, scientist or other trained expert the Responsible Party(ies) plan to call as a witness before the EDM Hearing Committee; or
c. may agree to a disposition of the charges without the necessity of a hearing.

Notwithstanding the foregoing, failure of a Responsible Party(ies) to submit the evidence and other information within the time period set forth above may result in the exclusion of such evidence at the scheduled hearing.

**E. Hearing of Charges.**

1. All proceedings will be conducted in the English language and in the presence of the Responsible Parties(ies), unless the Responsible Party(ies) fails to appear, in which case the proceedings may be held in absentia.

Hearings shall be heard by an EDM Hearing Committee as constituted hereunder, which shall conduct the proceedings.

2. The EDM Hearing Committee shall determine and approve a Final Order setting forth the findings of facts and conclusions on which it is based, as well as the Penalty, if any, to be imposed on the Responsible Party(ies), will be entered by the EDM Hearing Committee within fifteen (15) calendar days following the conclusion of the hearing. Upon the conclusion of such hearing and the entry of a Final Order, copies of all findings, conclusions, recommendations and Final Orders will be delivered to the Association. The Association shall thereafter promptly provide the Responsible Party(ies) with a copy of all findings, conclusions, recommendations, and Final Orders.

3. At any hearing conducted pursuant to this section, the Responsible Party(ies), or counsel designated by same, will have an opportunity to present evidence, defend against the charges and cross examine witnesses.

**F. EDM Hearing Committees.**

The Board of Governors has authorized the creation of one or more committees to hold hearings on charges of any alleged Violation of the Equine Drugs and Medication Rules and make determinations on behalf of the Association on such matters (each, an "EDM Hearing Committee"). All EDM Hearing Committees considering alleged EDM Violations shall at all times consist of at least three (3) individuals, a majority of whom must also be Governors, at least one of whom shall be an equine veterinarian licensed in the United States, and all of whom serve at the pleasure of the Board of Governors.

**G. Evidence; burden and standard of proof required.**

1. Presentation of Evidence. The Responsible Party(ies) may attend the hearing on the alleged EDM Violation at their option, with or without counsel, or may send a representative and may call witnesses and submit signed statements or other evidence provided that such information is timely delivered to the Association before the scheduled hearing. Interpreters, if required by the Responsible Party(ies), are the responsibility of the Responsible Party(ies) and not the Association. The failure to understand the charges or any proceedings in English shall not provide the basis for an appeal.

2. Burden of Proof. The Association has the burden of proving the EDM Violation. The burden of proof shall not be that as required in a court of law. The standard of proof required for a finding of an EDM Violation shall be "substantial evidence," which means affirmative evidence of such a clear and definite nature as to reasonably establish a fact.

**H. Continuances.**

1. Applications for Continuance. Applications for continuance of any hearing must be made to the EDM Hearing Committee in writing, shall be subject to the requirements set forth in this paragraph below, and shall state the reasons why such a continuance is sought.

a. In all cases set for hearing on written notice to the Responsible Party(ies) exceeding ten (10) calendar days, the application for continuance must be received by the EDM Hearing Committee at the address designated in the Notice of Hearing at least seven (7) calendar days prior to the scheduled hearing date.
b. An application for continuance received less than seven (7) calendar days prior to the scheduled hearing date, but prior to the hearing, will not be granted unless a written arrangement is made to the satisfaction of the EDM Hearing Committee for the payment of all expenses incurred by the EDM Hearing Committee, the Association and witnesses resulting from the granting of any such application for continuance.
c. No continuances of expedited hearings will be granted to the Responsible Party(ies).

2. Continuance Fees. Except as otherwise provided with respect to expedited hearings, a continuance will be granted to any party to the proceeding only for good cause shown. An application for a first continuance of a hearing must be in writing and accompanied by a non-refundable continuance fee of Five Hundred Dollars ($500.00) made payable to the Association. Any second or subsequent application for continuance will only be

10

considered if submitted in writing together with a continuance fee of One Thousand Dollars ($1,000.00), payable to the Association.

**I.** **Temporary Suspension.**

If applicable, upon receipt by the Association of the testing report confirming the presence of prohibited drugs and/or medications in a sample taken from the horse of a Responsible Party(ies), the Chairman of the Association or Executive Director may, prior to a hearing, temporarily suspend any Responsible Party(ies) from participating in any manner in the affairs and events of any Association Member Club or the Association so long as an expedited hearing is noticed and held within seven (7) calendar days of the time such suspension is effective. In a case where the Responsible Party(ies) has(have) been temporarily suspended prior to a hearing, a decision on the charge shall be made by the EDM Hearing Committee within twenty-four (24) hours of the conclusion of the expedited hearing.

**J.** **Appeal of Decisions.**

1. Notice of Appeal. A decision by the EDM Hearing Committee will be final unless a party to the proceeding files a written Notice of Appeal together with the requisite Appeal Fee with the Association within fourteen (14) calendar days of the issuance of the Final Order.

    a. Any Notice of Appeal filed by a Responsible Party(ies) must be accompanied by an Appeal Fee in the amount of One Thousand Dollars ($1,000) payable to the Association.

    b. In the event that (a) Responsible Party(ies) do (does) not complete the appeal process, the Appeal Fee will be forfeited.

    c. Within thirty (30) calendar days following the conclusion of the Appeal Hearing, the Appeal Fee will be returned to the Responsible Party(ies) unless the Responsible Party(ies) is indebted to the Association for any fees, costs or fines, in which event the amount of such items shall be deducted from the Appeal Fee prior to any refund.

2. Appeal Committee, Further Appeal.

    a. On receipt of a timely Notice of Appeal from any party, the Association will designate an Appeal Committee which will have the authority, in their discretion, to either schedule and conduct a hearing or require the Responsible Party(ies) to submit its arguments in writing for consideration.

    b. The Appeal Committee shall consist of the following:
        1. A equine veterinarian licensed in the United States who did not sit on the Hearing Committee for the matter subject to appeal; and
        2. The Chairman or his designee, provided that such individual did not sit on the initial Hearing Committee for the alleged EDM Violations subject to appeal.
        3. Additionally, a majority of the members of the Appeal Committee shall be members of the Board of Governors, and all members of the Appeal Committee shall serve at the pleasure of the Board of Governors.

    c. At the hearing, should one be scheduled and conducted before the Appeal Committee, all testimony and other evidence previously presented to the EDM Hearing Committee shall be considered. The Appeal Committee may reduce, sustain, or increase any penalties initially imposed; provided, however, that any proposal to remove a Member from the Association shall be subject to the approval of the Board of Governors.

    d. On receipt of a written, timely Notice of Appeal from an Association Appeal Committee decision, the Appeal will be decided by the Executive Committee of the Board of Governors.

3. Appeals by a Responsible Party. In the event that the Responsible Party(ies) timely appeals a decision recommended by the EDM Hearing Committee, the Appeal Committee designated by the Association shall give the appellant at least ten (10) calendar days' written notice of the date, time and place of the appeal hearing, should one be scheduled. Unless the Appeal Committee decides otherwise for good cause, the appeal hearing shall be held in the State and County of the alleged EDM Violation. Likewise, unless the Appeal Committee decides otherwise for good cause, the hearing shall be held within forty (40) calendar days following the receipt by the Association of a properly filed appeal. If requested by the Responsible Party(ies), the Appeal Committee will permit the Responsible Party(ies) to be heard in person and/or as represented by an attorney. The parties may file written memoranda with the Appeal Committee objecting to or in support of the initial EDM Hearing Committee findings and accompanying disciplinary action.

4. Appeal Committee Report. Within fifteen (15) calendar days after completing the Appeal Hearing, the Appeal Committee will issue a report setting forth its findings, its decision and its reasons therefore, and will transmit the same to the Responsible Party(ies) and to the Association.

5. Executive Committee Authority on Appeal. If the Association timely receives a written Notice of Appeal from the Responsible Party(ies) of the decision of the Appeal Committee, the Executive Committee of the Board of Governors shall constitute the final body of appeal for all decisions and shall have the authority to review the entire transcript of any hearings and any and all evidence submitted to the EDM Hearing Committee and the Appeal Committee in connection with the alleged EDM Violation. The Executive Committee shall have the power to affirm, modify or reverse the decision appealed. Such an appeal must be filed with the Office of the Association within fourteen (14) calendar days of the Appeal Committee decision.

K. Penalties.

1. Penalties. If found guilty of any EDM Violation properly brought before a Hearing Committee, the Responsible Party(ies) will be subject to such penalties as the EDM Hearing Committee, the Appeal Committee, the Executive Committee, or the Board of Governors, as applicable, determine, including, but not limited to:

   a. For a first violation:
      1. Letter of censure to be listed in the Association's record of penalties and published by the Association;
      2. Fine of $1,000 (one thousand dollars) in addition to all fees and costs incurred by the Association and its witnesses;
      3. Probation for 6 (six) months.

   b. For a second violation:
      1. Letter of censure to be listed in the Association's record of penalties and published by the Association;
      2. Fine of $5,000 (five thousand dollars) in addition to all fees and costs incurred by the Association and its witnesses;
      3. Suspension for any period from participating in any Association or Member Club events and activities and an additional period of Probation; and

   c. For a third violation:
      1. Letter of censure to be listed in the Association's record of penalties and published by the Association;
      2. Fine of $10,000 (ten thousand dollars) in addition to all fees and costs incurred by the Association and its witnesses;
      3. Forfeiture of all of those games won and Association tournament won (if any) by the team for which horse that tested positive played in that Association tournament;
      4. Expulsion from Association membership. Whether such expulsion shall be temporary or permanent shall be at the discretion of the Board of Governors.

   d. For all violations:

      1. Disqualification. The EDM Hearing Committee may also impose the sanction of retroactive disqualification from any Association game or tournament.

2. Publication. Any findings, conclusions, rulings, recommendations and/ or penalties of a Hearing Officer, the EDM Hearing Committee, Board of Governors, or Chairman of the Association under this By-law may be published to the Member Clubs of the Association, any foreign associations and the news media.

2. Multiple Allegations. When more than one allegation of an EDM Violation against any Responsible Party(ies) arises out of testing of samples from one date in one location, the EDM Hearing Committee shall determine, in its sole discretion, whether those allegations constitute one or multiple EDM Violations for purposes of assessing the Penalties hereunder.

3. Probation Condition Violations. A violation of a Probation condition may be treated as an EDM Violation.

4. Publication. Any findings, conclusions, rulings, recommendations and/or penalties of an EDM Hearing Committee, Appeal Committee, Board of Governors, or Chairman of the Association, may be published to the Member Clubs of the Association, any foreign associations and to the news media.

5. Costs. Actual reasonable costs and out of pocket expenses incurred by the EDM Hearing Committee, Appeal Committee, Association and/or witnesses may be assessed in addition to any penalty. Failure to timely pay for costs shall be treated as an EDM Violation.

**L. Publication and Enforcement of Association Decisions by Member Clubs.**

The issuance on the Association's website of a final decision by the Association as to any EDM Violation and any attendant penalties imposed therefore shall, once all rights of appeal have either been exhausted or lapsed, be binding on all Member Clubs.

**M. Stay of Penalty Upon Appeal.**

If a penalty of any kind is appealed, the Responsible Party(ies) may request, in writing, that any penalty imposed be stayed until such time as the Appeal has been heard by the proper Committee or Board. The Committee hearing the appeal will timely grant or deny the Responsible Party's(ies') request for a stay as it deems appropriate. To the extent that a stay of the penalty is granted by the Committee hearing the appeal, and the Responsible Party(ies) fails to prevail on the appeal, the time periods relating to the penalty shall be extended by a number of days equal to the stay.

**N. Effective Date of Penalty.**

1. The effective date of any suspension, probation or expulsion, and the deadline for the payment of any fine, will be set by the EDM Hearing Committee.

2. Failure to timely pay a fine and/or costs which have been properly levied will constitute automatic suspension of the Responsible Party(ies) subject to the fine and/or order of costs from the date the fine and/or costs were payable until the fine and/or costs are paid. A fine and/or costs are considered paid when actually receipt by the Association in cleared funds.

# EXHIBIT C

1

# UNITED STATES POLO ASSOCIATION

9011 Lake Worth Road
Lake Worth, Florida 33467

July 23, 2021

**By email only**

Darrell Gaebel
24182 Audubon Trail Drive
Aldie, Virginia 20105
Tel: (703) 507-9831
Email: cdrdjg2000@yahoo.com

> Re:   **Notice of Alleged Conduct Violations, Issuance of USPA Charges**
> **and Notice of Hearing.**

Dear Mr. Gaebel:

Notice is given, pursuant to Part I, Section (C) of the Disciplinary Procedures Policy (as amended on April 17, 2021) ("DPP") of the United States Polo Association (the "Association") that you have been charged with violations of subparagraphs (2), (3), (8), (9) and (10) of the Association's Code of Conduct.  In accordance with Part I, Section (C) of the DPP, a hearing will take place before a USPA Hearing Committee on **Friday, August 6, 2021 at 10:00 a.m.**[1]  The hearing will be conducted via a live Zoom teleconference.  At the hearing, you will be entitled to present evidence, defend against the charges, and cross-examine witnesses. A decision on the charge will be made within fifteen (15) days after the conclusion of the hearing.

## I.      The Alleged Conduct Violations

The alleged conduct violations took place on Saturday, July 10, 2021, at the Twilight Polo Club in Plains, Virginia, during an arena polo game between Battlefield and Polo Yacht Club.  During the game, it is alleged that you used "foul and racial language" and that you called Aleem Rahman Siddiqui, who is 14-years old, a *"mother-fucking nigger."*  Thereafter, when you were asked to apologize to Mr. Siddiqui, it is alleged that you "bullied [Aleem] by pushing his shoulder" and "slapping his upper arm."

These allegations were made in a Conduct Violation Complaint made by Delora Burner, an Association member, on Sunday, July 11, 2021, and delivered to the Association that same day.  A copy of Ms. Burner's Conduct Violation Complaint is attached hereto as Exhibit 1.  On Wednesday, July 14, 2021, the Association, in accordance with the DPP, timely provided you with notice that a Conduct Violation

---

[1] The Members of the Hearing Committee will be Chrys Beal and Chris Green.

2

Complaint had been made against you.  A copy of this Notice is attached hereto as Exhibit 2.

Your conduct as described above, if proven to be true, would amount to violations of subparagraphs (2), (3), (8), (9) and (10) of the Association's Code of Conduct.

## II.       The Association's Policies Governing Member Conduct

The Association's Code of Conduct provides, in pertinent part:

The United States Polo Association (the "USPA") strives to maintain the highest standard of conduct in all of its operations and, accordingly, has established the following code of conduct (this "Code of Conduct") for all of the Member Clubs and Individual Members.

(2) Always respect your teammates, opponents, officials, and fellow Members.

(3)  Always demonstrate good sportsmanship.

***

(8) Always demonstrate respect and good citizenship towards other Association Members in all Association-related communications, including, but not limited to, discourse at Association meetings.

(9) Always adhere to and comport yourself in accordance with the Articles of Incorporation, By-laws, Constitution, Rules, terms and conditions of the Membership Application, Code of Conduct, and other policies of the Association, all as in effect from time to time.

(10) Always act in a manner that is in the best interests of the Association and the sport of polo.  An Individual Member shall be deemed to have not acted in the best interests of the Association and the sport of polo where such Individual Member:

A. Acts, or incites any other Member to act, in a manner contrary to the Articles of Incorporation, By-laws, Constitution, Rules, terms and conditions of the Membership Application, or this Code of Conduct;

B. Acts, or incites any other Member to act, in a manner deemed to be improper, unethical, dishonest, unsportsmanlike, intemperate, or prejudicial to the best interests of the sport or the Association;

D. Publishes, or incites any other Member to publish, in social media or elsewhere, statements, comments, or remarks considered to be offensive or

3

made with the intent to influence or cast aspersions on the character or integrity of the Association, an Individual Member, a Member Club, or an official of the sport;

### III.    The Association's Procedures Governing Conduct Violations

#### A.    By-laws

Article VIII, *Disciplinary Procedures*, of the By-laws provides that "[t]he Board of Governors has the authority to discipline Association Members, including to suspend, revoke, or terminate membership of any Member Club or Individual Member, in accordance with and subject to any disciplinary procedures of the Association ... Failure of a Member to discharge [his] obligations to the Association may be grounds for suspension or termination of membership, or other penalty, in accordance with any Board-approved disciplinary procedure."

#### B.    Disciplinary Procedures Policy

Part I, Paragraph A, of the DPP provides:

**A. Conduct Violations.**

Any Member Club or Individual Member will be deemed to have committed a "Conduct Violation" for a violation of the Association's Code of Conduct (whether on or off the polo field), Rules (as defined in the By-laws), Constitution, By-laws, Board-approved policies, directives or Terms and Conditions of Membership, or for a failure to obey a penalty imposed under the Rules or these Sports-Related Conduct Violations Procedures, to the extent such violation or failure relates to the Member Club's or Individual Member's conduct relative to the sport of polo, including, but not limited to, player or umpire or any equine welfare issues.

### IV.    Evidence to Be Introduced at the Hearing

#### A.    Identity of Witnesses

At the hearing, the following witnesses may testify: (i) Delora Burner; (ii) Aleem Rahman Siddiqui; (iii) Humera Rahman; (iv) Taha Rahman; (v) Umpire George Krabbe; (vi) John Gobin; and (vii) any other individuals who are located in the interim with first-hand knowledge of the incident at issue.

#### B.    Substance of the Witnesses' Testimony

The above referenced witnesses are expected to testify that on Saturday, July 10, 2021, at the Twilight Polo Club in Plains, Virginia, during an arena polo game between

4

Battlefield and Polo Yacht Club, you used foul language, that you used the racial slur referenced above and, when you were asked to apologize to Mr. Siddiqui, you refused to apologize and instead attempted to bully Mr. Siddiqui by pushing his shoulder and slapping his upper arm saying "we settled this on the field, didn't we kid."

**C.    Additional Evidence**

At the hearing, the following documents will be used: (i) Conduct Violation Complaint authored by Delora Burner dated July 11, 2021 [Exhibit 1]; (ii) Notice to Darrell Gaebel dated July 14, 2021, notifying Mr. Gaebel that a Conduct Violation Complaint had been made [Exhibit 2]; (iii) written statement of Humera Rahman dated July 11, 2021 [Exhibit 3]; (iv) three photographs from the subject arena polo game [Exhibit 4]; and (iv) two (2) videos of the subject arena polo game.[2] Other documents or videos may also be used if they are relevant and identified before the hearing.

**IV.    Hearing and Pre-Hearing Procedures**

Prior to the scheduled hearing, you may submit a written response to the charges and include written and signed statements of others having first-hand knowledge of the facts. You may attend the hearing with or without counsel, or you may send a representative on your behalf.  You may call witnesses and present other relevant evidence.  Any pre-hearing submissions made by you should be provided to both the USPA, at the above address, and to USPA counsel, Craig T. Galle, Esq., whose contact information is listed below.

The relevant sections of the Association's Disciplinary Procedures Policy (as amended on April 17, 2021) can be found in the document attached to the email by which I have transmitted this letter to you, if you would like to familiarize yourself with them. Part I, Paragraph C, subparagraph 4 of the Disciplinary Procedures Policy provides that you, as the charged party "may agree to the disposition of the charges without the necessity of a hearing." If you would like to discuss that possibility, please contact USPA counsel, Craig T. Galle, Esq., at your earliest convenience.

Sincerely,

UNITED STATES POLO ASSOCIATION

By: Carlucho Arellano
Its: Executive Director, Services

---

[2] Links to the two (2) videos will be provided to you in advance of the hearing by email.

5

cc:    Craig T. Galle, Esq.
       The Galle Law Group, P.A.
       13501 South Shore Blvd., Suite 103
       Wellington, Florida 33414
       Tel: (561) 798-1708
       Fax: (561) 798-1709
       Email: pololawyer@aol.com
       (USPA Counsel)

       Chrys Beal, Hearing Officer
       Email: chrysbeal@gmail.com

       Chris Green, Esq., Hearing Officer
       Email: chris@uspolo.org

       Teresa N. Taylor, Esq.
       Email: taylortn@butzel.com
       (Respondent's Counsel)

**Exhibit 1**

---

**From:** Chris Green <chris@uspolo.org>
**Sent:** Wednesday, July 14, 2021 5:25 PM
**To:** cdrdjg2000@yahoo.com
**Subject:** USPA Conduct Violation Complaint

Dear Mr. Gaebel:

Please see attached a Conduct Violation Complaint filed with the USPA by member Delora Burner.  The Complaint will be presented to the USPA Executive Committee pursuant to the attached USPA Disciplinary Policy Procedures (As Amended 04.17.21).  The Executive Committee will meet to decide whether to issue charges based on the Complaint.

Please contact me if you have any questions.

Sincerely,
Chris

**CHRIS GREEN**
**Chief Operating Officer & In-House Counsel**
**UNITED STATES POLO ASSOCIATION**



**9011 Lake Worth Road | Lake Worth, FL 33467 | <u>uspolo.org</u>**
**t: (800) 232-8772  |  f: (888) 391-7410  |  c: (914) 552-0625**

<u>**Facebook**</u> **|** <u>**Twitter**</u> **|** <u>**Instagram**</u> **|** <u>**YouTube**</u> **|** <u>**LinkedIn**</u>

**CONFIDENTIALITY AND PRIVILEGE NOTIFICATION:**
Notice: This email and its contents and attachments are an electronic communication transmission pursuant to the Electronic Communications Privacy Act, 18 U.S.C. §2510-2521 and may contain information protected by attorney-client privilege and the work product doctrine. This email is a confidential communication intended for the recipient only, and is not intended for release to any third party person or entity. DO NOT PRODUCE A COPY OF THIS E-MAIL IN DISCOVERY OR OTHERWISE. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may constitute a felony and subject you to civil and criminal penalties. If you have received this email in error, please notify us immediately by reply email and immediately delete the communication from your computer. Thank you.

**Exhibit 2**

| | |
|---|---|
| **From:** | Delora Burner |
| **To:** | Carlucho Arellano; Chris Green |
| **Subject:** | Incident Report 7/10/2021 |
| **Date:** | Sunday, July 11, 2021 8:47:26 PM |

To the United Stated Polo Association,

An incident occured during a 6:30 pm game last night July 10, 2021 at Twilight Polo in the Plains Virginia. Battlefield was playing a game against the Polo Yacht Club and a player from each team collided midfield. Darrell Gaebel from Polo Yacht Club and Aleem Siddiqui from Battlefield resulting in foul and racial langauge (mother-fucking nigger) by the adult Darrell Gaebel towards my fourteen year old student Aleem.

I walked directly to the umpire George Crabb after the game and asked if he heard the comments on the field, he had not, then I went to the manager John Gobin to report this incident. I stated I was beyond angry and that this is unacceptable, John was in 100% agreement and said he would not tolerate this behavior. John accompanied me to speak to his player Gaebel and asked him directly did he say these things to Siddiqui? Gaebel responded, "Now John when have you have heard me say that word?" John said again did you say this to the kid? Gaebel evaded...John told Gaebel to go over there and apologize to the player and his family.

I accompanied Gaebel to speak to my student and his family and Gaebel as not happy. When we arrived Aleem's mother, father, uncle, grandparents, and friends as well as all our families and kids were nearby. I said Darell has come to apologize to you Aleem. Gaebel said well no, I looked at him and watched as he totally evaded an apology, Gaebel with his teeth gritting said, "No we settled this on the field, didn't we kid?" Gaebel pushed Aleem's shoulder and said, "Didn't we already settle this kid?" He actually stood there and bullied my student by pushing his shoulder, never acknowledged my student by name. It was "kid".

As I stood there I realized that Gaebel did not acknowledge the the Siddiqui's in any way or even as human beings. Gaebel's entire demeanor suggested he didn't feel they warranted acknowledgement, let alone an apology, Gaebel kept gritting his teeth and pushing Aleem on his shoulder and slapping his upper arm and saying, "We already settled this on the field right kid?"

In that moment I felt shame, humiliation, I felt racism up close and in my face. Any rational person would either deny outright saying the word "Nigger" as it is the social norm to deny saying such a hateful word, with a connotation of slavery.

Oh I heard the word "no" from Gaebel, it was when I asked him to issue the apology, and he responded by saying, "No we settled this on the field, didn't we kid". I did not hear him say that he did not use the word Nigger or apologize for any other foul language. What decent human being behaves like this towards anyone, anywhere, ever?

There was a moment in recent times I thought Gaebel had changed his behavior and been kinder asked if a couple of my female students could ride his horses, My instinct was to say no because of his behavior in the past, but I relented and allowed them to ride the horses, hoping he had changed, but now I realize they were white children.

Over 5000 people have learned to ride or started in polo here at Battlefield we have a dozen adults and 18 children currently playing with us and hold multiple memberships and boxes at Twilight polo and Virginia United, many of the players and the patrons on the fields in Northern Virginia began their career here at Battlefield now playing 6,8,12 goal. They go on to buy horses, farms, pay pros, grooms, and it makes me happy to be living the dream. Last night was a nightmare it was a disgrace to our beloved sport.

I have to date never filed any complaint with any organization in my life, but I am asking you to sanction Gaebel, and maintain zero tolerance for discrimination of any kind. Be the light.

Thank you
Dori Burner
Battlefield Park Polo Club
Gainesville VA 20155

239-989-2011

## Exhibit 3

**From:** <u>humera rahman</u>
**Sent:** Sunday, July 11, 2021 6:31 PM
**To:** <u>Carlucho Arellano</u>; <u>Chris Green</u>; <u>Stewart Armstrong</u>
**Cc:** <u>delorab@hotmail.com</u>; <u>tahasiddiqui@gmail.com</u>
**Subject:** Incident at Twilight Polo (07/10/2021)

On July 10th our son, Aleem Rahman Siddiqui, played at Twilight Polo in the Plains, Virginia. Aleem was playing for Battlefield Polo Park under the coaching of Dori Burner. The opposing team was Polo Yacht Club and had a player by the name of Darrell Gaebel.

In the fourth chukker, both Aleem and Darrell went towards the ball; Darrell got to the ball first and turned sharply in front Aleem's horse. Aleem turned his horse immediately to avoid a collision but the horse's head brushed Darrell's shoulder. Aleem went to apologize and take responsibility for what had happened but Darrell wouldn't accept the apology and began yelling and cursing.

Darrell then called him a "motherfucker" and the N-word. Aleem immediately came to us to explain the interaction with but due to the noise we couldn't hear him and sent him back to apologize to Darrell again.

Aleem apologized to him again near other players and he called him a "motherfucker" again. Later in the game in front of the goal, Darrell came into the ride off fast and slammed into Aleem knocking his foot out of the stirrup. He then began cursing again resulting in both Aleem and Darrell receiving a warning.

After the game Aleem explained in detail what had occurred. We were shocked and Dori immediately went to speak with John Gobin (organizer and owner of Twilight Polo), George Krabbe (umpiring), Darrell and the other players.

Dori brought Darrell over to Aleem to apologize for what he had said. Darrell denied saying the N-word and said that "motherfucker" was not directed towards Aleem. He kept pushing Aleem's shoulder in an attempt to intimidate him and insisting that Aleem acknowledge that the matter had been sorted out in the arena.

We have seen and supported Darrell play for the last few years at Twilight and are extremely saddened to hear him direct such hateful language at a fellow player let alone a 14 year old.

We would like you to ensure that Darrell Gaebel is sanctioned and held fully accountable for his behavior and language towards Aleem.

Sincerely,
Humera Rahman
Taha Siddiqui

# EXHIBIT D

| | |
|---|---|
| **From:** | Taylor, Teresa N. |
| **To:** | Dennis, Lindsey; Craig T. Galle |
| **Cc:** | chris@uspolo.org; chrysbeal@gmail.com; Darrell Gaebel; carlucho@uspolo.org; lebersbach@uspolo.org |
| **Subject:** | Re: [EXTERNAL] USPA/Darrell Gaebel |
| **Date:** | Wednesday, August 4, 2021 9:03:52 PM |
| **Attachments:** | image001.png |

Craig,

We still await your answer to my last email of this morning addressing witness sequestration for Aleem and his mother, Humera, before finalizing our list and providing any additional witnesses who await your final reply prior to committing to testifying.

Teresa

Sent from my iPhone

> On Aug 4, 2021, at 8:54 PM, Taylor, Teresa N. <taylortn@butzel.com> wrote:
>
> Craig,
>
> Please also add to the witness list Adam Doble to follow after Brock Bromley preferably in that order.
>
> Thank you,
>
> Teresa
>
> **From:** Dennis, Lindsey <dennisl@butzel.com>
> **Sent:** Wednesday, August 4, 2021 8:26 PM
> **To:** Taylor, Teresa N. <taylortn@butzel.com>; Craig T. Galle <pololawyer@aol.com>
> **Cc:** chris@uspolo.org; chrysbeal@gmail.com; Darrell Gaebel <cdrdjg2000@yahoo.com>; carlucho@uspolo.org; lebersbach@uspolo.org
> **Subject:** RE: [EXTERNAL] USPA/Darrell Gaebel
>
> Craig,
>
> I am submitting this on behalf of Teresa Taylor.
>
> Please see below for the list of witnesses testifying on behalf of Darrell on Friday. In the preferred order please.
>
> Please see attached for the translation of one of Aleem's family members speaking in the background of the video capturing the crash between Darrell and Aleem submitted by Humera Rahman, Aleem's mother.

Witnesses:

George Krabbe
John Gobin
Brock Bromley
David Tafuri
Marisa Wells
Matt Potter
Danielle Quinn
Joe Noonan
Dan Coleman
Whitney Ross
Gardiner Mulford

Best,

Lindsey

**Lindsey Dennis**
**Associate**
**Pronouns: They/Them/Theirs**
DennisL@butzel.com
Direct: 202.454.2854
Mobile: 360.607.0092
Ext. 2854

<image001.png>

1909 K. Street N.W. Suite 500
Washington, DC 20006
Office: 202.454.2800 | Fax: 202.454.2805
www.butzel.com
Michigan | New York | Washington, D.C.

<image002.jpg>

<image003.gif>

---

**From:** Darrell Gaebel <cdrdjg2000@yahoo.com>
**Sent:** Wednesday, August 4, 2021 4:39 PM
**To:** Taylor, Teresa N. <taylortn@butzel.com>
**Cc:** Craig T. Galle <pololawyer@aol.com>; chris@uspolo.org; chrysbeal@gmail.com;

carlucho@uspolo.org; lebersbach@uspolo.org; Dennis, Lindsey <dennisl@butzel.com>
**Subject:** Re: [EXTERNAL] USPA/Darrell Gaebel

<image006.jpg>

Sent from my iPhone

> On Aug 4, 2021, at 10:19 AM, Taylor, Teresa N. <taylortn@butzel.com>
> wrote:

Craig,

Good morning and thanks for your prompt reply.

To be clear, I did not state that it is my client's belief that Dori and/or
Aleem's family will retaliate against witnesses, and provided no opinion
on such concerning my client's thoughts in this regard. Those fearing
retribution from Dori and Aleem's family are potential witnesses for my
client. They have adamantly and directly expressed this fear to me, not
through my client. While agreeing to sequester Dori assists with
mitigating this fear, it is unfortunately insufficient. Aleem and his family as
we understand are one of Dori's largest and consistent clients – Aleem
and his younger brother train and compete through Dori's operation. A
few of our client's potential witnesses stated that it is more likely than not
that Aleem and/or his mother will disclose their identities and testimony
to Dori, especially given these potential witnesses' association with Dori.
This is concerning for these potential witnesses as they have close
connections to Dori and her operation, and one of the potential witnesses
expressed that he/she has already faced retribution from Dori in the past.
Unfortunately, without consistent and reasonable sequestration, these
potential witnesses refuse to testify because that is just how afraid they
are. This clearly limits the extent to which my client may select his
witnesses to fully defend himself from serious and damaging allegations.

You still fail to provide any logical reason justifying why Aleem and his
mother will be able to listen and observe to every witness's testimony
merely because he's a minor.  Such makes sense only that his mother
should be able to listen to his testimony, and a stretch would be that
Aleem also gets to listen to his mother's testimony, but not that being a
minor is a blanket pass to listen to all witness testimony, especially when
both are merely witnesses and not also complainants.

Further, I have not and am not equating this hearing with that in front of a

court of law, so I'm not sure why or how you made that assumption from my prior emails as I did not cite to any such rules of civil or criminal evidence, although I know them well. I merely stated general principles that the rules should be applied reasonably and fairly of which are also the underlying principles behind use of the tool of witness sequestration that the USPA has opted to utilize in hearings. I am quite aware that the USPA is a private sporting organization and as such is not bound by formal legal rules such as the rules of evidence. However, for any hearing to be fair, the policies and procedures such as those concerning witness sequestration need to be reasonably and consistently applied, not arbitrarily or capriciously, and should be provided for clearly in its rules and policies, particularly when sanctions exist as possible penalties on members.

Teresa

**From:** Craig T. Galle <pololawyer@aol.com>
**Sent:** Wednesday, August 4, 2021 8:01 AM
**To:** Taylor, Teresa N. <taylortn@butzel.com>
**Cc:** chris@uspolo.org; carlucho@uspolo.org; lebersbach@uspolo.org; Dennis, Lindsey <dennisl@butzel.com>; cdrdjg2000@yahoo.com
**Subject:** [EXTERNAL] USPA/Darrell Gaebel

Teresa,

Good morning.

Private sporting organizations (such as the USPA) are not bound by, nor are they governed by, formal rules of evidence. Indeed, the proceeding will not take place before a court of law, but rather before hearing officers appointed by the Executive Committee of the Association. Private clubs and sporting organizations are granted very broad discretion as to their internal procedures and proceedings. Because of this, courts do not review disciplinary actions of social clubs, including voluntary membership country clubs. *See, e.g., Boca West Club, Inc. v. Levine*, 578 So.2d 14 (Fla. 4th DCA 1991); *State ex rel. Barfield v. Florida Yacht Club*, 106 So.2d 207 (Fla. 1st DCA 1958) ("We agree that the courts should leave to the members of a private social club or to the proper board to which the members have lawfully delegated that power, the right to determine whether the action of a member has been such that, in the opinion of such Board, it would interfere with the pleasant, friendly and congenial social relationship between the members."). That having been said, and in accordance with your request, the USPA has agreed that the complainant Ms. Burner will be sequestered during the portion of the proceedings where Mr. Gaebel presents his witnesses' testimony so as to mitigate against your client's belief that she will later retaliate

against the witnesses.   As to the witness identity, it will not be
published or otherwise disseminated beyond the necessary leadership
and staff of the USPA, but we cannot guaranty that Aleem or his
mother will keep their identities confidential. You will be given an
opportunity to state your procedural and other objections for the
record provided that you do so in a manner that is neither disruptive
or repetitive.

Craig

**The Galle Law Group, P.A.**
13501 Southshore Blvd., Suite 103
Wellington, FL 33414
Office: 561-798-1708
Cell: 561-818-6659
Fax: 561-798-1709
Email: pololawyer@aol.com; craig@gallelaw.com


*IMPORTANT WIRE INFORMATION: Due to the overwhelming amount
of fraudulent cashier's checks circulating in Florida, we will require all cash
to close to be tendered in the form of a wire transfer. Our wiring instructions
will be sent with every closing transaction and are available upon request.
Thank you."*

*CONFIDENTIALITY NOTICE: This message is intended for the
individual or entity to which it is addressed and may contain information
that is privileged, confidential and exempt from disclosure under applicable
law. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited, and you are requested to please notify us immediately by
telephone at 561-798-1708.*


-----Original Message-----
From: Taylor, Teresa N. <taylortn@butzel.com>
To: Craig T. Galle <pololawyer@aol.com>
Cc: chris@uspolo.org <chris@uspolo.org>; carlucho@uspolo.org
<carlucho@uspolo.org>; lebersbach@uspolo.org <lebersbach@uspolo.org>;
Dennis, Lindsey <dennisl@butzel.com>; cdrdjg2000@yahoo.com
<cdrdjg2000@yahoo.com>
Sent: Tue, Aug 3, 2021 8:22 pm
Subject: RE: [EXTERNAL] USPA/Darrell Gaebel

Craig,

The Disciplinary Proceedings Policy you attached is the same document that
we have reviewed thoroughly in its entirety multiple times.  Can you please
refer to where in the policy, which section(s) specifically, you rely upon for the
responses you provided below to our questions?  There is nothing in the
policy you attached regarding witness sequestration, the role of the
complainant, or who may be present during the hearing.  Where specifically is

it provided that witnesses (Aleem and Humera) are allowed to listen to the entire hearing and testimony of all witnesses when they are merely witnesses themselves, and solely because Aleem is a minor? We understand and it makes sense that Humera as Aleem's mother should observe her son's testimony, but not the testimony of every witness, nor even Aleem's observation of his mother's testimony.

To clarify, Aleem is not a charged party, but is the minor person who has accused Darrell of calling him a racist slur, the "N.." word. As such, what is the purpose of allowing both Aleem and his mother, Humera, to listen to and observe the entire hearing and every person's testimony, especially when Aleem and Humera are not also the complainants? Relatedly, why would Dori be permitted to observe the testimony of Aleem and Humera if there is supposed to be witness sequestration of all witnesses? This is not logical given the purposes underlying witness sequestration in hearings.

Is there a reason why in this hearing the witness identities and testimony of Darrell's witnesses cannot remain confidential? There is nothing in the policy you provided that indicates hearings are open and public. Who then would be providing the details of testimony and the identities of witnesses to the other parties?

We appreciate your statement that the USPA does not tolerate witness intimidation or retaliation, but that is not a guarantee those things will not occur, nor does it explain any redress procedures should such occur. Further, the USPA cannot control whether Dori or Aleem's family, working together or separately, would take retributive action within or outside of the polo community. If witness intimidation or retaliation do occur, what would the USPA do? Would a witness need to report the perpetrator and go through further hearings? It seems that it would be safer and more efficient to simply keep witness identities and testimony confidential among all witnesses and the complainant(s) – especially given that we are on notice of fears of retaliation by more than one potential witness. Such witnesses unfortunately will not testify on Darrell's behalf if you cannot provide specific answers that can be relied upon and verification that witness testimony will be confidential for and among all witnesses with all required to be sequestered (with exception being for Humera observing her son's, Aleem's, testimony solely) and treated uniformly, and not in an arbitrary or capricious way.

A prompt, direct and full response is needed and appreciated as Friday is quickly approaching.

Best,

Teresa

From: Craig T. Galle <pololawyer@aol.com>
Sent: Tuesday, August 3, 2021 5:39 PM
To: Taylor, Teresa N. <taylortn@butzel.com>
Cc: chris@uspolo.org; carlucho@uspolo.org; lebersbach@uspolo.org;
Dennis, Lindsey <dennisl@butzel.com>; cdrdjg2000@yahoo.com
Subject: [EXTERNAL] USPA/Darrell Gaebel

Teresa:

I refer you to the Association's Disciplinary Proceedings
Policy (copy attached).

Aside from that, please see the answers to your questions set
forth below.

1. As Darrell Gaebel is the one being possibly charged with
misconduct, both he and his counsel will be permitted to stay
on the Zoom hearing, listening to all witness testimony, for
the entirety of the hearing. Correct?  [CORRECT]

2.  The only persons who will be permitted to remain on the
Zoom hearing for the entirety of the hearing are the hearing
officers, yourself, Darrell, and Darrell's counsel (myself and
my associate). Correct? [INCORRECT.  ALEEM AND HIS
MOTHER WILL BE PERMITTED TO STAY ON FOR THE
ENTIRE PROCEEDING]

3.  Witnesses will testify individually and other witnesses will
not know who else is testifying nor the content of their
testimony, and will not be provided such information at any
point?  [SEE THE ANSWERS TO QUESTIONS 1, 2, 4, 5, 6
AND 7.   THE QUESTIONS OVERLAP AND ARE IN
MANY INSTANCES REPETITIVE]

4.  Dori Burner is the complainant and also a witness. Since
she is a witness, will she be sequestered from hearing all
other testimony and will not know the identity or testimony of
other witnesses who testify on Darrell's behalf?   [MS.
BURNER IS LIKELY TO HEAR ALEEM AND HIS
MOTHER'S TESTIMONY.   MS. BURNER WILL BE
SEQUESTERED AND NOT PERMITTED TO HEAR
OTHER WITNESS TESTIMONY.  YOU SHOULD NOT
ANTICIPATE THAT MS. BURNER, ALEEM OR HIS
MOTHER WILL NOT KNOW THE NAMES OF OTHER
WITNESSES]

5.  Is Aleem Siddiqui also a complainant? [NO]  Or is he only
a witness? [HE IS A WITNESS]  Will he also be sequestered
as required of all other witnesses? [NO]

6.   Aleem is a minor and as such his mother, Humera

Rahman, will be permitted to listen to his testimony only. [NO] However, she also submitted a written statement to the USPA, so is she also a witness? [YES, SHE IS ALSO A WITNESS] Will she be sequestered as required of all other witnesses except for listening to Aleem's testimony? [NO]

7. Will our witness list remain confidential so that other witnesses and the complainant(s) (Dori, Humera, and Aleem) will not know who testified on behalf of Darrell? [NO]As my prior emails have mentioned, there are potential witnesses who would like to testify, however they fear retribution from Dori and possibly Aleem's family. [THE ASSOCIATION WILL NOT TOLERATE INTIMIDATION OF OR RETRIBUTION AGAINST WITNESSES]

Craig

**The Galle Law Group, P.A.**
13501 Southshore Blvd., Suite 103
Wellington, FL 33414
Office: 561-798-1708
Cell: 561-818-6659
Fax: 561-798-1709
Email: pololawyer@aol.com; craig@gallelaw.com

*IMPORTANT WIRE INFORMATION: Due to the overwhelming amount of fraudulent cashier's checks circulating in Florida, we will require all cash to close to be tendered in the form of a wire transfer. Our wiring instructions will be sent with every closing transaction and are available upon request. Thank you."*

*CONFIDENTIALITY NOTICE: This message is intended for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone at 561-798-1708.*

-----Original Message-----
From: Taylor, Teresa N. <taylortn@butzel.com>
To: Craig T. Galle <pololawyer@aol.com>
Cc: Chris Green <chris@uspolo.org>; carlucho@uspolo.org <carlucho@uspolo.org>; lebersbach@uspolo.org <lebersbach@uspolo.org>; Dennis, Lindsey <dennisl@butzel.com>; Darrell Gaebel <cdrdjg2000@yahoo.com>

Sent: Tue, Aug 3, 2021 4:35 pm
Subject: RE: [EXTERNAL] USPA/Darrell Gaebel

Craig,

With the hearing coming up on Friday, I would like to clarify in more detail than your reply below re some specifics of the process and complainant(s) for the hearing based upon my reading of the Disciplinary Policies and Procedures and your emails. The policies and procedures are not clear on the following:

Here are the points I need clarified as soon as possible:

1. As Darrell Gaebel is the one being possibly charged with misconduct, both he and his counsel will be permitted to stay on the Zoom hearing, listening to all witness testimony, for the entirety of the hearing. Correct?
2. The only persons who will be permitted to remain on the Zoom hearing for the entirety of the hearing are the hearing officers, yourself, Darrell, and Darrell's counsel (myself and my associate). Correct?
3. Witnesses will testify individually and other witnesses will not know who else is testifying nor the content of their testimony, and will not be provided such information at any point?
4. Dori Burner is the complainant and also a witness. Since she is a witness, will she be sequestered from hearing all other testimony and will not know the identity or testimony of other witnesses who testify on Darrell's behalf?
5. Is Aleem Siddiqui also a complainant? Or is he only a witness? Will he also be sequestered as required of all other witnesses?
6. Aleem is a minor and as such his mother, Humera Rahman, will be permitted to listen to his testimony only. However, she also submitted a written statement to the USPA, so is she also a witness? Will she be sequestered as required of all other witnesses except for listening to Aleem's testimony?
7. Will our witness list remain confidential so that other witnesses and the complainant(s) (Dori, Humera, and Aleem) will not know who testified on behalf of Darrell? As my prior emails have mentioned, there are potential witnesses who would like to testify, however they fear retribution from Dori and possibly Aleem's family.

A response as soon as possible is appreciated so we can ensure that the hearing is seamless and efficient.

Thank you,

Teresa

**From:** Craig T. Galle <pololawyer@aol.com>

**Sent:** Monday, August 2, 2021 12:02 PM
**To:** Taylor, Teresa N. <taylortn@butzel.com>
**Subject:** [EXTERNAL] USPA/Darrell Gaebel

Teresa:

Good morning.

Generally, testifying witnesses are sequestered such that they do not hear how other witnesses testify.

I will need to confirm whether that applies to Dori, who is the "complainant" in this instance.

Craig

**The Galle Law Group, P.A.**
13501 Southshore Blvd., Suite 103
Wellington, FL 33414
Office: 561-798-1708
Cell: 561-818-6659
Fax: 561-798-1709
Email: pololawyer@aol.com; craig@gallelaw.com

*IMPORTANT WIRE INFORMATION:   Due to the overwhelming amount of fraudulent cashier's checks circulating in Florida, we will require all cash to close to be tendered in the form of a wire transfer. Our wiring instructions will be sent with every closing transaction and are available upon request. Thank you."*

*CONFIDENTIALITY NOTICE: This message is intended for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone at 561-798-1708.*

-----Original Message-----
**From:** Taylor, Teresa N. <taylortn@butzel.com>
**To:** Craig T. Galle <pololawyer@aol.com>
**Sent:** Mon, Aug 2, 2021 10:58 am
**Subject:** Re: [EXTERNAL] USPA/Darrell Gaebel

Craig,

I hope your trip to Italy was great.  I want to clarify who will hear witness testimony beyond the USPA hearing officers.  Will Dori and Aleem's family hear all witness testimony and be given the list of character and other witnesses Darrell chooses to additionally call?  Some witnesses who would like to testify expressed concern about retribution from Dori should she know/hear such.

Thank you.

Best,

Teresa

Sent from my iPhone

> On Jul 23, 2021, at 11:22 AM, Craig T. Galle <pololawyer@aol.com> wrote:
>
> Mr. Gaebel,
>
> Attached is a Notice of Alleged Conduct Violations, Issuance of USPA Charges and Notice of Hearing.
>
> Please note that a hearing has been scheduled for Friday, August 6, 2021 at 10:00 a.m. via Zoom.  The Zoom information will be provided in advance of the scheduled hearing.
>
> I have also attached links to the two videos that are referred to in the attached letter, and the USPA's Disciplinary Procedures Policy, as amended on April 17, 2021.
>
> Your attorney has been copied on this email.  Thank you.
>
> Craig T. Galle
>
>
> The Galle Law Group, P.A.
> 13501 Southshore Blvd., Suite 103
> Wellington, FL 33414
> Office: 561-798-1708
> Cell: 561-818-6659
> Fax: 561-798-1709
> Email: pololawyer@aol.com<mailto:pololawyer@aol.com>; craig@gallelaw.com<mailto:craig@gallelaw.com>
>
>
> IMPORTANT WIRE INFORMATION:  Due to the overwhelming amount of fraudulent cashier's checks circulating in Florida, we will require all cash to close to be tendered in the form of a wire transfer. Our wiring instructions will be sent with every closing transaction and are available upon request. Thank you."
>
> CONFIDENTIALITY NOTICE: This message is intended for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone at 561-798-1708.
>
>

VIRGINIA:

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

|  |  |
|---|---|
| DARRELL GAEBEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 21-6897 |
| ) | |
| UNITED STATES POLO ASS'N, ) | |
| 9011 Lake Worth Road ) | |
| Lake Worth, FL 33467 ) | |
| ) | |
| Defendant. ) | JURY TRIAL DEMANDED |
| ) | |

# EXHIBIT E
## (HEARING TRANSCRIPT)

# EXHIBIT E

Alleged Conduct Violations, Issuance of USPA Charges

Hearing before:

USPA Hearing Committee

August 06, 2021

# PHIPPS REPORTING

*Raising the Bar!*

1            UNITED STATES POLO ASSOCIATION

2

3

4   IN RE:  DARRELL GAEBEL

5

6  ————————————————————————————/

7

8         TRANSCRIPT OF DISCIPLINARY PROCEEDINGS

9      Alleged Conduct Violations, Issuance of USPA
       Charges, and Notice of Hearing

10            Pages  1 - 295

11

12   DATE TAKEN:  Friday, August 6, 2021
     TIME:       1:00 p.m. - 6:05 p.m.
13   PLACE:      All parties appeared remotely
     BEFORE:    Hearing Officer Chris Green
14              Hearing Officer Chrys Beal

15

16     This cause came on to be heard at the time and
  place aforesaid, when and where the following
17  proceedings were stenographically remotely reported by:

18

19         Meschelle D. Manley, CSR, LCR

20

21

22

23

24

25  JOB NO.:  201623

```
                                                    Page 2
 1                  APPEARANCES
              (Via Web Video Conferencing)

 2

 3

 4

 5

 6   On behalf of the USPA:

 7        The Galle Law Group, LLC
          13501 South Shore Boulevard
 8        Suite 103
          Wellington, Florida  33414
 9        561-798-1708

10        BY:  CRAIG GALLE, ESQ.
               pololawyer@aol.com
11

12

13

14

15   On behalf of Darrell Gaebel:

16        Butzel Long
          1909 K Street Northwest
17        Suite 500
          Washington, DC  20006
18        202-454-2800

19        BY:  TERESA N. TAYLOR, ESQ.
               taylortn@butzel.com
20             LINDSEY DENNIS, ESQ.
               dennis@butzel.com
21

22   USPA HEARING OFFICERS:  Chris Green
                             Chrys Beal
23

24

25
```

USPA Hearing Committee
August 06, 2021

Page 3

1                          I N D E X

2                                                    PAGE

3   Opening Remarks by Mr. Galle                      6
    Opening Statement by Mr. Galle                    6
4   Opening Statement by Ms. Taylor                  16

5
                 TESTIMONY OF DELORA BURNER
6
    Direct Examination by Mr. Galle                  19
7   Cross-Examination by Ms. Taylor                  34

8
                 TESTIMONY OF ALEEM SIDDIQUI
9
    Direct Examination by Mr. Galle                  44
10  Cross-Examination by Ms. Dennis                  51

11
                 TESTIMONY OF HUMERA RAHMAN
12
    Direct Examination by Mr. Galle                  62
13  Cross-Examination by Ms. Taylor                  72

14        TESTIMONY OF MOHAMMED TAHA SIDDIQUI

15  Direct Examination by Mr. Galle                  80
    Cross-Examination by Ms. Taylor                  84
16
             TESTIMONY OF GEORGE NEWTON KRABBE
17
    Direct Examination by Mr. Galle                  97
18  Cross-Examination by Ms. Taylor                 104

19
                 TESTIMONY OF JOHN GOBIN
20
    Direct Examination by Mr. Galle                 113
21  Cross-Examination by Ms. Taylor                 118

22             TESTIMONY OF BROCK BROMLE

23  Direct Examination by Ms. Dennis                132
    Cross-Examination by Mr. Galle                  137
24

25

USPA Hearing Committee
August 06, 2021

Page 4

1                       I N D E X
                       (continued)
2                                              PAGE

3            TESTIMONY OF ADAM DOBLE

4   Direct Examination by Ms. Taylor           142
    Cross-Examination by Mr. Galle             151
5

6          TESTIMONY OF MARISSA WELLS

7   Direct Examination by Ms. Taylor           156
    Cross-Examination by Mr. Galle             165
8

9          TESTIMONY OF DAVID TAFURI

10  Direct Examination by Ms. Taylor           167
    Cross-Examination by Mr. Galle             173
11

12         TESTIMONY OF DANIELLE QUINN

13  Direct Examination by Ms. Taylor           176
    Cross-Examination by Mr. Galle             180
14

15          TESTIMONY OF MATT POTTER

16  Direct Examination by Ms. Taylor           183
    Cross-Examination by Mr. Galle             191
17

18          TESTIMONY OF JOSEPH NOONAN

19  Direct Examination by Ms. Taylor           194
    Cross-Examination by Mr. Galle             199
20

21          TESTIMONY OF DAN COLEMAN

22  Direct Examination by Ms. Taylor           202
    Cross-Examination by Mr. Galle             208
23

24

25

USPA Hearing Committee
August 06, 2021

Page 5

1                    I N D E X
                    (continued)

2                                                   PAGE

3   TESTIMONY OF WHITNEY ROSS

4   Direct Examination by Ms. Taylor              215
    Cross-Examination by Mr. Galle                229
5   Redirect Examination by Ms. Taylor            233

6
              TESTIMONY OF GARDINER MULFORD
7
    Direct Examination by Ms. Taylor              237
8   Cross-Examination by Mr. Galle                241

9
              TESTIMONY OF DARRELL GAEBEL
10
    Direct Examination by Ms. Taylor              245
11  Cross-Examination by Mr. Galle                267
    Redirect Examination by Ms. Taylor            280
12

13  Closing Remarks by Ms. Taylor                 293
    Closing Remarks by Mr. Galle                  294
14  Certificate of Reporter                       295

15

16        NO EXHIBITS MARKED TO THIS PROCEEDING

17

18

19

20

21

22

23

24

25

USPA Hearing Committee
August 06, 2021

Page 6

1    The following proceedings began at 10:00 a.m.

2         MR. GALLE:   Okay.   We're going to have just a

3    little introduction here in the beginning.   This

4    is Craig Galle, attorney for the USPA.   I think we

5    have most people here on the line that's going to

6    be participating in some manner or another with

7    the proceedings today, but the way we're going to

8    do this is, after a little, brief introduction

9    here, we're going to put the witnesses into a

10   waiting room until it's their turn to testify

11   today in the proceeding, with some limited

12   exceptions as to parties and parents and things.

13   And the reason is that, typically, we don't want

14   witnesses hearing testimony from other witnesses

15   that could consciously or subconsciously affect

16   the testimony they otherwise give.

17        So why don't I just start off with a little

18   introduction about the matter we're here on today

19   and how I expect the proceedings to unfold.   As I

20   mentioned, my name is Craig Galle.   I'm a lawyer

21   for the USPA.   And we're here on a notice of

22   alleged conduct violations, issuance of USPA

23   charges, and notice of hearing in the matter of

24   USPA vs. Darrell Gaebel, G-A-E-B-E-L.

25        These proceedings arose out of a complaint

USPA Hearing Committee
August 06, 2021

Page 7

1    that was made by Delora Burner, who is a member of

2    the Association, on July 11, 2021, which complaint

3    was delivered to the Association.  And we're here,

4    as I mentioned, pursuant to this notice of

5    hearing, which takes part [verbatim] under Part 1,

6    Section C of the Disciplinary Procedures Policy as

7    amended on April 17, 2021, of the Association.

8         The charges from which we'll hear evidence

9    today arise under Subparagraphs 2, 3, 8, 9, and 10

10   of the Association's code of conduct, and as I

11   mentioned, we're here to hear testimony and

12   evidence on the allegations that have been made in

13   the complaint.

14        So I think at this point, why don't we

15   exclude everybody but Mr. Gaebel, the respondent,

16   Mr. Gaebel's lawyers, Aleem, his mother and

17   father, and of course myself, lawyer for the USPA,

18   and the hearing committee is here.  And then we'll

19   start some openings just to the extent that the

20   respondent would like to do that through their

21   counsel.  I'll make just a little brief opening,

22   and then we can go into the witnesses.

23        I see there's a number of witnesses today, so

24   I think we should proceed as expeditiously as

25   possible to make sure everyone has the time to

USPA Hearing Committee
August 06, 2021

Page 8

1    present the evidence that they wish to do today.

2        MR. GREEN:  Craig, I'm sorry to interrupt.

3    This is Chris Green.  I'm one of the hearing

4    officers.  The other one is Chrys Beal.  Could we

5    also, for the moment, leave the complainant and

6    the group that will not be put in the waiting room

7    because I would like to ask that group a question

8    before we go further.

9        MR. GALLE:  Certainly.

10       MR. GREEN:  Okay.  Thank you.  So we're going

11   to keep in the group Teresa Taylor and Lindsey,

12   who is working with her, Darryl Gaebel, Aleem, who

13   is on here with his parents, and also our

14   complainant here, Ms. Burner.

15       MS. EBERSBACH:  Okay.  I'm going to go ahead

16   and put everybody else in the waiting room now.

17       All right.  Craig, I think we have the group

18   that you have requested.

19       MR. GALLE:  Chris, do you want to present

20   your thoughts?

21       MR. GREEN:  Yes.  Thank you, Craig, and

22   thanks everyone.  I would just like to ask a

23   question before we start on what portends to be a

24   long and difficult day, as well as an expensive

25   one.  I'll ask this question:  Is there any

USPA Hearing Committee
August 06, 2021

Page 9

1    possibility that the complainant, the respondent,

2    and the respective associated counsel and parties

3    would be interested in trying to work out some

4    form of settlement before we begin the hearing in

5    the nature of an apology or mutual apologies?

6        I'm not dictating that.  I'm not suggesting

7    what the terms might be.  I'm just asking you the

8    question, and if the question is one that you

9    might be interested in talking about, Ms. Beal and

10   I can leave the room while you do that.  But if

11   there's no interest in that, of course, we'll go

12   ahead.

13       MS. TAYLOR:  This is Teresa Taylor, Darrell's

14   attorney.  So I think we would say that that

15   actually is not even applicable here because

16   there's no jurisdiction.  So that's our position,

17   and we are going to talk about that through a

18   couple of the witnesses as well today.  So

19   settlement is not an option here, and I know that

20   my client would not want to, but our position is

21   that there is no jurisdiction here for the USPA.

22       MR. GREEN:  Well, thank you for that.  I

23   guess, Craig, we can proceed.

24       MR. GALLE:  Just some ground rules to discuss

25   here -- Teresa and Lindsey, I know you're both

USPA Hearing Committee
August 06, 2021

Page 10

1    counsel for the respondent.  And I don't know how

2    you're going to break up the questioning of your

3    witnesses, but let's say, for example, you have

4    six witnesses.  What I don't want to happen is

5    each of you ask questions of the same witness, so

6    you can break them up, but I don't want any

7    tag-team questioning because it will get a little

8    bit confusing.

9        MS. TAYLOR:  One hundred percent I agree, so

10   don't worry.  Lindsey is only going to question

11   Aleem and then Brock.

12       MR. GALLE:  Sounds good.

13       MS. TAYLOR:  I'm going to be doing the rest

14   of the questioning.

15       MR. GAEBEL:  Mr. Gaebel here.  I recognize

16   the position of just about everyone except

17   Ms. Manley.  I don't understand her relationship

18   to the hearing.

19       MR. GALLE:  Ms. Manley is a court reporter

20   who is taking it down.

21       MR. GAEBEL:  Thank you very much.

22       MR. GALLE:  You're welcome.  And good

23   morning, sir.

24       MR. GAEBEL:  Good morning.

25       MS. RAHMAN:  I have a question.  I wasn't

USPA Hearing Committee
August 06, 2021

1    aware that any of Mr. Darrell's lawyers were going

2    to be questioning Aleem.  I wasn't aware that that

3    was part of the proceedings.

4        MR. GALLE:  I thought that I had specifically

5    mentioned that yesterday.  You may recall that I

6    said to him, "You're going to be questioned, and

7    you shouldn't get worked up about it because it's

8    a fairly formal but informal process."  I know for

9    sure we had this conversation.

10       MS. SIDDIQUI:  Right.  I was aware that the

11   questioning was by the Board because I asked you

12   should I be calling character witnesses, should I

13   be doing anything, and I was sort of given the

14   okay that, no, I don't really need to do this.  I

15   wasn't aware.  I'm quite shocked right now.

16       MR. GREEN:  Ma'am, if I may interject.  I

17   know we spoke before the conduct violations

18   complaint was presented to the executive

19   committee, and I am quite sure at that point in

20   time that I informed you that Aleem was likely to

21   be questioned by the respondent or his counsel,

22   and that Mr. Galle and the hearing officers would

23   make sure that that questioning was appropriate

24   and not abusive.

25       MS. SIDDIQUI:  That's fine, as long as there

USPA Hearing Committee
August 06, 2021

Page 12

1    is someone to intervene if it gets to the point

2    where it becomes like badgering.

3        MR. GREEN:  There will be no badgering by

4    anyone.  So thank you.

5        Craig, I'm wondering if you want to exclude

6    Ms. Burner since we have established that there's

7    not going to be a settlement.  I just raise that

8    question.

9        MR. GALLE:  Well, I guess let's just talk

10   about it for a second.  I believe it's

11   Respondent's counsel's position or desire that

12   Ms. Burner be excluded from the proceedings except

13   for the portion where she testifies.  Is that

14   correct, Teresa and Lindsey?

15       MS. TAYLOR:  Yes.

16       MS. SIDDIQUI:  Would it be possible to keep

17   her on?  I would prefer that she stay on.

18       MS. BURNER:  I thought that we had discussed

19   this, that all we were looking for was apologies.

20   And I think Aleem apologized on the field, and I

21   think that we discussed that there needed to be

22   amends.  And if we want to do this whole hearing

23   and Darrell is not willing to make any kind of an

24   apology to a child, that's fine, but if I'm the

25   reason why this is -- I guess you said that it was

USPA Hearing Committee
August 06, 2021

Page 13

1    because of my letter to the USPA that this is

2    happening.  So probably I should stay on; right?

3    And it looks to me like I'm about ready to receive

4    a huge character assassination, according to --

5         MR. GREEN:  Ms. Burner, excuse me.  I don't

6    mean to interrupt you or shut you down, but we

7    have a long day ahead, and we don't really have

8    time for speeches.

9         MS. BURNER:  Okay.

10        MR. GREEN:  Mr. Galle will call on you if he

11   needs you to answer a question.  And he will

12   decide whether you are to be left in for this part

13   of the hearing and the rest of the hearing or not.

14   I'm sorry, but we just have to move on.

15        MS. BURNER:  That's fine.

16        MR. GALLE:  In light of the position that the

17   respondent's counsel is taking and to honor what

18   would typically be considered a sequestration

19   rule, I think Delora Burner will be excluded until

20   such time as she is called back in to testify.

21        MS. BURNER:  That's fine.

22        MR. GALLE:  And Teresa and Lindsey, it goes

23   without saying -- and sometimes I sort of violate

24   this rule as well, but we'll do our best, when we

25   present a question, to allow the witnesses to give

USPA Hearing Committee
August 06, 2021

Page 14

1    a full answer before we shoot out another

2    question.  Sometimes we talk over witnesses, and

3    it's particularly difficult with Zoom proceedings

4    and the court reporter if we start doing that.

5          And then the last thing, just sort of

6    following up with what Aleem's mother was saying,

7    as well as Chris Green, let's just keep in mind

8    that Aleem is 14 years old, and so if we can

9    present our questions in such a way to give some

10   credence to his age, that would be appreciated, I

11   know, by everybody.

12         MS. TAYLOR:  Absolutely.  We don't have an

13   issue with that.  Thank you.

14         MR. GALLE:  Great.  Okay.  So I'm just going

15   to -- the way I envision this going forward,

16   Teresa, is much like, say, a bench trial in the

17   sense that I will start off as, for lack of a

18   better word, you know, the prosecuting attorney,

19   and I have about five witnesses or so that are on

20   the July 23rd letter that I'll call.  I'll ask

21   direct questions.

22         Of course, you'll have the opportunity, or

23   Lindsey will have the opportunity, to

24   cross-examine each one of those witnesses, and

25   then the hearing officers, who are much like a

USPA Hearing Committee
August 06, 2021

Page 15

1    judge in a bench trial, will have the opportunity

2    to ask any follow-up questions that may not have

3    been covered that they would like to hear an

4    answer to.  And then after I go through the, you

5    know, sort of five or six witnesses on my end,

6    then you will lay out whatever witnesses from your

7    witness list you wish to present testimony by way

8    of direct, and I'll do some limited cross, I

9    suppose.  And we'll try to keep from going back to

10   redirect, but it's allowable as long as it doesn't

11   run on forever.  Does that sound okay?

12       MS. TAYLOR:  Yes.

13       MR. GALLE:  So let me just sort of lay out --

14   and this information is set out in the July 23rd,

15   2021 Notice of Alleged Conduct Violations,

16   Issuance of USPA Charges, and Notice of Hearing.

17   But the alleged conduct violations took place on

18   Saturday, July 10th, 2021, at the Twilight Polo

19   Club that's located in The Plains, Virginia,

20   during an arena polo game between Battlefield and

21   Polo Yacht Club.

22       During the game, it is alleged that

23   Mr. Gaebel used foul and racial language and that

24   he called Aleem, who is 14 years old, a, quote,

25   "motherfucking nigger."  Thereafter, it is alleged

USPA Hearing Committee
August 06, 2021

Page 16

1    that Mr. Gaebel was asked to apologize to Aleem,

2    and that instead of apologizing, he bullied Aleem

3    by pushing his shoulder and slapping his arm, and

4    making some statement directed towards Aleem that,

5    "We settled this on the field, didn't we, kid?"

6          As I mentioned earlier, these allegations

7    were made in a conduct violations complaint by

8    Delora Burner on July 11th, and the matter was

9    presented to the Association who elected, under

10   the disciplinary procedures policy, to have this

11   hearing to take evidence and reach a conclusion as

12   to the truth or accuracy or lack of truth of the

13   conduct violations and the allegations made

14   therein.

15         Teresa or Lindsey, would you like to make any

16   initial statements or presentations before I call

17   the first witness?

18         MS. TAYLOR:  All right.  So I think it's

19   pretty simple that there is no jurisdiction here.

20   Twilight Polo Club -- although it is a USPA polo

21   club, this was an exhibition game at Great Meadow,

22   which is not a USPA club.  It no longer is, and it

23   hasn't been for over a year, from what I

24   understand.  And part of the allegations here did

25   not happen in the arena.  They were off the field,

USPA Hearing Committee
August 06, 2021

Page 17

1    which are also not within USPA's jurisdiction.

2         Also, my client emphatically denies saying

3    any racial epithet whatsoever or cussing directly

4    at Aleem, and also emphatically denies that he

5    pushed him, bullied him, or any other such

6    behavior.

7         MR. GREEN:  I'd say, Craig, that I think the

8    hearing officers understand the jurisdictional

9    objection, and they will decide that after the

10   evidence is submitted and when they -- before they

11   consider the merits.

12        MR. GALLE:  Certainly.

13        MR. GREEN:  So I don't think there are any

14   witnesses that are necessary on that particular

15   point unless you have some compelling reason to

16   believe to the contrary, Ms. Taylor.

17        MS. TAYLOR:  Well, since they're already

18   being called for other reasons, I think it's

19   appropriate for John Gobin and -- at least for

20   John Gobin to opine on that, and possibly Dan

21   Coleman, just given his prior experience being

22   governor at large and sitting on the Board and

23   writing the prior rules.

24        MR. GREEN:  So you're going to have fact

25   witnesses opine on the legal question of whether

USPA Hearing Committee
August 06, 2021

Page 18

1    there is jurisdiction?

2        MS. TAYLOR:  Well, John Gobin -- it is his

3    club.  Is it a USPA club?  Was it an exhibition

4    game?  Yes.

5        MR. GREEN:  Okay.  So he can certainly answer

6    those fact questions.

7        MS. TAYLOR:  Yes, basic questions.

8        MR. GREEN:  But not give opinions -

9        MS. TAYLOR:  No, no, no.  Exactly.  It's

10   basic.  It's going to be simple.

11       MR. GREEN:  Okay.

12       MR. GALLE:  Teresa, if you don't have

13   anything further to add at this moment, I guess

14   we'll call our first witness, Delora Burner, which

15   is the complainant.

16       MS. TAYLOR:  I don't have anything further,

17   so yes.

18       MR. GREEN:  Hey, Delora.  Thanks for coming

19   back in.

20       MS. BURNER:  Sure.

21       MR. GREEN:  Okay.  So we're at the point in

22   the proceedings where we're going to start to take

23   testimony from witness, and you have the pleasure

24   of being our first witness today.

25       So Madam Reporter, would you kindly swear in

USPA Hearing Committee
August 06, 2021

Page 19

1      Ms. Burner.

2           THE COURT STENOGRAPHER:   If you can raise

3      your right hand, please.

4           In the testimony you're about to give, do you

5      swear to tell the truth, the whole truth, and

6      nothing but the truth?

7           THE WITNESS:   Yes.

8                 DELORA BURNER,

9  having been first duly sworn or affirmed, was examined

10 and testified as follows:

11                DIRECT EXAMINATION

12 BY MR. GALLE:

13     Q.   Good morning.   Would you kindly state your

14 name for the record.

15     A.   Delora Burner.

16     Q.   Ms. Burner, did you author an incident report

17 on July 11, 2021, that discussed the game taking place

18 the day before at Twilight Polo in The Plains,

19 Virginia?

20     A.   Yes.

21     Q.   And did you deliver your incident report or

22 complaint to the United States Polo Association?

23     A.   Yes, I did.

24     Q.   And did you -- by what mechanism did you

25 deliver -- we'll refer to this July 11th, 2001 document

USPA Hearing Committee
August 06, 2021

Page 20

1   as the complaint just for simplicity purposes.  By what

2   method did you deliver your complaint to the USPA?

3       A.    Email.

4       Q.    And did you email it to Carlucho Arellano and

5   Chris Green?

6       A.    Yes.

7       Q.    Tell us in general why you made the complaint

8   and reduced it to writing and delivered it to the USPA.

9       A.    Aleem was very upset and his mother was very

10  upset, and we wanted to resolve it fieldside, like, you

11  know, with an apology.  And when that didn't take

12  place, I felt compelled to see that this matter --

13  amends were made for this matter.  He's 14 years old.

14  I'm his coach, and I feel a huge responsibility towards

15  these children to keep them safe, be a good mentor, and

16  follow the rules of the U.S. Polo Association's

17  Interscholastic and Intercollegiate Program.  And I

18  just felt and his mother felt that if Darrell could not

19  apologize, then -- you know, Aleem apologized for

20  running into him on the field.  So, you know, this was

21  an important matter.  This is important.  This cannot

22  be.

23      Q.    Okay.  So you were the coach of an arena polo

24  team on that particular day, July 10th, and Aleem was

25  one of the members of your team; correct?

USPA Hearing Committee
August 06, 2021

1    A.    Yes.

2    Q.    And can you tell us who the other members of

3  the team were?

4    A.    It's spectator polo, so we mix the teams.

5  They're all mixed on Saturday nights.  It wasn't an

6  official interscholastic [verbatim].  The

7  interscholastic players mix in with other clubs and

8  play together at Twilight.  We pay for memberships with

9  John, and we take different teams every week.

10    Q.    Do you recall who the other players were on

11  the team during the game?

12    A.    Antonio Campos and Quincy, I believe, was

13  playing that night against, perhaps, Teresa, Darrell,

14  and Brock.  Is that correct?

15    Q.    Well, I'm just asking what your recollection

16  is, so I'll just take that as correct for now.

17         You mentioned that Aleem and his mother were

18  very upset and that y'all wanted to resolve it

19  fieldside.  What were the actions or inactions on the

20  part of Mr. Darrell Gaebel that caused Aleem and his

21  mother, and I guess yourself, to be upset?

22    A.    Aleem came over in the middle of the game.  I

23  mean, we were all standing there, all the families, and

24  he was just really upset.  And, you know, we said,

25  "Well, you did run in to him.  Go back and apologize."

USPA Hearing Committee
August 06, 2021

Page 22

1 And we couldn't hear what he was saying to us, so we

2 sent him back to apologize, but he said, "I apologized

3 to him, but he said" -- and we couldn't hear.  We

4 couldn't hear each other.

5           So we sent him back to apologize again, and

6 when he came out of the arena, he was like -- he was

7 kind of in shock.  And his mother was like, "What was

8 said exactly?"  And when he said it to her, she said,

9 "Dorie, this is not okay."  And I said, "No, it's not."

10          So I went to George Krabbe and I said,

11 "George, you're the umpire.  Did you hear anything?"

12 He did not.  I went to Antonio, who is our pro, and I

13 said, "Did you hear anything?"  And he said, "I did

14 not."  So I went to John and I said, "I'm really upset

15 about this.  You need to go talk to Gaebel."  And he's

16 like, "You do it."  And I said, "No.  We're doing it

17 together."

18          So we went over there together.  He asked him

19 a couple of times, "Did you say this?"  And he didn't

20 say, "No, I didn't say this."  He was like, "No.  When

21 have I ever used words like that."  And then, "Did you

22 say it?"  You know, he was kind of just like, "The kid

23 ran into me."  And John was like, "Go over and

24 apologize."  And he points to -- he goes, "Go over

25 there to family and apologize."

USPA Hearing Committee
August 06, 2021

Page 23

1        So we walked over there -- and you've read the

2   complaint -- and he just couldn't do it.  And I was

3   kind of just standing there in shock, you know.

4        Q.   Okay.  So you made reference to some words

5   that I want to talk about more specifically:  Did he

6   say this or did you say this.  What are the words that

7   you understand or you believe were said by Darrell

8   Gaebel to Aleem that caused Aleem to get upset?

9        A.   On the field?

10       Q.   On or off the field, yes.

11       A.   On the field, Aleem said that he called him a

12   motherfucking nigger.

13       Q.   Any other words, as you understand it?

14       A.   No.  That sticks out in my mind.  I mean, I

15   think that there was a continuation of this going on,

16   but the "N" word was very prevalent in the first

17   encounter.

18       Q.   What do you mean when you say there was a

19   continuation?

20       A.   Throughout the chukker.  I mean, there's a

21   video of the chukker.  There's pictures.  I mean,

22   throughout the video -- I mean, Aleem said that he said

23   this.  He called him a motherfucker more than once, and

24   he used foul language.  And we hear it all the time on

25   the field, but we ignore it.  But he was using foul

USPA Hearing Committee
August 06, 2021

Page 24

1    language two other times after that motherfucking

2    nigger statement, and he told me exactly where and when

3    it happened.  And, you know, he's 14 years old and he's

4    my student, and I believe him emphatically.

5         Q.   Okay.  Is it fair to say that you, yourself,

6    did not hear Darrell Gaebel --

7         A.   No, I did not.

8         Q.   And I just want to make sure we have a clear

9    record, so let me please finish the question before you

10   answer, and I'll wait until you finish your answer

11   before my next question.  Otherwise, the court reporter

12   has a problem taking down what we're saying.

13              Is it fair to say that you personally did not

14   hear Darrell Gaebel use the words "motherfucking

15   nigger"?

16        A.   Yes.  It's fair to say that.

17        Q.   And your source of information as to whether

18   that was said came from Aleem himself?

19        A.   Yes.

20        Q.   It's fair to say that you spoke with George

21   Krabbe about the incident; is that correct?

22        A.   Yes.

23        Q.   And George Krabbe was the umpire?

24        A.   Yes.

25        Q.   And is it fair to say that George Krabbe told

USPA Hearing Committee
August 06, 2021

Page 25

1  you that he did not hear any use of the word "nigger"

2  by Mr. Gaebel?

3     A.   Yes.

4     Q.   Did Mr. Krabbe tell you that he heard some

5  other words, or did he not say anything further?

6     A.   No.  He didn't hear anything.

7     Q.   Okay.  Are you aware of anybody other than

8  Aleem -- and by my questions, I'm not discounting,

9  myself, what Aleem said.  I'm just trying to figure out

10  if there's any other witnesses.

11     A.   I understand.

12     Q.   Are you aware of any other individuals that

13  have told you or you have heard from other sources,

14  heard with their own ears, Mr. Gaebel using the word

15  "nigger" or the phrase "motherfucking nigger"?

16     A.   No.

17     Q.   Okay.  I want to talk a little bit about what

18  you said earlier, that you-all wanted to resolve the

19  matter fieldside.  So after Aleem came out of the

20  arena -- I guess at the end of the game, was it?

21     A.   Yes.

22     Q.   And then there was a discussion with the

23  umpire and with John Gobin and then with Aleem and his

24  parents.  As I understand it, Mr. Gaebel did come over

25  and engage in some discussion.  Tell us about that,

USPA Hearing Committee
August 06, 2021

Page 26

1    please.

2        A.    When John asked him twice point-blank if he

3    had said that to Aleem, he did not outright say no.  He

4    evaded.  And essentially he said, "Get the hell over

5    there and apologize to that kid and his family."  So

6    Darrell and I walked over there, and I said, "Aleem,

7    Darrell is here to apologize."  And I know Darrell

8    said, "Well, no.  We settled this on the field."

9            And I said -- he was like, "We settled this on

10   the field, didn't we, kid?"  And he kind of pushed him

11   on his shoulder and said, "We're good, aren't we?" and

12   he patted him on the arm and said, "It's all good;

13   right?  Right?" and, you know, "I don't say things like

14   that."  You know, he said something to that effect and

15   just walked away.  And I was looking at Humera and

16   Aleem and standing there in shock, and I turned around

17   and walked over to John and said, "John, I have to

18   write a letter to the USPA about this."  I said, "He's

19   a minor.  I am his coach.  Darrell would not

20   apologize."

21           He said, "Go for it.  Do it."  He goes, "Write

22   it."  And I'm like, "I will CC you on it."  And I said,

23   "This isn't correct.  This cannot be okay."  And John

24   seemed to support it.  And I did CC him on that letter

25   of complaint.

USPA Hearing Committee
August 06, 2021

Page 27

1    Q.   Okay.  You mentioned, when questioned by John

2    Gobin and/or yourself, that Mr. Gaebel did not say, no,

3    I did not use those words.  Did I hear you correctly?

4    A.   That's correct.

5    Q.   At any time did Mr. Gaebel admit that he said

6    those words?

7    A.   No.

8    Q.   Okay.  So he didn't take a position either

9    way?

10   A.   No.

11   Q.   Did Mr. Gaebel articulate to you or, in your

12   presence, to Aleem or his mother or Mr. Gobin why he

13   was not willing to apologize?

14   A.   No.

15   Q.   You mentioned that Mr. Gaebel did say to

16   Aleem, "We settled this on the field, kid"; is that

17   correct?

18   A.   Correct.

19   Q.   And I was curious about the words you used

20   when you said he patted him on the shoulder.  Did I

21   hear you correctly?  He patted him on the shoulder?

22   A.   He pushed on his left shoulder and said, "We

23   settled this on the field," and then the right top of

24   his right shoulder, "Right, kid?  Right, kid?"  And

25   then that was it.

Page 28

1      Q.    Okay.  Would you characterize that

2  interaction, the statements, and the patting, however

3  you want to characterize the touching, on the part of

4  Mr. Gaebel as aggressive?

5      A.    I mean, it was certainly out of line.

6      Q.    Why do you believe it was out of line?

7      A.    Because, essentially, he's 14, and Darrell is

8  70.  And Darrell obviously doesn't want to say, "Hey,

9  kid.  I'm sorry," you know.  He was like, "We settled

10  this on the field."  And to me it appeared to me like

11  bullying, like, you know, go along with this; you know,

12  like it's good.  It's all good.  And sometimes it's not

13  all good.

14      Q.    Okay.  I want to follow up on another thing

15  that you said you heard Darrell Gaebel say during that

16  interaction off the field:  "I don't say things like

17  that."  I just want to confirm -- and that's what you

18  testified about.  I wrote it down in my notes.  To me,

19  that seems like Mr. Gaebel is saying that he didn't use

20  those words.  Is that how you took his response to you?

21      A.    No.  I just -- I mean, we're in a situation

22  that is untenable for both sides of the equation.  I

23  mean, that's as close as it got to an apology.  Let's

24  put it that way.  It's as close as it got to an

25  apology, but there was no apology.

1    Q.    There was no "I'm sorry" or words to that

2  effect?

3    A.    No.  Maybe that's his version of making

4  amends, you know.  What can I say?  I don't -- Aleem

5  and his mother were not satisfied with it as an

6  apology, and --

7    Q.    Okay.  Did Aleem respond to Darrell saying,

8  "We took care of this on the field, kid, didn't we"?

9    A.    He didn't say anything, I don't think.  I

10  don't think he said a word.  I don't recall it.

11    Q.    Okay.

12    A.    I think he was in shock.

13    Q.    Understood.  I want to go back to some events

14  in the arena.  And you watched the whole arena game;

15  did you not?

16    A.    I can't say that I did.

17    Q.    Okay.

18    A.    I had a lot of horses there and a lot of

19  students there.  I probably had two teams there, and it

20  was in and out.  So no, I will not say I watched the

21  whole thing at all.  I was there in the box when Aleem

22  came over.  I was standing next to his mother when he

23  came over.  But I'm always in and out, up and down with

24  the horses.  So no, I cannot say I watched the entire

25  game.  I cannot say I watched the entire chukker.

USPA Hearing Committee
August 06, 2021

1     Q.   I understand that there was some collision of

2   sorts with Aleem and his horse into Mr. Gaebel and his

3   horse.  Are you aware of that?

4     A.   Yes, I am.

5     Q.   And did you see that yourself?

6     A.   Kind of on the periphery, yes.

7     Q.   Okay.  Tell us about that.

8     A.   Darrell turned his horse very quickly, and

9   Aleem came into the back of him.

10     Q.   Okay.  And when Aleem came into the back of

11   Darrell, what did you observe?

12     A.   I mean, I've seen the video as well, so I

13   think the horse's head hit Darrell's back.

14     Q.   And from your understanding of the facts, from

15   your discussion with Aleem and others, is it your

16   understanding that at that point, Darrell allegedly

17   uttered curse words or used the offensive language that

18   we heard earlier?

19     A.   Yes.

20     Q.   What was your approximate distance from where

21   you were standing to where that collision took place?

22     A.   It probably happened on the 30- or 35-yard

23   line, and we were approximately -- it was to my right,

24   but like I said, I mean, it was on the periphery.

25     Q.   Understood.

USPA Hearing Committee'
August 06, 2021

Page 31

1    A.   I was talking to other people.  I was watching
2    while I was talking.  So I mean, you know, it's the
3    video that I actually saw more.  But yes, I was there.
4    I saw it, but I wasn't paying very close attention to
5    it.
6    Q.   From what you observed while watching the game
7    and the collision in particular or from the video after
8    the fact, did it appear that the collision caused some
9    pain or injury to Mr. Gaebel?
10    A.   I mean, I'm not certain.  I don't know.  I
11    mean, we get run into so much.  Every polo player gets
12    run into a half a dozen times in a game, and I don't
13    know that we really register it.  I think Darrell said,
14    "Ouch," and, you know, he kind of stretched out in the
15    saddle or something, but he continued playing.
16    Q.   Did you hear Mr. Gaebel say "Ouch"?
17    A.   I mean, I heard him yell, you know, but I
18    don't know whether it was the video or live.  I can't
19    remember.
20    Q.   I guess the point is, when the collision took
21    place, is it fair to say that you observed some impact
22    between Aleem's horse and Darrell's body and then
23    Darrell reacting verbally in some manner?
24    A.   Yes.
25    Q.   Correct?

USPA Hearing Committee
August 06, 2021

Page 32

1      A.    Yes.

2      Q.    And from either personally witnessing it or

3   from the video, you heard Darrell utter the word

4   "Ouch"?

5      A.    I don't know.  It was just a yell.  It was

6   like --

7      Q.    Okay.

8      A.    I mean, you can't really hear anything.

9   There's music playing; lots of distractions.  I mean,

10  you can't hear there.

11     Q.    Understood.  Okay.  So you don't know what he

12  said, but you saw that there was some reaction?

13     A.    There was a reaction for sure, absolutely, and

14  we sent Aleem back to apologize.

15     Q.    Understood.  And why did you send Aleem back

16  to apologize?

17     A.    He came to the rail and he was, like -- you

18  know, he was very upset.  He was very upset and he was

19  talking, but we couldn't really hear him.  So we were

20  like, "Well, you ran into him.  Of course he's upset."

21  And then we said, "Go back and apologize."  That's what

22  we did.  "You ran into him."  We both said it.

23         And it wasn't until after that we know why he

24  came over in the middle of a chukker to talk to his

25  mother.  I guess maybe he didn't know how to process

USPA Hearing Committee
August 06, 2021

Page 33

1   it, so he came to her, and I was standing next to her.

2        Q.    Did you reach the conclusion that the reason

3   Darrell Gaebel said to Aleem after the fact, "We

4   settled this on the field already, didn't we, kid," was

5   because of the earlier apology that took place in the

6   arena or around the arena?

7        A.    Well, I think that Aleem certainly apologized

8   when he ran into Darrell, for the incident, and I think

9   that maybe, you know, he didn't feel that he had been

10  apologized to for the verbal behavior.  In any case, we

11  hear cursing all the time.  The kids do; I do; everyone

12  does.  But this is different, and, you know, it's a --

13  it's different.  And that's all I can say.  I mean,

14  obviously it felt differently to Aleem.

15       Q.    Understood.  Are there any other facts that

16  you believe are pertinent to the complaint you made and

17  the allegations about Mr. Gaebel that you'd like to

18  share with us today?

19       A.    No.  I think it should stand as it is.  This

20  is what happened.  I think that the family was looking

21  for an apology.  That's it.  And you know -- I mean,

22  how easy [verbatim].  I apologize to people every day,

23  all day, anytime I think for one second that I have

24  offended them.  It doesn't matter if I did it or didn't

25  do it.

USPA Hearing Committee
August 06, 2021

Page 34

1         MR. GALLE:  Okay.  That's all the questions I

2     have for you at this moment.  I believe Ms. Taylor

3     or Ms. Dennis will probably have some questioning

4     as well, and then, thereafter, the hearing

5     committee members may have a couple of follow-up

6     questions.  So I'll turn it over to you, Teresa or

7     Lindsey.

8         MS. TAYLOR:  Thank you, Craig.

9                   CROSS-EXAMINATION

10    BY MS. TAYLOR:

11    Q.    So I just wanted to confirm.  You said many

12    times that you did not hear anything?

13    A.    Correct.

14    Q.    You watched the match and saw the collision

15    or --

16    A.    I mean, it was on the periphery.  I saw them

17    collide, but not in detail.  I was just -- I was

18    talking to parents; I was talking to clients; kids were

19    coming up to me; and they were playing.  And on the

20    periphery, yes, I was there, I saw it, and I saw the

21    video of it afterwards.

22    Q.    Were you in the box?

23    A.    Yes.

24    Q.    And so the last few comments you just made

25    about how you apologize all the time, and you have a

USPA Hearing Committee
August 06, 2021

Page 35

1    lot of kids, and that -- you know, going back to this

2    being such a serious allegation and so disturbing to

3    hear that Aleem was called -- or Aleem says he was

4    called -- a motherfucking nigger.  And that's extremely

5    disturbing, I would say, to everyone and definitely to

6    your average person, and certainly, I would say, most

7    of the people that we play polo with; right?  Do you

8    agree?

9        A.    I agree.

10       Q.    If someone said that you said that and you did

11   not, you would apologize for saying it?

12       A.    If someone told me that I said that, I would

13   emphatically deny it and shout it to the rooftops

14   because I don't use that word, okay, ever.  It's just

15   not a word that's in my vocabulary.  So I would deny it

16   outright and say, "I'm sorry for what you heard, but it

17   wasn't that because I don't use that word."

18            So yes, I do -- I feel that making amends and

19   forgiveness is the foundation of every religion on the

20   planet.  I feel like it's meaningful.  I feel like it's

21   how we communicate as human beings and what makes us

22   human.  And if I've injured someone and hurt their

23   feelings, and I wasn't aware that I did it with my

24   abruptness -- I have ADD, so sometimes I'm distracted

25   and abrupt -- I would apologize, yes.

USPA Hearing Committee
August 06, 2021

Page 36

1          I mean, it's not -- it's something with

2    regularity that we -- you know, we say "I'm sorry" all

3    the time, don't we, as women, as people, as men?  We

4    say -- you know, I frequently hear it regularly every

5    day, and I do it myself if I feel I have injured

6    someone.  That's all this family was looking for.  You

7    don't have to admit you said it or didn't say it.  It's

8    just, "Look.  I hurt your feelings, and I'm sorry,"

9    whatever, you know.

10        **Q.    So I did hear you testify earlier that you**

11   **heard Darrell say, "I don't say things like that"?**

12        A.    Yeah.  That's what he said.  I did, something

13   to that effect.  But I kind of was standing there, and

14   it was just a strange time.  I can't explain it.  It

15   was like time stood still.  It was like I was standing

16   there and I was, like, in a tunnel.  So, yeah, I heard

17   him say something like, "I don't use words like that,"

18   or something.  And I was like, "Why don't you just

19   say," you know, 'I'm sorry'?"

20        **Q.    So a very serious allegation like that, that**

21   **could have serious repercussions, you would admit and**

22   **apologize to that?**

23        A.    No.  I would say, "I didn't say the word

24   'nigger'."  I would say, "I don't use that word."  I

25   would never -- that's a harmful word.  It has a

Page 37

1   connotation of slavery.  It has a connotation of

2   servitude, so I would never use that word.  But I would

3   say, "I don't use that word.  It's not in my

4   vocabulary.  I know the connotation of those words, and

5   I'm sorry that you thought I did.  I'm sorry that" --

6   you know, if I had used other language I, you know,

7   would say, "I'm sorry.  I was in shock, but I didn't

8   say that word," and, you know, "maybe you misheard, but

9   I don't use that word."

10          So I would say, "I didn't use that word.  I

11   don't use that word," and deny that I used it, because

12   I don't.  Do you see what I'm saying?  "I'm sorry I

13   hurt your feelings.  If I used any curse words, I'm

14   sorry."  Yes, I would apologize.  Absolutely,

15   emphatically.  Nobody wants this to be anything more

16   than an apology.  It doesn't have to be this.  It

17   didn't have to be this.

18      Q.   But Darrell said, "I don't use words like

19   that" or something similar; right?  So he did say

20   something exactly -- not identically to the way you

21   would say it, but he did say, "I don't use words like

22   that"?

23      A.   I think that he was probably standing there in

24   his own place and probably he was like -- you know,

25   he's a guy, and maybe that's the way he communicates.

Page 38

1   But, you know, we sent Aleem back over, after he

2   allegedly said that to Aleem, to apologize to him,

3   because he said -- you know, he said -- we couldn't

4   really understand what he was telling us, but,

5   effectively, he was coming over because he had heard

6   this from Darrell, allegedly.  And he came over to tell

7   his mother, and we sent him back to apologize.

8           Apologies are easy stuff, you know.  It's

9   like:  I'm really sorry if I hurt your feelings, kid.

10  I'm sorry if I used curse words out there.  I was in

11  pain.  We would -- this would have not been.  But it

12  wasn't -- his mother and Aleem didn't feel amends were

13  made.  They did not feel an apology was issued, and

14  that makes a person feel worse sometimes.

15      Q.   I understand what you're saying about

16  apologies.  So it sounds like the real issue here is

17  that Darrell did not say he's sorry for something he

18  did not say?

19      A.   Darrell didn't say that he didn't say the word

20  "nigger."  He just said, "I don't use words like that,"

21  and he said, "We settled it on the field."  And I don't

22  think they felt that -- they didn't feel an apology was

23  made.  And I didn't either, frankly.  I thought it was

24  insensitive.  But, also, I wrote a letter, and you have

25  that letter.  Any other questions for me?

USPA Hearing Committee
August 06, 2021

Page 39

1     Q.    One more.  So you said that you sent Aleem

2  back to the field, that he was saying something, trying

3  to tell you something, and you told him to go back to

4  apologize, you and/or his family.  So how much time

5  would you say elapsed between that collision and Aleem

6  coming over, which we do not see in the video?

7     A.    I have no idea.  I can't speak to that.  I

8  have no idea.

9     Q.    And the time period --

10    A.    I mean, a minute, 30 seconds, 10 seconds.  I

11 mean, within a minute probably.

12    Q.    Okay.  And then after it occurred, after they

13 left the arena, about how much time elapsed before you

14 heard what happened and talked to John?

15    A.    It was immediately.  When he came off the

16 field, he had a discussion.  He talked to his mother,

17 and his mother talked to me.

18    Q.    Did you talk to Krabbe first?

19    A.    I went straight to George Krabbe, the umpire.

20 Then I went to my pro, who was just standing right

21 there, and I said, "Did you hear anything?" and he

22 said, "No."  And then I went to John and I'm like,

23 "This isn't okay."  And John said, "No, it's not okay."

24 He was as, you know, pissed about it as I was.  And

25 he's like, "Go talk to him."  And I said, "No.  We need

USPA Hearing Committee
August 06, 2021

1    to go together."

2           So we walked over there together, and, you

3    know, John did the right thing.  He's like, "Did you

4    say it?  Did you say it?"  And when he didn't say no,

5    when he didn't deny it, he goes, "Get over there and

6    apologize."  So we walked over there to apologize, and

7    I get there and I'm like, "Aleem, Darrell is here to

8    apologize to you for the stuff on the field."  And

9    Darrell was like, "Well, no.  We settled this on the

10   field."  It just -- it wasn't -- it wasn't there.  It

11   was a forced thing.  Do you know what I'm saying?  I

12   mean, Gobin's like, "Go," and we went.  You know what I

13   mean?  It was just -- maybe that was -- you know, look.

14   Nobody is trying to say anything here other than, "That

15   wasn't okay, so say you're sorry and be done with this.

16   Everybody can go home today.  Darrell, say you're sorry

17   to Aleem, and we'll go home today."  That's it.  You

18   can say, Aleem, I didn't call you a nigger.  You can

19   say that right here and just say, I'm sorry for what I

20   did say, for the cursing.  I was in pain.  I accept

21   your apology, you accept mine, and go home.

22          This is -- you know, this is all it is.  He

23   didn't feel apologized to.  Aleem and his mother and I

24   stood there, and there was no apology made.  That's why

25   we're here.  That's what needs to happen, just an

USPA Hearing Committee
August 06, 2021

Page 41

1    apology.

2        Q.    But Darrell said that he does not say things
3    like that.

4        A.    Well, you know, if he doesn't say things like
5    that -- I'm on Zoom.  If he doesn't say things like
6    that, then when John and I went over there, why didn't
7    he say, I didn't say it.  I didn't use that word.  I
8    didn't say it to the kid."  I mean, if someone came
9    over to my trailer and said I used that word, I would
10   say, What the hell are you talking about?  No way.  I
11   don't use that word.  It's not in my vocabulary.  I
12   would be upset, I would be angry, but I would deny that
13   I said it.

14          And if somebody said, Go make an apology, I'll
15   go apologize, but I'm going to tell them, I did not use
16   that word.  You know what I'm saying?  It's like, I was
17   there when Gobin and I went over there.  Listen.
18   It's -- the truth is there.  Okay?  The truth exists.
19   Deny the truth, but the truth exists anyway.

20       Q.    So you said that Darrell was patting his
21   shoulder -- and I know you've already kind of testified
22   about that, but the patting is --

23       A.    He pushed on his left shoulder:  "We settled
24   this on the field, didn't we, kid?  We settled this on
25   the field, didn't we, kid?"  And then I remember him

Page 42

1   patting him on the upper right arm.  It was just

2   like -- and it was an aggressive thing.  It was, you

3   know, Let's be done with this.  Let's move on, you

4   know.  It was whatever.  And I get it.  I see guys do

5   it all the time.  But he's 14, and his feelings were

6   injured.  Okay?

7            So, you know, it was -- I think all three of

8   us were just -- just the transaction, I think Humera

9   was in shock.  I mean, I was, like, shocked, and I just

10  was -- I was angry.  I went over to John and I said,

11  "You know, we could have ended this right here.  He

12  could have just said 'I'm sorry.'"  He's like, "He

13  didn't apologize to him?" and I said, "I'm writing a

14  letter."  He goes, "Do it.  Do it."

15           So Gobin was -- you know, he said the right

16  thing.  He did the right thing.  You know, I CC'd him

17  on it.  You know, I know Darrell's a client of his.  I

18  understand that.

19      Q.   **And Humera and Aleem are clients of yours?**

20      A.   That's true.  Totally true.

21           MS. TAYLOR:  Okay.  Thank you, Dorie.

22           Craig, I don't have anything further.

23           MR. GALLE:  I do not have any further

24      questions.

25           Hearing committee members, do you have any

Page 43

1    follow-up questions of your own?

2         MR. GREEN:  This is Chris.  I don't have any

3    follow-up questions for Ms. Burner.

4         Thank you for your testimony, Ms. Burner.

5         MS. BURNER:  You're welcome.  Have a good

6    day.

7         MR. GREEN:  Thank you very much for your

8    time.

9         MR. GALLE:  We'll see if Chrys has any

10   questions.  She may have some.

11        MS. BEAL:  I don't have any further

12   questions.  And I also thank you, Delora, for

13   everything that you've done.

14        MS. BURNER:  Thank you.  I appreciate you.

15        (The witness was excused.)

16        MR. GALLE:  Okay.  So the next witness I will

17   call will be Aleem.  Good morning, Aleem.

18        MR. ALEEM SIDDIQUI:  Good morning.

19        MR. GALLE:  So Madam Court Reporter, even

20   though he's 14, would you swear Aleem in, please.

21        THE COURT STENOGRAPHER:  Yes, sir.  I need to

22   swear you in for the record, if you can raise your

23   right hand.

24        In the testimony you're about to give, do you

25   swear to tell the truth, the whole truth, and

USPA Hearing Committee
August 06, 2021

Page 44

1      nothing but the truth?

2            THE WITNESS:  Yes.

3                  ALEEM SIDDIQUI,

4    having been first duly sworn or affirmed, was examined

5    and testified as follows:

6                  DIRECT EXAMINATION

7    BY MR. GALLE:

8      Q.  Would you kindly state your name for the

9    record, please.

10     A.  Aleem Siddiqui.

11     Q.  And I'm going to try to streamline my

12   questions and make them simple and not have you

13   answering more questions than are necessary.  So you

14   played at the Twilight Polo Club in The Plains,

15   Virginia, on July 10th, 2021?

16     A.  Yes.

17     Q.  And your team was coached by Delora Burner;

18   correct?

19     A.  Yes.

20     Q.  And on the opposing team was Darrell Gaebel?

21     A.  Yes.

22     Q.  And I understand that there was some

23   interaction during the arena polo game where your horse

24   collided with Mr. Gaebel; is that correct?

25     A.  Yes.

Page 45

1    Q.   Will you tell us about that.

2    A.   Yes.  So me and him were both going towards

3    the ball, and he got to the ball first and took a tight

4    right turn, trying to max the aisle to turn my horse,

5    but my horse ran into the back of him, and my horse's

6    head brushed on his shoulder.  And then after that, for

7    a little bit, he was hunched over, and then he looked

8    over at me, and that's when he called me an M-effing

9    "N" word.

10   Q.   You mentioned he was hunched over.  Was that

11   because of the collision?

12   A.   Yes, I believe so.

13   Q.   Do you believe Mr. Gaebel was injured or felt

14   some pain after observing him hunched over?

15   A.   Maybe for a minute or two, but after that, he

16   played fine.

17   Q.   Understood.  Okay.  Did Mr. Gaebel make the

18   statements that you just attributed to him at the time

19   that the collision occurred?

20   A.   Yes.

21   Q.   And after he made those statements, what did

22   you do?

23   A.   I went back over to Ms. Dorie to go tell her

24   and my mom what had happened, but no one could hear me

25   because of all the music in the background and the

USPA Hearing Committee
August 06, 2021

1  commentating.  And so then that's when they told me to

2  go back and apologize to him.  So I went back and asked

3  him if he was okay, and then he called me an M-effer

4  again.

5       Q.    So you're saying he said it twice?

6       A.    Three times, but twice as of right now.

7       Q.    Okay.  What was the third time?

8       A.    The third time, me and him were both going

9  towards the goal, and he came in to the right off the

10  bump really fast on purpose, and I had my strap knocked

11  out.  And then he put his mallet over my horse's neck

12  and yanked the reins out of my hands, and then he

13  called me an M-effer again.

14       Q.    Okay.  When you say -- I need to be a little

15  specific, and I understand the words are uncomfortable.

16  We're focusing on the third occasion.  Was the word he

17  used on that occasion "motherfucker"?

18       A.    Yes.

19       Q.    And then on the second occasion, did he use

20  the word "motherfucker," or something different?

21       A.    No.  He said that.

22       Q.    What did he say?

23            MR. GREEN:  You can say it.

24            MR. ALEEM SIDDIQUI:  He said, "Motherfucker."

25  ///

USPA Hearing Committee
August 06, 2021

Page 47

1    BY MR. GALLE:

2        Q.    Okay.  On the first occasion, what were the

3    exact words he used?

4        A.    "Motherfucking nigger."

5        Q.    Okay.  So it seems like the first occasion is

6    when he used the three words, and the second and third

7    occasion, he just used the two words, "motherfucker"

8    [verbatim]; is that correct?

9        A.    Yes.

10        Q.    After you had spoken to Ms. Burner and your

11    mother, after the first occasion where those words were

12    uttered that you mentioned by Mr. Gaebel, you went back

13    into the arena and apologized to him; is that correct?

14        A.    Yes.

15        Q.    And did you feel that there was a legitimate

16    reason for you to apologize to him?

17        A.    I went back to apologize to him for running my

18    horse into him because he looked like he was in pain.

19    But I don't --

20        Q.    Okay.  And did he react to you having

21    apologized to him?  Did he say, It's okay?  Did he say

22    anything?

23        A.    No.

24        Q.    Okay.  And did the game continue at that

25    point?

USPA Hearing Committee
August 06, 2021

Page 48

1       A.    Yes.

2       Q.    Okay.  Did you mention to any of the other

3   players on the field, maybe on your team, what he had

4   said, or did you just speak to your mother and your

5   coach?

6       A.    To my coach and -- I went to my coach and my

7   mom, and I told Antonio, our pro, what had happened.

8   And he said, "It's fine."  "Just get back into playing,

9   and we'll figure it out afterwards."

10      Q.    Okay.  So then tell us what happened after the

11  game concluded in terms of any interactions first with

12  your mother and your coach, and then when Mr. Gaebel

13  came over.  Tell us about those.

14      A.    So after the game, I put my horse away at the

15  trailer, and I walked back to the box to tell Ms. Dorie

16  and my mom what had happened.  And Ms. Dorie

17  immediately went back to George Krabbe and told him,

18  and then she went to John Gobin, and she told him.  And

19  then she brought Mr. Darrell back here.  So I went to

20  go talk to him.  And he said that he would never say

21  anything like that, that it's not in his vocabulary,

22  and then he kept trying to intimidate me into agreeing

23  with him.  I knew that he had said it, so I didn't.

24      Q.    So he denied saying it to you or denied using

25  those words; is that a fair statement?

USPA Hearing Committee
August 06, 2021

Page 49

1    A.    Yes.  He said that he wouldn't ever say that.

2    Q.    Okay.  And tell us about the patting on the

3  shoulder, at least as Ms. Burner described it.  In your

4  words, what happened there?

5    A.    It kind of felt like he was trying to

6  intimidate me into agreeing with him that we had

7  already settled it, and he would push it a couple of

8  times to try to get me to agree with him, but I just

9  didn't say anything back.

10   Q.    And about how many minutes or seconds was this

11  interaction after the game?

12   A.    I would say about a minute and a half maybe.

13  Maybe less than that.

14   Q.    Okay.  And after that, was there any further

15  interaction with Mr. Gaebel?

16   A.    No.

17   Q.    Have you heard from Mr. Gaebel at all after

18  the incident?

19   A.    No, sir.

20   Q.    On the field, you mentioned that it was very

21  difficult to hear people.  I think you referenced that

22  you immediately went over to your mother and your coach

23  and told them what Mr. Gaebel said, but they couldn't

24  hear you; is that right?

25   A.    Yes.

Page 50

1    Q.   Are you confident that you heard correctly, as

2  you have testified, what exactly was said on the first,

3  second, and third occasions that we talked about

4  earlier?

5    A.   Yes.

6    Q.   Prior to this game, have you ever had any

7  other interactions that you would feel were unusual or

8  not comfortable with Mr. Gaebel, either on or off the

9  arena or field?

10    A.   No.

11    Q.   Are you aware of -- first of all, how long

12  have you been playing polo?

13    A.   I have been playing for four years.

14    Q.   And I understand you're a good player, so

15  that's great.

16    A.   Thank you.

17    Q.   So have you ever had any other -- excuse me.

18  Have you ever heard of any other unpleasant reactions

19  or encounters that Mr. Gaebel's had with any other

20  players?

21    A.   No, not that I have heard of.

22       MR. GALLE:  Okay.  That's all the questions I

23    have for you.  Teresa or Lindsey?

24       MS. DENNIS:  Yes.  I will be questioning

25    Aleem.

USPA Hearing Committee
August 06, 2021

Page 51

1                    CROSS-EXAMINATION

2   BY MS. DENNIS:

3       Q.   Hi, Aleem.  So I just want to go back through

4   what happened on July 10th.  Okay?  So you mentioned

5   there was a collision between your horse and Darrell

6   Gaebel; correct?

7       A.   Yes.

8       Q.   And can you tell me more about that?

9       A.   From the beginning of the incident?

10      Q.   Yes.

11      A.   Okay.  So me and Mr. Darrell were both going

12  towards the ball, and he had reached it first.  So he

13  took a right turn, and I had tried to match his turn so

14  that I wouldn't go straight on with him.  So I turned,

15  but my horse ran into the back of his horse and the

16  head slightly brushed his shoulder, and then he looked

17  at me and he called me an M-effing "N" word then.

18          So I turned around and went back to Ms. Dorie

19  and my mom, and I told them what had happened, but no

20  one could hear me because of all the volume.  So I went

21  back to Mr. Darrell and I asked if he was okay and

22  apologized again, and he called me an M-effer again

23  after that.

24      Q.   Okay.  Thank you for running through all of

25  that again for me.  So after the collision, when you

USPA Hearing Committee
August 06, 2021

Page 52

1    say that he called you this racial epithet, a

2    motherfucking nigger, how close were you?

3        A.    Right next to him.

4        Q.    And how loud was the arena?

5        A.    Very loud.

6        Q.    Very loud?  Okay.  And how do you know that he

7    was speaking directly to you?

8        A.    Because he looked at me.

9        Q.    Okay.  But didn't you just say your horse's

10   head had hit him?

11       A.    Yes.  But when you hit a horse, you even out

12   like that, so I come into him here and evened out like

13   that, and that's when he called it to me [verbatim].

14   And that's when I circled back and went to my parents

15   and my mom.

16       Q.    Okay.  But he -- have you ever been hit by a

17   horse when playing polo?

18       A.    Yes.  Many times.

19       Q.    Okay.  And what is your reaction when that

20   happens?

21       A.    Nothing.

22       Q.    Nothing?

23       A.    No.

24       Q.    It doesn't hurt?

25       A.    No.

USPA Hearing Committee
August 06, 2021

Page 53

1    Q.   Okay.  It just seems like a horse's head in
2  your back would hurt a lot.
3    A.   I've gotten used to it.
4    Q.   Okay.  So, now, after this collision happened,
5  what happened next?
6    A.   After the collision happened, that's when I
7  went back to my mom and Ms. Dorie to tell them what
8  happened.
9    Q.   Okay.
10    A.   And then I went back to Mr. Darrell to
11  apologize again.
12    Q.   Okay.  Did you get a foul for that collision?
13    A.   Not -- the umpire, Mr. George Krabbe, he had
14  called a foul for that one and gave the other team a
15  penalty shot for that.
16    Q.   Okay.  What was the basis for the foul?
17    A.   The collision.
18    Q.   Was that, like, dangerous riding, or was it
19  something else?
20    A.   I don't remember the exact call.
21    Q.   Okay.  And so, Aleem, have you seen the video
22  of the collision?
23    A.   Yes.
24    Q.   And in that video, it looks like you ride away
25  from Darrell pretty quickly.

USPA Hearing Committee
August 06, 2021

Page 54

1          MR. GREEN:  Is that a question?

2          MS. DENNIS:  Yes.

3    BY MS. DENNIS:

4      Q.    Do you agree with that statement?

5      A.    I wouldn't say quickly.

6      Q.    Okay.  How would you describe it?

7      A.    Normal.  That's just . . .

8      Q.    Okay.  And how recently have you seen the

9    video, first of all?

10     A.    I think yesterday I watched it.

11     Q.    Okay.  So it's pretty fresh in your mind?

12     A.    Yes.

13     Q.    So how would you describe your reaction after

14   the collision in that video?

15     A.    So after the collision, I felt bad.  That's

16   why I apologized to him for running into him, but he

17   never said anything back.  But he had said the M-effing

18   "N" word to me.

19     Q.    Okay.  So I'm asking this because I watched

20   the video about an hour ago, at this point, and it

21   looks like you shrugged and smiled; is that correct?

22   Is that what happened?

23          MR. TAHA SIDDIQUI:  Excuse me.  I'm not sure

24      where this line of questioning is going.  I mean,

25      this is not something that -- language that we use

Page 55

1    or my son has been called before.  This is the

2    first time that he's encountered this type of

3    discrimination.  So I don't see what the relevance

4    is of him smiling or laughing it off.  I mean, I

5    think we've appropriately described that he was in

6    a lot of shock.

7        I mean, I'm the one that took that video.  I

8    video all of his games.  So thank God I videoed it

9    that day because, otherwise, this would have just

10   been a he-said she-said situation.  And he was in

11   utter shock, and we were in utter disbelief when

12   he came over.  And the fact of the matter is, I

13   mean, we're arguing about how loud it was or how

14   quiet it was.  I mean, as my son explained, he was

15   side by side when this was said.  So, I mean, if I

16   sit right next to him and say something, there

17   could be a hundred-decibel noise and he"d be able

18   to hear it.  When he came and told us, he was

19   about a good 10 to 15 feet away.  We had no clue

20   what he was saying.  We thought it was just the

21   incident.

22       MR. GREEN:  Sir, for the record, your name

23   is?

24       MR. TAHA SIDDIQUI:  I'm his father, Taha

25   Siddiqui.

USPA Hearing Committee
August 06, 2021

Page 56

1            MR. GREEN:  All right, Mr. Siddiqui.  Thank

2      you for your comments.

3            We'll ask counsel to try to direct her

4      questioning and keep it relevant.

5            MS. DENNIS:  Yes.

6            MR. GREEN:  So thank you.

7            MS. DENNIS:  Absolutely.

8  BY MS. DENNIS:

9       Q.    So, Aleem, earlier when Mr. Galle was asking

10 you questions, you said that after everything in the

11 arena and when you were having the discussion, for lack

12 of a better term, with Mr. Gaebel, he said that he had

13 never said it, but that you knew that he said it; is

14 that correct?  Is that what you said?

15      A.    Yes.

16      Q.    Okay.  And you had also, earlier, heard

17 Ms. Dorie testify that all of this could be taken care

18 of with an apology?

19      A.    Yes.

20      Q.    Is that true, that this could all be taken

21 care of with an apology?

22      A.    A sincere one.

23      Q.    A sincere one.  So -- okay.

24            MR. TAHA SIDDIQUI:  Sorry for stepping in

25      here.  I mean, a sincere apology.  I think, you

USPA Hearing Committee
August 06, 2021

Page 57

1   know, you're asking a 14-year-old child what would

2   be the appropriate resolution to the situation,

3   which I think -- you know, I trust my son.  He

4   should be able to speak for himself, but I want to

5   clarify what we mean by a sincere apology.

6        A sincere apology is not a weak apology of,

7   "I'm sorry you were offended."  It would be an

8   apology that was directed to Aleem specifically,

9   saying that "I apologize for the words that I used

10  on the field."  And that potentially could be a

11  resolution.  So a full apology as opposed to an "I

12  was sorry you were offended" type of apology.

13       MR. GREEN:  We're mindful of your view, sir.

14       Please proceed, counsel.

15       MS. TAYLOR:  Actually, can I just note, Chris

16  and Craig, please, that we would like -- you know,

17  Aleem is testifying.  He is a witness.  I

18  understand, you know, that Taha and Humera are

19  concerned for their son, but they need to let

20  Aleem answer the questions.  The question about

21  whether he shrugged and smiled -- we put it on the

22  record.  We're noting it as relevant.  It goes to

23  his credibility and how upset he says that he was

24  when he rode away.  But let's let Aleem answer

25  these questions, please, instead of his parents

USPA Hearing Committee
August 06, 2021

Page 58

1    testifying for him.

2        MR. GREEN:  I think that Aleem has answered

3    the questions that have been asked.  And I

4    appreciate your comment, but I question the

5    relevance of questions about whether an apology

6    would be sufficient since you have said that there

7    will be no apology and you're contesting

8    jurisdiction.

9        So I would just like for counsel to try to

10   keep it brief, keep it relevant, and not push the

11   envelope on abusiveness, please.

12       MS. DENNIS:  Of course.

13       MS. TAYLOR:  Well, first off, I would say

14   there's no abusiveness that's happened whatsoever,

15   so --

16       MR. GREEN:  I didn't say there was.

17       MR. TAYLOR:  I hear what you're saying,

18   Chris, but I have to say that we haven't even gone

19   there at all, so -- but we hear it; it's noted.

20   Thanks.

21       MR. GREEN:  Yes.

22       MS. DENNIS:  And I was only asking the

23   question about the apology as it goes to

24   credibility.

25   ///

Page 59

1   BY MS. DENNIS:

2       Q.   So I just have a couple of more questions for

3   you, Aleem, and this is going to go back to in the

4   arena for the game.  You allege that Mr. Gaebel called

5   you a motherfucker two other times; correct?

6       A.   Yes.

7       Q.   And how do you know that he was using those

8   words directly towards you and not just as an outburst?

9       A.   Because he was looking at me.

10      Q.   And so it was your belief, since he was

11  looking directly at you, that that meant he was

12  speaking to you?

13      A.   Yes.

14      Q.   Okay.  Did you say anything to him in the

15  arena?

16      A.   No.

17          MS. DENNIS:  Okay.  Let me just confirm that

18      that's everything on my end.  (Brief pause.)  I

19      have nothing further.

20          MS. TAYLOR:  I just have another question or

21      two.

22          So, Aleem, you said nothing further --

23          MR. GREEN:  Excuse me.

24          MS. TAYLOR:  Hold on.  I just wanted to

25      confirm, because earlier he testified that he

Page 60

1         apologized in the arena.

2              MR. GREEN:  I thought that we agreed that

3         there would be one attorney questioning each

4         witness.  So if you would like to give your

5         questions to your colleague and have her ask them,

6         you can text them to her or email them.  But I

7         think if we make rules, we need to stick by them.

8              MS. DENNIS:  And that was my mistake.  I just

9         saw that Ms. Taylor had texted me right as I was

10        saying "nothing further".

11             MR. GREEN:  That's fine.

12                  FURTHER CROSS-EXAMINATION

13   BY MS. DENNIS:

14        Q.   So, Aleem, you just said that you said nothing

15   to him in the arena, but you also said that you

16   apologized to him.  So I just want to clarify which it

17   was.

18        A.   What do you mean, "nothing in the arena?"  Do

19   you mean after all the incidents had occurred, or in

20   the whole entire game itself?

21        Q.   In the whole game, did you ever say anything

22   to Darrell?

23        A.   Okay.  So, yeah, I had apologized to him.

24        Q.   Okay.  And nothing else?

25        A.   No.

USPA Hearing Committee
August 06, 2021

Page 61

1        MS. DENNIS:  Now I have nothing further.

2    Thank you.

3        MR. GALLE:  Hearing officers, do you have any

4    questions?

5        MR. GREEN:  I don't have any further

6    questions.

7        Thank you, Aleem, for your testimony.

8        MR. ALEEM SIDDIQUI:  Thank you.

9        MS. BEAL:  I have one or two.  So after

10   watching videos of yourself playing, Aleem --

11   because I assume you've seen quite a few -- would

12   you say that you're a mouth-breather and your

13   teeth show when you play polo, or would you say

14   you keep your mouth closed all the time and

15   breathe through your nose?

16       MR. ALEEM SIDDIQUI:  I would say sometimes I

17   do open my mouth.  I tend to keep my tongue out of

18   my mouth a lot when I play, but I can't really

19   tell.

20       MS. BEAL:  And one more question.  If

21   somebody had called you a name that was offensive

22   to you, do you think that you would shrivel away

23   from it, or do you think that you would stand up

24   straight and act like nothing happened?

25       MR. ALEEM SIDDIQUI:  That was the first time

USPA Hearing Committee
August 06, 2021

Page 62

```
 1      I had been called that, so it was my instinct to

 2      go and tell Ms. Dorie and my mom.  So I went away

 3      from that situation and I went to go tell them.

 4           MS. BEAL:  All right.  Thank you.

 5           MR. GALLE:  Okay.  Thank you, Aleem.  We're

 6      done with your testimony, and then the next

 7      witness will be your mother.  Thanks for being

 8      patient.

 9           (The witness was excused.)

10           MR. GALLE:  Madam Reporter, would you swear

11      in the witness, please.

12           THE COURT STENOGRAPHER:  Ma'am, could you

13      raise your right hand, please?

14           In the testimony you're about to give, do you

15      swear or affirm to tell the truth, the whole

16      truth, and nothing but the truth?

17           THE WITNESS:  I do.

18                    HUMERA RAHMAN,

19  having been first duly sworn or affirmed, was examined

20  and testified as follows:

21                  DIRECT EXAMINATION

22  BY MR. GALLE:

23      Q.   Good morning, ma'am.  Would you kindly state

24  your full name for the record.

25      A.   Yes.  Humera Rahman.
```

USPA Hearing Committee
August 06, 2021

Page 63

1       Q.    And how do you spell your last name?

2       A.    R-A-H-M-A-N.

3       Q.    Rahman?  Am I pronouncing it correctly?

4       A.    Yes.

5       Q.    Okay.  You are Aleem's mother; correct?

6       A.    I am, yes.

7       Q.    And you were present on the evening of July

8  10th, 2021, at the Twilight Polo Club in The Plains,

9  Virginia?

10      A.    I was.

11      Q.    Is it fair to say that you observed the entire

12  arena game?

13      A.    I did.

14      Q.    Did you observe the collision that we had

15  talked about earlier between Aleem and Mr. Gaebel?

16      A.    I did.

17      Q.    And tell us what you saw.

18      A.    So I saw Aleem and Darrell both going for a

19  ball.  Darrell went ahead.  He got the ball and made a

20  sharp turn to the right.  Aleem came up.  He didn't

21  want to collide, you know, T-bone him, so he quickly

22  turned his horse to the right, thereafter brushing

23  Darrell's shoulder.  And then after that, we were like,

24  "Okay."  You know, "He's brushed his shoulder."  Then

25  we saw Aleem come up to us and he was trying to tell us

USPA Hearing Committee
August 06, 2021

Page 64

1  something, and we were like, "Go back and apologize.

2  Just say sorry to him."  And so, immediately, he turned

3  and went to apologize.

4      Q.   And did you find it unusual that Aleem, in the

5  middle of a game, would come over to talk to you and

6  his coach?

7      A.   Yes.  Absolutely.  You know, I've already

8  mentioned that profanity is not unique at Twilight

9  Polo.  Children play with adults all the time, and

10  they've heard all sorts of curse words.  So even if

11  Aleem -- if he had turned to him and called him -- you

12  know, had cursed at him and not used hate speech, Aleem

13  would have continued on in the game because, you know,

14  it's just part and parcel.

15          But for him, when he was called the "N" word,

16  that's when -- I mean, that is what sort of brought him

17  to us, because he never would come in the middle of a

18  game to say, "This person called me an A-hole" or "This

19  person called me," you know, "an MF" or anything.

20      Q.   Okay.  So you did find it unusual that, in the

21  middle of a game, he came over to speak with you and

22  his coach in general?

23      A.   Right.  Yes.

24      Q.   And Aleem was communicating or attempting to

25  communicate at that time with yourself and his coach;

USPA Hearing Committee
August 06, 2021

Page 65

1   correct?

2      A.   Yes.

3      Q.   And he was attempting, as you understand it

4   now, to communicate and tell you both what he had heard

5   Mr. Gaebel say to him; is that right?

6      A.   That's correct.

7      Q.   And as I understand your testimony, I think,

8   and Ms. Burner's testimony earlier, you could not hear

9   what Aleem was saying to you; is that right?

10     A.   Right.  We couldn't really make out what he

11  was saying to us.

12     Q.   Okay.  Did you ask him to repeat what he was

13  saying on that occasion?

14     A.   No.  We were just like, he's probably telling

15  us that he did it by accident, you know, that he didn't

16  do it intentionally.  I mean, the thought of someone

17  using hate speech or a word like that wasn't even --

18  you know, hadn't even crossed our minds.

19          So it wasn't -- we just thought that he was

20  coming over just to say, you know, I did it by

21  accident.  I'm sorry I did it.  And we were like, you

22  know, "Please tell him that you're sorry; that it was

23  an accident."

24     Q.   Okay.  Fair to say that you presumed that

25  Aleem was coming to speak with you regarding him having

Page 66

1    collided with Mr. Gaebel?

2        A.    Yes.    Absolutely.

3        Q.    Okay.    And without being able to hear what he

4    was saying to you, you said to Aleem, "Just go and

5    apologize to Mr. Gaebel"?

6        A.    Yes.

7        Q.    And Ms. Burner basically said the same thing?

8        A.    We both did.

9        Q.    Okay.    Do you know why Aleem was able to hear

10   what you were saying to him but you were not able to

11   hear what he was saying to you?

12       A.    Dorie has a very -- she's quite loud, and the

13   kids could hear her, you know, even with all the noise

14   because she -- you know, her voice carries.    I was

15   also -- we were all sort of in unison shouting to him,

16   "Go back and apologize to him.    Say that you're sorry."

17   So he could hear that, but he was, you know, quieter

18   when he came up.    You know, at his decibel, we couldn't

19   hear him.

20       Q.    Understood.    Okay.    And then at that point,

21   was there any further discussion between yourself,

22   Ms. Burner, and Aleem before Aleem returned to the

23   arena?

24       A.    No.    That was it, because the play was still

25   going on.    You know, the foul was being called.    He

USPA Hearing Committee
August 06, 2021

Page 67

1   sort of had to get back into the game at that point,

2   and the game did go on right after; immediately after.

3       Q.   Okay.  I think this is clear, but just for the

4   record, is it fair to say that you never heard

5   Mr. Gaebel make any of the three comments or statements

6   that Aleem had testified about here earlier today?

7       A.   No.  I did not hear it myself.

8       Q.   Okay.  So then Aleem returns to the arena, the

9   game continues, and then it concludes.  Tell us what

10  happens next.

11      A.   So when the game concludes, Aleem comes up to

12  me and he's like -- he says, "Mom, Mr. Darrell called

13  me an M-effing nigger."  And I said, "Are you sure?"

14  You know, like, "When did this happen?"  And he said,

15  "I came to tell you that he called me an M-effing "N"

16  word."  And I said, "We couldn't hear you.  We sent you

17  back to apologize."  He's like, "Yeah.  I went to

18  apologize, and he called me an M-effer."

19          At this point, I told Dorie -- because Dorie

20  had stepped away.  I told Dorie: "Dorie, this is what

21  happened.  This is what Aleem had come to tell us."

22  And then you know what transpired after.

23      Q.   Okay.  So the game is over; Aleem comes to

24  you; you have this discussion you just told us about.

25  Tell us what happened relative to further interactions

Page 68

1   that you observed or overheard between Aleem and

2   Mr. Gaebel.

3       A.   So when Darrell came over, it was Darrell,

4   Dorie, Aleem, and myself.  And we had a box right

5   there, so, you know, everyone else in the box was

6   watching and listening to what was happening.  Darrell

7   came over and, you know, Dorie said, "Aleem, Darrell is

8   here to apologize to you."  And he said, "No, but we

9   settled it on the field" and, you know, "I don't say

10  things like that."

11        And Aleem was extremely quiet.  His eyes were

12  filled with tears.  And I knew at that moment that if

13  he had even opened his mouth, he would have -- you

14  know, the tears would have been flowing.  But he did

15  not want to, you know, show that sort of emotion in

16  front of Darrell.  And just like this (indicating), he

17  was pushing on Aleem's shoulder and saying, "Hey, we

18  settled it on the field, didn't we, kid?  We settled it

19  on the field.  At that point, you know, I was still in

20  a state of shock.  And I should have told him to not

21  touch my child, but I really was in a state of shock

22  that he was, at this point, even laying his hands on

23  him.

24      Q.   Is it your testimony that Mr. Gaebel denied

25  making racial statements or the statements that have

USPA Hearing Committee
August 06, 2021

Page 69

1   been attributed to him?

2       A.   Right.  And denial is sort of very -- you

3   know, I mean it was a very, very, sort of, cold denial.

4   It wasn't an emphatic denial:  Hey, you know, there was

5   no way that I could do that.  You know, I would never

6   do that to anyone.  I would never do that to --

7   whatever words.  There was no emotion in it.  It was

8   like, "I don't use that kind of language."  You know,

9   it was just kind of, like, matter of fact.

10          He was just kind of standing back, just -- you

11  know, it wasn't like, Hey, I did not do this, and I

12  want to let you know that this did not happen and I

13  want you to believe me.  There was no emotion in it.

14  It was just very -- like, "Yeah.  I don't say stuff

15  like that.  Hey, kid, come on."  You know, it was just

16  like, Let this be over, that sort of deal.

17      Q.   You, as well, made a written complaint, so to

18  speak, regarding these incidents at the game in

19  question, to the USPA; is that correct?

20      A.   That's correct.

21      Q.   You're not a USPA member; is that correct?

22      A.   I'm not, but I did make them on behalf of a

23  minor child.

24      Q.   Understood.  I'll ask the question just

25  because it's been offered in some of the testimony

USPA Hearing Committee
August 06, 2021

Page 70

1    earlier, and it came up briefly in some of the

2    questioning.  So I'm just going to ask it, but I'm not

3    going to spend a lot of time on it.  It seems like what

4    you, on behalf of your son, your son's coach,

5    Ms. Burner, and maybe Aleem himself, were -- what were

6    you looking for out of Mr. Gaebel at that time?  Was it

7    just an apology; a sincere apology?

8         A.   We wanted him to acknowledge -- I wanted him

9    to acknowledge that he used the word.  I wanted him to

10   say that he shouldn't have used it and that he is sorry

11   that the words came out of his mouth, both the hate

12   speech as well as the vulgar language.  And that's what

13   I wanted.  I wanted a genuine apology from him, saying

14   that, I said it; I'm sorry; and, you know, I -- you

15   know, a heart-felt apology from him.  So that's what we

16   wanted him to do.

17        Q.   Is there any information in particular that

18   either is not contained in your complaint or that I

19   haven't asked you yet today that you would like to

20   share and you think is important for the hearing

21   officers to know?

22        A.   So I just wanted to -- I mean, can I speak

23   about the day after?

24        Q.   Yes.  Tell us about the day after.  We'll

25   start there.

USPA Hearing Committee
August 06, 2021

Page 71

1      A.    Can I speak about John Gobin?

2      Q.    Well, let's talk about the day after.  What

3   are you referring to?

4      A.    So I'm referring to Aleem had a game the day

5   after, the last game that he played at Twilight Polo,

6   which is owned by John Gobin.  And John Gobin came up

7   to -- I'm going to let my husband explain because

8   that's --

9      Q.    Your husband is not being questioned under

10  oath at this moment.

11     A.    Okay.

12     Q.    So you tell us what you know or don't know.

13     A.    So what I know is that he came up and he

14  apologized for what had happened.  He apologized to my

15  husband, he apologized to Aleem, and he said that, you

16  know, "We know this about Darrell.  We know this thing

17  about Darrell."  You know, "You kind of, like, have to

18  sort of, like, just excuse him."  Like, "Everyone knows

19  this."  And this is what John Gobin came and said to my

20  husband to sort of, like, smooth things over, and this

21  is before the letter had been sent to the USPA.

22     Q.    But this wasn't said to you?  This was said to

23  your husband?

24     A.    Yes.  So I mean, if he can come under oath, he

25  can --

USPA Hearing Committee
August 06, 2021

Page 72

1      Q.   At this moment, I want to confirm that these

2   are not things that John Gobin said to you.

3      A.   They are not things that John Gobin said to

4   me, no, but this is something that was said.

5      Q.   To your husband, and then your husband told

6   you?

7      A.   Right.

8          MR. GALLE:  Okay.  That's all the questions I

9      have for you at this time.  I'll turn it over to

10      Teresa or Lindsey.

11                    CROSS-EXAMINATION

12   BY MS. TAYLOR:

13      Q.   Hi, Humera.  I only have few questions for

14   you.  So the video that you submitted of the crash,

15   were you speaking in that video?

16      A.   I'm not sure.

17      Q.   The Urdu -- who's speaking in Urdu on that

18   video?

19      A.   I don't know.  Maybe my mother.  Maybe --

20      Q.   It's a man.

21          MR. TAHA SIDDIQUI:  It's probably me.

22          MS. TAYLOR:  Okay.

23   BY MS. TAYLOR:

24      Q.   So what is being said in Urdu during that

25   video?

USPA Hearing Committee
August 06, 2021

Page 73

```
 1    A.    I don't know.  I'd have to watch the video.

 2    Q.    When was the last time you watched it?

 3    A.    I haven't sat down and watched it properly

 4  until -- since I sent the video to the USPA.

 5    Q.    Okay.

 6    A.    It's been a while.

 7    Q.    So is there more to the video?  Was it clipped

 8  short?

 9    A.    No.  I mean, it was like that was the end of

10  the video.  Videos are -- when my husband takes videos,

11  if the play stops, the video doesn't continue.  I mean,

12  you know, the play stops.  And he was coming over, and

13  we were kind of like, Okay.  Why is he coming over, you

14  know.

15    Q.    Okay.  And so you said that Darrell was not

16  enthusiastic enough -- is that what you said? -- in his

17  denial or --

18    A.    I didn't say "enthusiastic."  I said that it

19  was a very cold, you know, way of apologizing, or what

20  he believed was an apology.  I mean, I don't think that

21  was an apology, but his response was cold, is what I

22  want to say.  It was just a cold response.  It was just

23  matter of fact.  It was really not -- you know, there

24  was no emotion to it.

25    Q.    What did he deny saying?
```

USPA Hearing Committee
August 06, 2021

Page 74

1    A.    He said, "I don't use" -- he did not say to

2    him, Aleem, on the field, I did not say those words to

3    you.  He did not say that.  He said, "I don't use

4    language like that."  I don't know what that means.

5    That does not -- to me, that does not mean that, Hey, I

6    didn't say it to you.

7        Q.    So you would apologize differently?

8        A.    Yes.  I absolutely would have apologized

9    differently.  I mean, if I was in that situation and

10   somebody -- if I was in Darrell's situation and Darrell

11   felt that he was being wronged, my response to him or

12   to another person would not be this sort of, Hey, it's

13   okay; it's all right; let's just let it go.  You know,

14   I would be angry if I feel like I'm being wronged.

15       Q.    And Darrell was not angry?

16       A.    I mean, Darrell was very cold.  Darrell was

17   very, sort of -- you know, he was sort of very -- you

18   know, I don't know what the word is, but he was very,

19   sort of, matter of fact:  "Hey, let's just move on."

20   You know, "Come on."

21       Q.    But at no time did he say that he said

22   anything -- that he cussed at Aleem or said what the

23   allegation is, "motherfucking nigger," unquote?  At no

24   time did he say that he said that?  In fact, he said

25   that he doesn't use that word.

USPA Hearing Committee
August 06, 2021

1   A.   He didn't say that he said that, but he didn't

2   say that he didn't say that either.  So, you know, he

3   did not use those words to say, I did say this or I did

4   not say those exact words.

5   Q.   **But I thought you said that he said, "I do not**

6   **use those words," or "Those words don't exist in my**

7   **language"?**

8   A.   Then you're mistaking what I'm saying.  I'm

9   saying to you, when you quoted that, he did not say, I

10  said those words.  He did not deny saying those words

11  either.  Do you know what I'm trying to tell you?

12  Q.   **But I thought you testified that he did say**

13  **something to the effect --**

14  A.   He did not.  Again, I don't know why you're

15  trying to twist my words.  He did not use those exact

16  words.  Do you know what I mean?  I mean, I'm trying to

17  tell you something.  You're asking me did he come and

18  say, Oh, I didn't use those words.  He did not use the

19  exact -- you know, the M-effing "N" word.  He did not

20  say, I did say this or I didn't say this.  So either

21  way, he did not specifically say, I did not call you an

22  M-effing "N" word.  He said, "I don't use those words."

23  Q.   **Okay.  And so he did not apologize in the way**

24  **that you would --**

25  A.   He did not apologize at all.

USPA Hearing Committee
August 06, 2021

1    Q.    Hold on.   -- or in the way that you think

2    people should if accused of saying something, whether

3    they said it or not?   In this situation, you think he

4    should have apologized, and he should have showed more

5    emotion and not been cold?

6    A.    There was no apology there.   By saying, "I did

7    not say those things; hey, kid, come on; we settled it

8    on the field," that is not an apology.   In anyone's

9    vocabulary, that's not an apology.   There was no

10   apology given.

11   Q.    Okay.   So this is really for you-all, that

12   there was no apology from Darrell in the way that you

13   expected it?

14   A.    In the way that anybody would expect it; me or

15   anybody else.   It was not an apology.   You're saying

16   that this was not an apology that I expected.   There

17   was no apology given.

18        MS. TAYLOR:   Thank you.   I don't have any

19        further questions.

20        MR. GALLE:   Chris or Chrys, do you have any

21        questions?

22        MR. GREEN:   I do have a question, Ms. Rahman.

23        I'm interested in understanding the encounter

24        after the game when, as I understand it -- and the

25        complaint says -- Mr. Gaebel touched your son in

USPA Hearing Committee
August 06, 2021

1   some manner and said, in words similar to these,

2   if not identical, "We settled it on the field,

3   kid," maybe more than once.

4        MS. RAHMAN:  Yes.

5        MR. GREEN:  Do you remember that?

6        MS. RAHMAN:  Yes, I do.

7        MR. GREEN:  Can you show me, as if you are

8   Mr. Gaebel, as exactly as you can how he touched

9   your son and what he said.

10        MS. RAHMAN:  So he kept -- with one hand, he

11   kept pushing him and he's like, "We settled this

12   on the field, kid, didn't we?"  And it was

13   multiple times of him sort of jolting him to

14   acknowledge that it had been settled on the field.

15   And he did not say anything at that moment.

16        He was just completely silent.  He did not

17   want to start showing emotion and crying.  His

18   eyes were red and about to burst.  And at that

19   moment -- yeah.  So it was like, "We settled it on

20   the field, kid, didn't we?" and it was multiple

21   times that he said that and multiple times that he

22   pushed his shoulder.

23        MR. GREEN:  All right.  Thank you for that.

24   So after those multiple times and stating that

25   multiple times, did the parties just walk away

USPA Hearing Committee
August 06, 2021

Page 78

1     from each other, or was there more?

2          MS. RAHMAN:  That was it.

3          MR. GREEN:  That was it?

4          MS. RAHMAN:  He had nothing more to say.  He

5     left.  I did not want to make it a bigger deal at

6     that moment.  I wanted to observe some decorum.  I

7     did not want words flying, anything like that.  I

8     did not want to start using any sort of -- you

9     know, showing anger.

10          There were many, many people there.  We had a

11     box full of grandparents and friends who had come

12     in from out of town, who were all there -- who

13     were watching as this was going on in disbelief

14     that it could even happen.  And I wanted to know

15     what the procedure was.  I didn't want to be out

16     of line, and I wanted Dorie to sort of guide me

17     and let me know how to proceed.  So that's how we

18     moved forward.

19          MR. GREEN:  All right.  Thank you.  I don't

20     have any further questions.  Maybe Ms. Beal has

21     some questions?

22          MS. BEAL:  I don't have any questions.  Thank

23     you.

24          (The witness was excused.)

25          MR. GALLE:  Okay.  The next witness we'll

USPA Hearing Committee
August 06, 2021

1    call is George Krabbe.

2         MR. GREEN:  Craig?

3         MR. GALLE:  Yes.

4         MR. GREEN:  I'm wondering if we could agree

5    to call Aleem's father to have him testify about

6    what was averred to in his wife's testimony; that

7    is, what Mr. Gobin said to him the next day.  I

8    wonder if counsel would agree that we can do that?

9         MS. TAYLOR:  Sure.

10        MR. GREEN:  Okay.  It shouldn't take long.

11        MR. GALLE:  Yes.

12        MS. TAYLOR:  But I also have a question for

13   him if that's possible about the video, since

14   we're going to put him on about what happened the

15   next day.

16        MR. GREEN:  I think if we put him on, it's

17   only fair that you are able to ask him questions.

18        MS. TAYLOR:  Okay.  Thank you.

19        MR. GALLE:  Madam Reporter, would you kindly

20   swear the witness in?

21        THE COURT STENOGRAPHER:  If you can raise

22   your right hand, please.

23        In the testimony you're about to give, do you

24   swear to tell the truth, the whole truth, and

25   nothing but the truth?

USPA Hearing Committee
August 06, 2021

Page 80

```
 1              THE WITNESS:  Yes.
 2                  MOHAMMED TAHA SIDDIQUI,
 3   having been first duly sworn or affirmed, was examined
 4   and testified as follows:
 5                  DIRECT EXAMINATION
 6   BY MR. GALLE:
 7       Q.   Sir, would you kindly state your full name for
 8   the record.
 9       A.   Yes.  It's Mohammed Taha Siddiqui.
10       Q.   Okay.  And you are Aleem's father?
11       A.   Yes, I am.
12       Q.   And you were present on the evening of July
13   10th, 2021, and Twilight Polo in The Plains, Virginia?
14       A.   I'm present at every game, yes.
15       Q.   Okay.  And your wife was talking earlier in
16   her testimony and was wanting you to comment as well.
17   Can you tell us what you were wanting to say at that
18   point in time?
19       A.   Absolutely.  We can talk about what happened
20   that night, but I mean, I was livid when I found out
21   what happened.  I mean, there's no way that anybody
22   should use this kind of language; not an adult, let
23   alone a 14-year-old child.  That's my kind of piece on
24   it.
25              But what actually happened on Sunday was Aleem
```

USPA Hearing Committee
August 06, 2021

Page 81

1  had a grass game again with Dorie's club, and so I was

2  setting up the chairs, getting ready for the family to

3  arrive, and Mr. Gobin came over on his club bike.  I

4  think he was with his daughter.  I don't know who it

5  was exactly.  But as I was setting up, he came over and

6  he said, "Hey, you Aleem's dad?"  You know, "I just

7  want to apologize."  And, you know, I had to go back

8  and think to remember what he said, but he basically

9  said, "Hey, I want to apologize for Darrell.  I told

10 him before to be nice, but what can I say?  That's just

11 the way he is.  He's old, and that's just how he is."

12     Q.   And is there anything else that John Gobin

13 said besides that?

14     A.   No.  He shook my hand, and he left.  So that

15 was probably more of an apology than we've gotten so

16 far.

17     Q.   Okay.  I'll ask you a couple of questions,

18 then, about the evening of July 10th.  Did you hear

19 Mr. Gaebel make any of the three statements or comments

20 or alleged derogatory remarks that's been attributed to

21 him with your own ears?

22     A.   No, I did not.  But can I clarify because --

23 just as an observer?  So, you know, we're talking about

24 who heard what; right?  And so obviously there's a

25 difference between Aleem being on the field on a horse

1  next to Mr. Gaebel and us being in the box, you know, a

2  good 30, 40, 50 feet away; right?  So when Aleem came

3  up to -- when the incident happened, I mean, a lot of

4  times, I'm videoing.  I may be looking.  I may be

5  looking around.  I'm trying, quite often, just to

6  follow the ball and the action for Aleem, as he likes

7  to go back and watch his videos.

8          So we saw the incident happen.  You know, I do

9  not know what I said.  I could have been talking to my

10  mother-in-law or to my wife.  I'd be happy to go back

11  and review the video with you, and I can translate if

12  you wish.  But essentially what had happened was, we

13  saw the incident happen as described.  I was videoing.

14  We then we saw Aleem come back.

15          Aleem stopped probably a good, I would say,

16  ten feet away.  You know, obviously, you cannot move

17  the horse right up to us, and it was loud as everyone

18  has said.  He was trying to yell and tell us something.

19  And as my wife has said, you know, we don't use that

20  kind of language in the house, but they hear all sorts

21  of stuff at the barn.  So hearing the "F" word, the

22  "MF" word, any word, unfortunately, these kids just

23  have to let it go.  But we knew something was up

24  because he was so upset, and we just didn't pick up on

25  it.

USPA Hearing Committee
August 06, 2021

Page 83

1          So when he came up, we thought it was the

2    incident.  We had seen the incident happen.  We told

3    him to go and apologize, to be a sportsman, because

4    that's what you do.  So we had no idea.  It was only

5    after the whole game had happened that we understood

6    the incident that had occurred.

7       Q.   Okay.  Were you present after the game when

8    Mr. Gaebel came up with John Gobin and was interacting

9    with Aleem?

10      A.   Yes, I was.  So I was actually further back.

11   I was in the box.  The incident happened outside of the

12   box, because, obviously, we had a lot of family.  We

13   had a lot of guests.  We didn't want this to ruin the

14   evening.  So Dorie, Darrell, Aleem, and my wife were

15   outside of the box, and I was watching from above with

16   our friends.  But quite frankly, I was just shocked

17   beyond belief that somebody would do this and that

18   somebody would do this to my child.

19          It would not have been a good situation,

20   because I would have shown my displeasure, you know,

21   verbally; not physically, but verbally.  I would not

22   have accepted the lack of an apology that Mr. Darrell

23   had done that.  But I did watch Darrell, as has been

24   described here, trying to cajole my son into basically

25   just brushing it off.  And I would actually say, as

Page 84

1   somebody that was watching from further away, that it

2   was actually not as described; a small, you know, kind

3   of gentle shove.  It was more like -- you know, more a

4   point, like, "Hey, kid.  Come on.  We settled this;

5   right?  We settled this."  I mean, you don't do that in

6   a professional environment, let alone in a sporting

7   environment.

8        Q.  Did you hear Mr. Gaebel state at that time

9   something to the effect of, "I don't say things like

10   that," as other witnesses have testified?

11       A.   Yes.

12            MR. GALLE:  Okay.  That's all the questions I

13   have for you, sir.

14            MR. SIDDIQUI:  Thank you.

15            MR. GALLE:  Lindsey or Teresa?

16                    CROSS-EXAMINATION

17   BY MS. TAYLOR:

18       Q.  Hi, Taha.

19       A.   Hi.

20       Q.  So I only have a few questions for you as

21   well.  I'm going to ask you about your impression of

22   Mr. Gobin's apology to you the next day since you said

23   that he apologized on behalf of Darrell.  So how did

24   you take that apology?  As a general apology or as an

25   admission that Darrell said what Aleem alleged that he

Page 85

1   had said?

2       A.   Well, to me, it sounds like this is not the

3   first time that such an event has occurred; right?  I

4   mean, it sounds like this is --

5       Q.   Can you just clarify what you mean by "an

6   event," that such an event like this has occurred,

7   please?

8       A.   Oh, it could be this type of language that's

9   used, these type of derogatory terms that's used,

10  whether they're against minorities or women or whoever.

11  It just, to me, appeared that, you know, "Hey, this is

12  just acceptable behavior."  I mean, I run -- just, you

13  know, as an aside, I run, you know, large projects with

14  hundreds of people working for me.  You know, we

15  wouldn't tolerate this behavior in a professional

16  environment, and if anybody was to come out and do

17  something like this it would need to be dealt with.

18          And so the apology -- again, I'm looking back

19  at what I noted.  I mean, it's not really an apology.

20  It's more of a, "Hey," you know, "pardon my language.

21  "Shit happens."  Like, "We've just got to move on," you

22  know.  That's what it comes across as, reading between

23  the lines.  And that, in my mind, is just not an

24  apology.

25      Q.   Did you take notes that day or right after you

USPA Hearing Committee
August 06, 2021

Page 86

1  spoke with John Gobin, or were these notes that you

2  referred to that you took later?

3      A.   No.  I took them later.  I mean -- because I

4  told my wife that this is -- I mean, hey.  You know, we

5  very rarely interact with John.  I mean, John does the

6  announcing at the games.  He may swing by the box a

7  couple of times to see Dorie, to see people that he

8  knows, but we're not on friendly terms with him.  So he

9  came up, purposely sought me out, purposely came up to

10  talk to me.  But again, this is not really an apology.

11      Q.   Did you ask John anything about his comments

12  to you?

13      A.   When John said this to me, I told John I was

14  displeased; I was unhappy.  And I said again, just as I

15  said throughout this whole hearing, "Who speaks to a

16  child like this?  I don't speak to my own child like

17  this, or anyone else's child."

18      Q.   And did John respond to that further?

19      A.   No.  Like I said, we are not on friendly

20  terms, as in we know each other.  He got on his bike,

21  and he drove off.

22      Q.   Okay.  And so in the video submitted of the

23  crash, it sounds like you are the one speaking, from

24  hearing you speak now, and so there's some Urdu in that

25  video.  If you recall, do you know what you might be

USPA Hearing Committee
August 06, 2021

Page 87

1  saying?

2    A.   I honestly would not know.  I mean, like I

3  said, I record all of Aleem's games.  I mean, if you

4  were to play it, I would absolutely, you know,

5  translate it for you.  That would be fine.  But off the

6  top of my head right now, I wouldn't know what I said.

7  I mean, it may have just been, "Oh, wow.  There's a" --

8  you know, "A crash occurred."  Just wondering if

9  everyone's okay is most probably what it is.  You know,

10  we saw Aleem collide and probably were concerned.

11         My mother-in-law was there, so I usually speak

12  to her in Urdu.  So it was probably something to her.

13    Q.   Do you chat with Aleem about his riding often

14  and about how he should be playing polo?

15    A.   Of course.

16    Q.   And what did you think about the crash when

17  you saw it?

18    A.   Well, there are some things that are

19  avoidable, and there are some things that are

20  unavoidable; right?  Now, as far as I'm concerned --

21  and you can ask the opinion of anyone that is a

22  professional.  You can ask Dorie's opinion; John's

23  opinion.  I mean, that was not reckless; right?  I

24  mean, Aleem has to ride -- he's a young rider.  He's

25  getting better every day.  He has to ride different

USPA Hearing Committee
August 06, 2021

Page 88

1    horses.   Each horse behaves differently.

2              He did, you know, everything that he could to

3    keep that horse under control, but unfortunately,

4    collisions do happen.   I mean, there's a big sign in

5    the arena that says, "Don't enter here unless you're

6    willing to risk the loss of life."   So, I mean, I

7    personally do not believe that it was malicious from

8    Aleem's side.   That is why, you know, we asked him to

9    go back and apologize, because we thought that the

10   collision was what had happened; that that was the

11   primary incident.   It's only later that we came to find

12   out that something more had occurred.

13             And to answer your question, you know, do we

14   talk to Aleem about his riding?   I mean, Dorie does.

15   And again, you know, not to brag about Dorie's barn,

16   but I mean, those are some of the most well-behaved

17   children.   They're always taught to be graceful in

18   defeat.   They're always taught to accept

19   responsibility.   And Aleem, you know, is no different.

20   If there's --

21        Q.   And again --

22        A.   Sorry.  Go ahead.

23        Q.   No, no, no.

24        A.   Well, I was just going to say, if there's any

25   doubt -- I mean, there's been a couple of lines of

Page 89

1  questioning, and I just want to go on the record that,

2  you know, we're not here to question the character of a

3  14-year-old child.  You know, we've asked Aleem

4  multiple times, you know, "Are you sure that this is

5  what occurred?"  And, you know, he knows what the

6  penalties are for lying.  You know, it's not just a

7  grounding.  You know, we've have asked him to confirm

8  that this is exactly what happened, and we believe him.

9  This is what happened.

10      Q.   So do you know what type of collision -- what

11  would you say we normally call the collision that you

12  saw happen?

13      A.   I don't know the USPA rules.  So I just saw

14  what's been described, that Aleem's horse ran into

15  Darrell's horse; into Darrell and Darrell's horse.  You

16  know, that's the sum total of my knowledge.

17      Q.   And do you know what type of foul --

18      A.   I have no idea.

19      Q.   -- Aleem received?

20      A.   No.

21      Q.   In the statement submitted, I think there was

22  some discussion that both sides received a foul.  Do

23  you recall that, or was it just Aleem?

24      A.   I think both sides.  I'm not sure.  My wife

25  submitted the document, but --

USPA Hearing Committee
August 06, 2021

Page 90

1      Q.    So we translated the Urdu.

2      A.    Uh-huh.

3      Q.    And, you know, we're happy to get an official

4  translation company as well to do so if needed, but I

5  think this suffices for this hearing, if you don't

6  mind.  And of course, it's very short (as read):  Now,

7  that's how you play.  You have to push it.  No, he

8  didn't push it hard enough.  No, he didn't push it

9  hard."

10          With that type of collision, you know, we

11  generally call it a T-bone.

12          MR. GREEN:  Excuse me.  I'm sorry to

13      interrupt, but can I interject for a minute,

14      please?

15          MS. TAYLOR:  Sure.

16          MR. GREEN:  I'm sorry to interrupt.  But

17      Ms. Taylor, you were a player in this game; is

18      that right?

19          MS. TAYLOR:  Yes.

20          MR. GREEN:  Okay.  So as a lawyer, I don't

21      think you should be opining on what we generally

22      call --

23          MS. TAYLOR:  Okay.  I agree.

24          MR. GREEN:  Because you're encroaching on

25      getting close to being a fact witness when you do

USPA Hearing Committee
August 06, 2021

Page 91

1     that.

2          MS. TAYLOR:  Sure.

3          MR. GREEN:  Please rephrase your question.

4          MS. TAYLOR:  Sure.  So we have an umpire

5     who's going to testify as to the foul, so I'll

6     leave it at that.

7          MR. GREEN:  All right.  Good.

8  BY MS. TAYLOR:

9     Q.   So I just want to go back to how you chat with

10  Aleem about his riding and, you know, what you

11  understand to be encouraging to him to be good riding,

12  to be respectful, and have good sportsmanship.  And

13  Aleem did say that he's had several crashes like this

14  often, and, you know, he's fine; he feels nothing.

15    A.   So -- no.  Go ahead.  I'm sorry.  I want to

16  hear your question.

17    Q.   That's it.  So can you explain a little bit

18  more?

19    A.   Yeah.  So let's just clarify.  So, I mean,

20  when you play the game of polo -- and I just came to

21  understand that you're a polo player as well as a

22  lawyer, so you understand that, obviously, within the

23  game -- the game is not a soft game; right?  You have

24  to go and push against the opposing player to get the

25  ball.

USPA Hearing Committee
August 06, 2021

Page 92

1          Now, again, you're quoting my words, and

2    again, the translation is out of context.  We're not

3    looking at the video.  And again, if we want to pull

4    the video up, we can talk about it.  We can review the

5    audio in conjunction with the video.  So I think that's

6    a little bit, you know, incorrect, to just pull up the

7    words out of context; right?

8          So we should be looking at the video and the

9    words.  And there's a high probability that I was not

10   saying on the video, "Wow, well done."  You know, "You

11   pushed into him and," you know, "you knocked him off."

12   I mean, T-boning, we know, is not allowed in the game.

13   I mean, we've seen Aleem get T-boned; we've seen other

14   riders get T-boned.  We've seen that happen in the

15   game.  But of course, I would not be encouraging my son

16   to play recklessly, which is what we're talking about

17   here; right?

18          I mean, afterwards, we've also got to remember

19   that there was not just intimidation off the field.

20   There was retaliation on the field; right?  So let's

21   not lose track of that, too.  You know, we've got video

22   as well as stills of Mr. Gaebel then coming up to my

23   son, yanking his reins out of his hands, pulling the

24   horse close, and then again swearing at him.

25   Q.    We've not seen those stills.  They were not

USPA Hearing Committee
August 06, 2021

Page 93

1    attached in what was sent to us.  But if someone can

2    send it now, we can look at it quickly.  That's fine.

3    We've not seen those still pictures.  We can deal with

4    it later.  If somebody wants to send it to us later,

5    that would be great.

6              MS. TAYLOR:  Craig, that was not in your

7         attachments to us.

8              MR. GALLE:  I can probably pull them up and

9         email them to you.

10             MS. TAYLOR:  Okay.  You know, I don't need

11        them right now to go further, but I would like to

12        have them so we can at least look at them right

13        now during the hearing, if you don't mind.

14             MR. GREEN:  Just to be clear, are you

15        prepared to finish with this witness without

16        seeing those photos?

17             MS. TAYLOR:  Yes.  Absolutely.

18             MR. GREEN:  Okay.

19             MS. TAYLOR:  But I think we should just have

20        them now so that --

21             MR. GREEN:  All right.

22   BY MS. TAYLOR:

23        Q.   So, Taha, I just want to reiterate the

24   question and your prior testimony, that you did not

25   hear Darrell yourself say -- I understand how you feel.

Page 94

1    It's your son.  You believe your son.  I'm not

2    questioning your belief in your son, but you did not

3    hear Darrell say any of the alleged words at issue?

4         A.    That is correct.

5               MS. TAYLOR:  Okay.  Thank you.

6               MR. TAHA SIDDIQUI:  Thank you.

7               (A recess was taken from 12:12 p.m. to

8               12:22 p.m.)

9               MR. GREEN:  Mr. Siddiqui, I understood you to

10   say something, but I just want to make certain I'm

11   correct.  You don't purport to understand the USPA

12   arena rules; is that right?

13              MR. TAHA SIDDIQUI:  I mean, to clarify the

14   answer -- I mean, I don't know the rule book

15   inside and out.  But I know that, you know, for

16   example, bumping is allowed.  Like, you're allowed

17   to ride up, but you're not allowed to throw

18   elbows; you're not allowed to T-bone.  But I'm not

19   a player; right?  I'm just a spectator.  So that

20   was what my comment was.

21              But I do also want to clarify one point, my

22   comment earlier about the video and the audio:

23   You know, I haven't looked at it since the day of

24   the incident, and I gave it to my wife.  I went

25   back and I watched it, and I just want to go on

USPA Hearing Committee
August 06, 2021

Page 95

1    the record and state that, you know, my words are

2    being taken out of context.

3        We went back and we watched the video.  The

4    comments that I make in Urdu basically can be

5    translated as, you know, to paraphrase:  "This

6    happens in the game.  You have to push.  He didn't

7    push hard enough," which I think is what

8    Ms. Taylor said.  But those comments are before

9    the collision occurred, not during the collision.

10   It wasn't, "Bravo.  Well done.  He should have

11   pushed harder."  So, again, those words were taken

12   out of context.

13       MR. GREEN:  Well, that may or may not result

14   in additional questions from Ms. Taylor, but I

15   don't have any further questions, sir.  I'd like

16   to thank you for your testimony.

17       MR. TAHA SIDDIQUI:  Thank you.

18       MS. TAYLOR:  No.  I think the video speaks

19   for itself.  I don't have anything further.

20   Thanks.

21       MR. GALLE:  All right.  Teresa, did you

22   receive the email with the three photographs that

23   were referenced earlier?

24       MS. TAYLOR:  I'm sorry.  I haven't had a

25   chance to look.  Let me look.

USPA Hearing Committee
August 06, 2021

Page 96

1          MR. GREEN:  While she's checking, maybe

2     Ms. Beal has questions.

3          MS. BEAL:  Just a point to clarify,

4     Mr. Siddiqui, you mentioned that you video all the

5     games at Twilight, but I assume that you meant

6     only the games that your son is playing in; is

7     that correct?

8          MR. TAHA SIDDIQUI:  That's true, yeah.  I

9     would run out of memory if I did every game.

10    Yeah, just my son's games.  I have a vested

11    interest in that.

12         MS. BEAL:  That's all I have.

13         MR. GREEN:  I think that's all the questions

14    we have for this witness.

15         MR. GALLE:  Okay.  Thank you, sir.

16         (The witness was excused.)

17         MR. GALLE:  Lindsey, could you ask Mr. George

18    Krabbe to join us.

19         THE COURT STENOGRAPHER:  If you can raise

20    your right hand, please.

21         In the testimony you're about to give, do you

22    swear to tell the truth, the whole truth, and

23    nothing but the truth?

24         THE WITNESS:  Yes.

25    ///

Page 97

1                    -. GEORGE NEWTON KRABBE,

2    having been first duly sworn or affirmed, was examined

3    and testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. GALLE:

6        Q.   Mr. Krabbe, please state your name for the

7    record.

8        A.   George Newton Krabbe.

9        Q.   And I understand -- and correct me if I'm

10   wrong -- that from time to time, you act as an umpire

11   of polo games?

12       A.   Yeah.  I help Gobin out usually most Saturday

13   nights.

14       Q.   Okay.  And on the night of July 10th, 2021,

15   did you umpire any of the arena polo games at Twilight

16   Polo in The Plains, Virginia?

17       A.   Yes, sir.

18       Q.   Did you act as the umpire for the Battlefield

19   versus Polo Yacht Club arena game that evening?

20       A.   Yes, sir.

21       Q.   And in that arena game, did you have occasion

22   to umpire the whole game?

23       A.   Yeah.  I was in there for all four chukkers.

24   I think, actually, that one was a round robin, so it

25   was six chukkers.

Page 98

1    Q.   Got it.  And that particular game, Darrell

2    Gaebel was on one of the teams and Aleem Siddiqui was

3    on another team; is that correct?

4    A.   Yes, sir.

5    Q.   Okay.  I want to talk about, during the game,

6    a particular collision that we have been discussing

7    here before you got on the line.  Was there any

8    collision between the players and their horses?  And

9    when I say "the players," I'm referring to Darrell

10   Gaebel and Aleem.

11   A.   Yeah.  Aleem ran his horse into the back of

12   Darrell, and I blew the whistle.  I didn't give him a

13   yellow flag or anything like that.  I just said, "Hit

14   from the spot" after Darrell didn't continue.  He

15   grabbed his back once he got hit by the horse's head.

16   So I just gave dangerous riding [verbatim], but no

17   yellow or anything like that.  I felt it was

18   unintentional.  And then I did a hit from the spot for

19   Polo Yacht Club.

20   Q.   Were there any whistles called on Mr. Gaebel

21   as a result of that collision?

22   A.   No.  There was nothing -- the only thing,

23   which I guess I could have, was when he got -- when the

24   horse ran into his back he gave a reaction.  He said,

25   "Motherfucker," not looking at Aleem or anything like

USPA Hearing Committee
August 06, 2021

Page 99

1   that, as he grabbed his back.  So I just took it as a

2   reaction.  He didn't scream it.  He kind of just said

3   it.

4        Q.   Okay.  Did you hear Mr. Gaebel say the words

5   "motherfucking nigger" at all during that game?

6        A.   No, sir.  And it was that play that,

7   afterwards, Dorie came up to me.  This was in the last

8   chukker.  I think there was a couple of minutes left on

9   the clock.  After that game, I went back to the trailer

10  to get a new horse to umpire the next game, and as they

11  were dragging the arena, Dorie approached me saying

12  that Aleem had gone to her and his parents and said

13  that that's what he had heard.  But at that time, I had

14  not heard anything.  I told her that I did not hear

15  that word whatsoever.

16       Q.   I asked you about a phrase, but now I'll ask

17  you about a --

18       A.   Oh, no, no, no.  I didn't.  The only thing I

19  heard was "motherfucker" when he grabbed his back, as a

20  reaction.  He didn't yell it or anything like that.  He

21  just kind of said it as he was holding his back because

22  he had just gotten the horse's -- I think the horse was

23  in a pelham, and he had just gotten pelham shanks to

24  the back.

25       Q.   Okay.  At any time during the game or after

USPA Hearing Committee
August 06, 2021

Page 100

1   the game, did you hear Darrell Gaebel utter the word,

2   in the singular, "nigger" or something to that effect?

3       A. . No, sir.  I've known Darrell five years.  I've

4   never heard any racial slur out of his mouth.

5       Q.   Okay.  Apart from what you observed or heard

6   in the arena during the game, were you a witness or did

7   you participate or hear any of the discussion that

8   occurred after the game between Aleem, the coach, and

9   Aleem's mother?

10      A.   No.  As I said, right after the game, I went

11  back to the trailer, dropped off that umpire horse and

12  got another umpire horse.  At that point, they were

13  still dragging the arena.  So I was standing at the

14  entry gate, and that's where Dorie approached me,

15  asking me if I had heard that, and I told her that I

16  had not heard that.  So that's, I mean -- and then I

17  got back on my umpire horse.  And I think what you're

18  talking about was while I was umpiring.

19      Q.   Okay.  So sounds like you weren't a

20  participant in discussions after the game?

21      A.   No, sir.  I mean, from what I have been told,

22  I think the discussion after game was during the next

23  game when I was in the arena umpiring.

24      Q.   Okay.  Fair to say that you can't share any

25  firsthand knowledge of what occurred, at least during

USPA Hearing Committee
August 06, 2021

Page 101

1   that discussion, because you were back in the arena?

2        A.   I didn't even know they had a discussion until

3   I heard, afterwards, about the situation.  As I said, I

4   didn't even know that this had gotten blown up so big,

5   because in the arena, as I said, I heard no racial

6   slurs.  The only thing I heard was "motherfucker" as he

7   grabbed his back as a reaction.

8        Q.   Okay.  Apart from the collision, the resulting

9   whistle and the foul you called, and the comments that

10  were uttered from Mr. Gaebel, "motherfucker," did you

11  see any other interactions between Aleem and Mr. Gaebel

12  that struck you as unusual during the match?  Any

13  aggressive play towards each other?

14       A.   Afterwards, there was one other time where

15  both of them kind of were riding each other off

16  aggressively.  I had blown the whistle for a different

17  foul.  They were kind of following the play up.  I blew

18  the whistle and I just said, "Guys, there's two minutes

19  left on the clock.  Just stay away from each other."

20       Q.   Did you say, "Stay Away from each other"

21  because --

22       A.   I just said, "Guys, there's two minutes left

23  on the clock."  You know what I mean?  You know, it was

24  the last chukker.  I just kind of said just -- I mean,

25  I didn't hear any verbiage or anything.  I just saw

Page 102

1  both of them bumping hard.  You know what I mean?  Both

2  of them just, you know, going excessively hard against

3  each other.  And as I said, this is the first game of

4  the night, where the polo gets faster and faster

5  throughout the night.

6          So this is pretty slow polo.  So I mean, you

7  know, both of them going at it, it was just -- it kind

8  of wasn't necessary on both sides.  And I just said,

9  "Guys, there's two minutes left on the clock.  Just

10  kind of stay away from each other for the remainder of

11  the chukker."

12      Q.    And then after the remainder of the chukker --

13  the remainder of the game for that matter -- did they

14  stay away from each other?

15      A.    Yeah.  I saw nothing else.  I didn't feel like

16  I needed to blow the whistle to, you know, reprimand

17  either of them.  You know what I mean?  As I said,

18  there wasn't -- I didn't even think there was a foul

19  getting caused.  It's just -- you know, that's slow

20  polo.  You just don't need to be bumping that hard

21  against each other when, you know, the ball's going at

22  a trot pace in front of you, you know.

23          But I would say that was both ways as well.

24  It wasn't one was going harder than the other.  Both of

25  them were both doing the exact same thing.  And

USPA Hearing Committee
August 06, 2021

Page 103

1  that's -- and, as I said, I didn't blow the whistle for

2  that.  I had blown the whistle for something else, and

3  then I just told them to stay away from each other.

4      Q.  Have you read the complaint that was authored

5  by Delora Burner?

6      A.  I have not seen the whole thing.

7      Q.  Okay.  After the game, you did speak with her

8  about whatever complaint she was verbalizing at that

9  point in time?

10     A.  Yeah.  She verbalized it.  As I said, it was

11  less than ten minutes, whatever.  I mean, the first

12  couple of games get moved really quickly.  So I, like,

13  told her there's a trophy presentation after the first

14  game, between the second game.  So I mean, it was

15  literally -- I rode out as they went around, you know,

16  shaking hands with the crowd, and then I got on a new

17  umpire horse.

18        They were still dragging the arena as I was

19  waiting at the entry gate.  And that's where Dorie

20  approached me and asked me if I had heard anything like

21  that, and I told her I had not heard that.  And I kind

22  of thought that was the end of it until a couple of

23  days later when I heard that -- I didn't even know that

24  they had a discussion afterwards, so . . .

25     Q.  Okay.  You mentioned that you have known

USPA Hearing Committee
August 06, 2021

Page 104

1    Mr. Gaebel for about five years.  Have you --

2        A.    Just through polo.

3        Q.    Through polo.  Okay.  The allegations that

4    you've heard about the language used, is it

5    characteristic, in your interactions in the polo world

6    for five years, or is this something that sounds

7    unusual to you?

8        A.    This is very unusual from what I was told.  As

9    I said, in the past five years of knowing Darrell, I've

10   never heard a racial slur out of his mouth against any

11   race.  It's just very uncharacteristic.  I've never --

12   I've been around him a lot.  You know, I do every

13   Saturday night -- it's very seldom that he misses a

14   Saturday night, and then I also help John Gobin out at

15   the farm sometimes, you know.  So I mean, I see Darrell

16   a couple of days a week, and I've never once heard

17   anything like that.

18           MR. GALLE:  Okay.  That's all questions I

19       have for you.  I think Darrell's lawyer is going

20       to have some questions.

21           MR. KRABBE:  Oh, okay.  No problem.

22                   CROSS-EXAMINATION

23   BY MS. TAYLOR:

24       Q.    Hi, George.

25       A.    Hi.  How are you, Teresa?

USPA Hearing Committee
August 06, 2021

Page 105

1    Q.    Good, thank you.  So was this a USPA match?

2    A.    This was not a USPA match.  I'm not a

3    USPA-certified umpire, and it was also not a USPA club.

4    Q.    Okay.  And so what foul did you call on Aleem?

5    A.    I called dangerous riding.  I saw that it was

6    unintentional.  It wasn't at a high speed where there

7    was a huge amount of risk.  So I didn't think there

8    needed to be a yellow card pulled or anything.  I just

9    said, "Hit from the spot."

10   Q.    And what was your impression -- you touched

11   on this a little bit -- when Darrell was hit in the

12   pelham shanks on his back?

13   A.    Yeah.  I think the horse might have had a

14   pelham on it.  And as all polo players know, because

15   we've all had that happen, it is quite painful.  And

16   I've never known anybody to not have a reaction after

17   that type of collision.

18   Q.    After yelling out, you mentioned -- you said

19   that he was hunched over?  Did you say that or --

20   A.    He was hunched over grabbing his back, yes.

21   He was holding his back when he made that reaction.  As

22   I said, he did not look directly at Aleem.  It was just

23   a general -- excuse my language -- "Motherfucker."

24   Q.    Hunched over on the horse, you mean?

25   A.    Yeah.  He wasn't laying on the horse's neck or

USPA Hearing Committee
August 06, 2021

1   anything, but he was leaning forward with his hand on

2   his back where he had just gotten a bit to his back.

3        Q.   And did he stay in that position for a little

4   bit?

5        A.   Yeah.  I mean, not an extended, extended

6   amount of time, but it wasn't, like, ten seconds and

7   then he was up.  I mean, you could see that there was a

8   lot of pain.  Everybody who plays polo has had a bit to

9   the back, and everybody knows that it's not a pleasant

10  feeling.

11       Q.   What's your impression of -- did Aleem seem

12  extremely upset or disturbed or anything unusual after

13  that collision?

14       A.   I saw nothing that would have made me think

15  that he was under stress or anything like that.

16       Q.   Did he seem upset after the collision with

17  Darrell?

18       A.   I mean, there was visible -- I saw nothing on

19  his face that would make me think that he was visibly

20  upset or anything like that.

21       Q.   And the riding that you saw that night by

22  Aleem and Darrell, would you say that they were riding

23  and playing as they typically do?

24       A.   Yeah.  It was a normal match.  I don't think

25  there was any grudge between anybody or anything like

Page 107

1  that.  I think they just -- you know, I've played

2  against Aleem in the Two Bowl.  I've played against

3  Darrell multiple times.  They're just competitive

4  people.  I don't think that there was anything other

5  than just going out there and being competitive.

6          MS. TAYLOR:  Okay.  Those are the only

7      questions I have.

8          MR. KRABBE:  Thank you, Teresa.

9          MS. TAYLOR:  Thank you.

10         MR. GALLE:  Hold on one second.  The hearing

11     committee members, Chrys Beal or Chris Green, may

12     have some questions.

13         MS. RAHMAN:  Would I be able to ask a

14     question?

15         MS. TAYLOR:  No.

16         MS. BEAL:  If Chris doesn't have a question,

17     I'll ask a quick question.

18         MS. BEAL:  You say it was round robin,

19     George?

20         MR. KRABBE:  I'm pretty sure that was a round

21     robin.  So it was Polo Yacht Club and Battlefield.

22     Like I said, they dragged the arena right after.

23         MS. BEAL:  So there were winner/winners

24     [verbatim] you're saying, going into this?

25         MR. KRABBE:  I think they just decide

USPA Hearing Committee
August 06, 2021

Page 108

1   beforehand.  I don't do the scheduling.  And mind

2   you, this is not competitive polo.  This is just

3   exhibition.  There's no trophies given, nothing

4   like that.

5        MS. BEAL:  Okay.  Thank you.

6        MR. GREEN:  I think I'm off mute now, George.

7   Can you hear me?

8        MR. KRABBE:  Yes, sir.

9        MR. GREEN:  How are you?

10       MR. KRABBE:  I'm good, Chris.  How are you

11  doing, sir?

12       MR. GREEN:  I'm doing good.  I wanted to ask

13  you just one or two questions.

14       MR. KRABBE:  No problem.

15       MR. GREEN:  You said that you heard Darrell

16  say "motherfucker" after he was hit, because you

17  understood he was reacting to being hit; right?

18       MR. KRABBE:  Yes, sir.  I mean, I've

19  definitely made the same statement after catching

20  a bit to the back.

21       MR. GREEN:  And how far away, if you

22  remember, were you from Darrell?

23       MR. KRABBE:  I would say no more than -- this

24  pretty much happened around the 15- or 20-yard

25  mark.  I mean, I couldn't have been more than 25

1    yards away.  I mean, close enough that I'm not

2    going to get into the play, but, definitely, I

3    think I was in a position to make all the calls.

4         MR. GREEN:  Do you think it's possible that

5    he could have uttered the racial slur and you

6    didn't hear it?

7         MR. KRABBE:  I mean, at the volume that he

8    had said the first part of it, I would have been

9    able to hear the second part of it.  I was

10   definitely within ear range, and I heard nothing

11   that would make me think he said anything more.

12        MR. GREEN:  Right.  But if he said it more

13   quietly, is it possible that you could have not

14   hear it?

15        MR. KRABBE:  I'm standing right there, and I

16   saw nothing that would have been like, you know,

17   his mouth moving and saying something.  You know

18   what I mean?  At that point, he was still holding

19   his back, kind of, "Ahh."

20        MR. GREEN:  So is it fair to say that you do

21   not think it's possible that he could have uttered

22   the --

23        MR. KRABBE:  I think that's a fair

24   assumption.  I do not think it's possible that he

25   said it.

USPA Hearing Committee
August 06, 2021

Page 110

1       MR. GREEN:  Okay.

2       MR. KRABBE:  As I said, I don't know what

3  happened outside of the arena, but in the arena, I

4  do not think it's possible that he said it.

5       MR. GREEN:  Okay.  All right.  I don't have

6  any further questions.  Thank you for your

7  testimony, George.

8       MR. KRABBE:  Thank you, Chris.  Good to see

9  you.

10       MR. GREEN:  Good to see you.

11       MS. BEAL:  Can I ask one more question, I

12  guess, about your position, George?  Sorry.

13       MR. KRABBE:  Yes, ma'am.

14       MS. BEAL:  So the play started off in one

15  direction and turned 180 degrees because there was

16  a pretty sharp turn on the play?

17       MR. KRABBE:  Yes, ma'am.

18       MS. BEAL:  So now the players' backs,

19  basically, are on the video.  I don't know where

20  you are compared to where they were.

21       MR. KRABBE:  So I'm on the side where the

22  announcer's side would be, but way closer to the

23  play.  I'm not quite in the middle of the arena.

24  I'm kind of between the center and probably where

25  the 25 would be.

USPA Hearing Committee
August 06, 2021

Page 111

1        MS. BEAL:  And so are you looking at the

2    players' faces, or are you looking at --

3        MR. KRABBE:  I saw Darrell's face.  Darrell's

4    face was directed at me because that's where he

5    got run into.  Aleem came from behind and ran into

6    his back.

7        MS. BEAL:  When they turned around, you were

8    looking at their faces?  They were following the

9    play, and then they turned 180 [verbatim] and are

10   looking at you?

11       MR. KRABBE:  As far as I can remember, yes.

12   I mean, this was close to a month ago, and I

13   didn't realize that -- you know, I didn't realize

14   I had to put it into my memory play by play.  But

15   yes, I mean, from what I saw, there's no way he

16   could have said it.

17       MS. BEAL:  Okay.  Thank you.

18       MR. KRABBE:  Thanks, Chrys.  Good to see you

19   as well.

20       MR. GALLE:  Before you leave, hold on one

21   second.  I just want to address something.

22   Aleem's mother asked if she could ask a question.

23   Generally that wouldn't be permitted.  Teresa, I

24   don't have an objection to it, but I want to know

25   what your position on it is.

USPA Hearing Committee
August 06, 2021

Page 112

1        MS. TAYLOR:  No, no.  I think we're going to

2    leave it.

3        MR. GALLE:  Okay.  All right.  Thanks,

4    George.  I appreciate it.

5        MR. KRABBE:  All right.  Thank you, guys.

6    Good luck and everything.

7        (The witness was excused.)

8        MS. RAHMAN:  Can I add something to the

9    record after this regarding the same?

10        MR. GALLE:  We'll address something at the

11    tail end.

12        MS. RAHMAN:  That's fine.

13        MR. GALLE:  So just keep a mental note of

14    that.

15        MS. RAHMAN:  Because he was saying something

16    about the actual video, and I just want to clarify

17    the video because it doesn't go along with his

18    recollection.

19        MR. GALLE:  Okay.  All right.  Lindsey, would

20    you call in Mr. Gobin, please?

21        THE COURT STENOGRAPHER:  I need to swear you

22    in, if you can raise your right hand, please.

23        In the testimony you're about to give, do you

24    swear to tell the truth, the whole truth, and

25    nothing but the truth?

USPA Hearing Committee
August 06, 2021

Page 113

1          THE WITNESS:  Yes.

2                    JOHN GOBIN,

3    having been first duly sworn or affirmed, was examined

4    and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. GALLE:

7          Q.   Sir, would you kindly state your name for the

8    record.

9          A.   John Gobin, G-O-B-I-N.

10         Q.   Okay.  And Mr. Gobin, were you present at

11   Twilight Polo in The Plains, Virginia, on the evening

12   of July 10th, 2021?

13         A.   Yes.

14         Q.   And did you observe the arena polo game

15   between Battlefield and Polo Yacht Club on that

16   evening?

17         A.   Most of it, yes.

18         Q.   Okay.  And did you see or hear -- let me break

19   that up.  Did you hear any discussion, colloquy, or

20   words exchanged during the polo game between Darrell

21   Gaebel and Aleem Siddiqui?

22         A.   No.  I didn't observe any verbal interaction.

23         Q.   Okay.  You didn't hear any verbal interaction

24   as well?

25         A.   No.  I didn't hear anything; I didn't see

Page 114

1   anything.

2        Q.   You didn't hear any cuss words uttered by

3   Mr. Gaebel?

4        A.   No.

5        Q.   Or vice versa, for that matter?

6        A.   Or vice versa.  I didn't hear any -- you know,

7   we have a sound system going, so I didn't hear

8   anything.

9        Q.   Okay.  And how about after the game?  Did you

10  see any interaction or hear any discussion that would

11  have involved Darrell Gaebel and Aleem?

12       A.   After the game, Dorie Burner come up to me and

13  informed me that Darrell had said the "N" word to

14  Aleem, and I thought it was impossible.  And I said,

15  "Well, let's just go talk to Darrell right now."  And

16  so we went over, spoke with Darrell, and Darrell was

17  shocked and said, "Never."  He was totally surprised.

18  And I said, "Well, just go and talk to him and his

19  family and tell him," you know, "we're all friends and

20  that never happened; it's impossible," whatever.  I

21  can't remember exactly what I said.

22            But Great Meadow is a family.  We're all

23  friends.  We do things together, have dinners together,

24  Florida together, trips together, and that kind of

25  behavior would never happen at Great Meadow -- well,

Page 115

1  Twilight Polo.  The premises was Great Meadow.

2      Q.   Okay.  The language that was attributed to

3  Darrell by Dorie, did you find that unusual or not

4  consistent with your past dealings with Darrell?

5      A.   Darrell would never -- Darrell plays hard.  He

6  goes hard, no harder or -- you know, he's not

7  dangerous.  He goes as hard as, like, an aggressive

8  player; a good player, but he's never, ever, you know,

9  verbally assaulted anyone on the polo field.  And I

10 think he's been playing with me for ten years.

11     Q.   Okay.  After you spoke with Dorie and she made

12 the accusations or attributed the statements to

13 Darrell, did you participate in any discussions with

14 Aleem, Darrell, Aleem's parents, or Dorie?

15     A.   Dorie and I spoke a few days afterwards on the

16 phone.  I finished running the night, so that night,

17 no.  I thought everything was fine.  So Dorie and I

18 spoke on the phone three or four days later, and she

19 was irate, crazy, still wanting to go after Darrell and

20 was calling him "White Privilege," and she was

21 attacking him.  And just no matter what anyone would

22 say or I would say, she would not calm down, cool off,

23 zero.  She was ready for battle.

24     Q.   Did that strike you as unusual?

25     A.   It is with the "N" word.  It isn't -- she gets

USPA Hearing Committee
August 06, 2021

Page 116

1   heated up a lot, thinking that, you know, she's

2   overlooked in polo and her ability as an instructor

3   because she's a woman.  She thinks, you know, it's a

4   man's world and a man's sport, and she gets heated up

5   over that a lot, thinking that she doesn't get any

6   respect because she's a woman.  And I try to assure her

7   that we all appreciate her.  She does a lot for kids

8   polo in the area, and -- but does it -- no, it doesn't

9   surprise me.

10       Q.   Okay.  The next day after -- I guess it would

11   be the 11th of July -- the day after the polo the

12   evening before [verbatim], did you have any discussions

13   or communications with Aleem or his parents about the

14   incident that had been alleged?

15       A.   I don't think so.  I don't think I've spoken

16   to his parents.

17       Q.   As you sit here today, you don't have any

18   recollection speaking with either one of Aleem's

19   parents about what Dorie had alleged to have been

20   stated or what Aleem --

21       A.   I don't think so.  And if I did, I would have

22   probably just tried to defuse the situation, not

23   thinking that it would go this far, and just be like,

24   "Come on.  Let's just all play polo, have fun, forget

25   about it.  Let's move on."  You know, not saying

Page 117

1  Darrell would ever say a word like that, just -- I

2  mean, there's arguments and bickering on the polo

3  field, whether it's my ball or your line or, you know,

4  stuff like that constantly, and I put small fires out

5  consistently to try to keep everybody, you know, being

6  friends and staying friends for the entire summer.  So

7  I didn't think this was going to blow up like that.

8  But I don't think I have spoken to his parents, other

9  than that night for a second or two.

10     **Q.   Okay.  And on that evening where you had a**

11  **short discussion with Aleem's parents, just tell us**

12  **generally what you recall being discussed.**

13     A.   I can't even remember.  I mean, it would have

14  been just trying to make everyone happy.  It wouldn't

15  have been saying Darrell said that.  Darrell would

16  never say that, he told me.  He seemed shocked when

17  Dorie and I asked him, and he said he would never say

18  that.  He denied it from the first moment we brought it

19  to his attention.

20     **Q.   When you and Dorie spoke with Darrell on that**

21  **evening, was there any discussion about Darrell**

22  **apologizing?**

23     A.   I just said, "Go kiss and make up, guys,"

24  because I was there when Aleem ran into Darrell.  His

25  horse was running off with him, and it ran into

USPA Hearing Committee
August 06, 2021

Page 118

1   Darrell's back, and it looked like it hurt.  Darrell

2   flew up on the horse's neck and didn't move for, I

3   don't know, five seconds.  He was, like, hanging onto

4   the horse's neck.  And the umpire blew a whistle on

5   Aleem for dangerous riding, and that's all -- I was

6   like, "Look, we have to play a lot of polo all summer

7   long.  Everyone just shake hands and make friends," you

8   know, just to diffuse the situation; not to diffuse the

9   situation with the "N" word or anything like that.  So

10  if they read into me saying, "Hey, everyone, let's get

11  along and drop it," they read wrong.

12          MR. GALLE:  That's all the questions I have

13      for you, but I believe Darrell's lawyer is going

14      to have some questions now.

15          MR. GOBIN:  Okay.

16                  CROSS-EXAMINATION

17  BY MS. TAYLOR:

18      Q.   **Hi, John.**

19      A.   Hi.

20      Q.   **How are you?**

21      A.   Doing great.  How are you-guys doing?

22      Q.   **Good, thank you.  So was this a USPA match?**

23      A.   No.  It's an exhibition match that we hold all

24  summer, and it's not an exhibition tournament -- I

25  mean, it's not a USPA tournament and it's not umpired

USPA Hearing Committee
August 06, 2021

Page 119

1   by a USPA umpire.  It's umpired by my friend, George

2   Krabbe.  And it's a venue that I rent, so I go over

3   there once a week and rent the facility on Saturday

4   night.

5       Q.   Okay.  And knowing Darrell for ten years, have

6   you ever seen him get physical with anybody off the

7   field, meaning, like, physically intimidate anybody

8   beyond showing that he might be mad about a flag?

9       A.   Never.  Darrell is probably 160 pounds soaking

10  wet.  He's not that scary.  And it's just not in his

11  DNA to be an aggressive person.  On the polo field, he

12  goes hard, he plays hard, he rides hard, but he's

13  always a gentleman, and off the field, not at all.

14      Q.   So let's go back to the apology.  So I think

15  you made it clear, but I just want to reiterate and be

16  sure.  So you did not tell Darrell to apologize for

17  saying a racial epithet?

18      A.   Look, no way; no way.  Darrell would not say

19  it.  I would do something at the club -- in our club --

20  if someone did that.  He wouldn't be welcomed back.  So

21  I saw Aleem run into him, and that's what I thought

22  they were talking about, when Aleem ran into Darrell;

23  for everybody just to shake hands and get along and be

24  friends.  That's all.  Because if you don't end it that

25  night, the next time they play against each other,

USPA Hearing Committee
August 06, 2021

Page 120

1   someone could possibly go after the other person and

2   try to T-bone them or hit them with the mallet; just

3   something silly.

4            So I try to diffuse all of those situations,

5   because it's a long hot summer here in Virginia, and we

6   play against the same players throughout the summer.

7   And, you know, old grudges or new grudges, I try to end

8   them quickly.

9       Q.   So you made a comment that you were surprised

10  to hear the allegation that Darrell said or called

11  Aleem, quote, "You motherfucking nigger," but you were

12  not surprised -- you said that you were not surprised

13  about Dorie making a complaint.  Can you clarify and

14  talk about that a little bit?

15      A.   I lost you for one blip.  Say that about

16  Dorie --

17      Q.   You made a comment that you were not surprised

18  that Dorie filed a complaint.  Can you elaborate on

19  what you think about Dorie --

20      A.   Well, she gets heated up.  She gets heated up

21  if -- I was a friend of Dorie's.  This is definitely

22  disappointing.  So when Dorie and I were talking as

23  friends, she would be heated up, saying that no one in

24  the sport respects her because she's a woman,

25  blah-blah-blah.  So she definitely has a chip on her

USPA Hearing Committee
August 06, 2021

Page 121

1   shoulder about a lot of issues, but I've never heard

2   her ever accuse anyone of being a racist.

3           So going after Darrell in this direction -- it

4   doesn't surprise me that she is going after him.  When

5   I've spoken to her before about this, four days after

6   when I spoke to her about it on the phone -- I mean, I

7   believe she is insanely going after Darrell.  She would

8   love to make this a huge issue and be on CNN or

9   whatever news channel that would allow her [verbatim].

10  And, yeah, I believe it's quite scary what she's doing.

11     Q.    Do you think Dorie has a pattern of going

12  after people or getting worked up about issues?

13     A.    I mean, I don't know.  I wouldn't say about

14  race issues, no; not about race.  I mean, she's always

15  complaining, you know, about how she isn't respected in

16  polo because she's a lady, a woman, but never on this

17  level going after someone on a race issue.

18     Q.    Have you seen her go after somebody on other

19  issues that didn't seem fair or honest?

20     A.    Well, last summer, she bought horses -- or two

21  summers ago, she bought horses from a guy.  I can't

22  remember what horses.  She signed a contract that she

23  was going to pay the guy for the horses, and she didn't

24  pay the guy and the guy had to sue her.  She wanted us

25  all to lie and testify for her and we wouldn't, and she

Page 122

1  lost the lawsuit about two months ago to the guy.  So I

2  don't know.  Read into that what you may.

3      Q.  **Was there a similar issue with horses and**

4  **anybody else that you can think of within the last year**

5  **or so?**

6      A.  Well, we had a problem with David Tafuri.  He

7  shipped a horse over there for the winter, and I

8  believe the other players were playing with his horse

9  and the horse got injured.  We had to turn the horse

10  out for a full year.  So that's another issue that we

11  have had with Dorie, and that was another issue that I

12  tried to tell everyone to, you know, let's move on.

13  And both parties were saying that they were going to

14  sue each other over that issue, but it never went to

15  that extreme.  But that was another issue that we had

16  with Dorie, yes.

17      Q.  **So in that situation, the horse wasn't being**

18  **played, but it was being played [verbatim]?**

19      A.  It was being kept at Dorie's facility in -- I

20  forget the name of the town, but it was being kept at

21  her arena for the winter.  David wanted to go stick and

22  ball [verbatim] throughout the winter and ride the

23  horse.  And what I believe is that the kids were

24  playing it in tournaments and games at her farm, and

25  David never got out to stick and ball, and it blew a

Page 123

1   check ligament or a suspensory.  So when we got it back

2   in the spring, it had a big suspensory and it was lame,

3   so we had to turn it out for a full year.

4        Q.   Did she deny that it had been ridden?

5        A.   She said it came with big legs.  But it didn't

6   come with big legs and it didn't go there lame,

7   so . . .

8        Q.   Were there pictures of that horse being played

9   in tournaments?

10       A.   No.

11       Q.   Okay.  So would you say that Dorie is

12   generally caught up in messes where honesty versus

13   maybe credibility is an issue often?

14       A.   I wouldn't say often, but a few times, yeah.

15   There's always drama with Dorie; lots of drama.

16       Q.   Okay.  And did you tell Darrell to apologize

17   for using a racial epithet, even if he said he didn't?

18       A.   No, no.  I didn't tell Darrell to apologize

19   for saying the "N" word.  Darrell didn't say the "N"

20   word.  I just told everyone to go shake hands and make

21   up; kiss and make up.  That's all.  I wasn't getting

22   involved -- I saw the play where Aleem ran into

23   Darrell.  I saw the play, but I didn't see Darrell -- I

24   didn't see him cuss, and I didn't even him say the "N"

25   word.

USPA Hearing Committee
August 06, 2021

Page 124

1  Q.  Did you apologize for Darrell saying the "N"

2  word?

3  A.  No, no, no, not at all.  I would never

4  apologize for anyone saying that word.

5  Q.  Did you ever make any comments to anyone after

6  that, that "Darrell is just this way; that's just

7  Darrell"?

8  A.  No.  I don't believe I would ever say that to

9  anyone -- "That's just Darrell" -- for this incident.

10  Darrell would never say that, you know.  Never.

11  Darrell playing hard, yes.  Darrell plays hard, but he

12  follows the rules, plays aggressive, and he's always a

13  gentleman, or most of the time a gentleman.  I mean,

14  I've never seen him not be a gentleman.

15  Q.  Does he carry the field off the field; the

16  issues that happen on the field off the field after the

17  play?

18  A.  Never.  Never.  And if Darrell does run into

19  someone on the polo field, he's the first one to go,

20  after the game, and apologize.  If Darrell were to do

21  something like that, he would be the first one to go

22  and say:  Hey, I didn't mean to run into you.  I didn't

23  see you.  Or something like that.

24  Q.  And how did Darrell seem when you walked over

25  with Dorie to chat with him?  What was his demeanor?

USPA Hearing Committee
August 06, 2021

Page 125

1    A.    Darrell was in a good mood.  I think he was

2   giving his horse carrots.  And when I told him, "Hey,

3   Darrell, what happened out there?" and told him what

4   Dorie said -- Dorie was right next to me -- Darrell was

5   shocked, surprised, and was like, "I would never say

6   that, ever."  He wasn't lying at all.

7        Q.    And did you see Aleem's demeanor at all coming

8   out of the arena?

9        A.    No.  I did not pay attention.

10        MS. TAYLOR:  Okay.  I don't have any more

11   questions.  Thank you, John.

12        MR. GOBIN:  Thank you, guys.

13        MR. GALLE:  John, hold on one second.  Chrys

14   Beal or Chris Green may have some follow-ups.

15        MR. GREEN:  I have some questions for you,

16   John.  This is Chris Green.  Can you hear me?

17        MR. GOBIN:  Yes, sir.

18        MR. GREEN:  So you said that you were a

19   friend of Dorie's.  Is it accurate to say that

20   you're no longer a friend of Dorie's?

21        MR. GOBIN:  Yeah.  I don't think I can be a

22   friend of someone who would do this to a person.

23   Darrell was on the phone with me crying four or

24   five days later.  He couldn't believe what was

25   going on.  This is a nice guy.  This is not a bad

USPA Hearing Committee
August 06, 2021

Page 126

1    person.  This is not some guy from Alabama with a

2    redneck flag.  This is a good man.  And the way

3    Dorie is attacking this guy is extremely scary.

4         MR. GREEN:  Did you talk to Aleem's father

5    the following day before a grass game that was

6    played?

7         MR. GOBIN:  I don't remember if I did.  I

8    don't remember.  And if I did, it would have been

9    me trying to just tell a joke; tell something

10   funny; everyone move on.  And that's how I usually

11   diffuse these situations because it's typically

12   childish what people fight about on the polo

13   field.  You know, it's something like, You crossed

14   my line; you didn't hit me the ball.  Silly stuff

15   like that.  So I thought that we were just going

16   to all move on and go back to playing polo.

17        MR. GREEN:  But just to be clear, you don't

18   remember talking to Aleem's father the next day?

19        MR. GOBIN:  I don't remember.  I might have,

20   but I do not remember.

21        MR. GREEN:  Are you -- how would you

22   characterize your relationship with Aleem's

23   father?

24        MR. GOBIN:  They seem like very nice people.

25        MR. GREEN:  Okay.  But you're not close to

USPA Hearing Committee
August 06, 2021

Page 127

1    them?

2        MR. GOBIN:  No.  They seem like very nice

3    people.

4        MR. GREEN:  Now, you said that after the

5    game, you encouraged Darrell to go over and kiss

6    and make up.  I think that's the words you used.

7        MR. GOBIN:  Yeah, but not from a racial slur.

8    Kiss and make up because I watched Aleem run into

9    him, and if there was any hard feelings on the

10   field, to leave it out there and move on.

11       MR. GREEN:  Were you satisfied that he made

12   every effort to kiss and make up?

13       MR. GOBIN:  Yes.  Absolutely.  I thought it

14   was all over until someone mentioned a letter

15   going to the USPA -- or I believe someone called

16   me from the Great Meadow Foundation -- and I was

17   shocked to find out all this stuff was going on.

18       MR. GREEN:  Were you present when he spoke to

19   Aleem and his mother?

20       MR. GOBIN:  No, I was not.

21       MR. GREEN:  So he went over and spoke to

22   them, but you didn't go with him?

23       MR. GOBIN:  I didn't -- typically, on

24   Saturday nights, I'm like a chicken with my head

25   cut off.  I'm running in ten different directions.

USPA Hearing Committee
August 06, 2021

Page 128

1    And when I'm running around, running polo here,

2    usually we're tacking horses; driving trucks,

3    trailers; playing; getting umpires.  I'm always

4    running around like a lunatic, so no, I wouldn't

5    have had time to go and hang out there.

6         MR. GREEN:  So the answer is, no, you didn't

7    go over there with him?

8         MR. GOBIN:  No, I did not.

9         MR. GREEN:  Okay.  Is Twilight Polo Club an

10   active member club of the USPA?

11        MR. GOBIN:  Yes, sir.

12        MR. GREEN:  And was it formally known as

13   Great Meadow Polo Club?

14        MR. GOBIN:  Yes.

15        MR. GREEN:  And that name change took place

16   in early 2021 or sometime around then?

17        MR. GOBIN:  Yeah.  It was around then.  In

18   January or February, we moved the name.

19        MR. GREEN:  Okay.  So I understand that this

20   was not a USPA event from your testimony, but was

21   it an event that was played under the auspices of

22   Twilight Polo Club?

23        MR. GOBIN:  Yes.  And we follow the USPA

24   rules.

25        MR. GREEN:  Okay.  So it was basically -- am

USPA Hearing Committee
August 06, 2021

1    I correct to say that it was basically a club

2    event of Twilight Polo Club?

3         MR. GOBIN:  Yeah.

4         MR. GREEN:  I don't have any more questions,

5    John.  Thank you for your testimony.  I think

6    maybe Chrys Beal might have a question or two.

7         MS. BEAL:  Hi, John.

8         MR. GOBIN:  Hi, Chrys.

9         MS. BEAL:  There's been some mention that you

10   talked to Dorie about writing the letter.  Do you

11   remember encouraging her or mentioning

12   something --

13        MR. GOBIN:  I never encouraged Dorie to write

14   a letter.

15        MS. BEAL:  Did you say anything about it at

16   all?

17        MR. GOBIN:  No.  I didn't tell her to or say

18   anything about writing a letter.

19        MS. BEAL:  Thank you.  Appreciate that.

20        MR. GALLE:  It sounds like that's all the

21   questions from the hearing committee?

22        MR. GREEN:  Correct.

23        MR. GALLE:  Okay, John.  Thanks for your

24   time.

25        MR. GOBIN:  Thank you.

Page 130

1        MR. GALLE:  Have a good day.

2        (The witness was excused.)

3        MR. TAHA SIDDIQUI:  So can I ask a quick

4    question for clarification for just a moment, if I

5    can?  So I think we're losing track of what we

6    have actually come here to discuss; right?  There

7    was an incident that occurred on July 10th which

8    we are supposed to be discussing, and I really had

9    to bite my tongue during that last testimony.

10       We're not here to discuss Dorie's character

11   or what Dorie has done in her past dealings.  That

12   has no relevance to this matter.

13       MR. GREEN:  Mr. Siddiqui, I don't mean to be

14   rude, but I have to interrupt you.  It's the

15   hearing committee's job to determine what's

16   relevant and what's not relevant.  It's not your

17   job.  I understand how you feel and I understand

18   what you're saying, but I have to ask you to

19   desist so that we can move on with the hearing.

20       MR. TAHA SIDDIQUI:  That's fine.  And that's

21   why I didn't interrupt, but I wanted to just go on

22   the record and --

23       MR. GREEN:  All right.  That's fine.  Thank

24   you, sir.

25       MR. TAHA SIDDIQUI:  Thank you.

USPA Hearing Committee
August 06, 2021

Page 131

1        MR. GALLE:  So that's all the witnesses that

2    I'm going to call today.  I know that Teresa and

3    Lindsey have a list of witnesses that they would

4    like to call, so I will turn it over to them to

5    embark upon calling their witnesses.

6        MS. TAYLOR:  Thank you, Craig.  I'm just

7    looking for our list because I had a preferred

8    order.  I believe Brock is next.

9        MS. DENNIS:  He is.

10        MS. EBERSBACH:  He has been admitted.

11        MS. DENNIS:  Hi, Brock.

12        MR. BROMLE:  Hello.  How are you?

13        MS. DENNIS:  I'm great.  Thanks for asking.

14        MS. DENNIS:  So I think before we get started

15    if we can have the court reporter swear Brock in

16    for us, please.

17        THE COURT STENOGRAPHER:  Sir, I need to swear

18    you in for the record, if you can raise your right

19    hand.

20        In the testimony you're about to give, do you

21    swear to tell the truth, the whole truth, and

22    nothing but the truth?

23        THE WITNESS:  I do swear to tell the whole

24    truth and nothing but the truth.

25    ///

USPA Hearing Committee
August 06, 2021

Page 132

1                          BROCK BROMLE,

2   having been first duly sworn or affirmed, was examined

3   and testified as follows:

4                       DIRECT EXAMINATION

5   BY MS. DENNIS:

6        Q.    So Brock, let me just start off with something

7   simple.  How old are you?

8        A.    I'm 13.

9        Q.    When did you turn 13?

10       A.    May 1st.

11       Q.    Okay.  Well, happy belated birthday.

12       A.    Thank you.

13       Q.    So Brock, do you know why you're here today?

14       A.    I do.

15       Q.    Can you tell me what it is.

16       A.    Darrell Gaebel is being accused of saying some

17   things to Akeem [sic] on the polo field, and we are

18   here to decide if that is true or not.

19       Q.    Okay.  That's a pretty good synopsis.  So

20   Brock, this accusation was -- it apparently happened on

21   July 10th.  Were you playing polo that day?

22       A.    I was.

23       Q.    How long have you been playing polo?

24       A.    For about three years now.

25       Q.    And were you playing in the game with Darrell

USPA Hearing Committee
August 06, 2021

Page 133

1    and Aleem?

2        A.    I was.

3        Q.    Whose team were you on?

4        A.    I was on the Polo Yacht Club [verbatim].

5        Q.    And that was with Darrell?

6        A.    Yes.

7        Q.    So while you-guys were playing, did you

8    witness any kind of collision between Darrell and

9    Aleem?

10       A.    I did.

11       Q.    Can you tell me what you saw?

12       A.    First off, is it "Akeem" or "Aleem"?  I'm

13   sorry.

14       Q.    "Aleem" with an "L."

15       A.    Okay.  Aleem had T-boned Darrell, and the head

16   of Aleem's horse went up against Darrell's back.  I'm

17   pretty sure it hit Darrell on the back too, and Darrell

18   kind of yelled out in pain.  It was clearly not a very

19   good experience for him.  He was hunched over.  It did

20   not feel good.

21       Q.    Okay.  When this collision happened, where

22   were you in the arena in relation to Darrell and Aleem?

23       A.    I was a few feet behind them.

24       Q.    Okay.  So you had a good view of what

25   happened?

USPA Hearing Committee
August 06, 2021

Page 134

1      A.   Yes.

2      Q.   And were you within earshot?

3      A.   I was.

4      Q.   What did you hear Darrell yell out?

5      A.   I believe he yelled out "motherfucker," but

6  not at Aleem.   And he never said the "N" word.

7      Q.   So it wasn't at Aleem.   It was just a general

8  cry-out?

9      A.   Yeah.

10      Q.   Have you played with Darrell before?

11      A.   I have.   I've been playing with him for a

12  year, maybe a year and a half now.

13      Q.   And how would you describe Darrell's demeanor

14  when he plays?

15      A.   He plays really well.   He's very focused on

16  the game, but at the same time, he's trying to give

17  pointers and trying to help everyone.   He's a really,

18  like, good-hearted person on the field too.

19      Q.   Okay.   So you like playing with Darrell?

20      A.   Oh, yeah.   Totally.

21      Q.   Great.   And have you ever heard him use foul

22  language in an arena before?

23      A.   No.   Never.

24      Q.   So how did it strike you that he yelled out

25  this swear word after he was hit?

USPA Hearing Committee
August 06, 2021

1     A.    I assumed that he was probably in a lot of

2   pain.

3     Q.    Okay.  And Brock, do you know Aleem?

4     A.    Not very well.

5     Q.    Have you played against Aleem before?

6     A.    A few times.

7     Q.    And what's that experience been like?

8     A.    I don't really have too much of an opinion.  A

9   normal game; we treated each other like normal players;

10  nothing out of the ordinary.

11    Q.    Okay.  Cool.  And Brock, have you ever won any

12  awards for playing polo?

13    A.    I have.  Junior sportsmanship of the year.

14    Q.    Okay.  And what -- how does someone win that

15  award?

16    A.    I guess just shaking hands at the end of the

17  match; never getting mad at the other players; smiling

18  a lot, I guess.

19    Q.    So just like general good sportsmanship?

20    A.    I guess so.

21    Q.    So based on your experience with good

22  sportsmanship, how would you describe what happened

23  between Darrell and Aleem?

24    A.    Not very good sportsmanship, because when

25  Aleem hit Darrell, he kind of, like, slowly started to

USPA Hearing Committee
August 06, 2021

Page 136

1   trot away, and he shrugged his shoulders and smiled

2   towards his parents.  That did not really seem like he

3   was sorry for hitting him at all.

4        Q.   Did you see Aleem apologize to Darrell?

5        A.   I don't believe so.

6        Q.   And after the game, did you see Aleem and

7   Darrell interact?

8        A.   No.  I believe I was just taking my stuff off

9   and putting it in the car, so I wasn't really around.

10       Q.   So you didn't think there was anything else

11  that was going to happen outside of the arena after the

12  game?

13       A.   No.  I didn't really think anything of it.

14       Q.   Okay.  And I just have one other question for

15  you.  I asked you about any awards that you've won.

16  Was that an award with the USPA?

17       A.   That was.

18       Q.   And where did you get it?

19       A.   I got it in -- well, I got it at IPC in

20  Wellington, Florida.

21          MS. DENNIS:  Okay.  Great.  I have no further

22       questions.

23          MR. BROMLE:  Okay.  Well, thank you.

24  ///

25  ///

USPA Hearing Committee
August 06, 2021

1                              CROSS-EXAMINATION

2     BY MR. GALLE:

3          Q.    I have some questions for you.  I won't be

4     long.  Thanks for coming today.  So I understand that

5     you were within a few feet of Darrell and Aleem at

6     about the time of the collision and just shortly after

7     the collision.  And you told us that you heard Darrell

8     say "motherfucker," but you did not hear that he said

9     the word "nigger."  What I'd like to know is, from that

10    point forward through the rest of the game, did you

11    hear any other words uttered between Darrell and Aleem?

12         A.    I did not.

13         Q.    How about before the collision?  Did you hear

14    any words that struck you as unusual being uttered

15    between the two of them?

16         A.    I did not.

17         Q.    So throughout the entire arena game on that

18    evening, the only words that you heard Darrell say

19    after the collision was "motherfucker"?

20         A.    Uh-huh.  But again, that was not directed at

21    Aleem.  That was kind of just, like, in the air.

22         Q.    Okay.  After the game, you did not observe,

23    participate in, or overhear any interactions between

24    Aleem and Darrell; is that correct?

25         A.    That is.

USPA Hearing Committee
August 06, 2021

Page 138

1    Q.    Or between Darrell and Aleem's parents?

2    A.    I did not hear anything.

3    Q.    Or between Darrell and Delora Burner?

4    A.    I did not.

5          MR. GALLE:  Okay.  That's all the questions I

6    have for you.  Thank you.

7          MR. BROMLE:  Thank you.

8          MR. GREEN:  I have a few questions for you,

9    Mr. Bromle.  My name is Chris Green, and I'm one

10   of the hearing officers that is going to be

11   deciding this case.  Can you hear me okay?

12         MR. BROMLE:  I can hear you perfectly fine.

13         MR. GREEN:  Great.  Have you read any of the

14   papers that have been filed in this matter?

15         MR. BROMLE:  I have.

16         MR. GREEN:  Where did you get those papers

17   from?

18         MR. BROMLE:  My mother as -- it was just the

19   complaints that were filed.

20         MR. GREEN:  Your mother?

21         MR. BROMLE:  Uh-huh.

22         MR. GREEN:  Do you know where she got them

23   from?

24         MR. BROMLE:  I assume you-guys.

25         MR. GREEN:  You assume what guys?

Page 139

1        MR. BROMLE:  USPA.

2        MR. GREEN:  Did you meet with any of the

3   lawyers in this case before you testified today?

4        MR. BROMLE:  No.

5        MR. GREEN:  So you haven't talked to or met

6   with Ms. Dennis before today?

7        MR. BROMLE:  No.  This is the first time I've

8   ever seen her.

9        MR. GREEN:  Okay.  And you haven't talked to

10  or met with Ms. Taylor?

11       MR. BROMLE:  Not really.

12       MR. GREEN:  What do you mean by "not really"?

13       MR. BROMLE:  Well, I mean, we live together,

14  so of course I've been saying "Hi" to her and

15  such, but we haven't talked about the case.

16       MR. GREEN:  Oh, I see.  Is she your mother?

17       MR. BROMLE:  She is.

18       MR. GREEN:  Okay.  All right.  So she's the

19  person that gave you the papers in the case?

20       MR. BROMLE:  She is, as I asked to read them.

21       MR. GREEN:  And was she on the team with

22  Mr. Gaebel in the arena that night and you?

23       MR. BROMLE:  She was, yes.

24       MR. GREEN:  And you and your mom, other than

25  her giving you the papers, have not talked about

USPA Hearing Committee
August 06, 2021

Page 140

1    this case before today?

2         MR. BROMLE:   No.

3         MR. GREEN:   Okay.   Let me see if I have any

4    additional questions for you.   (Brief pause.)

5         I don't think I do.   I appreciate your

6    testimony.

7         MR. BROMLE:   Okay.   Thank you.

8         MR. GREEN:   Maybe Ms. Beal will have some

9    questions for you.

10        MR. BROMLE:   All right.

11        MS. BEAL:   I just have one.   Hi, Brock.

12        MR. BROMLE:   Hello.

13        MS. BEAL:   My name is Chrys also.

14        MR. BROMLE:   Nice to meet you.

15        MS. BEAL:   Nice to meet you.   There was a

16   video of this incident -- actually, two incidents.

17   Have you seen those videos?

18        MR. BROMLE:   I have.

19        MS. BEAL:   On the second video, you're also

20   pretty close to the play.   I see you're close to

21   the play of the first incident.

22        MR. BROMLE:   Yes.

23        MS. BEAL:   The second incident, you're also

24   there.   Did you see a mallet go over a horse and

25   run into it or hear any more cuss words?

USPA Hearing Committee
August 06, 2021

1          MR. BROMLE:  No.

2          MS. BEAL:  So even if it shows up on the

3     video, you didn't see it happen?

4          MR. BROMLE:  No.

5          MS. BEAL:  Okay.  Thank you.  I appreciate

6     you answering my questions.

7          MR. BROMLE:  Thank you.

8          MS. DENNIS:  I think that's everything for

9     Brock.

10          MR. BROMLE:  Awesome.

11          MR. GREEN:  Thank you.

12          MR. BROMLE:  Thank you.  Shall I leave the

13     meeting then?

14          MS. DENNIS:  Yes.

15          (The witness was excused.)

16          MR. GREEN:  Lindsey or Teresa, next witness?

17          MS. DENNIS:  I have the list in front of me

18     right now.  I believe next is Adam Doble.

19          MS. EBERSBACH:  I believe Adam is connected

20     now.

21          THE COURT STENOGRAPHER:  Sir, I need to swear

22     you in for the record, if you can raise your right

23     hand.

24          In the testimony you're about to give, do you

25     swear to tell the truth, the whole truth, and

USPA Hearing Committee
August 06, 2021

Page 142

1      nothing but the truth?

2            THE WITNESS:   I do.

3                      ADAM DOBLE,

4    having been first duly sworn or affirmed, was examined

5    and testified as follows:

6                      DIRECT EXAMINATION

7    BY MS. TAYLOR:

8        Q.    Hi, Adam.  How are you today?  This is Teresa.

9        A.    I'm well, thank you.  And yourself?

10       Q.    Good, thank you.  And thank you for meeting

11   with us and taking the time.  Can you just tell us who

12   you are and what your relation is to Twilight Polo and

13   Battlefield Polo.

14       A.    Yes.  My name is Adam Doble.  I am the father

15   of Sophia Doble.  And she plays or played -- you, know,

16   I don't know -- polo at Battlefield.  She played polo

17   at Battlefield, and she has also played at Twilight.

18       Q.    Okay.  And so does Sophia still play at

19   Battlefield?

20       A.    She does not.

21       Q.    And what was her experience like?  Why is she

22   not playing there anymore?

23       A.    Well, there's a handful of reasons.

24   Primarily, I think she felt like -- I think she felt

25   like a lot of the parents kind of did not like her and

USPA Hearing Committee
August 06, 2021

Page 143

1 were sort of out to get her, and they constantly were

2 trying to get her in trouble.  So I think she just

3 started trying to look for other places to play polo,

4 and with this recent event, I think that was sort of

5 the final straw over some of the things that were said

6 to her.

7      Q.   So did you speak with Sophia about the events

8 of that night?

9      A.   I did, yes.

10     Q.   And was Sophia present?

11     A.   I was not -- was I present?

12     Q.   Was Sophia present?

13     A.   Yes.  She was present.

14     Q.   And can you share with us the conversation you

15 had with her about what she witnessed in the match and

16 the events that night?

17     A.   She said that she was just watching the match,

18 and she could apparently -- well, she didn't really see

19 much of anything.  Like, she didn't hear anybody say

20 anything, but, I mean, they kind of, I guess, were

21 bumping into each other or something like that, and I

22 guess tempers were flared about that or something.  But

23 she told me later on that she heard that the gentleman

24 in question supposedly said -- you know, called the boy

25 a racial slur.  And Sophia was like:  "I was right

USPA Hearing Committee
August 06, 2021

Page 144

1    there.  I didn't hear anything like that.  There was

2    nothing like that said."  And she even witnessed -- I

3    guess there was a conversation that they had

4    afterward -- I guess, that the gentleman was completely

5    shocked that he was being accused of that.  But Sophia,

6    she witnessed all of that, as far as she told me.

7            MR. GREEN:  Counselor, may I just ask a

8        question, not of the witness, but of you?

9            MS. TAYLOR:  Yes.

10           MR. GREEN:  I assume you would agree that

11       this is all hearsay?

12           MS. TAYLOR:  Yes.  It's fine.

13           MR. GREEN:  Okay.

14   BY MS. TAYLOR:

15       Q.    So Mr. Doble, how old is Sophia?

16       A.    She is 16.

17       Q.    And so when you say that the gentleman was

18   surprised, who are you referring to?

19       A.    I'm terrible with names, but it's the

20   gentleman that it's being said that he called Aleem, I

21   believe his name is, a racial slur.  I don't remember

22   his name off the top of my head.

23       Q.    Has Sophia played with Darrell -- and his name

24   is Darrell.  Has Sophia played with Darrell as far as

25   you know?

USPA Hearing Committee
August 06, 2021

Page 145

1     A.    I don't know if she has played with him.   I
2   think she knows -- sort of knows who he is.   She didn't
3   really know him that well at the time, I don't believe.
4   At least that's how she explained it to me.   It was
5   that, you know -- because I asked her specifically
6   that:   "Well, do you know this guy?"   And she said,
7   "No, not really."
8     Q.    And so does Sophia know Aleem?
9     A.    Well, yeah.   She's known him for a while.
10  They've played polo -- or they did play polo together
11  for some time.
12    Q.    And are they friends?
13    A.    I don't know if they are friends.   She never
14  had anything negative to say about him, you know, but I
15  don't know that I would say that they're friends or
16  not.
17    Q.    And what's your experience been?   Do you know
18  Aleem's parents?
19    A.    I know who they are.   I tend to stay away from
20  a lot of the other parents at these polo -- at least at
21  Battlefield, primarily because it felt like being in an
22  episode of Dance Moms.   There was always gossip.   There
23  was always, you know, somebody talking bad about
24  someone else.   I mean, I don't want to say always, but
25  I overheard that a lot, so I usually just stayed away.

Page 146

1    So I didn't really have a lot of interactions
2  with them, but I would hear this stuff, and that's kind
3  of, like I said, why I stayed away.
4    Q.   So you said that this incident with the crash
5  and the allegations against Darrell were kind of the
6  last straw?
7    A.   Yeah, because -- well, there were a couple of
8  things.  I mean, Sophia, I guess, actually had an
9  incident with Aleem's mother.  Aleem and Sophia had
10 gotten into an argument about something -- I don't know
11 what -- and she called -- well, because they got into
12 an argument, she called Sophia a racist.  And so
13 putting that with this, Sophia was like, "I'm done."
14   Q.   Do you know what that argument was about?
15   A.   No.  I don't know.  I mean, I think it was
16 just typical -- you know, the kids always seemed to
17 argue about who was controlling their horse properly
18 and who wasn't, and who was doing, you know, things I
19 don't fully understand because I've never been on a --
20 or I've been on a horse one time in my life.  I don't
21 understand horses; I don't understand the idea of how
22 to control them.  So the things that they're talking
23 about, I don't -- it's like another language to me.
24 But it was something to do with, you know, just the
25 aspect of the game itself.

USPA Hearing Committee
August 06, 2021

Page 147

1    Q.    So it was an argument after a match about what

2    happened in the arena?

3    A.    I believe it was during -- actually, I picked

4    her up from a practice.  Or maybe they had a match or

5    something like that, but, you know, she was -- so they

6    had been practicing, and I guess maybe they were

7    playing a chukker of some sort or whatever they're

8    called, for practice, and that's what happened.

9    Q.    And so what was your response or what

10   conversation did you have with Sophia when Sophia told

11   you that she had an argument with Aleem and Aleem's mom

12   jumped in and called her a racist?

13   A.    I was kind of, you know, wanting to go

14   confront her about this, but Sophia wouldn't let me.

15   She just said, "No.  Just don't worry about it.  It's

16   not that big of a deal."  Actually, the way it was

17   brought up, I could tell something was wrong with her,

18   and being the annoying parent that I am, I pressured

19   her until she said it to me.  So I was going to say

20   something, but she didn't want me to say anything at

21   all.  She wanted me to just drop it and let it be

22   because she figured I would embarrass her.

23   Q.    Okay.  And did Sophia -- has Sophia had any

24   similar incidents with Dorie?

25   A.    No.  Actually, she got along very well with

Page 148

1    Dorie, I believe.  I mean, they would have their spats,

2    but I think it was more like Dorie would ask, you know,

3    "What's on your mind?  Tell me what you're thinking."

4    You know, things like that.  And Sophia may not be the

5    one to say that to because if you really want to know

6    what she's thinking, she will let you know.  And it's

7    not always pretty and it's not always, you know -- I

8    mean, if she's upset about something, she'll tell you

9    why.  I mean, it's both a character flaw and a positive

10   thing with her.  But I think she liked Dorie --

11   actually, I know she liked Dorie a great deal, and she

12   enjoyed being around her and playing polo for her and

13   with her.

14        Q.   Did Sophia work for Dorie?

15        A.   She did, yes.

16        Q.   For how long, and what did she do?

17        A.   I don't know -- so I don't fully know how long

18   she was technically employed.  They would always work

19   after -- you know, like, they would clean stalls.  So

20   there was always that work, but then she started

21   working for her, I guess, about a month ago to start

22   being paid, and it was basically the same thing that

23   she was doing.  I mean, I think there were lessons

24   involved, you know, teaching people polo; there was

25   cleaning the stalls, you know, and washing the horses.

USPA Hearing Committee
August 06, 2021

Page 149

1    Just the things that they do all the time.

2        Q.    So was she supposed to be an employee and not

3    just doing work that she was doing as part of being a

4    polo player out at the farm or at the club?

5        A.    As Sophia understood it and explained it to

6    me, she was an employee and she was to be getting paid.

7    Now, I think one of the things that Dorie does is sort

8    of -- there's also another aspect of it, like a

9    pay-to-play-type thing so things don't cost as much --

10   or not pay to play, but work to play.  So things aren't

11   as expensive because you work, and so then you get

12   certain discounts or stuff like that on your chukkers

13   or on your lessons or whatever.

14            I don't fully understand it, but that's what

15   Dorie explained to me one time.  But then Sophia

16   understood that she was going to be officially an

17   employee and be getting paid, and Dorie did explain to

18   me that she would be getting paid.

19       Q.    So this is kind of like a work-study situation

20   where you get paid a little bit and learn how to run

21   the barn?

22       A.    Yeah, primarily, I believe.

23       Q.    Do you know if Sophia ever mentioned to Dorie

24   that Humera called her a racist?

25       A.    That, I do not know.  She did not mention that

USPA Hearing Committee
August 06, 2021

Page 150

1  to me if she did.

2     Q.  And so she's not working there anymore?

3     A.  She is not.

4     Q.  Is she happy where she is now?

5     A.  Oh, very much so.  She actually -- yeah, she's

6  very, very [verbatim].  I mean, I even said something

7  to her, that it's nice to see her happy.

8     Q.  And where is she now?

9     A.  She works for a gentleman named John.  As I

10 said, I'm terrible with last names.  His name is John.

11 He would kind of like, I guess you would say, announce

12 the polo games at Twilight.  He has a farm out in

13 Middleburg, though.

14    Q.  John Gobin, maybe?

15    A.  Yeah.  I think that's right.

16    Q.  Okay.  And was Sophia willing to testify

17 today?

18    A.  Actually, she was, yes.

19    Q.  And whose decision was it to just call as few

20 children as possible?

21    A.  Well, I mean, you and I discussed that, and we

22 both said that it would probably just be better not to

23 have her and probably other kids as well.

24       MS. TAYLOR:  Sure.  Okay.  Well, thank you so

25    much, Adam.  I don't have any more questions.

USPA Hearing Committee
August 06, 2021

Page 151

1          MR. DOBLE:  Okay.

2          MS. TAYLOR:  I don't know if anybody else

3     does, so stay on the line, please.

4          MR. DOBLE:  Okay.

5                    CROSS-EXAMINATION

6  BY MR. GALLE:

7     Q.   Mr. Doble, I have some questions.  Good

8  afternoon.  My name is Craig Galle, and I represent the

9  USPA.  How are you today?

10    A.   I'm well, thank you.  It's a pleasure to meet

11 you.

12    Q.   Same here.  Not many questions, but I just

13 want to confirm a couple of things.  Is it fair to say

14 that you were not present on the date in question when

15 the incident that we're talking about here between

16 Aleem and Darrell Gaebel took place; is that correct?

17    A.   That is fair to say, yes.  That's correct.

18    Q.   And is it fair to say that most everything

19 you're telling us here today is as a result of

20 conversations and information given to you by your

21 daughter, Sophia?

22    A.   Yes.  That is correct.

23    Q.   Can you confirm for us that Sophia did not

24 hear, one way or another, any of the discussions

25 between Aleem and Darrell Gaebel during which they

USPA Hearing Committee
August 06, 2021

Page 152

1  communicated with each other on the day in question,

2  which I believe is July 10th, 2021?

3      A.   Well, I mean, she said she could hear what was

4  being said, and what she did not hear was a racial

5  slur.  So she said she heard what was said, but there

6  was no racial slur.

7      Q.   Well, what did she tell you that she heard was

8  said?

9      A.   I believe it was, "Control your" -- and pardon

10  my language -- "Control your fucking horse."

11      Q.   Anything else that she heard?

12      A.   No.  And I don't know -- I'll be honest.  I

13  don't know if she added the "F" word in or if that was

14  what was actually heard.  Sometimes with her it's hard

15  to tell which exact -- you know, when it's her word or

16  somebody else's.

17      Q.   Understood.  I'm interested to hear just a

18  little bit more about Sophia's comment to you, when you

19  were telling us earlier that Aleem's mother had called

20  her a racist.  Can you be a little more specific about

21  what was said and the context within which it was said?

22      A.   Well, like I said, I had picked her up after

23  practice, and I could tell that something was wrong.

24  She was rather upset and rather quiet, which is unusual

25  for her.  She usually wants to tell me about her entire

USPA Hearing Committee
August 06, 2021

Page 153

1    day at the barn, and for a 45-minute drive home, I will

2    hear everything that happened.  But she was just sort

3    of throwing her stuff into my car and not wanting to

4    talk, so I knew she was upset.

5            So I pressed her on it and pressed her on it,

6    and finally she -- the way it started, she was like,

7    "Well, I got into an argument with Aleem."  And I'm

8    like, "Okay.  Well, what was it about?"  And she

9    wouldn't really -- you know, she would just say that it

10   was just polo stuff, and she didn't want to go much

11   into it.  So I said, "But that's what you're so upset

12   about?" and she said, "No.  His mom called me a racist

13   because we were fighting."

14       Q.    Sophia was fighting with Aleem?

15       A.    Yeah.  I mean, she said they were fighting;

16   you know, bickering and arguing.  I don't know -- you

17   know, it was probably just some words being exchanged

18   about riding and stuff like that.

19       Q.    Did she provide any more specifics as to why,

20   from her standpoint, she was called a racist?  Like,

21   was there any words that were used or commentary that

22   was used?

23       A.    No.  She was actually kind of surprised by it.

24   She said, you know, "I didn't say anything, Dad.  I

25   didn't say anything to him.  We were just arguing about

1  the game," or something.  I don't remember her exact

2  words on that because I was more concerned with why she

3  was upset, not, per se, the exact words.  But she said

4  that she didn't say -- she said, "I didn't say anything

5  that was racist or anything like that."

6          MR. GALLE:  That's all the questions I have

7      for you.  We have two hearing committee members

8      here, Chris Green and Chrys Beal, who may have

9      some follow-up questions.

10         MR. DOBLE:  Okay.

11         MR. GREEN:  I don't have any questions.

12         MS. BEAL:  I have no questions either.  Thank

13     you.

14         MS. TAYLOR:  Okay.  Thank you, Mr. Doble, for

15     your time.

16         MR. DOBLE:  All right.  Thank you.

17         MR. GALLE:  Have a good day.

18         MR. DOBLE:  You as well.

19         (The witness was excused.)

20         MR. GREEN:  I do have a comment, though.  My

21     comment is, I understand it's your case to put it

22     on how you want to, Ms. Taylor, but that was not

23     helpful.  It was secondhand hearsay from a very

24     ill-informed witness who gave very ambiguous and

25     unclear testimony.  So you go ahead as you choose,

USPA Hearing Committee
August 06, 2021

Page 155

1    but I just wanted to say that.

2        MS. TAYLOR:  Well, thank you, Mr. Green, but

3    I think that, you know, with the amount of kids

4    and people at issue here, there were a few

5    witnesses that wanted to testify but wanted

6    Aleem's family sequestered.  That was not going to

7    happen.  You all were emphatic about that.  And I

8    think it's in the interest of not only my client,

9    but of those individuals, you know, not to call so

10   many kids.  So I hear you, but, you know, I

11   disagree.

12       MR. GREEN:  As I said, it's your case.  You

13   put it on how you want to.

14       MS. TAYLOR:  All right.  Well, thanks for

15   your comment, but we disagree.  Thank you.

16       So Lindsey, can you call the next witness?

17       MS. DENNIS:  Yes.  Next, we have David

18   Tafuri.

19       MS. TAYLOR:  Okay.

20       MS. EBERSBACH:  I do not see David in the

21   waiting room at this point.

22       MS. DENNIS:  Okay.  He might have needed to

23   log off for another meeting.

24       MS. TAYLOR:  Okay.  Then why don't we call

25   Marissa in the meantime.

USPA Hearing Committee
August 06, 2021

Page 156

1          MS. EBERSBACH:  I'll let Marissa in.  (Brief

2     pause.)  It says she's joining, but it might be a

3     connection -- she might have a slow connection.

4     (Brief pause.)

5          THE COURT STENOGRAPHER:  Are y'all ready for

6     her to be sworn in?

7          MS. DENNIS:  Yes.  We're ready for Marissa to

8     be sworn in.

9          THE COURT STENOGRAPHER:  Ma'am, I need to

10     swear you in for the record, if you can raise your

11     right hand.

12          In the testimony you're about to give, do you

13     swear to tell the truth, the whole truth, and

14     nothing but the truth?

15          THE WITNESS:  Yes.  Can y'all see me?

16          MS. EBERSBACH:  Yes.  There's just buffering

17     issues with the internet connection.

18                    MARISSA WELLS,

19     having been first duly sworn or affirmed, was examined

20     and testified as follows:

21                    DIRECT EXAMINATION

22     BY MS. TAYLOR:

23     Q.   Okay.  Marissa, can you hear me now?

24     A.   Yes.  I can hear you, Teresa.

25     Q.   Okay.  So even though the video is not working

Page 157

1    so well, I think we can ago ahead if you can just hear

2    and the audio seems to be okay.

3         A.    I can see you and hear you.

4         Q.    Okay.  Great.  Thanks for joining us, Marissa.

5    So were you there that night of the match at issue with

6    Darrell and Aleem?

7         A.    Yes.

8         Q.    Did you see or hear the match?

9         A.    I did not hear or see it because I was

10   playing against -- I played against both of them.

11        Q.    Okay.  And so how long have you -- you used to

12   work for Dorie -- is that correct? -- at Battlefield?

13        A.    Yes.

14        Q.    And did you know Aleem when you were there?

15        A.    Yes.  He was one of my students.

16        Q.    Okay.  Do you recall anything about his

17   riding, as far as, you know, his ambitions for riding,

18   or how he plays, or his character?  Anything at all

19   that you can recall from when you knew him and coached

20   him?

21        A.    So he was very aggressive.  I mean, most young

22   boys around his age are aggressive and physical.  They

23   like to bump.  I wouldn't say he was the best rider.

24   He didn't really come out and focus on his riding.

25   Like most boys, you know, they just want to hit the

Page 158

1  ball.  When I was leaving, he started to get, you know,

2  very competitive, and he would kind of talk back to

3  some of the other students, so I had some issues there.

4  He wasn't really a great teammate.  I remember many

5  kids would complain about him, you know, that he

6  wouldn't share the ball; he hogged the ball.  So he's

7  just a typical boy:  Aggressive.

8      Q.   **And did you ever have any encounters with his**

9  **family?**

10     A.  ⁻ Yes.  They would always come to -- they came

11 to every practice that we had at Battlefield.  Mostly

12 his mom, not his dad.

13     Q.   **And so when you worked for Dorie, were you**

14 **happy there?  What was the situation training the kids?**

15 **Did it seem like a good one?**

16     A.   I enjoyed my time over at Battlefield.  It was

17 a little chaotic at times because she would kind of

18 schedule lessons whenever and not really give me a

19 heads up.  I enjoy teaching the youth, so I really like

20 that.  The horse situation is a little chaotic because

21 her farm is only six acres, so there's not -- the

22 horses aren't, I don't think, as taken care of as well

23 as they could be.  She has a field down the road, so we

24 would constantly be ponying horses back and forth from

25 the property down the road to her farm.  But other than

Page 159

1    that, I love teaching and I enjoyed working for Dorie.

2        Q.    And so did you have any interaction with the

3    Ride to Work Program [verbatim]?

4        A.    They were a competitor that we would play

5    against, and they would come to Battlefield to play

6    against the Battlefield teams.  So we played against

7    them a bunch.

8        Q.    Did you find anything about the way they

9    played -- or did you ever hear Aleem make any comments

10   about how they played or about him looking up to them?

11       A.    So he's really close friends with all the

12   Work-to-Ride kids.  I mean, he really likes that

13   program.  I know that he has his own polo company for

14   his, like, sportswear; the shirt company that he makes

15   [verbatim], and he donates 10 percent of the proceeds

16   to them.  But, yeah, some of the older members that

17   graduated from the Work-to-Ride Program -- (garbled

18   audio) -- and Brandon Reese, he looked up to them.

19   They're polo players, but also very physical boys,

20   aggressive and fast, so he would always talk about the

21   Work-to-Ride Program, yes.

22       Q.    Did you find it at all problematic for you, as

23   a coach, with him looking up to the Ride-to-Work [sic]

24   boys?

25       A.    No, not really, but the only problem was when

Page 160

1    I would be playing -- there was one time that, I

2    think -- there's a 10,000 Tournament held at Great

3    Meadow at the Twilight arena.  He cheered for them

4    against me, and I was his coach.  I mean, that was kind

5    of disheartening, but other than that, no.

6        Q.   As far as talking back, when he would talk

7    back or engage with the other kids in arguments, did

8    you ever intervene?

9        A.   I never really witnessed anything.  It was

10   kind of all under their breath, you know.  I never had

11   an issue with him as, like, a coach to a student, but

12   other kids would tell me that, you know, "Aleem is

13   .really aggressive," and they would tell us that he

14   would yell at them.  So I would never really hear

15   anything or witness anything.  It was all just kind of

16   under their breath.

17       Q.   And so how long have you known Darrell?

18       A.   Three years; two or three years.  This is my

19   third summer, I think, being in Virginia since I

20   graduated college.

21       Q.   And what was your impression upon hearing

22   Aleem's allegations against Darrell?

23       A.   I disagree with it.  I think Darrell is a

24   great guy.  I mean, he's aggressive too in polo.  I

25   mean, polo is very competitive and it's a fast sport,

USPA Hearing Committee
August 06, 2021

Page 161

1  but I just don't think he would ever say that.

2      Q.    And what about intimidating or getting

3  physical when outside of the field?

4      A.    Who?  Darrell?

5      Q.    Yes.

6      A.    No.  I've never seen anything.  He's sweet.

7  He's like a grandfather to me.  I mean, he always

8  brings carrots and peppermints to his horses.  He's one

9  of the sweetest people I know.  Especially since

10 working for John this summer, I'm getting to know

11 Darrell even better, and I've watched him interact with

12 his horses.  He always comes out.  He always comes with

13 sticks and balls, and he's really dedicated and loves

14 the sport.

15     Q.    So would you say he's a good team member?

16     A.    He is a good team member, yeah.  He never

17 yells at his teammates.  If anything, he's really hard

18 on himself when he screws up or he misses a play.  And

19 he's always asking me for advice on what he could have

20 done better or what he should have done there.

21     Q.    Would you say he carries issues off the field?

22 The disagreements in the arena, he carries outside of

23 the arena after a match?

24     A.    Sometimes he's a little hard on himself, like

25 when he loses.  I mean, everyone gets upset when they

USPA Hearing Committee
August 06, 2021

Page 162

1  lose, but I've never seen him argue with anyone.   I

2  think he has pretty good sportsmanship on and off the

3  horse.

4       Q.   And could you ever see him intimidating,

5  pushing, or bullying a child?

6       A.   No.   I mean, he's 70 years old.   No.

7       Q.   Age aside, just his personality or character?

8       A.   No.

9       Q.   Did you find that believable?

10      A.   No.

11      Q.   And how did you feel about Aleem and Aleem's

12  family when you heard the allegations about Darrell?

13      A.   I was honestly shocked by the whole situation,

14  and I didn't think it would -- (garbled audio).

15      Q.   So you were breaking up a little bit.   I

16  didn't hear all of what you said there.   I'm sorry.

17  Can you just repeat that response?

18      A.   I said I was really shocked about what's been

19  going on with Aleem and his family and the allegations

20  against Darrell.

21      Q.   And were you surprised that Dorie filed a

22  complaint or about Dorie's reaction and her allegations

23  or anything?

24      A.   That does not shock me on Dorie's part because

25  Dorie is known to do that.   When she has an issue or if

Page 163

 1   she feels attacked, she generally tries to attack

 2   someone else.

 3       Q.   And can you think of -- are there any other

 4   situations that you can think of that you feel

 5   comfortable sharing just as an example?

 6       A.   Yes.  So there was a situation between Dorie

 7   and my mom -- (garbled audio).

 8       Q.   Marissa, I'm going to stop you.

 9       A.   Dorie was hosting an interscholastic

10   tournament during the interscholastic season with

11   COVID, and she --

12           THE COURT STENOGRAPHER:  Ma'am, you're going

13       to have to --

14           MS. WELLS:  Can you hear me?

15   BY MS. TAYLOR:

16       Q.   You were breaking up quite a lot.  Maybe if

17   you could just stay where you were --

18       A.   Can you hear me?

19       Q.   Yeah.  Now we can.  Maybe if you could just

20   stay still and just --

21       A.   Okay.  Let me get -- I'm going to go closer to

22   the farm.  Maybe they have better service over there.

23   (Brief pause.)  Can you still hear me?  Is this better?

24       Q.   Yes.  Maybe why don't you just start repeating

25   what you said, since we can hear you right now.  That

USPA Hearing Committee
August 06, 2021

Page 164

1    would be great.

2         A.    Okay.  So there was a situation between Dorie

3    and my mom.  Dorie was hosting an interscholastic

4    tournament at her firm, and, generally, interscholastic

5    is supposed to be high school-age students.  So my mom

6    brought an eighth-grader that Dorie felt was too strong

7    for this tournament, and she felt the need to put it

8    (garbled audio) -- who graduated high school two years

9    prior.  And it started a huge feud over -- (garbled

10   audio).

11        Q.    So Marissa, you're breaking up.  It was better

12   where you were right before you went in the barn.

13   Maybe if we could just try that, if you could step

14   outside not too far.   (Brief pause.)

15        A.    I don't know where to --

16        Q.    Okay.  We can hear you now.

17        A.    How is that?

18        Q.    Yeah.  Can you just stand right there and not

19   move?

20        A.    Okay.

21        Q.    Thank you.  So were saying that your mom

22   brought in an eighth-grader and Dorie brought in --

23        A.    -- a student that had already graduated high

24   school to this tournament.

25        Q.    Okay.  So she brought in someone who had

Page 165

1   already graduated to the tournament because your mom

2   brought in an eighth-grader who Dorie thought was too

3   strong of a player?

4        A.   Yes.

5        Q.   Okay.  Don't move.  Stand right there, please.

6   So because of the connectivity issues, I'm going to go

7   ahead and stop there and see if anybody else has any

8   questions.

9                      CROSS-EXAMINATION

10  BY MR. GALLE:

11       Q.   Hi, Marissa.  My name is Craig Galle, and I'm

12  going to ask you a couple of questions.  I won't be too

13  long.

14            Did you personally hear with your own ears any

15  of the interactions during the arena polo game on July

16  10th, 2021, between Darrell and Aleem?

17       A.   No, I did not.

18       Q.   So you don't know what was said or, for that

19  matter, what was not said?

20       A.   Correct.  I was working at the trailer

21  untacking horses during that game.

22       Q.   After the game ended, did you participate in

23  any discussions or interactions between Darrell and

24  Aleem with or without Aleem's parents and Dorie?

25       A.   No.  I did not witness any of those

Page 166

1    conversations happen.

2         MR. GALLE:  Okay.  That's all the questions I

3    have for you.  Thank you.

4         MS. WELLS:  Okay.

5         MR. GREEN:  Marissa, this is Chris Green.

6    Can you hear me?

7         MS. WELLS:  Yes.

8         MR. GREEN:  Okay.  Great.  I don't have any

9    questions for you.  I just want to thank you for

10   your testimony.

11        MS. WELLS:  Thank you.

12        MR. GREEN:  Maybe Chrys Beal will have some

13   questions.

14        MS. BEAL:  I have no questions for you.

15   Thanks for coming in.

16        MS. WELLS:  You're welcome.

17        MS. EBERSBACH:  Marissa, you can go ahead and

18   log off.  Thank you.

19        MS. TAYLOR:  Thanks, Marissa.

20        MS. WELLS:  Thanks.

21        (The witness was excused.)

22        MS. DENNIS:  Okay.  Next, then, is David

23   Tafuri for us.

24        MR. TAFURI:  Hello.

25        MS. DENNIS:  Ms. Manley, could we have David

USPA Hearing Committee
August 06, 2021

Page 167

1          sworn in, please?

2                THE COURT STENOGRAPHER:  Yes, ma'am.  Sir, if

3     you could raise your right hand.

4                In the testimony you're about to give, do you

5     swear to tell the truth, the whole truth, and

6     nothing but the truth?

7                THE WITNESS:  Yes, I do.

8                          DAVID TAFURI,

9     having been first duly sworn or affirmed, was examined

10    and testified as follows:

11                      DIRECT EXAMINATION

12    BY MS. TAYLOR:

13        Q.   Hi, David.  Thanks so much for taking the time

14    today.

15        A.   Sure.

16        Q.   I know you don't have much time, so I just

17    wanted to chat with you a little bit.  Were you there

18    the night of the match?

19        A.   Sorry.  Can we hold on for one moment?  I'm

20    really sorry.  I actually have to get in my car and

21    drive somewhere.  I thought this was going to be

22    earlier.  How long do you think this is going to take?

23        Q.   I'm going to be just a couple of minutes.

24        A.   Oh, okay.  All right.  Then let's go ahead.

25        Q.   But the two hearing officers and counsel for

Page 168

1    the USPA might have some questions when I'm done.   I

2    still don't anticipate a whole lot of time.

3         A.   Can we take a break for five minutes so I can

4    get in my car and check back in?

5              MS. TAYLOR:   Is that okay with everybody?   We

6         can just go on to the other witnesses.

7              MR. GALLE:   It's up to you, but if your

8         questions are just going to be a couple of

9         minutes, mine are probably going to be half that.

10             MR. TAFURI:   Okay.   Then let's -- then we can

11        do it.   Go ahead.

12   BY MS. TAYLOR:

13        Q.   Okay.   Great.   So David, you've had some

14   interaction with Dorie and your horses.   Can you tell

15   us about that quickly?

16        A.   Sure.   Let me close my door.   Hang on.   (Brief

17   pause.)

18             So I have had some interactions with Dorie.

19   I've known Dorie for a long time.   I've played some

20   polo with her.   I've played polo at her farm.   I've

21   been playing polo for about ten years.   I started

22   buying horses about five years ago, and when I bought

23   my first horse, I was keeping it at the Great Meadow

24   Polo Club.   And I decided that I wanted to have

25   somewhere to keep it here, in the Washington,

Page 169

1  DC/Virginia area during the winter, and Dorie offered

2  that I could board it at her farm, so I moved it from

3  Great Meadow to her farm.

4        And when we agreed that I would pay her to

5  board it, she said she might have people ride it just

6  to keep it in shape, and she promised me that they

7  would just do trail rides or maybe some very mild stick

8  and ball, but it wouldn't be played in any polo matches

9  and certainly no competitive matches.  So I left it

10 with her all winter, and I rode it a few times or

11 sometimes.  And when I called her in April or May and

12 told her that I was going to come pick it up, she told

13 me, "Oh, sure, but you should know that it's lame."

14        And I said, "Well" -- you know, I was

15 surprised that she hadn't told me that before.  She

16 just told me when I was coming to pick it up.  And I

17 asked her how that happened, and she said she didn't

18 know.  And I learned later that she had -- her and her

19 students had played it competitively, and they played

20 it in multiple matches.  And in one match -- some folks

21 that I know were there -- it got injured in the match,

22 and it had to be taken off the field, and then a week

23 later, the same people saw it being played again.

24        And I was never told by Dorie that it had been

25 injured in a match.  No one informed me of that.

USPA Hearing Committee
August 06, 2021

Page 170

1  Certainly no one informed me that it was continued to

2  be played after it was injured and had to be taken out

3  of a match because it was injured.  I would have

4  certainly asked that nobody ride it after it was first

5  injured.  And then I learned later from others that she

6  had played it in competitive scholastic matches and

7  that everyone liked the horse so much that they

8  double-chukkered it multiple times.

9          People showed me photos of the horse being

10  played in competitive matches or on social media.  I

11  was really surprised, and when I went back to Dorie and

12  I asked her, she denied all of this.  She claimed it

13  was never injured and she claimed that it was never

14  played in matches, even though I had seen photos that

15  showed it was played in matches, and she, generally,

16  was untruthful about what had happened with my horse.

17  I had really trusted her to take care of my horse.  And

18  at the time, I was new to horse ownership, so I think

19  she really took advantage of me and took advantage of

20  my trust.

21      Q.   And so what did you do or what were you

22  contemplating doing?  What did you resolve with her, if

23  anything?

24      A.   I asked her to pay me for the damage she did

25  to the horse or to reimburse me for all of the payments

Page 171

1   that I made for board, and she refused to do that.   She

2   blamed me.   She claimed the horse was injured when I

3   bought it, which was not true because I had played it

4   for a year or two before I boarded it with her, and she

5   generally denied any wrongdoing and was quite difficult

6   to deal with.   So I just gave up and stopped dealing

7   with her.

8        Q.   Did you contemplate suing her?

9        A.   I did contemplate suing her, but I decided not

10   to do that.

11        Q.   And are you an attorney?

12        A.   Yes.

13        Q.   And so what happened when you got your horse

14   back?  Were you able to ride it shortly after or --

15        A.   No.   It was injured, and I had to have a

16   veterinarian look at it and treat it, and ultimately,

17   we had to take it out of play for a year.

18        Q.   Okay.  So what would you say about Dorie's

19   character, generally, knowing the allegations that have

20   been alleged against Darrell Gaebel by Aleem and Dorie?

21        A.   Well, I would just say two things:  First of

22   all, I don't think Dorie is necessarily someone who can

23   be trusted or someone who is truthful, and I think that

24   in some of this dealing and others that I have

25   observed, it has given me concern about the way she

Page 172

1    conducts herself.

2          Secondly, I would say that I was not there for

3    this incident.  Well, I was there, but I didn't witness

4    this incident.  I was at the arena, but I did not

5    witness this, and I don't know what was said,

6    personally.  However, I know Darrell and I have played

7    with Darrell for a long time, and I cannot imagine,

8    based on what I know of him, in my many, multiple

9    interactions with him, that he would ever say what it

10   is alleged he said.

11        **Q.   Any racial slurs?  Have you ever heard him say**

12   **anything racist, derogatory, or discriminatory about**

13   **any group ever in conversations on the field or off?**

14        A.   Absolutely not.  This is something that I'm

15   very sensitive to.  I do not let anyone around me make

16   racial comments without me confronting them.  I have

17   always been like that, and I would never put up with

18   that from anyone.

19        **Q.   And have you ever seen Darrell intimidate**

20   **anybody physically or bully anybody, push them, outside**

21   **the arena?**

22        A.   Absolutely not.  Darrell and I have had

23   disagreements on the polo field, because we played

24   together a lot, but as soon as we left the polo field,

25   we've always been very cordial with each other.  I have

USPA Hearing Committee
August 06, 2021

Page 173

1    never seen any -- I have never seen him ever be
2    confrontational after a polo match, and I can't
3    imagine, in my observation and my knowledge of him,
4    that he would do the things that have been alleged.
5        Q.    Have you ever seen him doing that to a child?
6        A.    I do not believe he would do that, based on
7    what I know of him, no.
8        Q.    And when you had this issue with Dorie about
9    your horse, do you feel that she was trying to
10   blackball you or gossip about you to others, or any of
11   that type of behavior?
12       A.    Yes.  I think she did do that.  I heard she
13   said some negative things about me.  She acted in a
14   negative manner.  Her whole family was very difficult
15   to deal with after that incident.  I heard them make
16   comments about me, you know, claiming that I had lied
17   about my horse and things like that.  I honestly tried
18   to be above all of this.  You know, I didn't really
19   engage with her or anyone in her family.  I just
20   ignored them.
21           MS. TAYLOR:  Okay.  I don't have any further
22       questions.  Thank you, David.
23                   CROSS-EXAMINATION
24   BY MR. GALLE:
25       Q.    David, just a couple of questions.  I know

USPA Hearing Committee
August 06, 2021

Page 174

1   you're in a hurry.

2       A.   Sure.

3       Q.   I understand from your testimony that you've

4   had some issues with Dorie kind of unrelated to what

5   we're here on today.  So setting that aside, is it fair

6   to say that you did not observe, nor did you hear, any

7   communications between Darrell and Aleem on the 10th of

8   July, 2021, at Twilight Polo.

9       A.   Yes.  That is correct.

10      Q.   That would be both during the game or after

11  the game; correct?

12      A.   Correct.

13      Q.   So you have no firsthand knowledge of what was

14  said or wasn't said, nor any firsthand knowledge with

15  respect to the allegations of racial comments; is that

16  correct?

17      A.   Yes.  That's correct.

18          MR. GALLE:  Thank you.  That's all the

19      questions I have.

20          MR. GREEN:  David, this is Chris Green.  I'm

21      one of the hearing officers.  I don't have any

22      questions for you.  I appreciate you taking the

23      time to testify.

24          MR. TAFURI:  Hi, Chris.  Nice to meet you.

25      And thank you.

USPA Hearing Committee
August 06, 2021

Page 175

1        MR. GREEN:  You're welcome.  Thank you.

2        MS. BEAL:  I'm the other Chrys on the totem

3   pole; Chrys Beal.  I have no questions also.

4        MR. TAFURI:  Hi, Chrys.  Nice to meet you.

5   And thank you.

6        MR. GREEN:  Thanks, David.  Have a good day.

7        MR. TAFURI:  All right.  Thanks, you-guys.

8   Good luck.

9        MS. TAYLOR:  Thanks, David.

10       (The witness was excused.)

11       (Brief recess taken from 2:20 p.m. to

12        2:30 p.m.)

13       MS. EBERSBACH:  I think everyone is back, if

14   you want to start.

15       MR. GALLE:  Hi, Danielle.

16       MS. QUINN:  Hi.  How are you?

17       MS. TAYLOR:  Good, thanks.  Can we get

18   Danielle sworn in when you're ready, please?

19       THE COURT STENOGRAPHER:  Yes, ma'am.  Just

20   one moment.

21       Ma'am, if you would, raise your right hand.

22   In the testimony you're about to give, do you

23   swear to tell the truth, the whole truth, and

24   nothing but the truth?

25       THE WITNESS:  I do.

USPA Hearing Committee
August 06, 2021

Page 176

1                    DANIELLE QUINN,

2  having been first duly sworn or affirmed, was examined

3  and testified as follows:

4                    DIRECT EXAMINATION

5  BY MS. TAYLOR:

6       Q.   Hi, Danielle.  Thanks so much for taking the

7  time to meet with us today on Darrell's behalf here.

8            So do you want to just tell us how you know

9  Darrell and how long you have known him.

10      A.   Sure.  So I met Darrell in -- I believe it was

11  in 2015 when I began playing polo at Twilight Polo

12  Club, and I have regularly interacted with him on at

13  least a weekly basis since that time.

14      Q.   And how would you characterize Darrell, his

15  personality?  What type of person is he?

16      A.   I would characterize him as a very welcoming,

17  friendly person since day one.  He was the one person

18  who, like, really went out of their way to welcome me

19  into the club.  He's always offering helpful tips as

20  far as polo goes.  I can honestly say that I've never

21  had any bad interactions with him.  I would go so far

22  as to say that I don't think I have ever even heard him

23  say a curse word to anyone.  He has just always been a

24  happy-go-lucky, easygoing guy.

25      Q.   And are you aware of the allegations against

USPA Hearing Committee
August 06, 2021

Page 177

1   him by Aleem's family?

2       A.   I am.

3       Q.   And so what do you know?

4       A.   I know the allegation is that a few weeks ago

5   at the Twilight match at Great Meadow on Saturday

6   evening, Aleem had essentially T-boned Darrell, hitting

7   him hard in the back, causing excruciating pain to

8   Darrell, who has had numerous injuries over the years.

9   And as a result, Darrell got frustrated, and I believe

10  he told Aleem to fuck off or something along those

11  lines.  And it was also alleged that he used a racial

12  slur.

13      Q.   Have you ever heard Darrell use any raciest

14  language or any derogatory or prejudicial comments

15  beyond even racist comments?

16      A.   No.  And we do have a fairly diverse polo

17  club.

18      Q.   And have you ever seen him bully or

19  intimidate, get physical -- besides just the

20  physicalness of playing polo, have you ever seen him

21  get physical or attempt to bully or intimidate anybody?

22      A.   No.  Quite the opposite.  He's always trying

23  to be helpful, and if there is ever a dispute between

24  people, he is essentially, like, the mediator.

25      Q.   Would you ever see him doing that to a child?

USPA Hearing Committee
August 06, 2021

Page 178

1      A.   No.  Never.

2      Q.   And what do you think about these allegations,

3   knowing that that's what's alleged?

4      A.   I think that the allegations are patently

5   false.

6      Q.   Do you know Aleem or Aleem's family?

7      A.   Only from the interactions that I have had

8   playing polo.  I don't think I've ever played against

9   Aleem, but I've seen him play at Twilight.  I've never

10  had any interactions with his family.

11     Q.   What would you say about what you have

12  observed with Aleem playing?

13     A.   Nothing notable, other than he may not be

14  qualified to be playing in some of these games, based

15  on his experience level and ability to play.

16     Q.   Can you explain that a little bit more?

17     A.   Just not following the flow of play, I guess,

18  would be the best way of saying it, and kind of looking

19  around wondering where the ball has gone and not being

20  ready for the next play, and getting in the way of

21  other players at times.

22     Q.   And so how long have you been playing at

23  Twilight?

24     A.   I've been there since 2015.

25     Q.   And has Darrell been there -- you said he

USPA Hearing Committee
August 06, 2021

Page 179

1    welcomed you into the club?

2         A.    Yes.

3         Q.    And so how often do you play?

4         A.    I play on a weekly basis between March and

5    usually November, and then I'll go down to Florida.

6         Q.    Okay.  So you've played with him quite a lot?

7         A.    I have.

8         Q.    Would you say that you know him well?

9         A.    I do believe I know him very well.

10        Q.    And have you heard anything about Dorie?  Do

11   you know Dorie?

12        A.    I do know Dorie.  I've known Dorie for at

13   least a few years since I've been playing polo.  I know

14   that she has wanted to get the contract at Great Meadow

15   and has had an interest in that.

16        Q.    Do you know -- were you surprised to hear that

17   Dorie filed a complaint with these allegations?

18        A.    I was a bit surprised.  I never -- given the

19   discussions I have had with her, politically and

20   otherwise, she just never struck me as somebody that

21   would go this route instead of just dealing with it

22   quote/unquote "in-house."

23        Q.    Okay.  You mentioned Darrell's injuries.  Can

24   you tell me what you know about his injuries?

25        A.    So I believe it was last summer, when he was

Page 180

1  playing, I believe he went to hit the ball, and when he

2  reached back, he tore a bunch of muscles in his

3  abdominal area.  So he wasn't able to play for a while.

4  He's also had a couple of foot injuries.  And then I

5  believe it was two years ago, he got hit in the hand by

6  a grass ball and broke his hand, and he had to have

7  surgery on it.

8          MS. TAYLOR:  Okay.  I don't have anything

9      further, Danielle, but the hearing officers and

10     the USPA counsel might.

11         MS. QUINN:  Okay.

12                   CROSS-EXAMINATION

13  BY MR. GALLE:

14     Q.   Hi, Danielle.  My name is Craig Galle.  Thanks

15  for being here today.

16         On July 10th, 2021, were you present at

17  Twilight Polo in The Plains, Virginia?

18     A.   I was not.

19     Q.   You were not?

20     A.   No.

21     Q.   Okay.  Is it fair to say, then, that you

22  cannot tell us anything that was said or not said that

23  day or that evening between Aleem and Darrell?

24     A.   No, because I wasn't there.  The only reason

25  that I'm aware of these allegations are from what I

Page 181

1   have heard from everybody else that's been involved

2   with it and talking about it.

3       Q.   Okay.  So you have no personal firsthand

4   knowledge about any of the information related to the

5   allegations?

6       A.   No.

7            MR. GALLE:  Okay.  Thanks for your time.

8   That's all the questions I have.

9            MS. QUINN:  Thank you.

10           MR. GREEN:  Danielle, my name is Chris Green.

11   How are you?

12           MS. QUINN:  I am well, thanks.  How are you?

13           MR. GREEN:  Good.  I'm one of the hearing

14   officers.  I just have a couple of questions.

15           You said you have known Mr. Gaebel for how

16   many years?

17           MS. QUINN:  Five to six years.

18           MR. GREEN:  Is your relationship with him

19   that of just two polo players at the same club, or

20   have you ever worked for him or --

21           MS. QUINN:  I've never worked for him.  It's

22   mostly been at the polo club.  We'll talk outside

23   of polo over texts or, like, Facebook Messenger,

24   and he's coming to my wedding.

25           MR. GREEN:  Okay.  That was my only question.

USPA Hearing Committee
August 06, 2021

Page 182

1    I thank you for your time and your testimony.

2         MS. QUINN:  Thank you.

3         MR. GREEN:  Ms. Beal may have a question or

4    two.

5         MS. BEAL:  Hi, Danielle.  I'm Chrys Beal.

6    It's nice to meet you.  I don't have any

7    questions.  Thank you.

8         MS. QUINN:  Thank you.

9         MR. GALLE:  Thanks, Danielle.  Have a good

10   day.

11        MS. QUINN:  You as well.

12        (The witness was excused.)

13        MS. TAYLOR:  So the next person is Matt

14   Potter.

15        MR. POTTER:  Hey, guys.  How are you doing?

16        MS. TAYLOR:  Hey, Matt.  Thanks for joining

17   us.  Thanks so much for taking the time.

18        MR. POTTER:  Hey, not a problem.

19        THE COURT STENOGRAPHER:  Mr. Potter, I need

20   to swear you in for the record, if you can raise

21   your right hand.

22        In the testimony you're about to give, do you

23   swear to tell the truth, the whole truth, and

24   nothing but the truth?

25        THE WITNESS:  Yes.

USPA Hearing Committee
August 06, 2021

Page 183

1                         MATTHEW POTTER,

2   having been first duly sworn or affirmed, was examined

3   and testified as follows:

4                     DIRECT EXAMINATION

5   BY MS. TAYLOR:

6       Q.   So Matt, are you aware of the allegations

7   against Darrell for why we're here today?

8       A.   I believe so.  I think it was for a slur in

9   the arena.  And then is it for physical abuse after?

10  Is that correct?

11      Q.   Yes.  So Dorie and Aleem's family -- his

12  mother, Humera -- submitted statements in a complaint

13  to the USPA that during the match on July 10th -- and I

14  believe you were there, but we'll get to that in a

15  moment -- that after the collision and chukker in the

16  arena, Darrell turned to Aleem and called him, quote,

17  "You motherfucking nigger," unquote, and then after,

18  outside of the arena when he went over to chat with the

19  family, he pushed, intimidated, and bullied Aleem at

20  that time.

21      A.   Okay.  Yeah.  Understood.

22      Q.   So it's a little bit more -- I'm not sure what

23  the -- the story is that it was said once, and maybe it

24  was said more times.  We're not sure.  So how do you

25  know Darrell?

USPA Hearing Committee
August 06, 2021

Page 184

1    A.    I've been playing polo with Darrell for

2    probably five years now.  Maybe a little more.

3    Q.    At Twilight or --

4    A.    Yeah, at Twilight, whether it's Twilight or

5    during the week or at other fields.  I mean, that's how

6    we know each other for sure.

7    Q.    So how many times would you say that you play

8    polo per week?  How frequently?

9    A.    Generally, I play about once a week.

10   Sometimes it's twice per week.  But that's a span of,

11   like I said, about five years.  So about once or twice

12   per week.

13   Q.    Do you feel as though you know Darrell as a

14   person as well as just a polo player?

15   A.    Oh, absolutely.

16   Q.    And what kind of person would you say that he

17   is?

18   A.    I think the first thing that comes to mind

19   when I think of Darrell is just -- for me, personally,

20   Darrell was the first person that came up to welcome me

21   when I came to Green Meadow, and I know that that's the

22   case for most of the new people, if not all the new

23   people.  If Darrell is there, he's the first one to

24   come up and welcome you and make you feel included.

25        I think, just from what I know about Darrell,

USPA Hearing Committee
August 06, 2021

Page 185

1   he's -- I hate to say "one of the good people in the

2   horse community," because we all know that that ranges

3   from -- you know, it's a wide spectrum of people in the

4   horse community.  But from my interactions with him,

5   he's always been genuine, and he's always been very

6   kind and sincere.  I really -- I mean, I consider him a

7   good person and, quite frankly, a friend.

8       Q.   So were you there that night for the match?

9       A.   I was not.

10      Q.   How did you feel when you heard the

11  allegations that Darrell used a racial epithet?

12      A.   I was shocked, quite frankly.  You know, like

13  I said, I've known Darrell a while.  We've had

14  interactions in the arena, on the grass, outside, just

15  talking, and I, for one, have never heard him use a

16  racial slur of any kind, whether that's even, you know,

17  in jest, in seriousness, or in a joke.  So for me -- .

18  and I can only speak to what I've personally witnessed

19  and experienced -- I was pretty shocked because that

20  doesn't seem like behavior that Darrell partakes in.

21           And, you know, I'll just speak to the -- do

22  you only want me to speak to the first point, or do you

23  want me to speak to the second one?

24      Q.   No.  Go for it, yes.

25      A.   I mean, look:  I would say that I have -- I

USPA Hearing Committee
August 06, 2021

Page 186

1   have never seen Darrell take anything negatively from

2   the arena and bring it outside of the arena.   I mean, I

3   think we have all had our moments of frustration in the

4   arena -- I know I have -- but I think what is always

5   remarkable about Darrell is that anytime he and I have

6   had disagreements in the arena, it seems like it never

7   crosses that threshold, whether it's in the area or on

8   the grass.

9        He's really the first person to come up to you

10  and say, you know:   Hey, mate.   Sorry about that.   I

11  didn't mean to foul you.   He's always the first person

12  to come up -- if he perceives that he did something

13  wrong or maybe I perceived him to do something wrong,

14  he's always the first person to come up and apologize

15  and sort of "right" it.   It never transcends beyond the

16  playing field.

17       Q.   Okay.   And so did you have an incident where

18  you physically injured Darrell in a match?

19       A.   Yeah, unfortunately so.   A couple of years

20  ago, I took an ill-advised grass shot -- let's put it

21  that way -- and it turns out that I broke Darrell's

22  hand.   And I still feel terribly about it to this day.

23  And, you know, he screamed out in pain, as he should

24  have, but I'll say that he never made me feel badly

25  about it.   His thing is, if I get hurt out there, it's

Page 187

1    an occupational hazard.  That's his go-to phrase.  And

2    it's true.  If anybody deserved blame for that, it was

3    me.  I was in the wrong.

4          I still think about that every time I'm out

5    there playing on the grass.  And from a physical

6    standpoint, he takes his lumps, but there was never any

7    retaliation and never any ill will, and, you know,

8    that -- honestly, I'm a little surprised.  I don't know

9    if I would have the same reaction if somebody did that

10   to me.  So that's always stuck with me.

11        **Q.   Okay.  And as far as physically intimidating**

12   **anybody, the allegation that he physically intimidated**

13   **Aleem by pushing him and bullying him outside of the**

14   **arena after the match, what do you think about that?**

15   **What are your feelings?**

16        A.   I mean, obviously, I wasn't there, but I have

17   never seen Darrell do that with anybody, let alone --

18   I'm not going to say a peer of Darrell's, but I think

19   just because of the age gap, I think that that would be

20   a line that Darrell probably -- I would be surprised if

21   he crossed it.  I find it very hard to believe,

22   personally, and as I said before, any post-match

23   interaction has always been friendly and congratulatory

24   or apologetic.  Nothing ever angry or malicious,

25   certainly.

Page 188

1      Q.    And have you played with Aleem?

2      A.    I have, yeah.  I think once or twice.

3    Definitely once on the grass and possibly in the arena.

4      Q.    And do you have any comments about Aleem as a

5    player or anything that you've seen?

6      A.    All my interactions with Aleem and his family

7    have been fairly positive.  I don't have anything

8    negative to say about them.  They have always been very

9    nice to me.  They play battlefield polo, which is

10   aggressive and physical.  It's not necessarily wrong.

11   That's just a style.  And I think that's -- I wouldn't

12   say that it's not a -- I'm not saying that's a

13   character flaw or anything, by any means, or that he's

14   a bad player or anything.

15          Actually, I was looking to put a team

16   together, and I saw that Aleem was a negative 1.  He's

17   been somebody that I was considering as a negative 1,

18   because I think that he has a ton of potential.  I

19   think he's going to be a great player.  But they do

20   play -- I mean, Battlefield just plays aggressive polo.

21   I mean, anybody that comes up and has played them,

22   that's just their mantra.  That's their style.

23     Q.    As opposed to what other type of polo?

24     A.    I mean, look:  I think that that style is --

25   it's almost borderline overly aggressive.  It's an

USPA Hearing Committee
August 06, 2021

Page 189

1   emphasis on the bumping, an emphasis on the

2   physicality.   Certainly, in arena, that's part of the

3   match, so I, for one, would never fault them for that,

4   but I've seen multiple instances -- and this isn't

5   specifically to Aleem.   This is more their program.

6              It's just very aggressive and it's very

7   physical.   It's bumping; there are reckless -- I mean,

8   look:   Recklessness and physical play, it happens

9   everywhere.   I'm not trying to single out Battlefield,

10  and I'm not trying to single out Aleem, because I do I

11  reckless things sometimes and I do aggressive plays

12  sometimes.   I think we all do, especially if you play

13  enough.   But when I think of the way that maybe they're

14  taught to play polo or the -- because it's not one

15  individual.   I would say that it's more a mind-set.

16  It's just an "is" thing.   It's not a right or wrong

17  thing, I guess.   In my mind, it's just a style of play.

18      Q.   And do you know Dorie?

19      A.   I do.   I don't know her very well.   I've

20  certainly talked to her on multiple occasions.

21      Q.   Have you talked to her about the style of play

22  at all for Battlefield, or has it just been -- what's

23  your impression?

24      A.   No.   Dorie and I don't talk about that.

25  That's just observational on my part.   That's just from

Page 190

1   what I have experienced.  Dorie and I don't talk about

2   that.  I mean, we barely talk about much, but that's

3   certainly not something that I would go up and talk to

4   her about.  I just feel like that's kind of a known

5   thing.

6       Q.   And so what did you think when you heard about

7   the complaint that she filed about Darrell with the

8   USPA?

9       A.   I guess -- I think I understand it as a

10  protecting-your-own sort of mentality.  I don't quite

11  understand -- like, I don't quite understand what her

12  end game is.  I don't know if there is an end game.  I

13  think that on one hand, she's obligated to protect the

14  people in her barn.  That's why they come to her.  I

15  think that probably the job of any coach or farm

16  manager is to protect their own people.

17            So from that standpoint, I understand her

18  being upset about it.  Aside from that, I can't really

19  speak to it.  I feel like anything that I say beyond

20  that would be speculation, and, you know, I don't

21  really want to speculate.  I'm just here telling the

22  truth.

23      Q.   But again, you can't see Darrell ever saying

24  that?

25      A.   I personally can't, no.

USPA Hearing Committee
August 06, 2021

Page 191

1          MS. TAYLOR:  Okay.  Thank you so much, Matt.
2     There might be some other questions for you, but I
3     don't have anything further.
4          MR. POTTER:  Okay.
5                    CROSS-EXAMINATION
6  BY MR. GALLE:
7     Q.   Hi, Matt.  My name is Craig Galle.  I'm a
8  lawyer for the USPA.  How are you?
9     A.   Hey.  I'm good, Craig.  How about yourself?
10    Q.   Great.  I just have a couple of questions, I
11 think.
12    A.   Sure.
13    Q.   Were you present at Twilight Polo on the
14 evening of July 10th, 2021?
15    A.   Is that the night of the incident?
16    Q.   Yes.
17    A.   No, I was not.
18    Q.   Is it fair to say that you can't tell us, with
19 any firsthand personal knowledge, what occurred that
20 night since you were not there?
21    A.   Correct.
22         MR. GALLE:  That's all the questions I have
23    for you.  Thank you.
24         MR. GREEN:  Matt, my name is Chris Green.
25    I'm one of the hearing officers.  I don't have any

Page 192

1  questions for you.  I want to thank you for your

2  time and your testimony.

3      MR. POTTER:  All right.  Thanks, Chris.  I

4  appreciate it.

5      MS. BEAL:  Matt, my name is Chrys Beal, and

6  I'll just echo Chris Green our appreciation and

7  also for your positive attitude.

8      MR. POTTER:  All right.  Appreciate it.

9      MR. GREEN:  Thanks, Matt.  Have a nice

10  weekend.

11      MR. POTTER:  Good luck, guys.  I know you've

12  had a long day.  So hang in there, everybody, and

13  I appreciate all of your time.

14      MS. TAYLOR:  Thank you, Matt.

15      (The witness was excused.)

16      MS. TAYLOR:  Teresa, I have a question.  Of

17  course, you're entitled to put on the case that

18  you deem appropriate.  It seems the last four

19  witnesses after your son -- none of them really

20  offered any testimony as to what was said or not

21  said since they weren't there, and I think that

22  most of them talked about the characters of

23  Mr. Gaebel and some, to a lesser extent, of Aleem.

24      So I think that, you know, you've made those

25  points through a number of witnesses, and I'm just

USPA Hearing Committee
August 06, 2021

Page 193

1    curious as to whether you think the remaining ones

2    on your list will be cumulative, because I don't

3    know, at least in my view, that it will add that

4    much since you've already had a number of

5    witnesses that have said the things that -- you

6    know, how they feel and what their interactions

7    were in the past with the parties.

8         MS. TAYLOR:  Right.  So I understand what

9    you're saying, and I think we're going to take

10   Victoria off.  Darrell is going to testify last.

11        MR. GREEN:  Okay.

12        MS. TAYLOR:  Okay.  So we will take Victoria

13   off, and the rest will be quick.

14        MR. GREEN:  Okay.  Let's roll.

15        MS. TAYLOR:  Thank you.  Let's see.  Joe

16   Noonan is next, I think.  Is that right, Lindsey?

17        MS. DENNIS:  That's correct.  He is ready.

18        THE COURT STENOGRAPHER:  Mr. Noonan, I need

19   to swear you in for the record, if you can raise

20   your right hand.

21        In the testimony you're about to give, do you

22   swear to tell the truth, the whole truth, and

23   nothing but the truth?

24        THE WITNESS:  I do.

25   ///

USPA Hearing Committee
August 06, 2021

Page 194

1                    JOSEPH NOONAN,

2   having been first duly sworn or affirmed, was examined

3   and testified as follows:

4                    DIRECT EXAMINATION

5   BY MS. TAYLOR:

6       Q.   So, Joe, thank you so much for joining us

7   today.  Were you there the night in question at the

8   match?

9       A.   I was.

10      Q.   So did you hear anything first hand?  Or

11  what's your recollection of the match that night?

12      A.   I actually did not see the impact.  My wife

13  saw it, and she explained it to me a little bit.  I did

14  not talk to or even see Darrell after that, so it's a

15  brief recollection that I was there, but I did not see

16  Darrell get hit.

17      Q.   Okay.  And so you're aware of the allegations?

18      A.   The "allegations" meaning that Darrell said

19  something to this young man, or --

20      Q.   Right.  The racial epithet that he cursed at

21  him and said, quote, "You're a motherfucking nigger,"

22  after the horse collision.

23      A.   No.  I am not familiar with that.  Well, I

24  heard later on just from you-all what it was, but I

25  didn't hear anything like that that evening.  I didn't

USPA Hearing Committee
August 06, 2021

1    hear it from my wife, and I didn't hear anyone else say

2    that.

3        Q.    You mean just generally, at Twilight Polo or

4    around the field, you've heard what happened?

5        A.    I did.

6        Q.    Okay.  Are you aware of what it was alleged

7    that Darrell did after the arena -- outside of the

8    arena -- with Aleem?  That he is alleged to have

9    bullied and pushed Aleem in front of his parents?

10       A.    I did not hear that until we talked the other

11   day.

12       Q.    Okay.  So how do you feel and what do you

13   think upon hearing these allegations and knowing

14   Darrell?

15       A.    Well, you know, I've known Darrell for several

16   years now.  I was pretty shocked about that type of

17   language.  I can't see Darrell -- I've never even heard

18   Darrell swear at me, and I have seen him, you know, in

19   a lot of matches.  And I just -- I don't know.  It

20   seems unlikely to me that Darrell would say anything

21   like that, just knowing Darrell and knowing his

22   profession in the past, knowing what he's been like on

23   the field, and his sportsmanship.  No.  I'll just say I

24   can't see it happening, personally.

25       Q.    And have you played with Aleem?

Page 196

1.     A.    I have.  Yes, I did, and I had a bad

2  experience with that, actually.  I think that if you

3  asked any of the grooms that night, after I finished

4  that match, I believe my exact words were, when I got

5  done with that match, "I feel like I just got the shit

6  kicked out of me."  It was the worst polo match I had

7  ever played in my life.  And I am a relative beginner.

8  I have been riding for almost 40 years, but I've only

9  been playing polo for 4 years, and it was really

10  unpleasant.

11     Q.    And can you explain that?  What do you mean by

12  that?

13     A.    I just felt as though I was targeted all

14  night.  I don't know the other two gentlemen that Aleem

15  was playing with.  In fact, I didn't even know Aleem; I

16  didn't know his age; I didn't know anything about him.

17  But it seemed to me like, even during the match, the

18  two older gentlemen were kind of encouraging him to

19  just be aggressive with me.  There was a lot of

20  contact, Teresa.  I mean, I was hit so many times.  At

21  one point, I got my boot stuck behind the stirrup.  You

22  know, the only time I had ever been hurt in polo was

23  that night, and I had twisted my knee pretty bad.

24          A lot of it happened in front of the goal.

25  Some it happened in the middle of the field.  I was hit

USPA Hearing Committee
August 06, 2021

Page 197

1    from the side, and it was, you know, probably about a

2    30-degree contact from the side.   Sorry.   I use numbers

3    because I'm a carpenter.   But it felt as though I had

4    been targeted that night.   And I'm not just saying

5    that.   I mean, really, you-guys.   It was just a bad

6    scene.   It was the worst night I had ever had playing

7    polo by far.

8        Q.   So when you are talking about being targeted

9    or being hit from the side, are you talking about Aleem

10   hitting you or the other players?

11       A.   Oh, no.   It was Aleem on all accounts.   The

12   other guys -- the other two guys were, you know,

13   really -- and I can't give you a quote as to what they

14   were saying, but I know that they were yelling at Aleem

15   and telling Aleem to get after me and follow me, and

16   just to cover me.   And that's what it was; the gist of

17   it.   There was a lot of that going on that night.

18       Q.   When you discuss that, you mean beyond the

19   usual type of polo playing, which is aggressive and

20   physical, especially in the arena?

21       A.   It's always aggressive, but it's usually not

22   that aggressive.   And I just couldn't seem to shake

23   him, but it was more or less the other gentlemen kind

24   of encouraging him to do that.   I thought -- when I was

25   playing the game, I was thinking, This guy must be a

USPA Hearing Committee
August 06, 2021

Page 198

1    protégé or something; you know, they must be teaching

2    him how to play polo defensively.  That was my

3    interpretation of it as to why they kept saying that.

4         I can recall, specifically, certain times in

5    the corners, when I was in the corner and the two older

6    gentlemen would be -- you know, maybe they weren't in

7    the corner with me, but Aleem was with me, and they

8    would be telling Aleem what to do.  But that happened

9    several times that evening.

10   Q.   Okay.  So you were injured a little bit, and

11   you thought it was overly rough; is that right?

12   A.   Yeah.  For sure.

13   Q.   So you've known Darrell for a while.  What

14   would you say about Darrell's character and what would

15   you say about him as a person?

16   A.   I think he's a professional.  I think Darrell

17   is the consummate professional.  He's always been very

18   polite to my wife and I.  We have been with Twilight

19   Polo for three years now.  We've known him a little bit

20   longer than that, but for the last three years, we have

21   gotten to know him.  He's always very friendly.  He's

22   big for a handshake before and after the evening, and

23   there's always pleasant conversation.

24        So I mean, Darrell, to me, has been a great

25   friend.  I mean, he's just a good guy.  He's not even

Page 199

1    really that great of a friend.  He's a friend, but he's

2    someone I know through polo.  Well, yeah, I would

3    consider him a good friend now, but, I mean, I haven't

4    known him for decades.  I've known him for years; you

5    know, several years.  But I've just always had a good

6    interpretation of him, and he's always been very

7    professional and courteous to us.

8        Q.   Okay.  So you could not see Darrell saying or

9    doing anything like what's being alleged?

10       A.   Absolutely not.

11            MS. TAYLOR:  All right.  Thank you, Joe.  I

12       don't have any other questions, but Mr. Galle,

13       Mr. Green, or Ms. Beal might.

14                     CROSS-EXAMINATION

15   BY MR. GALLE:

16       Q.   Hi, Joseph.  My name is Craig Galle.  How are

17   you?

18       A.   Yes, sir.  Doing well, thank you.

19       Q.   I take it from your testimony that what you're

20   here to provide by way of testimony is details

21   regarding your past interactions with Darrell, as well

22   as Aleem; is that correct?

23       A.   Yes, sir.

24       Q.   And you're not necessarily here to provide any

25   firsthand knowledge of the interactions or what was

USPA Hearing Committee
August 06, 2021

Page 200

1  said or not said between Darrell and Aleem on the

2  evening of July 10th, 2021, at Twilight Polo; is that

3  correct?

4      A.   Yes, sir.  I was not -- I didn't see the

5  incident, and I didn't see or hear anything about

6  Darrell or any kind of altercation up in the player's

7  box.

8      Q.   Okay.  And that would be the case both on the

9  field during the arena game, as well as after the game

10  concluded, that you have no personal firsthand

11  knowledge of any of the interactions between them or

12  what they said or didn't say?  Fair statement?

13     A.   Correct.

14          MR. GALLE:  Okay.  Thank you, sir.  That's

15     all the questions I have.

16          MR. GREEN:  Mr. Noonan, my name is Chris

17     Green.  I'm one of the hearing officers.  Can you

18     hear me?

19          MR. NOONAN:  Yes, sir, Mr. Green.  I saw you

20     earlier when things got going.

21          MR. GREEN:  Okay.  I have a question or two

22     for you.  In the game that you described, when you

23     played with Aleem and you said it was a rough or

24     bad experience because he played very aggressively

25     against you, was there an umpire or umpires in

USPA Hearing Committee
August 06, 2021

Page 201

1    that game?

2         MR. NOONAN:  Yes, there was.  And I believe

3    there were a few penalties handed out that

4    evening.  I'm always good for a penalty or two

5    because I'm not completely familiar with the rules

6    and regulations yet.  I'm getting better, though.

7    But I think a lot of the -- I can't specifically

8    say that there was a penalty that was given to

9    Aleem that evening, but throughout the match,

10   there were definitely penalty calls.

11        MR. GREEN:  Right.  But you don't recall any

12   penalties being given to Aleem for dangerous

13   riding in connection with his play against you?

14        MR. NOONAN:  I can't say for certain, no.

15        MR. GREEN:  Okay.  I don't have any further

16   questions.  Thank you for your time and your

17   testimony.

18        MR. NOONAN:  Okay.  Thank you.

19        MS. BEAL:  My name is Chrys Beal, and I don't

20   have any questions either.  Thank you for your

21   time.

22        MR. NOONAN:  Thanks.  Appreciate it.

23        MR. GALLE:  All right, Joseph.  Enjoy your

24   weekend.

25        MR. NOONAN:  Thanks, you-guys.  Appreciate

USPA Hearing Committee
August 06, 2021

Page 202

```
 1    it.

 2         (The witness was excused.)

 3         MS. TAYLOR:  Okay.  Our next witness is Dan

 4    Coleman.

 5         THE COURT STENOGRAPHER:  My name is

 6    Meschelle.  I'm the court reporter.  I need to

 7    swear you in for the record, please, if you can

 8    raise your right hand.

 9         In the testimony you're about to give, do you

10    swear to tell the truth, the whole truth, and

11    nothing but the truth?

12         THE WITNESS:  I do.

13                   DAN COLEMAN,

14    having been first duly sworn or affirmed, was examined

15    and testified as follows:

16                   DIRECT EXAMINATION

17    BY MS. TAYLOR:

18    Q.   Hey.  Thank you, Dan.  Are you aware of the

19    allegations against Darrell by Dorie, Aleem's mother,

20    and Aleem?

21    A.   I am.

22    Q.   And so have you -- well, are you familiar with

23    Darrell?  Have you played a lot with Darrell?  Have you

24    played with Aleem?

25    A.   Yes.  I've known all the people -- Darrell,
```

Page 203

1   Aleem, and Dorie -- for three, almost four years.  I

2   play with them every weekend in the summer just about,

3   and in the winter as well.

4       Q.   Okay.  And were you there the night of the

5   match on July 10th?

6       A.   I was not.

7       Q.   And so what is your impression -- or what did

8   you think when you heard about the allegations lodged

9   by Dorie and Aleem's family?

10      A.   Well, I first heard of this as part of a

11  teenage whisper campaign the next day or a few days

12  later.  I run a kids program here, as most of you know,

13  and the kids were all atwitter about the -- that

14  Darrell had done this and that complaints were going to

15  be filed, et cetera, et cetera.  And I've known Darrell

16  a long time.  Darrell is a veteran; a man of honor.  I

17  very quickly tried to explain to people that this is

18  probably not true.  It's just outside of Darrell's

19  character to even engage in this kind of behavior.

20      Q.   And have you ever known, seen, or heard of

21  Darrell bullying, intimidating, getting physical with

22  somebody that doesn't involve the actual play of polo,

23  on the field or off the field?

24      A.   No.  Not at all.  Darrell is a very nice man.

25  My son recently joined the Army, and we spend a lot of

USPA Hearing Committee
August 06, 2021

Page 204

1  time talking -- I'm in the Guard. We spend a lot of

2  time talking about military things. I mean, we all

3  play a rather aggressive sport, and on the field, you

4  know, there's a lot of, "Hey, hey. Get out my way,"

5  blah-blah-blah. But we all do that.

6          I mean, this is polo. If you don't like

7  people yelling, polo is probably not the sport for you.

8  But Darrell is no more aggressive on the field than

9  anyone else -- probably far less than I am -- and off

10  the field, I have never known him to be anything other

11  than a total gentleman. And I see him every -- two to

12  three days a week for, you know, six months of the

13  year.

14      Q.   And what kind of matches do we have at Great

15  Meadow or, do you understand, Twilight Polo to have

16  every Saturday night?

17      A.   Well, this was one of the things that I

18  brought up when these kids were all telling me they

19  were going to file a complaint with the USPA, and I

20  tried to explain to them that I didn't think the USPA

21  would even get involved with this because it's not a

22  USPA club; it's not a USPA game. Most of the people

23  there probably aren't USPA members, or many of the

24  people.

25          This is just pure exhibition polo. And the

USPA Hearing Committee
August 06, 2021

Page 205

1  Great Meadow Polo Club has not been a USPA club for a

2  year, as far as I know.  I didn't think the USPA would

3  even hear this case.  Certainly, when I was chairman of

4  the constitution committee, I would have argued against

5  the Association getting involved, because if two USPA

6  members walk into a bar and get into a fight, it

7  doesn't have anything to do with the Association.  So

8  that was my initial take on this, because there is no

9  association with the USPA at the Great Meadow Polo

10  Club.

11        Now, the USPA is a -- the U.S. Polo A-S-S-N is

12  a sponsor of the Great Meadow Polo Club, I believe,

13  this year, but the Great Meadow Polo Club is no longer

14  part of the USPA as a member club.

15    Q.    But Twilight Polo Club is?

16    A.    Right.  But this isn't a Twilight Polo Club

17  match.  Twilight Polo Club is in Middleburg, Virginia,

18  at a very nice field and arena over off of Sam Fred

19  Road.  This is the Great Meadow Polo Club, which is

20  owned and operated by Great Meadow; Bill Ballhaus, et

21  cetera.  Most of the players there are Twilight Polo

22  players, but not all of them.  Some of them are

23  Battlefield Polo players.  And the promoter -- John is

24  the promoter, and I'm not sure what the contractual

25  obligations are there, but it's clear -- the sign says,

Page 206

1   "Great Meadow Polo Club."  It doesn't say "Twilight

2   Polo Club."

3      Q.   But the umpires are not USPA umpires that are

4   used there; correct?

5      A.   George Krabbe is not a USPA-certified umpire,

6   to the best of my knowledge.  My son umpires there on

7   occasion.  He is.  I have umpired there on occasion.  I

8   am, but I'm certainly not being paid by the Association

9   to umpire there.  We don't use USPA rules when we play.

10  You'd be hard-pressed to get a foul called in polo at

11  Great Meadow.

12     Q.   Okay.  And so like you said, these are

13  exhibition matches on Saturday nights?

14     A.   That's correct.  They're six-minute chukkers,

15  continuous play.  There's no throw-ins; there's almost

16  no right-of-way violations.  Most of the players there

17  know this, so we keep the game moving pretty quickly in

18  a gentlemanly way.  It's not a hard-fought game.  We're

19  not killing ourselves for a five-dollar piece of silver

20  like we would on Sunday on the field at Twilight Polo.

21     Q.   And so you've played with Aleem.  Do you know

22  Aleem?  Do you know his family?

23     A.   I do.  I have umpired many games with Aleem

24  and his younger brother as well.  I have seen Aleem and

25  his parents at almost every game.  I go to Battlefield

Page 207

1    Polo to umpire.  I am a professional interscholastic

2    umpire -- an intercollegiate umpire -- for the

3    Association, so I know almost every youth player in the

4    east.

5        Q.    And would you say that Aleem frequently gets

6    fouls called on him maybe more so than you typically

7    see, or dangerous-riding fouls?  Would you say that

8    that's kind of a pattern?

9        A.    I would say that there's a pattern amongst all

10   the youth players in Virginia because there is a

11   complete lack of understanding of the rules of polo

12   here in Virginia.  The rules are not taught.  We do at

13   our program, because all you-guys know that I am a

14   stickler for the rules.  I was the chairman of the

15   arena rules committee for many years, so we teach the

16   rules here.

17            I umpire a lot of polo, youth polo.  I have to

18   stop the game several times a game to explain to people

19   some basic rules about right-of-way and carrying the

20   ball on the nearside, switching to the nearside for no

21   reason, dangerous ride-offs, a lot of stuff.  There is

22   a general lack of understanding of the rules in all

23   levels of polo.

24            It's a shame that it's true in the youth polo

25   here, but it's certainly more pronounced in the youth

USPA Hearing Committee
August 06, 2021

Page 208

1  polo.  And it's something that I'm not used to, coming

2  from out west where there's a much greater focus on the

3  rules of the sport.  I would like to hand everybody in

4  Virginia a rule book, which would be a good investment

5  on behalf of the Association.

6          MS. TAYLOR:  Okay.  Thank you, Dan.  I don't

7      have any more questions.  Some others might.

8                    CROSS-EXAMINATION

9  BY MR. GALLE:

10     Q.   Hi, Dan.  This is Craig Galle.  How are you?

11     A.   Good.  How are you, sir?  Long time, no speak.

12     Q.   Yes.  Thank you for being here today.  I only

13  have a handful of questions.  Is it fair to say that

14  since you were not present on July 10th, 2021, during

15  the arena polo game in question, that you do not have

16  firsthand knowledge of what was said or not said, for

17  that matter, between Darrell and Aleem?

18     A.   That is correct.

19     Q.   Regarding Twilight Polo or Great Meadow Polo

20  Club, I'm reading from the first sentence of the

21  complaint lodged by Delora Burner on July 11th, 2021,

22  with the Association, and she starts off:  "An incident

23  occurred at the 6:30 p.m. game last night, July 10th,

24  2021, at Twilight Polo in The Plains, Virginia."

25          Did the event in question or the game in

USPA Hearing Committee
August 06, 2021

Page 209

1  question not take place at Twilight Polo Club?

2      A.   No.  The event took place at Twilight Polo in

3  The Plains, Virginia, which the -- I can give you some

4  historical background to this.  Probably about 20 to 25

5  years ago, Jim Burton, Phil Carver, and others started

6  something called "Twilight Polo at Great Meadow," and

7  it has been run as "Twilight Polo" since then.  John

8  took that club over years ago.

9          Twilight Polo is the event.  The club was the

10  Great Meadow Polo Club.  They were a member club of the

11  Association all through last year.  John left Great

12  Meadow and formed something called the "Twilight Polo

13  Club," which is a facility that is in Middleburg,

14  Virginia off of Sam Fred Road.  There is an arena and a

15  field there.  If you know anything about Virginia, it's

16  Danielle Tognini's old practice field.  That is the

17  Twilight Polo Club.

18          The Twilight Polo event, which is at the Great

19  Meadow Polo Club, is in The Plains, Virginia.  It is

20  not the Twilight Polo Club.  And the Great Meadow Polo

21  Club, to the best of my knowledge, is no longer a USPA

22  member club.  It was, but now it's not.  It doesn't

23  appear in the Bluebook as a club anymore.

24      Q.   Okay.  Thanks for clarifying that point.

25      A.   The Great Meadow Polo Club does other events

USPA Hearing Committee
August 06, 2021

Page 210

1  too.  They have a field there where Virginia United
2  does some of their final games for the 6-8-12 goal as
3  well.  That's also part of the Great Meadow Polo Club.
4  Virginia United is not a polo club.  You know, a lot of
5  these things that we have around here are not polo
6  clubs.  They're not part of the Association.
7      Q.  **Understood.**
8      A.  Most of the polo in Virginia isn't part of the
9  Association.
10      MR. GALLE:  Thank you.  That's all the
11  questions I have for you.  Chrys Beal or Chris
12  Green, the hearing officers, may have their own
13  questions.  Thank you, Dan.
14      MR. COLEMAN:  No worries.  Good to see you
15  again, Craig.
16      MR. GALLE:  A pleasure.
17      MR. GREEN:  Dan, this is Chris Green.  Good
18  afternoon.
19      MR. COLEMAN:  Good afternoon, sir.
20      MR. GREEN:  I just have a few questions.  Do
21  you think that you are in a better position to
22  determine whether this particular event was played
23  under the auspices of Twilight Polo Club than John
24  Gobin is?
25      MR. COLEMAN:  That I'm in a better position?

USPA Hearing Committee
August 06, 2021

Page 211

1        MR. GREEN:   Right.   You seemed very insistent

2    that it was not a Twilight Polo Club event.

3        MR. COLEMAN:   I don't know what contractual

4    obligations the Twilight Polo Club itself has with

5    the Great Meadow Polo Club, so I can't speak to

6    that.   But I think I know better who is a member

7    club of the Association and who isn't than John

8    might.   I love John.   John is a dear friend of

9    mine.   John is not a real great reader of the

10   Bluebook.   He may not know who is a club and who

11   isn't a club, and he doesn't know what it takes to

12   be a club and not be a club off the top of his

13   head like I would.

14       So to answer your question, if he says it was

15   and he has a contract with them, then that may be,

16   but when I look at it as somebody who is intimate

17   with the membership rules of the Association, I

18   see this as an exhibition event held at a

19   non-member club.

20       MR. GREEN:   And you are familiar with the

21   disciplinary policies and procedures as amended in

22   April of 2021?

23       MR. COLEMAN:   Not as amended in April of '21.

24   To be honest, Chris, I stopped reading that stuff

25   when it was no longer part of my job as a board

Page 212

1    member.

2         MR. GREEN:  Okay.  And is there a

3    continuous-play option in the current USPA arena

4    rules?

5         MR. COLEMAN:  Yes, sir.

6         MR. GREEN:  And is it required in the current

7    USPA arena rules that all chukkers be seven and a

8    half minutes?

9         MR. COLEMAN:  They can be either seven and a

10   half minutes or five minutes.  At Great Meadow,

11   they play six-minute chukkers.

12        MR. GREEN:  Okay.  I don't have further

13   questions.  Thank you for your testimony.

14        MR. COLEMAN:  One other rule -- they have

15   some other rules there that are not in the rules.

16   When the ball goes out of bounds, it is a spot hit

17   wherever on the field it happened.  They don't

18   obey the rule that -- you know, the arena rules

19   have a specific procedure for that.  That's not

20   used at Twilight Polo.  The clock doesn't stop

21   when it goes out of bounds either unless they

22   can't find the ball; then they will stop the

23   clock.  There's a lot of other things that they do

24   there that are not USPA rules-related or, I should

25   say, our local rules.

Page 213

1      MR. GREEN:  I don't have any further

2   questions.

3      MS. BEAL:  Hi, Dan.  This is Chrys Beal.  I

4   have a question for you.  How are you doing?

5      MR. COLEMAN:  Good.  How are you, Chrys?  I

6   haven't seen you in a dog's age either.

7      MS. BEAL:  I can't say I've seen you either.

8   I have a question:  If a club rents a facility as

9   a club, doesn't that make the facility fall under

10   the rules of the club?  I didn't ask that question

11   well, but if you lease a field and you run an

12   event, then it's your event at the field; correct?

13      MR. COLEMAN:  I would say, generally, that's

14   true.  I mean, I don't think the Association gets

15   involved with that, generally.  But there

16   certainly are clubs that lease fields from other

17   clubs to do things, and then especially if it's a

18   USPA event, one of the clubs has to take ownership

19   of it.  I know Liberty Hall has run events at

20   fields that we have borrowed from other clubs, and

21   they were clearly our events and that's something

22   we put in the contract or the agreement when we

23   did it.

24      As I said, I don't know what all the

25   agreements are between the Great Meadow Polo Club

USPA Hearing Committee
August 06, 2021

Page 214

1    and the Twilight Polo Club.  I could be way off

2    base with my statement there.  I'm throwing that

3    out there for somebody to consider.  I haven't

4    seen the agreement.  But, yes, oftentimes fields

5    or arenas are leased from one club to another for

6    the purpose of having a game because another field

7    is rained out or it's an exhibition.  Our rules do

8    require that a club own or solely control a field

9    or arena, which Twilight Polo Club does, but not

10   in this location.

11       MS. BEAL:  I think you've answered my

12   question.  I appreciate it.  Thank you.

13       MR. GALLE:  Thanks, Dan.  Enjoy your weekend.

14   We appreciate your time.

15       MR. COLEMAN:  I'm finished?

16       MR. GALLE:  I think so.

17       MS. TAYLOR:  Thank you, Dan.

18       MR. COLEMAN:  Okay.  Good.  Well, you-guys

19   have been at this for quite a while, so better you

20   than me.  Have a nice day.

21       MR. GALLE:  Thank you.  Take care.

22       (The witness was excused.)

23       MS. TAYLOR:  Okay.  Our next witness is

24   Whitney.

25       THE COURT STENOGRAPHER:  Ms. Ross, I need to

USPA Hearing Committee
August 06, 2021

Page 215

```
 1      swear you in for the record, if you can raise your
 2      right hand.
 3           In the testimony you're about to give, do you
 4      swear to tell the truth, the whole truth, and
 5      nothing but the truth?
 6           THE WITNESS:  Yes.
 7                     WHITNEY ROSS,
 8  having been first duly sworn or affirmed, was examined
 9  and testified as follows:
10                ' DIRECT EXAMINATION
11  BY MS. TAYLOR:
12      Q.   Hi, Whitney.  Thanks so much for taking the
13  time today.  We really appreciate it.
14      A.   No problem.
15      Q.   So were you present the night of July 10th at
16  the match that's in issue?
17      A.   Yes.
18      Q.   And so are you aware of the allegations?
19      A.   Yes.
20      Q.   Okay.  So why don't you go ahead and tell us
21  what you understand them to be.
22      A.   I understand that Darrell is being accused of
23  using a racial slur against Aleem during our game at
24  Twilight Polo that night, and then I was also told that
25  after the game, he did not either apologize correctly
```

USPA Hearing Committee
August 06, 2021

Page 216

1    or didn't -- I don't know.  I don't know about after

2    the game, but I guess he didn't apologize immediately

3    or something like that.

4        Q.   Okay.  Since your bandwidth is low, can you

5    just go ahead and turn off your camera, if that's okay

6    with everybody else?

7        A.   Yes.

8        Q.   It will help so we can hear you and you don't

9    get cut off.  Thank you.

10       A.   Is that better?

11       Q.   Yes.  Much better.  Thank you.  So the

12   allegations are also that outside of the arena later in

13   one of the boxes that's down by the goal where the

14   event happened, that Darrell, instead of apologizing,

15   was bullying, intimidating, and pushing Aleem.

16       A.   Okay.

17       Q.   So how long have you known Darrell?

18       A.   For at least eight years, if not longer.  For

19   quite some time now.

20       Q.   And would you say that you know him well?

21       A.   Very well.

22       Q.   And what do you think about these allegations?

23       A.   I think that they are a hundred percent not

24   correct.  I've never, ever seen Darrell get aggressive

25   towards anyone, whether it be an umpire, another

USPA Hearing Committee
August 06, 2021

Page 217

1   player, a spectator, anyone.  I've never seen him yell

2   at another player, let alone use anything racial

3   whatsoever.  He's usually the first person to give a

4   compliment to say, Hey, great goal, or good play, or

5   Man, that horse is a good horse to ride, or it can

6   bump.  He's always giving compliments.  I never, ever

7   see him be aggressive towards another player on the

8   field.

9        Q.   And what about any discriminatory, race,

10  derogatory -- any other prejudicial language or

11  comments?

12       A.   Never.  I have never, even in conversations

13  outside of polo, heard him even hint at the slightest

14  racial slur ever, be sexist, or anything like that.  I

15  mean, he's always very gentlemanly in all of our

16  conversations, and even when you talk about politics,

17  he talks about it the proper way.  I mean, he's never,

18  ever come across that way in any kind of conversation

19  or game ever that I have seen.

20       Q.   And do you know Dorie?

21       A.   I do.  I have actually known Dorie longer than

22  Darrell.

23       Q.   Okay.  And so were you surprised to hear that

24  Dorie filed a complaint?

25       A.   Yes.  One hundred percent.

Page 218

1      Q.    Why?

2      A.    Because that has never, ever been accused of

3  any of our players.  We're very strict on who plays

4  with us at our club.  If anyone is ever aggressive or

5  argumentative or dangerous or anything, we boot them

6  out of our club.  We take pride in the people that we

7  have at our club, and this has never, ever been an

8  issue in my 11 years doing this.  And then for this to

9  come about and no one else heard it, and then for her

10 to file this complaint and take it to this level

11 completely blows my mind because we went through the

12 proper steps to ask what happened, and she didn't even

13 hear it.  So why she's filing this complaint, I have no

14 idea.

15     Q.    So what would you say about Dorie as a person?

16 Does she do things like this?

17     A.    There's always issues surrounding Dorie and

18 her operation.

19     Q.    What do you mean?

20     A.    Anything from her saying that every single man

21 that goes into her operation is horrible and says

22 things to her kids, or having issues with horses where,

23 you know, they bite, they kick, they're skinny and we

24 can't have them at the facility, and we ask her not to

25 bring them back, to issues with her kids, underage

Page 219

1  drinking, drugs.

2        You know, I have parents constantly calling me

3  and telling me:  "I can't have my kid at that operation

4  anymore.  Can you please run a kids program?"  And I

5  say, "No.  Dorie is the one that runs the kids

6  program."  They're like, "It's toxic, it's unhealthy,

7  it's bad.  I don't want my kid around drugs and

8  overdoses."  I mean, this is not the first time there's

9  been an issue.  I mean, this is not the first time a

10  player of hers has been aggressive or has yelled.  I

11  mean, there's always something each year.  There's

12  always issues.

13    **Q.   So when you say that this is not the first**

14  **time she's had a player become aggressive, polo is a**

15  **very aggressive --**

16    A.   Yeah.  I guess that it's aggressive

17  competitively, but it's a whole 'nother situation when

18  it's aggressive dangerously or they purposely come in

19  at bad angles or crash into people.  I mean, Dorie

20  breeds players that are aggressive and dangerous riding

21  [verbatim].  I mean, this isn't the first player of

22  hers that has had a penalty called like this, and this

23  isn't Aleem's first time either.

24        I mean, Dorie is on the sideline screaming and

25  yelling at the kids, and the kids are in the arena

Page 220

1   screaming and yelling and crashing into people.

2   They've always been an aggressive younger generation

3   that comes in and plays polo.  So I get that it's

4   competitive and it's an aggressive sport, but this is a

5   different aggressiveness.

6       Q.   And so you said that it's not Aleem's first

7   dangerous-riding foul.  What do you know?  What have

8   you seen?

9       A.   That he just usually is a little bit wild out

10  on the field.  I mean, I've watched him play for years.

11  This isn't the first time I've seen a foul thrown on

12  him or, you know, they've been, like, "Hey, knock it

13  off." He comes in at angles where he uses the horse as,

14  like, some sort of a weapon.  Like, you don't crash

15  horse's faces into people's bodies.  You don't come in

16  at an angle.  You don't yank and pull and, like, rip

17  them all around.  I mean, they're still horses.  They

18  still feel things.

19          So he is just known to be that type of player.

20  And everyone says it, and I know I can't be the first

21  one to say it.  And the same thing with some of the

22  other riders at her facility.  And it's always like a

23  little bit of a shit show when she comes and her

24  players are playing.  I mean, their stirrups are

25  falling off, or there's people crashing, and there's

USPA Hearing Committee
August 06, 2021

Page 221

1  screaming.  So I mean, Aleem rides just like a lot of

2  the other players from her facility.

3      Q.   Okay.  And what would you say about Dorie's

4  character or propensity for honesty or dishonesty?

5      A.   I think at times she does mean well and does

6  do things in a positive way, and there's other times

7  that are very dishonest.  And there's been many of

8  those times where I have tried to overlook them in the

9  past and move on from them, but when it happens

10  repeatedly, it's hard to do so.  And then when it also

11  affects clients of ours, it's even more harder to look

12  the other way.

13          I mean, there's been issues where she's used

14  horses, and then they break and she gives them back to

15  me and they say, "Oh, well, it played in one game and

16  it broke with you."  And I'm like, "No, no.  It broke

17  when you guys used it in your program."  And that was a

18  big lie.  And I stopped a person from suing her who

19  wanted to sue her for breaking his horse.  I mean, that

20  was very dishonest.

21          I have had her go around and say bad things

22  about me or the club or John, my business partner,

23  repeatedly, and I constantly have people coming and

24  telling me things.  And just even over this instance, I

25  had people coming and saying, "Oh, Dorie is trying to

Page 222

1  get you out of running Twilight Polo and put someone

2  else in.  I mean, it's just that craziness to me, where

3  I've done nothing but support and send her clients when

4  I leave for the wintertime.  I send her kids

5  constantly.  And the way she repays that favor is not

6  nice.  And I've caught her in many lies.

7      Q.   **Were you talking about David Tafuri when you**

8  **said you stopped a gentleman from suing her?**

9      A.   Yes.

10     Q.   **Can you tell us a little bit about that?**

11     A.   David wanted cheaper board, so Dorie said,

12  "Hey, let's make sure all of our prices are the same

13  from club to club to club so no one is getting more or

14  less money."  So I told her what our prices were, which

15  was 700 a month, and she said she was going to charge

16  750.  She ended up charging David, I think, only 500,

17  so therefore, he left our care to go have cheaper board

18  with Dorie for the wintertime.

19          She said that -- I guess they agreed that to

20  keep the horse fit, the horse could do lessons in her

21  pony camp.  The horse ended up playing in the "I.I."

22  program for people like Emmy Glacousky (phonetic) and

23  older kids that can really play, and then it broke her

24  suspensory.  I have pictures -- or I did -- of the

25  horse playing in these programs.  All of Dorie's kids

USPA Hearing Committee
August 06, 2021

Page 223

1  at her operation told me about it.  And then she lied

2  to David -- and they said, "Oh, she turned the horse

3  out for one week," and then David came and rode it, and

4  she said, "Oh, the horse is lame after you rode it."

5  But the horse went lame during the "I.I." program.

6         And then they gave it back to me in the

7  spring, and it has a big leg, and she's like, "Oh, no.

8  It's fine.  Everything is fine."  David plays it one

9  chukker; it's lame; I get it looked at, and it has a

10  suspensory [verbatim].  The vet confirmed it was not

11  new; it's old; it happened, you know, months ago.

12  And then she tried to say, "Oh, I never used it in the

13  program."

14         And there were pictures of the horse being

15  used.  Emmy told me she played it; lots of people

16  played the horse; they all told me.  So she lied about

17  how the horse was being used, and then she tried to

18  say, "Oh, well, you sold him a bad horse to begin with.

19  You sold him one with bad legs."  And when he bought

20  that horse, it had no suspensory; it had no lameness

21  issues.  Was she a little bit older?  Yes, so

22  therefore, she should have never gone into a program

23  like that.

24         And then David was very upset because his

25  horse had to get turned out for one year, and then he

USPA Hearing Committee
August 06, 2021

Page 224

1  wanted to sue Dorie for it.  And I and John and many

2  other people said, "David, don't do that.  Come on.

3  We're all friends here."  You know, we all said, "Don't

4  put the horse there.  We all told you not to put it at

5  her operation because something like this would

6  happen," and he did it anyway.  So I said, "It's kind

7  of on you."  Also, we said, "Don't sue Dorie.  Let's

8  all be friends.  Let's not have a big headache."  And

9  we talked him out of suing Dorie, which maybe in the

10  long run he should have because then other issues like

11  this wouldn't have happened.

12      **Q.   Do you know if Dorie has gone around talking**

13  **to anybody extensively about Twilight Polo not playing**

14  **anymore at Great Meadow as result of this complaint and**

15  **Aleem's family's complaint?**

16      A.   Yes.  I mean, obviously, she hasn't personally

17  said it to me, but I have countless people coming and

18  telling me how Dorie is trash-talking Twilight Polo and

19  saying how we should have kicked Darrell out for this,

20  and that we are horrible people and that no one should

21  play at our club, or that they're going to play at

22  Morven, which is totally fine with us.  And I've been

23  told that she's trying to get Marcus Spagnoli

24  (phonetic) to run Twilight now, who is one of her pros

25  at the moment, because she doesn't want us to run it

1    anymore.

2         I mean, I feel like this has gone way beyond

3    something that she never heard to now, like, she's out

4    for personally attacking or getting revenge or -- I

5    don't even know what.  I mean, it's gone to a whole

6    'nother level.

7         MR. GREEN:  Ms. Ross, I'm sorry -- this is

8         Chris Green.  I'm sorry to interrupt you.  But

9         Ms. Taylor, I assume you would agree that all of

10        this testimony is hearsay as well about what Dorie

11        is saying to other people.

12        MS. TAYLOR:  Sure.  But it does go to

13        credibility.

14        MS. ROSS:  I have people call me all the

15        time, daily, about it.

16   BY MS. TAYLOR:

17        Q.  **And so she went to Bill Ballhaus as well about**

18   **taking over Twilight Polo and kicking Twilight Polo**

19   **out?**

20        A.  Yes.  She went up to Tolito (phonetic) before

21   his 12-goal game and she went to ask him about it, and

22   then Tolito came and said, "Now they have to have a

23   sit-down meeting and talk about what's going on because

24   Dorie is talking their ear off about it," and then they

25   asked me what was going on.  So I know that she went

Page 226

1   and directly talked to them.

2       Q.   So, Whitney, do you have anything else that

3   you think would be helpful to share of your direct

4   experiences with Dorie and her business and potential

5   dishonesty, or anything else concerning Aleem that

6   night or your interactions with Darrell?

7       A.   I can say that that night, it was a round

8   robin, and I also want to just note that this was an

9   exhibition and it was a non-USPA game at a facility

10  that we rent, which is also non-USPA.  `And the first

11  round robin was super fun.  Everyone was laughing and

12  having a great time.  And then when Dorie's team gets

13  out there, it obviously got more aggressive and more

14  intense.  And then I know that there was a whistle

15  blown on Aleem for dangerous riding, which I agree -- I

16  saw that -- and then Darrell stooped over, and nothing

17  was like -- there was no argument, there was no

18  confrontation, there was nothing that would have ever

19  alluded to the fact that Darrell was saying anything or

20  being aggressive or attacking or any of that.  And then

21  after the game, not one person that I know of that was

22  around there said that Darrell assaulted Aleem.

23          And that didn't come up until weeks after, so

24  I think that the story has changed from what it was to

25  the weeks after, and all of a sudden now, he assaulted

1   him.  And I was, like, "Well, why didn't that come up

2   when it first happened?"  When we talked to everyone,

3   no one ever said that.

4           And then back to Darrell, I could never

5   picture him saying that at all, let alone to a

6   13-year-old, and it's just not his character and it's

7   not who he is.  He has African-American polo player

8   teammates, coworkers, friends.  I mean, he is not at

9   all a racist person.  I don't ever seeing him saying

10   that.  And even if he was to get intense on the field,

11   it's out of passion.  It's not out of anger or trying

12   to do a mean play or anything.  And if he fouls, then

13   he asks why or how can he improve it.

14           I mean, he's still taking lessons to this day

15   to improve on his skills.  I mean, he's just so

16   passionate about the sport, I don't see why he would

17   ever go and try to ruin something by saying this, and

18   it's just not his character at all.  And it doesn't

19   surprise me that we're having issues with Dorie's

20   operation because there's always been issues.  For

21   however many years I've known her, there's always been

22   issues, or her attacking or going after someone, or a

23   constant lawsuits and everything.  I mean, it does not

24   surprise me at all that it's from Dorie, but it's a

25   surprise to me that she's doing this to us after all

USPA Hearing Committee
August 06, 2021

Page 228

1  the support and other things that we have overlooked in

2  the past for her.

3      Q.   I just have one more question.  You mentioned

4  that you saw the actual collision and you saw the

5  match, and so you saw Darrell doubled over.  What were

6  you thinking when you saw that?  What was your

7  impression of that?

8      A.   Darrell was bent over like he had gotten hit.

9  I mean, he's older.  He's not 13.  He's in his

10 seventies.  So when you get hit at that age, you're

11 obviously not as strong or flexible or whatever, so

12 obviously, I would think that that would have really

13 hurt.  So I saw him bend over, and that's kind of his

14 reaction if he does get hit by something.  I've seen

15 him in the past when he's gotten hit with a mallet or

16 something in, like, a finger or a leg, or a bump, and

17 his reaction is to bend over because he, like, grabs

18 himself or takes a breath.

19         But I never saw him look towards Aleem or say

20 anything or act aggressive or anything.  It was more,

21 like, Holy shit.  That really hurt.  Not aggression at

22 all.  I then later found out that Aleem's horse hit him

23 in the back, and his reaction was to bend forward in

24 pain.

25         MS. TAYLOR:  Thank you, Whitney.  I don't

Page 229

1       have any other questions, but the others might.

2               MS. ROSS:  Okay.

3                       CROSS-EXAMINATION

4   BY MR. GALLE:

5       Q.   Hi, Whitney.  This is Craig Galle.  How are

6   you?

7       A.   Good.  How are you?

8       Q.   Good.  A couple of questions.  Twilight Polo

9   Club is a USPA member club; correct?

10      A.   Yes, it is, and our facility is in Middleburg,

11  Virginia.

12      Q.   And you're the manager of Twilight Polo Club?

13      A.   Yeah.  I mean, technically, John would be the

14  official manager, and I guess I could be assistant

15  manager or co-manager.  But yes, I am one of the

16  managers.

17      Q.   And the event on July 10th, 2021, as I

18  understand it, you ran that event?

19      A.   I did run that event, yes.

20      Q.   And Twilight Polo Club, if I understood your

21  earlier testimony correctly, rented a polo field at

22  Great Meadow Polo Club to stage that event?

23      A.   So we rent that arena on Saturday nights, June

24  through -- September 18th is our last night.  And then

25  the one Saturday that we don't rent it is August 21st.

USPA Hearing Committee
August 06, 2021

Page 230

1      Q.   And can we presume that that rental is

2   pursuant to a written lease agreement of sorts?

3      A.   Yes.

4      Q.   Okay.  Focusing in on the evening of July

5   10th, 2021, you were present throughout the entire

6   evening; correct?

7      A.   Yes.

8      Q.   I think you testified that you saw the

9   collision where Aleem and his horse collided with

10  Darrell and his horse?

11     A.   Uh-huh.

12     Q.   "Yes"?

13     A.   Yes.  I did see the collision.  I mean, I

14  can't tell you exact, specific details of it because

15  I'm watching and working and everything, but it looked

16  like Aleem came at kind of a bad angle and hit Darrell

17  in the back, is what I saw from it.

18     Q.   Now, what was your approximate distance from

19  where you were standing or sitting to where the two

20  players collided?

21     A.   So I was at the center of the arena in the

22  announcer's stand, and that is set maybe four feet back

23  from the arena itself.  So I don't know -- I'm really

24  bad with distance, so I guess another -- so that's four

25  feet plus another fifteen feet, I would say, from the

USPA Hearing Committee
August 06, 2021

Page 231

1   play.

2       Q.   About ten yards away?

3       A.   Sure.

4       Q.   Not to hold you to it, but just trying to get

5   an approximate distance.  So that's sufficient.

6            Were you able to hear any conversations or

7   back-and-forth at that distance uttered by either

8   Darrell to Aleem or Aleem to Darrell?

9       A.   No.

10      Q.   So is it fair to say that you didn't hear or

11  couldn't hear because of the distance what was said or

12  what was not said, for that matter?

13      A.   I did not hear -- if anything was said, it was

14  not loud.  But from my distance, could I hear other

15  things that are being said out there?  One hundred

16  percent.  Like, I could hear the pro yell at Aleem and

17  say -- when Aleem said, "I tried," he said, "Trying is

18  for girls."  So I could hear things like that, but that

19  was said louder.  I could hear when people yelled at

20  each other, but if anything was said, it was not loud

21  and I could not hear it from the distance I was.

22      Q.   Okay.  So just to sort of conclude on that

23  point, you could not hear what Darrell said to Aleem or

24  what Aleem said to Darrell at or about the time just

25  before the collision or after the collision?

USPA Hearing Committee
August 06, 2021

Page 232

1      A.    I did hear Darrell go, "Ahh" -- I heard

2  that -- but I didn't hear any back-and-forth that was

3  said to each other, no.

4      Q.    Okay.  How about after the game concluded?

5  Were you a part of any of the interactions between --

6      A.    I was not, because I'm on the side, the

7  opposite side of the players' side, because I run the

8  boxes, and it's general admission, so I have to stay on

9  that side.  I did not go to the other side for that

10  confrontation after the game.

11      Q.    And if I understood your testimony earlier

12  correctly, you're here to tell us that based upon your

13  interactions with Darrell over the years, you find the

14  alleged statements to be out of character with how he

15  comports himself and the type of person he is?

16      A.    Correct.

17            MS. GALLE:  That's all the questions I have

18      for you.  Chrys Beal or Chris Green may have some

19      questions of their own.

20            MS. TAYLOR:  Excuse me.  I just have a couple

21      of -- like, two questions for redirect, if that's

22      okay, or do you want me to wait?

23            MR. GREEN:  Sure.  You can go ahead.  I'm

24      fine with it.

25            MS. TAYLOR:  Okay.

USPA Hearing Committee
August 06, 2021

Page 233

1                    REDIRECT EXAMINATION

2   BY MS. TAYLOR:

3        Q.   So the announcer's box that you were in at

4   mid-field, is that elevated?

5        A.   Yes.

6        Q.   So would you say that you had a pretty good

7   view of everything happening in the arena?

8        A.   Yes.   That's where the announcer stands

9   because that's the best view of the arena where the

10  game can be watched the best and be announced.   So yes,

11  I would say I had a good view.

12       Q.   So you testified before that when Darrell was

13  hit, you could see him and you could see him doubled

14  over, and you did not see him turn back to Aleem.   Is

15  that because -- where you were in the announcer's box

16  when Darrell was hit?  Was he facing you?  Could you

17  see his face?

18       A.   I couldn't really see his face because he bent

19  down next to his horse's neck, but I could see that his

20  head did not turn back towards Aleem.

21            MS. TAYLOR:  All right.  Thank you.

22            MR. GREEN:  Whitney, this is Chris Green.

23       I'm one of the hearing officers.  Can you hear me

24       okay?

25            MS. ROSS:  Yes.

USPA Hearing Committee
August 06, 2021

Page 234

1      MR. GREEN:  Okay.  Great.  You are the USPA

2   delegate for Twilight Polo Club; right?

3      MS. ROSS:  Yes.

4      MR. GREEN:  And are you pretty familiar with

5   the USPA arena rules?

6      MS. ROSS:  Yes.  But they change often, so

7   some of maybe the newer ones, maybe not, but for

8   the most part, yes.

9      MR. GREEN:  Okay.  But you know that Arena

10   Rule 1 has, for a long time and still does have,

11   language in it that allow clubs to make house

12   rules in connection with their arena polo,

13   including the definition of the goal line, goal

14   map, the wall, what's out of play, and so forth?

15      MS. ROSS:  Yes.

16      MR. GREEN:  And you make some of those

17   exceptions at Twilight Polo; is that correct?

18      MS. ROSS:  An exception being what?

19      MR. GREEN:  Like, for example, I understand

20   that when the ball goes out of bounds,

21   irrespective of where it goes out of bounds, you

22   give a free hit to the team that didn't hit it out

23   of bounds, at least from what I was told earlier.

24      MS. ROSS:  Yes.  So it's a little bit

25   different.  We don't always go by the USPA rules

USPA Hearing Committee
August 06, 2021

Page 235

1    for that exhibition game because we are on a time

2    crunch for the whole evening.  So we don't do a

3    throw-in.  It's easier for the umpire to drop a

4    ball down and it's hit from the spot of the other

5    team, and then whoever -- usually kids grab the

6    ball that got hit out, and they bring it back and

7    get a lollipop.

8         MR. GREEN:  Sure.  So that would be a house

9    rule, I would think.  Would you agree?

10        MS. ROSS:  Yes.

11        MR. GREEN:  I don't think I have any more

12   questions.  I do appreciate your testimony.  Thank

13   you for taking the time to give it to us.

14        MS. ROSS:  No problem.

15        MS. BEAL:  Hi, Whitney.  This is Chrys Beal,

16   and I have a question about the game itself.  You

17   mentioned a little bit about it being a round

18   robin and how, at the beginning of the evening, it

19   was so much fun and everybody had a great time.

20   So this had be to the second two chukkers that

21   Aleem had played; is that correct?

22        MS. ROSS:  Yes.  So it was -- the first two

23   chukkers, Darrell played a different team, and

24   then his last two chukkers were against Aleem's

25   team; the Battlefield team.

Page 236

1      MS. BEAL:  And did Battlefield play two

2    chukkers prior to that also?

3      MS. ROSS:  So I believe Darrell was off the

4    first four chukkers.  I wasn't exactly paying

5    attention to which group was up first.  I just

6    know that when Darrell played a different team

7    first, there was no -- like, everyone was smiling

8    and having a good time.  And then when Darrell

9    played Aleem's team, the Battlefield team, things

10    did get more aggressive.  But like I said, that's

11    typical of the Battlefield teams.

12      MS. BEAL:  And that's my question about the

13    earlier chukkers with the Battlefield team.  I

14    haven't heard you mention how those chukkers went

15    at all.  And were the chukkers between Darrell and

16    Aleem the very last two chukkers of the round

17    robin where they all finished it after that, got

18    off their horses, and left the arena?

19      MS. ROSS:  I believe so.  I think it was -- I

20    thought it was the second chukker against Aleem

21    that this happened.

22      MS. BEAL:  Okay.  Thank you.

23      MR. GREEN:  Okay.  Let's take a ten-minute

24    break.

25    ///

USPA Hearing Committee
August 06, 2021

1           (A brief recess was taken from 4:00 p.m.

2       to 4:18 p.m.)

3           MS. TAYLOR:  So our next witness is Gardiner

4    Mulford.

5           THE COURT STENOGRAPHER:  Mr. Mulford, I need

6    to swear you in for the record.  Can you please

7    raise your right hand.

8           In the testimony you're about to give, do you

9    swear to tell the truth, the whole truth, and

10   nothing but the truth?

11          THE WITNESS:  Yes.

12               GARDINER MULFORD,

13   having been first duly sworn or affirmed, was examined

14   and testified as follows:

15               DIRECT EXAMINATION

16   BY MS. TAYLOR:

17      Q.   So Gardiner, we chatted the other day, and I

18   understand that you know Dorie Burner.

19      A.   Yes.

20      Q.   Do you want to tell me how, please?

21      A.   I know her through polo, and a friend of mine,

22   Scott Gray, was working for her.  So that's how I know

23   her.

24      Q.   And do you want to describe any interactions

25   that you've had with her?  Or what do you think about

Page 238

1  her character?

2     A.   Well, I had four horses that I was selling for

3  $6,000, and I was talking to Scott about, you know,

4  where I should look for a buyer.  And he said, "Well,

5  Dorie is interested in getting more horses."  So I

6  talked to Dorie, and she said she didn't have any

7  money.  So I said, "Okay.  Well, I'm not going to give

8  them away for free."  And that kind of went back and

9  forth, and then one day, Scott called me out of the

10 blue and says, "Hey, we're coming over with a trailer

11 to pick up the horses."  So I figured she came up with

12 some money.

13         So they came over and inspected the horses,

14 and then Dorie says, "Okay, Scott.  Load them up."  I

15 said, "Not so fast.  You need to pay for these horses."

16 And so we went inside and she started hemming and

17 hawing about not having any money, that her kids are in

18 college, and she'll have money in six months because

19 her family had some tracking wells.  So I said, "I'll

20 finance the horses for you for six months," and I did.

21 I had a nice contract, and she signed it, and Scott was

22 there as a witness.  And lo and behold, six months

23 later, she didn't pay me.  And then I filed one debt

24 [verbatim], and she crossed-filed saying that I owed

25 her $25,000 for vet bills and what have you.

USPA Hearing Committee
August 06, 2021

Page 239

1           Anyway, it went to court and I eventually won,

2    but she made an affidavit saying that I delivered the

3    horses and that they were starving, which was just a

4    blatant lie.  I mean, she is a shameless liar.  She

5    ended up paying the $6,000 plus about $1,000 in

6    penalties and interest.  But, you know, I had been

7    warned by a few others not to do business with her, but

8    Scott, who I have known a long time, vouched for her,

9    and I needed to move these horses because I had moved

10   onto a smaller piece of property and I couldn't keep

11   them.

12          But she lied in an affidavit; she lied in

13   court, under oath, and the judge saw it.  And she tried

14   to pass off some spreadsheets as veterinarian bills,

15   and I said, you know, veterinarian bills have -- you

16   know, they have the name of the vet, the type of horse,

17   the age, the markings, and the sex of the horse, and

18   she had these spreadsheets with the name of the horse.

19   It was just really stupid, but she tried to pull it off

20   and it didn't work.  But she, again, just basically

21   lied over something so minor that I'll never trust her

22   again.  I don't think, from what I've experienced with

23   her, she has any business being a member of the USPA,

24   and she has no business conducting business with the

25   public.  She's not trustworthy.

Page 240

1           And as far as Darrell Gaebel, I've known

2    Darrell for -- I started playing polo in 2006, and he

3    was there and he was always a fixture and he always had

4    a great reputation, and I never heard any negative

5    comment about Darrell.  So that's pretty much the

6    extent of what I know.  But Dorie Burner will just, in

7    your face, look you in the eye and lie to you.  It's

8    unbelievable.

9        Q.   And so the documents that you said were vet

10   bills, those were also -- those false documents were

11   also documents that she submitted in your court case?

12       A.   They were.  And I tried to sanction her

13   attorney and her for trying to pass false documents,

14   and her attorney should have known better as well.  But

15   it was obviously spreadsheets.

16       Q.   Okay.  So you won that case?

17       A.   Yes.

18       Q.   How did that happen?  How did that end?

19       A.   I represented myself.  How did that happen?

20       Q.   Yes.  You represented yourself, and she had an

21   attorney.  How did the case end?

22       A.   My attorney twice failed to file the

23   particulars, so I fired him and I just did it myself,

24   and I won.

25       Q.   And the suit that she brought against you, the

USPA Hearing Committee
August 06, 2021

Page 241

1    counter-suit for $25,000, what happened to that?

2        A.   It was thrown out.

3        Q.   Did they --

4        A.   Excuse me?

5        Q.   Did the counter-suit for $25,000 against you

6    that she brought -- was that dismissed, or how did that

7    end?

8        A.   It was dismissed.

9             MS. TAYLOR:  Okay.  I don't have any further

10       questions.  Thank you, Gardiner.  Some others

11       might have some questions.

12            MR. MULFORD:  Okay.

13                       CROSS-EXAMINATION

14   BY MR. GALLE:

15       Q.   Hey, Gardiner.  My name is Craig Galle.  I'm a

16   lawyer for the USPA.  How are you?

17       A.   Good.

18       Q.   Can I take it by the narrow scope of your

19   testimony that you don't have any firsthand knowledge

20   of the event on July 10th, 2021, at the Twilight Polo

21   event in The Plains, Virginia?

22       A.   That's correct.  I don't know of the incident.

23       Q.   Okay.  And so you're here to tell us your past

24   unpleasant interactions with Dorie Burner; correct?

25       A.   Correct.  And I don't know if I can add this,

USPA Hearing Committee
August 06, 2021

Page 242

1    but there was a teenager from Warrington that died in

2    her house of an overdose.  So drug use -- she's

3    known to -- she has a reputation for it.

4            MR. GALLE:  Okay.  Well, sorry to hear that

5        occurred.  I don't think I have any more questions

6        for you.  Chris Green may or Chrys Beal may.

7        Thank you.

8            MR. GREEN:  I have a few questions,

9        Mr. Mulford.  My name is Chris Green.  Can you

10       hear me?

11           MR. MULFORD:  Yes.

12           MR. GREEN:  This horse sale for $6,000, that

13       was the total price for the four horses?

14           MR. MULFORD:  Correct.

15           MR. GREEN:  And when you won your lawsuit

16       against Ms. Burner, did you get a judgment; a

17       money judgment?

18           MR. MULFORD:  Yes.

19           MR. GREEN:  What was the amount of that

20       judgment, if you remember?

21           MR. MULFORD:  It was for $6,000.

22           MR. GREEN:  Did you collect it?

23           MR. MULFORD:  Plus interest and -- I did.

24           MR. GREEN:  And when, if you recall, did you

25       get that judgment?  What year, approximately?

USPA Hearing Committee
August 06, 2021

Page 243

1      MR. MULFORD:  I think it was this year; this

2   spring.

3      MR. GREEN:  Oh, it was this spring?

4      MR. MULFORD:  Yeah.  It was two years after

5   the six-month term that I gave her.  I was doing

6   her a favor, and she just -- unbelievable.

7      MR. GREEN:  Okay.  So this agreement to sell

8   and finance the horses occurred about two years

9   ago; is that right?

10      MR. MULFORD:  Correct.

11      MR. GREEN:  All right.  You mentioned that a

12   young person, as least as far as you know, died in

13   her home from an overdose.  Do you know

14   approximately when that was?

15      MR. MULFORD:  No.  My attorney, Brook Howard,

16   in Warrington, told me about it.

17      MR. GREEN:  Okay.  So you don't know when it

18   was?

19      MR. MULFORD:  No.

20      MR. GREEN:  And your knowledge of that is

21   based upon what Mr. Howard told you?

22      MR. MULFORD:  Correct.

23      MR. GREEN:  Okay.  And you say that you know

24   Mr. Gaebel?  Am I right about that?

25      MR. MULFORD:  Yes.

Page 244

1        MR. GREEN:  How long have you known

2   Mr. Gaebel?

3        MR. MULFORD:  Well, I met him when I started

4   playing polo there in 2006.  I played up there a

5   year or two, and then I started playing at a

6   private club out of Ruckersville.  And I would go

7   up to Great Meadow every so often to play in a

8   tournament.  But, you know, you're always crossing

9   paths, and you hear about what's going on and who

10  is doing what, and I never heard one negative

11  thing about Darrell.  He's a gentleman, and I

12  remember him as that way, and I've never heard

13  anything negative about him.

14       MR. GREEN:  All right.  So you've known

15  Mr. Gaebel on and off for 15 years; is that about

16  right?

17       MR. MULFORD:  Yes, pretty much.

18       MR. GREEN:  Okay.  I don't have any further

19  questions.  Thank you for your testimony,

20  Mr. Mulford.  Ms. Beal may have some questions for

21  you.

22       MS. BEAL:  Hi, Mr. Mulford.  I'm Chrys Beal.

23  I have no questions.  Thank you very much for your

24  time.

25       MR. MULFORD:  Thank you.

USPA Hearing Committee
August 06, 2021

Page 245

1          MS. TAYLOR:  Thank you.

2          MR. GALLE:  Thank you.  Have a good weekend.

3          (The witness was excused.)

4          MS. TAYLOR:  Okay.  Our last witness is

5     Darrell.

6          THE COURT STENOGRAPHER:  Sir, I need to swear

7     you in for the record, if you can raise your right

8     hand.

9          In the testimony you're about to give, do you

10    swear to tell the truth, the whole truth, and

11    nothing but the truth?

12         THE WITNESS:  I do.

13              DARRELL GAEBEL,

14  having been first duly sworn or affirmed, was examined

15  and testified as follows:

16              DIRECT EXAMINATION

17  BY MS. TAYLOR:

18    Q.   So Darrell, let's start with the actual events

19  of that night and the match.  What do you recall?

20    A.   So the singular event for me in that match was

21  getting hit by Aleem and doubling over, and thinking

22  that this was the end of my polo career, such that it

23  was, and the end of my riding because I have severe

24  back injuries lingering from previous injuries.  And I

25  just felt that a hit like that -- I had no idea of the

Page 246

1  severity or the impact it was going to cause to my

2  back.  So that is the singular event that sticks in my

3  mind.

4         My recollection is, after the shock and the

5  realization that I had been hit, I looked to see what

6  had happened [verbatim] and how did this happen.  And

7  then the pain hit, and I doubled over for probably, I

8  would say, at least a minute, maybe longer.  And the

9  reason I say that is because it took a while for it to

10  register to me, and it took a while for George Krabbe

11  to realize what had happened and for him to blow the

12  whistle.  And then recognizing that I was not bouncing

13  up like I typically do, he rode over to me and asked

14  me, "Darrell, are you all right?" and I just turned my

15  head and said, "No, I am not."

16         So I laid there, and just like every athlete

17  who ever suffers a sports injury, the first thing you

18  want to do is a self-assessment of how bad it is, what

19  works and what doesn't work.  And I could feel my legs,

20  I could feel my arms, and I could feel just incredible

21  nagging pain on the right side of my lower back and my

22  shoulder where the horse had hit me.  As I now

23  understand -- having watched the videos and seeing the

24  impact, I now have a better understanding of that

25  impact.  And I eventually just rose from the saddle and

Page 247

1   just sort of moved around a little bit:  Does the back

2   work; does the neck work; are the arms working?  And

3   then George looked at me and said, "Are you okay to go

4   on?" and I said, "Sure.  Let's do it," and we continued

5   to play.

6       Q.   So you said you've had some back injuries.

7   Can you share that?

8       A.   I have a complete MRI readout of all my lumbar

9   discs and the severity of the herniations.  I can send

10  them, submit them for the record, if it's required.  I

11  am seeing Dr. Ketan Patel probably every six months for

12  assessments of how bad -- is it deteriorating; is it

13  getting worse; can I sustain the intermittent chronic

14  pain?

15       At one point in time, I asked him -- I said,

16  "Okay.  Hey, you know, I play polo.  I love to ride."

17  I said, "It doesn't hurt me when I ride, when I'm

18  physically riding.  It hurts when I get off the horse."

19  And he said, "Yeah.  That's not uncommon."  And I asked

20  him how severe the herniations were, and he said,

21  "Which one?"  I said, "The worst one."  He said, "On a

22  scale of 1 to 10, the L1-L2 disc has a herniation level

23  of about 8."  He said, "At some point in time, we are

24  going to have to consider surgery; your call."

25       So, again, I have that readout, and I can

USPA Hearing Committee
August 06, 2021

Page 248

1  submit it as required.

2      Q.    Thank you, Darrell.  So you've been dealing

3  with these back injuries.  Did you feel -- is that what

4  you thought, that you were not able -- are you saying

5  that when you were hit, you were afraid that your back

6  was injured permanently?

7      A.    Oh, yeah.  Absolutely.  Talking about it just

8  makes me relive it a little bit because I just dropped

9  and just wondered -- I mean, the first thing, when I

10  was hit, it was, like, what was that, and then all of a

11  sudden, the pain hit.  And the question in my mind was,

12  "All right.  How bad is this?  Just how bad did I get

13  hit?  How hard has it -- has it done the damage that

14  the doctor had suggested could be incurred if I didn't

15  take good care of myself."  And like I said, I figured

16  my riding and my polo were over.

17      Q.    Do you remember, when you were hit, if you

18  said anything?

19      A.    Oh, I think at one point in time, once the

20  pain hit and I doubled over -- I mean, again, you know,

21  sports injuries -- you get hit; you go into, I would

22  suggest, a mental shock like, What was that?  And then

23  the pain hits, and it's not uncommon to express some

24  kind of emotion.  And yeah, I did, but it was -- you

25  know, I was talking to the ground at the time.  At no

1    time did I ever direct anything at anybody.  I was bent

2    over.

3        Q.   And so does the video show the entire time

4    that you were bent over?

5        A.   No, it doesn't.  It's truncated.  Like I said,

6    I was bent over when George Krabbe rode up to me.  That

7    particular part of the video isn't there, so clearly it

8    is truncated to some level.

9        Q.   And so when you say that you didn't direct

10   your yelling at anybody -- obviously, you know what the

11   allegations are, that you turned and yelled -- yelled,

12   said, whispered, whatever -- to Aleem, quote, "You

13   motherfucking nigger," unquote.

14       A.   I understand those are the allegations.

15       Q.   Right.  Did you say that?

16       A.   Never in my life as a professional have I

17   ever, ever even contemplated that language, let alone

18   directed it at someone.  That is not me.  In my entire

19   professional career, you cannot find anyone in the

20   history of my interactions that will attest that I have

21   ever used that language, let alone directed it at a

22   competitor in a game.  I mean, as it's been said,

23   polo -- you know, you bump into each other, you hit

24   each other.  You know, it's an occupational hazard.

25   But you don't swear at people for those things.  You

Page 250

1   just don't do it.  I don't do it.  I've had it directed

2   at me, but I don't do it.

3        Q.   And you say your professional life.  What

4   about in your personal life?

5        A.   It's not in my language.  It's not.  I cannot

6   be more emphatic about it.  I don't know how else to

7   express it.  It's not in my vocabulary; it's not in my

8   lexicon.  I've never used that language.

9        Q.   Are you talking about cursing, or are you

10  talking about racial --

11       A.   Racial epithets.

12       Q.   That very word, did you say that --

13       A.   That word is not in my lexicon.  I'm a

14  professional.  I am required to take diversity

15  training.  Cultural diversity, ethnic diversity has

16  been my life.  I mean, I have lived that my entire

17  adult life.  There is no way I could ever let that come

18  into my being.  I mean, USPA sanctioning me is nothing

19  compared to what would happen to me professionally if I

20  ever uttered those words.

21       Q.   And so outside of -- well, let's step back.

22  So what do you recall about that evening or the match?

23  What do you know about the match?  What do you

24  remember?  How long was it?

25       A.   I have a memory of us -- so I usually show up

Page 251

1  and want to know who I'm playing; who am I playing

2  against.  I like to play a straight four.  Marissa

3  Wells says, "Darrell, you're going to split chukkers.

4  You're going to be up the first two and up the last

5  two."  I said, "Okay.  Fine.  That works."  I said,

6  "Well, who is playing first?  Who am I playing against

7  first?" and it was Joe Noonan's team with Claire Abbott

8  and another individual.  And I said, "Oh, that's going

9  to be a lot of fun," because they're fun people to play

10  with.  And then it was going to be Battlefield, and I

11  go, "I'm not going to like that."

12          I have played against the Battlefield teams

13  repeatedly at Great Meadow.  It is not a fun game.  It

14  is never a fun game.  It's always a question of who is

15  going to hit the hardest, who do I have to watch out

16  for, who do I need to stay away from, because they play

17  a very aggressive and -- I believe, from my experience,

18  a dangerous, aggressive game.  And I have talked to

19  countless people -- and I won't list their names now --

20  who have said the same thing.  They don't like playing

21  against Battlefield.  It's always a battering event for

22  them.

23          You know, I think I talked to Joe Noonan --

24  when he came off the first chukker, I asked him how it

25  was going, and he said, "I feel like I'm just getting

USPA Hearing Committee
August 06, 2021

Page 252

1   beaten out there, just getting the shit kicked out of

2   me."  I said, "Well, it's Battlefield," and he goes, "I

3   know, but they don't have to play like that."  He said,

4   "My knee is just wrenched," and I said, "Well, thanks

5   for warning me, so now I know what I'm going to be

6   going up against in the next two chukkers."

7          So I go into the arena knowing a lot of the

8   players because we have played against them, and

9   whenever I go into the arena and Battlefield is on the

10  agenda, I go in there with considerable trepidation.

11  Not just for me, but for my horses.  These are my

12  horses.  These aren't leased horses where, if it fails,

13  "Okay, well go get another horse."

14         These are my horses.  I have spent a lot of

15  money, a lot of energy, a lot of resources working with

16  these animals, knowing how they play and how I play.

17  The last thing in the world I want is to endanger them

18  by playing with people who have no regard for the

19  animal and are just out there to be expressing how good

20  they believe they are as opposed to how good they

21  really are.  And I'm fearful more for my horses than

22  for myself, because my horse can't tell me where he

23  hurts.  When I get hit by somebody, I know where I

24  hurt.  If my horse gets hit, I have to wait a day and

25  then, Oh, he's lame or he got cut.  So going into

Page 253

1    Battlefield Polo games, it's always:  Who is going to

2    get hurt worse?  My horse or me?

3        Q.   So when you say that they're aggressive,

4    you're talking about a different type of aggression

5    than what we normally understand?

6        A.   Teresa, you and I, and just about everybody

7    who has been on today, have played.  I play against Dan

8    Coleman; Dan and Zach and Livvie.  They're great

9    players.  They are aggressive players.  You have to

10   come to play.  You have to bring your A-game with you.

11   But they are good players.  They don't come at you at

12   obtuse angles.  They don't try to hurt you.  They are

13   just playing good, aggressive polo, riding up shoulder

14   to shoulder and then pushing.  Not coming at you at an

15   angle where you and/or your horse, or both are going to

16   get hurt.

17          So I've played many, many matches with many,

18   many aggressive players, but they're good, aggressive

19   players and they're professional, and I don't fear for

20   myself and I do not fear for my horses when I play

21   against them.

22       Q.   So when you were hit, what foul did Krabbe

23   call?

24       A.   So I didn't know that he called a foul.  I

25   just know he blew the whistle, dropped the ball, and we

USPA Hearing Committee
August 06, 2021

Page 254

1   started playing again.. It wasn't until we left the

2   arena that I went up to him and said, "Did you call a

3   foul on that?" and he looked at me and said, "Yeah,

4   dangerous riding.  You can't hit like that."

5       Q.    "You can't hit like that," meaning what?  Was

6   the foul on you, or what did you understand he was --

7       A.    The foul was against Aleem.  You cannot T-bone

8   people.  You cannot come at people with that angle.  We

9   all know, when you are riding off, the first rule is

10  same speed, shoulder to shoulder, and then you push.

11  That is not what happened here.  I got T-boned.  I

12  think the video clearly shows that.  And I would just

13  like to make one observation that I have heard a number

14  of times from the Siddiquis about the horse brushing my

15  shoulder.

16          If you slow down the video, that contact is

17  anything but brushing my shoulder.  You can see the

18  horse's teeth flaring when he's hitting me in the back.

19  So it wasn't brushing my shoulder.

20      Q.    And so the pictures that were submitted with

21  the complaint, have you seen those?

22      A.    I have not seen the pictures.

23      Q.    You have not seen the pictures?

24      A.    I have not seen the pictures.  I have seen the

25  video.  I haven't had time -- perhaps you can explain

Page 255

1   to me what you see in the pictures, objectively.

2       Q.   Well, we can't --

3       A.   Okay.  Never mind.

4       Q.   Let's not worry about that.  What about the

5   other video and the rest of --

6       A.   Well, let's talk about the other video.  Why

7   George Krabbe never called another foul on Aleem is

8   beyond my understanding, because as I said, my

9   understanding of the rules for a ride-off, shoulder to

10  shoulder, same speed -- you can clearly see that Aleem

11  is hitting me in the back with his shoulder.  My back

12  is to him, and he is hitting me in the back.  I don't

13  understand why a foul wasn't called.  But I'm not a

14  USPA-accredited umpire, and so you can't see

15  everything.

16      Q.   What did you understand this match to be?  A

17  USPA event?

18      A.   No.  John has said this repeatedly, and it

19  bears repetition:  These are exhibition games.  These

20  are put on for the enjoyment of the spectators that are

21  there; they are put on for the enjoyment of the

22  players.  We go out there as competitors.  Some of us

23  are fierce competitors and some aren't.  But when we

24  leave the polo arena, we are sportsmen; we are polo

25  players after that; we are polo comrades.  It begins

Page 256

1  and ends in the arena, and that's it.

2      Q.   So when you left the arena -- well, let's back

3  up.

4           So after you were hit and then you said,

5  "Yeah," to Krabbe, "let's continue to play," how did

6  the rest of the match go for you?

7      A.   There was -- I would say not continuous

8  physical contact with Aleem, but there were -- I

9  believe the video clearly shows that there was

10  aggressive play against me.  And that happened two or

11  three times, to the point where George Krabbe looked at

12  us both and said, basically, "Knock it off.  Cool down.

13  This is exhibition.  You don't need to do that that

14  hard.  The game is almost over."

15           I think what he was alluding to was, Let's not

16  get hurt again, because he knows how hard I got hit and

17  how much it hurt, and he just didn't want that to

18  happen again.  That is my understanding.

19      Q.   And so at the conclusion of the match, how did

20  you feel leaving the arena?

21      A.   Well, I will say this:  I think I was a bit

22  taken aback, and then I was quite pleasantly surprised

23  and pleased when Aleem rode up to me at the end of the

24  match and shook my hand, as good players do, and

25  apologized for hitting me.  And I looked him in the eye

Page 257

1    and I thought, All right.  It ends here.  You know,

2    I said, "Thank you.  Yeah, it hurt.  Maybe we shouldn't

3    have played that hard."  But we shook hands, as I shook

4    hands with all the rest of the players.

5            And for me, it ended there when I rode out of

6    that arena, and I was the second to the last one to

7    ride out of the arena.  But I was, like, Oh, the kid

8    has got class and recognizes that, potentially, he

9    shouldn't have hit me as hard as he did and he rides up

10   to me and apologizes, like any good sportsman would,

11   and shakes my hand.  I shake his, and I graciously

12   accepted his apology, and it ends there, because that's

13   what John Gobin taught us.  Your competitor today is

14   your teammate tomorrow.  You've got to leave it in the

15   arena or on the field.

16       Q.   And so what happened after you left the arena?

17       A.   I rode over to Margaret Bond, who I started

18   playing polo with in 2006.  I saw her when we went

19   around the arena shaking hands, and I yelled,

20   "Margaret," and I rode out of the arena and rode over

21   to where she and her husband were sitting.  They came

22   down and I started talking to them, and I said,

23   "Margaret, you know this horse.  This is Aragon"

24   (phonetic).  And she said, "Oh, yeah.  Where are the

25   rest?" and I had to explain what had happened to them.

USPA Hearing Committee
August 06, 2021

Page 258

1    And I said, "Come meet the rest of my string," and she

2    walked over with me and I introduced her to the rest of

3    my string.  And we were standing there talking when

4    Dorie Burner and John Gobin came around and said, "Hey,

5    Darrell, we need to speak with you."  And I looked at

6    them and said, "Oh, okay," and Margaret graciously

7    said, "Okay, Darrell.  Talk to you later," and walked

8    off.

9        Q.    What happened then; the conversation?

10       A.    John called me over and said -- I don't

11   know.  I think he said that something happened in the

12   arena and that Dorie wanted to talk.  And Dorie Burner

13   looked at me and said, "Aleem says you called him a

14   motherfucking nigger."  And my mouth dropped.  I was

15   stunned.  I was beginning to feel a little outraged

16   that anyone would even suggest that I would say that.

17   I was angry that someone would come over here and

18   allege that I would say something like that, and who

19   are they that they would say something like that about

20   me.

21           And John says, "Darrell, just go over there,

22   talk to the family, and smooth it out," and I said,

23   "Done."  And I think I beat Dorie over to where the

24   Siddiqui family sat, but I waited for her to show up

25   because I didn't know Aleem's parents.  Aleem's mom

Page 259

1  walked down the stairs, stopped mid-stair, and Dorie

2  said, "This is Aleem's mom."  I hadn't said a word to

3  anybody at that point.  I turned to her, looked her in

4  the eye, made eye contact, and emphatically said, "I

5  did not say that.  That word is not in my lexicon.  I

6  would never use that word, ever, period."

7      Q.   And then what happened?

8      A.   And then I turned and Dorie was standing there

9  and Aleem was standing there, and I looked at him and

10  said.  "Aleem, this is over.  We left it out in the

11  arena.  That's what we do."  And I tapped him on the

12  shoulder, competitor to competitor, not an old man to a

13  14-year-old -- it was competitor to competitor;

14  sportsman to sportsman -- and said, "Hey, we finished

15  this in the arena.  It's over.  Right?"  I did not

16  intimidate him.

17          Any allegations that I pushed a young child is

18  outrageous.  If I were Aleem's parents and I saw

19  somebody pushing my child, I would have come unglued at

20  that moment.  I would not have waited two or three days

21  to write up an allegation that said, This man came

22  over, intimidated and pushed my child.  I would not

23  have waited.  I did not intimidate him.  Well, I don't

24  know that I didn't intimidate him.  That's his

25  perception.  He owns that perception.

USPA Hearing Committee
August 06, 2021

Page 260

1          I looked him in the eyes, sportsman to

2    sportsman, tapped him on the shoulder, and said, "Hey,

3    we ended this in the arena, right, when you came up and

4    apologized to me and I accepted it?"  And then I walked

5    away, because as far as I was concerned, that's it.  I

6    didn't owe anybody an apology for anything because I

7    didn't do anything.

8          Q.   You said that it was outrageous what you were

9    being accused of in calling Aleem this and cussing at

10   him.  Did you use any language again?  Did you speak to

11   him much again --

12         A.   I don't -- I'm sorry.  I didn't mean to

13   interrupt.

14         Q.   You heard the testimony and you've heard the

15   statements.  You know, it was alleged that you did it

16   more than once and --

17         A.   No.  Anyone who says -- and I'll leave it at

18   that as opposed to "asserts."  Anyone who says that I

19   said "motherfucker" more than once is lying, pure and

20   simple.  I don't think he and I exchanged another word

21   in that arena because of what had happened already.  I

22   did not feel like I wanted to bring any of that baggage

23   into the rest of the game.

24          You know, it was going to be -- clearly, for

25   the next couple of minutes, it remained very

Page 261

1  aggressive, more aggressive than I like to play.  And

2  you've heard people talk about the fact that I am an

3  aggressive player, but I am an aggressive player

4  competitively; not to hurt anybody, but just to play

5  the game.

6         And it was clear that -- you know, you can see

7  it in the second video where he hit me.  I never said

8  another word to him like that, ever.  That was it, the

9  one time, and it wasn't directed at -- I was talking to

10  the ground at the time.

11     Q.    So are you saying that you yelled out in pain?

12     A.    Absolutely.  You know, once I realized -- once

13  I doubled over, that's when an exclamation came out,

14  when the pain hit.  I mean, you've been hit; we've all

15  been hit.  You don't realize -- the pain doesn't hit

16  you immediately.  Or maybe it does.  For me, it didn't.

17  It was only after, I'll say, seconds -- ten, five.  I

18  don't know -- when the pain hit.  And you can see me

19  looking over and then all of a sudden turning and

20  doubling over.  That is the time interval between

21  trying to understand what happened and experiencing the

22  first shock of pain, and that's when that exclamation

23  came out, after I had doubled over on my horse.  And

24  you can see that I'm doubled over on the left side of

25  my horse, not on the right side.

USPA Hearing Committee
August 06, 2021

Page 262

1    Q.   So how has this whole experience been for you,

2    Darrell?

3    A.   Appalling.  It has ruined two of my vacations,

4    because this thing has been hanging over my head.  I

5    wake up at night, every single night, and I just lay

6    there for hours thinking, What am I going to say?  What

7    is going to be said to me?  How is it going to be

8    addressed?  How am I going to be judged by my other

9    peers, the other players?  Is this something that is

10   going to be haunting me?  Because as a professional,

11   this is just appalling that this is being alleged and

12   is associated with me.

13        And it's put a strain on my marriage because

14   I'm trying to process what happened, why it's

15   happening, what are the bases for these allegations.

16   Somebody heard something, but what they heard, I can't

17   tell you because, clearly, it's not what I said.

18   Q.   Would you say that those allegations are lies?

19   A.   I will say that those allegations are a gross

20   misrepresentation of what I said, what is alleged that

21   I said, what is alleged about my behavior.  The only

22·  lie that I will attribute to anyone is anyone who looks

23   me in the eye and says, "You said motherfucking

24   nigger."  Anyone who says that is a liar, pure and

25   simple.

USPA Hearing Committee
August 06, 2021

Page 263

1          They can allege all they want:  Well, we

2     think, or it was said.  That's -- to quote Mr. Galle,

3     as he's said a couple of times, and Mr. Green, that's

4     hearsay.  Look me in the eye and tell me you heard me

5     say that, and I will call you a liar.  That's not me,

6     and I don't need people to reaffirm that because I know

7     what kind of person I am.

8          Q.   And so when you were asked to go and smooth

9     things over, did you expect that an apology would be

10    demanded of you, no matter what, or what did you expect

11    when you walked over and John said, "Go smooth things

12    over"?

13         A.   My understanding is, the way John rolls, he

14    wanted me to go over there, talk to the parents and

15    assure them that under no circumstances would I have

16    ever said that to their child; to affirm to them that I

17    did not say that to him.  I would not be surprised, if

18    a child heard that, that it would traumatize them, and

19    I wanted to affirm to them, in no uncertain terms, that

20    I did not say that.

21         And that's when I -- like I said, the first

22    thing I said to anybody when I got over there was to

23    his mother.  I looked her in the eye and said, "I did

24    not say that.  That word is not in my vocabulary or in

25    my lexicon," basically saying, Put your mind at rest.

Page 264

1    I didn't say it.

2        Q.   So you've heard a lot of testimony about you

3    not apologizing regardless and that you should have

4    apologized --

5        A.   For what?

6        Q.   Do you see that as your way of apologizing for

7    a misunderstanding, by saying, Hey, I did not say that?

8        A.   Absolutely.  I didn't say that.  I am not

9    going to apologize for something I did not do.  I will

10   not lend credence to an allegation by apologizing for

11   something that I did not do.  What I will do is, most

12   emphatically and with passion, state that I didn't say

13   it.  That's not me.

14       Q.   And do you see a statement like that, an

15   allegation like that, that you called somebody a racial

16   epithet that is that's serious -- do you see that as an

17   incredibly damaging, potentially damaging, allegation?

18       A.   Without a doubt.  We all know what social

19   media has done to people.  And mere allegations in the

20   court of public opinion leads to confirmation, Well,

21   surely somebody said that he said it, so he must have

22   said it or she must have done it or he must have done

23   it, because somebody said it.  Yeah, I fear that.  And

24   anyone in society right now has to fear that.

25            All it takes is for one person to allege

Page 265

1   something -- and it doesn't matter -- like today, it

2   won't matter how vehemently or passionately I deny

3   having said that, it won't matter to some people

4   because they will either, "A," know me and say, It

5   didn't happen, or, Huh, I wonder.  And that's the

6   damage, because people will wonder now, and that's what

7   I fear, because that is to my integrity.  And if you

8   don't have you integrity, you don't have anything.

9       **Q.   Would you say that you feel as though, if you**

10   **had apologized for something that serious that you did**

11   **not do, some would view you as having said it?**

12      A.   Yes.  Absolutely, unequivocally, which is why

13   I refused to apologize for it.  My apology, if you want

14   to call it an apology, was emphatically stating, "I did

15   not say that.  That is not in my vocabulary or in my

16   lexicon.  I did not say it," pure and simple.  And

17   anyone who says to me -- and I will say "says,"

18   again -- you called me that, I will call them a liar.

19   People can allege all they want, because they didn't

20   hear it.  The one person who thinks they heard it,

21   that's the liar.

22      **Q.   Okay.  And so as far as the allegation of the**

23   **pushing, do you feel the same way?**

24      A.   Absolutely.  Aleem knows the intent of that

25   contact.  He knows it was sportsman to sportsman,

USPA Hearing Committee
August 06, 2021

Page 266

1   competitor to competitor.  It was a tap on the shoulder

2   saying, "Hey.  Remember we finished this in the arena;

3   right?"  And I waited for him to acknowledge that, and

4   he never did.  And that disturbed me.  That concerned

5   me as I walked away.  He did not acknowledge what he

6   had acknowledged earlier in the arena when he rode up

7   and shook my hand and apologized, and I accepted it

8   graciously.

9        Q.   And when he rode up and apologized and shook

10   your hand, did he seem upset?

11        A.   No.  Well, I would say he felt a bit

12   admonished because he recognized that he had hit me

13   hard and that I was hurt.  And I don't think that was

14   his intent.  I never ascribed malice to what he did.  I

15   wouldn't call it premeditated.  I would call it what

16   George Krabbe called it:  Dangerous riding; not

17   controlling your horse; you shouldn't have done that.

18   You rode up to me after the game and you apologized to

19   me for it.  Over, done, exclamation point.  Thank you.

20   Very gracious of you to do that.  And I shook his hand.

21        One should stop and think, if I had harbored

22   any animosity toward him, harbored any bad feelings,

23   residual feelings, I would have turned and rode away

24   and never even acknowledged him.  That's not what

25   happened.  I shook his hand graciously and accepted his

USPA Hearing Committee
August 06, 2021

Page 267

1   apology.

2          MS. TAYLOR:  Darrell, I don't have any more

3      questions for you.  Is there anything else you

4      would like to share with us before the hearing

5      officers or Mr. Galle questions you?

6          MR. GAEBEL:  No.  I think I've said enough.

7      Anything else would simply be repetitious.  Thank

8      you.

9                    CROSS-EXAMINATION

10  BY MR. GALLE:

11      Q.   May I call you Darrell?

12      A.   Mr. Galle, yes, you can.  It's good to put a

13  face to a name.

14      Q.   Yes.  And please call me Craig.

15      A.   Okay.

16      Q.   We've been at it all day.  We have heard a lot

17  of witnesses.

18      A.   Yes, sir, we have.  And I have a polo game at

19  6:00 o'clock.

20      Q.   Okay.  Well, let me be as brief as I can.

21      A.   Thank you.

22      Q.   I'm curious, before the game on July 10th,

23  2021, whether there had ever been any interactions

24  between you and Aleem in the past from which he may

25  have harbored some ill feelings or remembered something

Page 268

1  that may have put him on edge or not thinking clearly,

2  maybe?

3      A.   Sir, thank you for that question.  And I would

4  remind you of what I said earlier, sir.  I go into

5  games with Battlefield with trepidation.  I had played

6  against Aleem in the past.  It had been a while.  I

7  mean, like John said, you forget that game and you move

8  on to the next game.  I harbored absolutely -- you

9  know, I had played against Quincy, who was also on the

10 team, and it was always fun playing against Quincy.

11         I had played against Aleem maybe once or

12 twice, but I don't remember the particulars.  I don't

13 remember the particular individual aggressiveness on

14 his part that would cause me to say, Oh, my God.  I

15 better gird my loins because it's coming down.  No,

16 sir.  None of that at all.

17     Q.   Okay.  So nothing sticks out to you as having

18 occurred in the past between the two of you during a

19 game for which he may have remembered that and been a

20 little on edge in this game?

21     A.   Not from my perspective, sir.  I cannot assert

22 what his demeanor was at the time or what his

23 impression was of me.

24     Q.   Okay.  In the game on July 10th, 2021, before

25 the collision, was the level of play that Aleem -- in

Page 269

1  your view, the way he was riding, did you determine it

2  to be aggressive or normal?

3      A.   Sir, I would attribute it to a level of

4  typical Battlefield aggressiveness.  And I was prepared

5  for that because I know how they roll.  Everybody knows

6  how Battlefield plays.  And you always go out there

7  with trepidation, but I have good, strong horses.  I

8  know how to protect myself.  And I would say that

9  Aleem, Quincy, and Antonio were not playing any more

10  aggressive than what I had expected when I went out

11  there.  I did not see them coming at me -- I don't

12  think Quincy and I actually even physically engaged.

13  It was always Aleem and me.

14         Why he targeted me -- other than the fact that

15  I was probably the better player, which is what you do.

16  But I wouldn't call it, necessarily -- I wouldn't call

17  it belligerent aggressiveness.  I would call it typical

18  Battlefield aggressiveness.

19      Q.   Got it.  Okay.  And then the game proceeds and

20  we have this collision.  As result of the collision, if

21  I understand you correctly, you were injured and you

22  felt pain; correct?

23      A.   I think "felt pain" is an understatement, but

24  yes, sir.

25      Q.   Okay.  You felt a great deal of pain?

USPA Hearing Committee
August 06, 2021

Page 270

1    A.    Yes, sir.

2    Q.    And as a result of -- I assume you didn't

3 expect to get hit in the back or hit by Aleem's horse,

4 correct, so it came as a surprise?

5    A.    Yes.

6    Q.    And as a result of that collision, the pain

7 that you felt -- you do admit that you uttered some

8 words; is that correct?

9    A.    Sure.  I don't know anyone who gets hurt, any

10 sportsman who gets hurt, who doesn't express some level

11 of emotion, verbal emotion, as a result of that pain.

12 Just a natural exclamation.

13    Q.    Understood.  And forgive me if I missed the

14 exact words, but what were the exact words that you

15 uttered just having been collided with or feeling the

16 pain that you were feeling [verbatim]?

17    A.    So if I could just walk through the event,

18 first of all, I get hit -- first of all, I'm in, what

19 we all know to be, the most vulnerable position in polo

20 with your head down, turning the ball.  And then you

21 get hit and you don't know what that was, and I looked

22 up and then all of a sudden, the shock and the pain hit

23 me and I doubled over.  And it was at that moment, I

24 believe -- again, I'm recreating this in my mind -- at

25 that moment is when I looked down and I uttered that

USPA Hearing Committee
August 06, 2021

1    phrase.  Again, I was talking to the ground.  I don't

2    express those feelings to other players.  You just

3    don't do that.

4         Q.   **Understood.  Refresh my recollection.  What**

5    **was the phrase?**

6         A.   Sir, we've all heard the phrase countless of

7    times.  You know the phrase, but I'll repeat it for the

8    court reporter.  I looked down and uttered

9    "motherfucker," trying to understand -- again, it was

10   in the context of the pain that I was now feeling and

11   also the realization that perhaps this could be a

12   career-ending hit because of the way I was hit.

13        Q.   **And your testimony is that those words were**

14   **uttered because of what had just happened to you as**

15   **opposed to you were not directing it at Aleem or**

16   **anybody else at that moment in time?**

17        A.   That's correct, sir.  At no time did I direct

18   those words at anybody.

19        Q.   **And at no time, in close proximity to the**

20   **collision, or for the remainder of the game for that**

21   **matter, did the word "nigger" come out of your mouth?**

22        A.   You are eliciting an emotional response

23   because of that word.  Pure and simple.  That alone

24   should tell you how I feel about that word and the fact

25   that I never uttered it.  That is the thing that

USPA Hearing Committee
August 06, 2021

1   bothers me the most, Mr. Galle, about these allegations

2   that are in black and white before you, before the

3   social media, potentially; the allegation that I would

4   use that word.  That's what is traumatic to me.

5       Q.    Understood.  And I can appreciate that.  We

6   have heard some testimony from a number of witnesses

7   that it was difficult for them to hear what was being

8   said or not being said because it's loud, there's

9   commotion in the arena and outside of the arena.  Do

10  you believe that Aleem may have misheard,

11  misunderstood, or didn't catch exactly what you said --

12      A.    Absolutely, sir.

13      Q.    -- as opposed to him making up something that

14  he knows for sure was never said?

15      A.    I cannot attest to what or how he interpreted

16  what he may or may not have heard.  I can only say,

17  sir, emphatically and passionately, that I never

18  uttered that phrase.  How he arrived -- I think what

19  you're asking me is how did he arrive at the conclusion

20  that I uttered that phrase.  I can't tell you.  You

21  will have to ask Aleem, because it didn't come out of

22  my mouth.

23      Q.    At some point shortly after the collision, I

24  think the testimony earlier that we all heard is that

25  Aleem went over to speak to his mother very quickly and

USPA Hearing Committee
August 06, 2021

Page 273

1    his coach, and they told him to apologize and come

2    back.  When he came back and apologized to you, did

3    Aleem say anything about what he thought he heard to

4    you?

5        A.   So there's some divergence between what you

6    just relayed and my memory.  I don't recall the apology

7    for hitting me until the end of the game; not during

8    the game.  Because as you might recall, Mr. Krabbe

9    pointed out that we still had minutes left, and he

10   dropped the ball and the play continued.  I never even

11   saw Aleem after that, after the collision.

12           He went out of my field of view, and I was

13   simply interacting with Mr. Krabbe.  I was watching

14   Mr. Krabbe, and he was asking, "Are you all right?"

15   And when we ascertained that, yes, I could go forward

16   with the game, he dropped the ball and the game

17   continued.

18           So I don't know how that interaction of him

19   coming over and apologizing to me after he had gone

20   over and spoken to his parents could have happened.

21   His apology was at the end of the game.

22       Q.   Okay.  And at the time, from your

23   recollection, that he came to apologize to you at the

24   latter part of the end of the game, did Aleem say

25   anything to you about what he thought you had said or

Page 274

1    the words he attributed to you?

2        A.    No, sir, not at all.

3        Q.    Did Aleem, directly, ever request you to

4    apologize for saying the words that he attributed to

5    having heard you say?

6        A.    Mr. Galle, I think it's appropriate at this

7    point to share that at no time did Aleem and I ever

8    exchange words after that.  I tried to evoke a response

9    from him to acknowledge, as I've said, that the game

10   was over, the interaction was over out in the arena,

11   and he never mentioned -- he never uttered a word.

12          I don't know if he felt -- intimidation works

13   two ways.  It wasn't just me looking at him.  He had

14   Dorie Burner, he had his mother, and he had his father

15   looking at him.  Anyone of them could have been the

16   intimidating factor, not just me.  To allege something

17   and then have to confront it face-to-face with the

18   person being alleged [verbatim] -- as you and I both

19   know, sometimes the stories change when you're

20   face-to-face.

21       Q.    So the game ends and Aleem apologized to you,

22   and then as I understand it, you were requested to

23   speak to Aleem and his parents and Dorie about the

24   allegations.  Is that a fair statement?

25       A.    I think to characterize it from my words, John

USPA Hearing Committee
August 06, 2021

Page 275

1    called me over and said, Darrell -- and he laid it out.

2    And he could see how appalled I was, because John has

3    known me a long time.  He could see how appalled I was

4    that it would even be suggested, and he said, "Could

5    you please go over and talk to the family."  He did

6    not -- repeat, "did not" -- say, Go apologize to them,

7    because he knew I had no reason to apologize, because I

8    never said it.

9         Q.    So at the point that John Gobin asked you to

10   please go talk to the family, can we presume that you

11   weren't even aware that there had been this allegation

12   that you had made these statements?

13        A.    No, sir.  Again, Dorie had come around the

14   corner with John, and Dorie is the one who said, "Aleem

15   said you called him a motherfucking nigger."  And

16   that's when, you know, I felt appalled -- I think

17   "disgusted" is another word -- shamed that someone

18   would think that I would be capable of saying that.

19            So Dorie said at that moment, "He's saying you

20   called him that."  And I felt no compulsion whatsoever

21   to apologize to her, to say anything to her, because in

22   my mind, it was categorically wrong.  But I was going

23   to go over there and assure his parents that I did not

24   say that and I would not say that.

25        Q.    How would you characterize Ms. Burner's

Page 276

1    demeanor at the time she made that statement to you

2    that it was alleged you had made these derogatory

3    statements directly to Aleem?

4        A.    I guess I don't understand your question.

5    Could you please --

6        Q.    In your interactions with Ms. Burner, did you

7    feel that she was worked up, that she was aggressive

8    when she communicated to you what the allegation was?

9        A.    She was clearly aggressive.  She and I have a

10   history, moderate history, but it was clear -- I will

11   assert that in her mind it was clear I had wronged one

12   of her students, and that I needed to go make it right.

13       Q.    Did Dorie Burner ask you straight out:  Did

14   you say those words?

15       A.    No.  She never asked.  She said, "Aleem said

16   you said that," and then she left it to John to speak

17   next.  And that's when John said, "Darrell, go over

18   there and talk to the family and just make sure they

19   understand" -- again, I'm paraphrasing John and

20   interpreting his demeanor towards me, which is

21   basically, Something happened.  You need to make sure

22   that they understand that it didn't.  And that's John's

23   approach to this, to polo.  Apologize if you did

24   something wrong.  If you didn't, go over there and try

25   to make it right and get people's feelings resolved.

USPA Hearing Committee
August 06, 2021

Page 277

1    Q.    So John asked you to go speak with the family?

2    A.    Yes.

3    Q.    And you were apparently willing to do so.  But

4    before we talk about that, real quickly, you mentioned

5    that you have some minor history with Ms. Burner.  Can

6    you tell us about that?

7    A.    To the extent that -- I will call it

8    irrelevant, sir, but I will leave it to you to make

9    that judgment.  There was a point in my career where I

10   may have been posted overseas, and I offered Dorie my

11   horses because I was going to sell my horses.  I was

12   going to be gone for a couple of years, and there was

13   no sense in hanging onto my horses.  And I gave her the

14   price, and I think she thought it was, again,

15   ridiculous.  And then it turns out that I didn't go

16   overseas.

17   Q.    Okay.  I was just curious what you meant by

18   that.  So then after speaking with John Gobin and him

19   requesting that you go speak to the family, indeed you

20   went over and spoke with the family?

21   A.    Yes, sir, I did.  Well, let me correct that.

22   I did not speak to the father.  The father did not come

23   down.  He may have -- again, my focus was on the mother

24   because the mother is the one who came down the stairs,

25   as mothers do when their child is in a situation, and I

Page 278

1   engaged her.  I looked her in the eye and engaged.  I

2   don't think I ever saw the father.

3       Q.    Okay.  And if I understood your testimony

4   correctly earlier --

5           MS. DENNIS:  Hold on.  I'm sorry.  Just to

6       interrupt really quickly.  I notice that the

7       Siddiquis no longer have their camera on, and just

8       to ensure that we have proper witness

9       sequestration and everything and that no one else

10      is present, I would request that they turn their

11      camera on.  Thank you.

12  BY MR. GALLE:

13      Q.    So you're telling us that you engaged with

14  Aleem's mother?

15      A.    Yes, sir.

16      Q.    And if I understood your testimony correctly

17  earlier, you, in your mind, one hundred percent, said

18  to her, "I did not say those words.  They're not in my

19  lexicon.  They're not in my vocabulary," something to

20  that effect?

21      A.    I think they were exactly to that effect, sir.

22      Q.    And did she respond to you at that point in

23  time in the interaction?

24      A.    Sir, that's kind of interesting that you

25  should ask because I don't think she ever did respond

USPA Hearing Committee
August 06, 2021

Page 279

1  to me, because after I looked her in the eye -- and,

2  sir, that's kind of important because I'm a

3  professional, and you are too.  When we engage people

4  on really serious things, we make eye contact so that

5  people don't misinterpret.  I held eye contact with her

6  and emphatically made my statement, and I let it pause,

7  and I don't recall her saying anything in response.

8  And then I turned to Aleem and engaged him.

9      Q.   And you were eliciting a response from him --

10  or at least the confirmation from him -- that the

11  matter had been resolved, as you understood it, on the

12  field?

13      A.   Yes, sir, because that's what good

14  sportsmen -- and if not, he could have said, Well, you

15  know, I really feel like -- he didn't say anything.

16  And, again, I looked at him, I tapped him on the

17  shoulder like you do to other sportsmen, like, Hey, we

18  got this over; right?  It's resolved; right?  And he

19  never said a word to me.

20      Q.   So what occurred next?  From your testimony,

21  you didn't get a response from Aleem's mother and you

22  didn't get a response from him.  What did you do next?

23      A.   I turned and looked at Dorie Burner, shook my

24  head, and walked away, because that was it.  I mean,

25  his mother wasn't going to engage me, Aleem wasn't

USPA Hearing Committee
August 06, 2021

Page 280

1  going to engage me.  I had done what John Gobin had

2  asked me to do and emphatically denied that I said

3  that, to assure his parents that that was not said,

4  that that's not who I am, and as far as I was

5  concerned, it was over and done.

6      Q.   And after you turned and walked away, did you

7  have any further communications or conversations with

8  Aleem or Aleem's parents or Dorie Burner before being

9  notified of the complaint that had been lodged?

10     A.   No, sir, I did not.

11          MR. GALLE:  I think that's all the questions

12     I have for you, sir.  I would imagine Mr. Green or

13     Ms. Beal may have a couple of follow-up questions.

14          MS. TAYLOR:  I have just one more redirect --

15     just one question.

16                    REDIRECT EXAMINATION

17  BY MS. TAYLOR:

18     Q.   So, Darrell, when you went over to talk with

19  Aleem's family and Aleem, at any time when you spoke to

20  Humera or Aleem, did you see that Aleem was teary-eyed?

21     A.   Absolutely not, no.  I don't know where that

22  came from.  Aleem is a sportsman.  He's a competitor.

23  He plays polo.  Tears in his eyes -- I don't see that

24  in Aleem.  I didn't look to see if he was crying or on

25  the verge of tears.  What I saw was a competitor that I

Page 281

1   needed to engage.

2       Q.   And you said you looked him right in the eye.

3   How did he look to you?  Did he look disturbed or

4   upset?

5       A.   He was blank.  And to my point with Mr. Galle,

6   it wasn't -- we talked about intimidation.  It is not

7   clear to me now whether I intimidated him or his mother

8   or Dorie Burner intimidated him, because as we all

9   know, when you look somebody in the eye and you ask

10  them point-blank, sometimes the story changes.

11      Q.   And so did you see any change in his mood or

12  his facial expressions when you did so?

13      A.   No.  None whatsoever.

14      Q.   Did he look over at his mother, or did he

15  maintain eye contact with you?

16      A.   He looked up at his mother a couple of times

17  and he looked at Dorie once or twice.

18      Q.   At any time did you see him teary-eyed and

19  upset?

20      A.   No, not at all.  No, absolutely not.

21      Q.   Did he seem to be the Aleem that you usually

22  see in the arena playing?

23      A.   No.  What I saw was a competitor who came off

24  the field:  Hey, game's over.  When is the next game?

25      Q.   Just to clarify -- because Craig asked you

Page 282

1  several different times, a couple of different ways --

2  the apology -- there was only one apology from Aleem.

3  And when did it come?

4      A.   It came at the end of the game.  And I was a

5  bit taken aback because he had -- it wasn't like, you

6  know, when we line up and go through the line and shake

7  hands.  He looked at me and rode directly -- I'd say he

8  rode probably five or ten feet right up to me and

9  extended his hands and said, "I'm sorry about hitting

10 you."  And for me, that was sincere, that was genuine,

11 that was competitor to competitor saying, I made a

12 mistake.  I'm sorry.  I hope you didn't get hurt too

13 badly.  Again, I'm paraphrasing, but it was a very

14 sincere apology, and I had nothing to do but graciously

15 accept it and acknowledge it for what it was.

16     Q.   And so when you were in the box with his

17 family --

18     A.   I was on the ground.  I was standing on the

19 ground.

20     Q.   So where was his father, Taha?

21     A.   I don't know.  I don't know his father.  I

22 only now recognize his father from being introduced.  I

23 couldn't tell you if his father looked at me or what,

24 because I didn't know his father.  I only knew that it

25 was his mom because his mom engaged me.  She came down

USPA Hearing Committee
August 06, 2021

Page 283

1  the stairs, and I drew the conclusion, Well, this is

2  his mother, and this is the woman who needs to

3  understand, under no circumstances, would I ever say

4  something like that.

5       Q.   Were there a lot of other people around, all

6  watching and listening?

7       A.   I don't know, counselor, because the box -- I

8  do know that when I walked up, I saw the box was full.

9  My focus -- my attention was on his mother and then on

10  Aleem.  I don't even think I looked at Dorie until I

11  left, because as far as I was concerned, she was not a

12  party to this.  It was between his mother and him and

13  me assuring, one, that I did not say that to your child

14  and, two, we resolved this.

15      Q.   So in their statements that you read, Humera's

16  statement and Dorie's complaint, I believe both may

17  have said -- or maybe only Humera's statement -- that

18  the box was full when you came over to chat with the

19  family and to, quote, "apologize"; you know, that it

20  was full of friends and family, grandparents, all these

21  people there that could have observed you exchanging

22  [verbatim] and possibly pushing Aleem.  What do you

23  think about that?

24      A.   I think if that allegation is correct, then

25  someone else would have observed it in that box,

1    because I can't believe that someone in that box

2    wouldn't have turned and looked down to see what is

3    this other player doing over here; you know, why is his

4    coach here?

5        Q.   Do you find it strange that the allegation had

6    already occurred with all the family there,

7    grandparents, friends, all just for Aleem's family,

8    having heard that you -- you know, that Aleem would

9    have been really upset and teary-eyed, talking in the

10   box to his parents that you said, quote, "You're a

11   motherfucking nigger" -- this whole event if somebody

12   else would have been there to be a witness [verbatim]?

13       MR. GREEN:  Ms. Taylor, if I may interrupt

14       just for a minute.  I think your redirect is

15       threatening to go beyond the scope of the

16       examination by Mr. Galle.

17       MS. TAYLOR:  I hear you and I respect what

18       you have to say, but I have to say that I think,

19       you know, for what Darrell has been through today,

20       when there's probably not even any jurisdiction,

21       and the other witnesses that we requested to

22       attend who were -- as you know from our emails,

23       that we were not able to call.  I have to say,

24       this is not a court, and you have some loose

25       rules, and I think that it's appropriate to ask

Page 285

1    if Darrell has an opinion about this.  And it was

2    alleged and written and submitted to the USPA as

3    part of this complaint, that all of these

4    witnesses were there in his box with his family

5    and friends -- I think it goes to show that, you

6    know, we can at least raise it and have Darrell

7    comment on it.  You know, there is no one here to

8    attest to that.

9         MR. GREEN:  All right.

10        MS. TAYLOR:  Thank you.  It goes to

11   credibility, so I appreciate it.

12        MR. GAEBEL:  So Mr. Green, to my counselor'S

13   point, I've heard it said that -- and lucky for

14   Aleem that he has such a supportive group to come

15   and watch him.  You know, everybody wants a big

16   crowd watching us play, if we play our best or we

17   play really, really good.  And to have a boxful of

18   parents and extended family there to watch the

19   game, and then the game ends, and the focus of the

20   whole reason for them being there is standing on

21   the other side of the box, that they don't turn

22   and pay attention to what is going on now as

23   opposed to what went on -- I find that kind of

24   interesting that they would all focus their

25   attention to when he's on the field but ignore him

Page 286

1   when he's standing there dealing with another

2   adult and his coach and his mom.  I find that kind

3   of surprising, sir, as far as witnesses go.

4       MR. GREEN:  Is that the answer to the

5   question?  Are you finished, Ms. Taylor?

6       MS. TAYLOR:  Yes.  Just that there was nobody

7   else that saw you -- that you saw who would have

8   been watching this conversation to potentially say

9   you didn't push him.  It just goes to show -- what

10  you say goes to show that you did not physically

11  push Aleem.

12      MR. GAEBEL:  Correct.

13      MR. GREEN:  You're just commenting on the

14  answer now, Ms. Taylor?

15      MR. TAYLOR:  Well, you know, he's accused of

16  physically assaulting, intimidating, and bullying

17  a child.

18      MR. GREEN:  I'm just trying to understand --

19      MS. TAYLOR:  So I'm done.  Thank you.

20      MR. GREEN:  Mr. Gaebel, I just have a few

21  questions.  I'm first trying to understand the

22  question and answer about Aleem's family.  And I'm

23  not trying to be argumentative.  I'm just trying

24  to understand.  Is it your view that because no

25  one said anything to you or came down out of the

USPA Hearing Committee
August 06, 2021

Page 287

1    box, that no one was watching what was going on

2    between you and Aleem?

3         MR. GAEBEL:  Mr. Green, what I'm trying to

4    state is -- and I'm probably not articulating it

5    very well -- the only person that I noticed paying

6    any attention to what was evolving when I showed

7    up was his mother.

8         MR. GREEN:  Okay.

9         MR. GAEBEL:  And as I think back to my

10   counselor's question, I find it surprising that

11   that whole group of people, who came to watch this

12   young lad play, all of a sudden have their backs

13   to him and are not paying any attention to him at

14   all to what's unfolding.  So I just wonder why

15   they're not witnesses to this.

16        MR. GREEN:  So you wonder why they're not

17   appearing as witnesses in the hearing?

18        MR. GAEBEL:  Correct.  If, in fact, any of

19   that happened, why they didn't acknowledge it.

20        MR. GREEN:  Why they didn't come and testify?

21        MR. GAEBEL:  I'm just wondering that, sir,

22   out loud.

23        MR. GREEN:  Okay.  Well, let me just say that

24   it's now 5:42.  You said you had a 6:00 o'clock

25   game?

Page 288

1          MR. GAEBEL:  Yeah.  I'm going to be late.

2          MR. GREEN:  I don't know if you're going to

3   make it unless you're there at the club.

4          MR. GAEBEL:  The club is -- the Middleburg

5   farm is about 25 minutes from my house.

6          MR. GREEN:  And you're at your home now?

7          MR. GAEBEL:  Yes, sir.

8          MR. GREEN:  So I think you're going to be

9   late, and I'm sorry for that.  Is it possible, do

10  you believe, that you may have intimidated Aleem,

11  notwithstanding that it was, in your view, not

12  your intention to do that?

13         MR. GABEL:  (Phone ringing.)  That's

14  Mr. Gobin calling and asking me if I'm coming.

15  Can I just take that call?

16         MR. GREEN:  Please go ahead.

17         (Brief pause in proceedings.)

18         MR. GAEBEL:  My apologies.

19         MR. GREEN:  That's quite all right.  Do you

20  want me to ask my question again?

21         MR. GAEBEL:  Please.

22         MR. GREEN:  Do you think it's possible that

23  you may have intimidated Aleem even though, as you

24  have testified, it wasn't your intention to do so?

25         MR. GAEBEL:  Sir, I find it ironic that as

USPA Hearing Committee
August 06, 2021

Page 289

1    staunch and fierce a competitor as Aleem is --

2    and, you know, that's been established -- that he

3    would feel the least bit intimidated by me when I

4    walk over there, because he certainly wasn't

5    intimidated by me on the field.

6         MR. GREEN:  So your answer would be, No, you

7    don't think it's possible; is that fair?

8         MR. GAEBEL:  That's fair.

9         MR. GREEN:  Okay.  In terms of the -- putting

10   aside the roughness of the chukkers against the

11   Battlefield group, which you've testified about,

12   and focusing on the speed of the polo, was this

13   polo faster or slower or about the same speed as

14   you typically play?

15        MR. GAEBEL:  Sir, this was a 6:00 o'clock

16   game.  The 6:00 o'clock game is always a slower

17   game.  Sir, you can see the video, so you can see

18   for yourself how fast the horses were going.

19        MR. GREEN:  No.  I have seen it.  I'm just

20   asking in relation to how you typically play, was

21   it faster or slower?

22        MR. GAEBEL:  This game was slower.  It's a

23   6:00 o'clock game.  We don't play the 6:00 o'clock

24   game fast.

25        MR. GREEN:  Do you think there's a

USPA Hearing Committee
August 06, 2021

Page 290

1  possibility that you turned too sharply in front

2  of Aleem?  I understand there was no foul called

3  on that, but do you think there's a possibility

4  that you did when he came into you and hit you in

5  the back?

6      MR. GAEBEL:  No, sir.  As I watch the

7  video -- and I've watched it a couple of times --

8  I'm on the line, I'm going down the line, and I'm

9  getting ready to turn the ball.  My understanding

10  is that a competitor is responsible for their

11  horse.  They should be aware of the play.  They

12  see the play unfolding.  They see me turning.  As

13  I've been told from the beginning, you are in

14  control of your horse.  When the play turns, you

15  need to be mindful of that.  So no, sir, I do not,

16  as alleged, believe that I turned into his horse.

17  I believe I was fairly, within the rules of the

18  game, turning the ball, and he hit me.

19      MR. GREEN:  Okay.  I just wanted your

20  perspective on that.  I had several more

21  questions, but they were all asked and answered by

22  Mr. Galle and your able counsel.  So those are all

23  the questions I have, Mr. Gaebel, for you, but I

24  do thank you for your testimony.

25      MR. GAEBEL:  Thank you, Mr. Green, for

Page 291

1    sitting on the Board.

2        MR. GREEN:  You're welcome.  I'm sure

3    Ms. Beal may have a question or two.

4        MS. BEAL:  Good afternoon, Mr. Gaebel.  I do

5    have a couple of questions, and they more deal

6    with the second video that we saw.  May I ask you

7    some questions about that video?

8        MR. GAEBEL:  Please.

9        MS. BEAL:  There was -- you were carrying the

10   ball again and doing a great job of turning it to

11   the left this time, and Aleem was on your right

12   side, I believe, trying to keep up and followed

13   you all the way around the turn, which is pretty

14   hard to do, and it ended up with your mallet over

15   his horse's neck and his reins maybe being pulled

16   out his hands and his foot out of the stirrup.

17   And I've heard great things about how you play

18   polo, about how adept you are and how nice you

19   are.  What can you tell us about that?

20       MR. GAEBEL:  Ma'am, to be perfectly honest, I

21   don't have complete recollection of that

22   engagement other than I beat him to the ball and I

23   turned the ball.  My mallet going over his horse's

24   head, I think that had more to do with his horse

25   running underneath my arm, which, as you know, can

Page 292

1    happen in polo.

2          At no time, ever -- and I cannot be -- I

3    can't be more emphatic about this -- would I ever

4    grab another rider's reins, because whether I'm

5    mad at the rider or not, I'm going to hurt that

6    horse if I do that.  If I grab his reins and jerk

7    his horse's head, I'm hurting the horse.  And as

8    we all know, 80 percent of the rules in polo are

9    to protect the animal.

10         So no, ma'am, at no time at all in that

11   engagement did I premeditatedly or with malice

12   reach out and grab the reins of another rider.

13   That's just not me.  And the mallet over his

14   head -- again, I will assert that when you look at

15   that video, maybe you would see that my mallet is

16   up and he's riding underneath it.

17         MS. BEAL:  Thank you.  I appreciate your

18   clarification on that.

19         MR. GAEBEL:  Yes, ma'am.

20         MS. BEAL:  And I have no more questions.

21         (The witness was excused.)

22         MR. GALLE:  Teresa, is that your last

23   witness?

24         MS. TAYLOR:  Yes.

25         MR. GALLE:  All right.  Is there anything

USPA Hearing Committee
August 06, 2021

Page 293

1   further, Teresa or Lindsey, that you want to add

2   before we conclude the evidentiary portion of our

3   hearing today?

4       MS. TAYLOR:  I think the videos speak for

5   themselves, and I don't think the pictures show

6   anything more.  And, you know, I think that, one,

7   as I voiced before -- and I'm just going to say it

8   again -- I don't see jurisdiction here, and I

9   think that that's clear.  But unfortunately,

10  Darrell has gone through this, and, you know, I

11  think that he is holding up as well as he can

12  considering the allegations, which, in this time

13  period, are scary ones.  Not just the ones that

14  everyone is repulsed with.  But they affect him in

15  all aspects of his life.

16      So polo is one place where we all go to have

17  fun, and we spend a lot of money to do so.  So,

18  you know, I hope that you-all take that into

19  consideration.  Yes, it's a -- no one has ever

20  said that it's not a serious allegation.  And had

21  it been said, that would warrant, you know,

22  definitely, a strong action.  Nobody disagrees

23  with that.

24      So, you know, Darrell says he didn't do it.

25  He's emphatic about it, he's emotional about it,

USPA Hearing Committee
August 06, 2021

Page 294

1    and that's it.  He didn't do it.

2         MR. GALLE:  All right.  Thank you.  I believe

3    under the policies of the USPA, the decision needs

4    to be rendered within 15 days if my recollection

5    is correct.  I will double-check it.  So sometime

6    within the next couple of weeks, there will be a

7    decision, and it will be in writing.  And if it

8    can be done sooner than the 15 days, I'm sure

9    we'll endeavor to do that because I know all

10   parties would like to bring this matter to some

11   conclusion after a very long day today and a

12   number of weeks that I'm sure have been stressful

13   for everybody.  But thank you, everybody, for your

14   time and your attention, and we'll be adjourned

15   for today.

16        MR. GAEBEL:  Thank you, Mr. Galle, Mr. Green,

17   and Ms. Beal.  Thank you, and I look forward to

18   you rendering some kind of statement about how

19   this gets finally resolved.  And I thank my

20   counsel, too, and I thank the court reporter.

21        MS. TAYLOR:  Mr. and Ms. Siddiqui, thank you

22   for your time as well.  And I know it's been a

23   stressful time.

24        MR. TAHA SIDDIQUI:  Thank you for your time.

25        (The proceedings concluded at 6:05 p.m.)

USPA Hearing Committee
August 06, 2021

Page 295

```
1                    CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA          )

4   COUNTY OF HILLSBOROUGH    )

5

6            I, MESCHELLE D. MANLEY, CSR, LCR, do hereby

7   certify that I was authorized to and did

8   stenographically report the foregoing hearing remotely

9   via Zoom and that the transcript, page 1 through 294,

10  is a true record of my stenographic notes.

11

12           I FURTHER CERTIFY that I am not a relative,

13  employee, attorney, or counsel of any of the parties,

14  nor am I a relative or employee of any of the parties'

15  attorney or counsel connected with the action, nor am I

16  financially interested in the action.

17

18

19

20

21           Dated this 26th day of August 2021.

22

23

24           MESCHELLE D. MANLEY BAKER, CSR, LCR

25
```

**$**

$1,000
   239:5
$25,000
   238:25 241:1,
   5
$6,000
   238:3 239:5
   242:12,21

**1**

1
   7:5 188:16,17
   234:10 247:22
10
   7:9 39:10
   55:19 159:15
   247:22
10,000
   160:2
10:00
   6:1
10th
   15:18 20:24
   44:15 51:4
   63:8 80:13
   81:18 97:14
   113:12 130:7
   132:21 152:2
   165:16 174:7
   180:16 183:13
   191:14 200:2
   203:5 208:14,
   23 215:15
   229:17 230:5
   241:20 267:22
   268:24

11
   7:2 19:17
   218:8
11th
   16:8 19:25
   116:11 208:21
12-goal
   225:21
12:12
   94:7
12:22
   94:8
13
   132:8,9 228:9
13-year-old
   227:6
14
   14:8 15:24
   20:13 24:3
   28:7 42:5
   43:20
14-year-old
   57:1 80:23
   89:3 259:13
15
   55:19 244:15
15-
   108:24
16
   144:16
160
   119:9
17
   7:7
180
   110:15 111:9
18th
   229:24

**2**

2
   7:9
20
   209:4
20-yard
   108:24
2001
   19:25
2006
   240:2 244:4
   257:18
2015
   176:11 178:24
2021
   7:2,7 15:15,
   18 19:17
   44:15 63:8
   80:13 97:14
   113:12 128:16
   152:2 165:16
   174:8 180:16
   191:14 200:2
   208:14,21,24
   211:22 229:17
   230:5 241:20
   267:23 268:24
21
   211:23
21st
   229:25
23rd
   14:20 15:14
25
   108:25 110:25
   209:4 288:5

1st
   132:10

**2**

2:20
   175:11
2:30
   175:12

**3**

3
   7:9
30
   39:10 82:2
30-
   30:22
30-degree
   197:2
35-yard
   30:22

**4**

4
   196:9
40
   82:2 196:8
45-minute
   153:1
4:00
   237:1
4:18
   237:2

**5**

50
   82:2
500
   222:16
5:42
   287:24

---
**6**
---

**6-8-12**
  210:2

**6:00**
  267:19 287:24
  289:15,16,23

**6:30**
  208:23

---
**7**
---

**70**
  28:8 162:6

**700**
  222:15

**750**
  222:16

---
**8**
---

**8**
  7:9 247:23

---
**9**
---

**9**
  7:9

---
**A**
---

**A-GAME**
  253:10

**A-HOLE**
  64:18

**A-S-S-N**
  205:11

**a.m.**
  6:1

**aback**
  256:22 282:5

**Abbott**
  251:7

**abdominal**
  180:3

**ability**
  116:2 178:15

**abrupt**
  35:25

**abruptness**
  35:24

**absolutely**
  14:12 32:13
  37:14 56:7
  64:7 66:2
  74:8 80:19
  87:4 93:17
  127:13
  172:14,22
  184:15 199:10
  248:7 261:12
  264:8 265:12,
  24 268:8
  272:12 280:21
  281:20

**abuse**
  183:9

**abusive**
  11:24

**abusiveness**
  58:11,14

**accept**
  40:20,21
  88:18 282:15

**acceptable**
  85:12

**accepted**
  83:22 257:12

**aback**
  260:4 266:7,
  25

**accident**
  65:15,21,23

**accounts**
  197:11

**accuracy**
  16:12

**accurate**
  125:19

**accusation**
  132:20

**accusations**
  115:12

**accuse**
  121:2

**accused**
  76:2 132:16
  144:5 215:22
  218:2 260:9
  286:15

**acknowledge**
  70:8,9 77:14
  266:3,5 274:9
  282:15 287:19

**acknowledged**
  266:6,24

**acres**
  158:21

**act**
  61:24 97:10,
  18 228:20

**acted**
  173:13

**action**
  82:6

**actions**
  21:19

**active**
  128:10

**actual**
  112:16 203:22
  228:4 245:18

**Adam**
  141:18,19
  142:3,8,14
  150:25

**add**
  18:13 35:24
  112:8 193:3
  241:25

**added**
  152:13

**additional**
  95:14 140:4

**address**
  111:21 112:10

**addressed**
  262:8

**adept**
  291:18

**admission**
  84:25 232:8

**admit**
  27:5 36:7,21
  270:7

**admitted**
  131:10

**admonished**
  266:12

**adult**
  80:22 250:17
  286:2

**adults**
  64:9

**advantage**

170:19

**advice**
161:19

**affect**
6:15

**affects**
221:11

**affidavit**
239:2,12

**affirm**
62:15 263:16,
19

**affirmed**
19:9 44:4
62:19 80:3
97:2 113:3
132:2 142:4
156:19 167:9
176:2 183:2
194:2 202:14
215:8 237:13
245:14

**afraid**
248:5

**African-
american**
227:7

**afternoon**
151:8 210:18,
19 291:4

**afterward**
144:4

**age**
14:10 157:22
162:7 187:19
196:16 213:6
228:10 239:17

**agenda**
252:10

**aggression**
228:21 253:4

**aggressive**
28:4 42:2
101:13 115:7
119:11 124:12
157:21,22
158:7 159:20
160:13,24
188:10,20,25
189:6,11
196:19
197:19,21,22
204:3,8
216:24 217:7
218:4 219:10,
14,15,16,18,
20 220:2,4
226:13,20
228:20 236:10
251:17,18
253:3,9,13,18
256:10 261:1,
3 269:2,10
276:7,9

**aggressively**
101:16 200:24

**aggressiveness**
220:5 268:13
269:4,17,18

**agree**
10:9 35:8,9
49:8 54:4
79:4,8 90:23
144:10 225:9
226:15 235:9

**agreed**
60:2 169:4
222:19

**agreeing**

48:22 49:6

**agreement**
213:22 214:4
230:2 243:7

**agreements**
213:25

**ahead**
8:15 9:12
13:7 63:19
88:22 91:15
154:25 157:1
165:7 166:17
167:24 168:11
215:20 216:5
232:23 288:16

**Ahh**
109:19 232:1

**air**
137:21

**aisle**
45:4

**Akeem**
132:17 133:12

**Alabama**
126:1

**Aleem**
7:16 8:12
10:11 11:2,20
12:20 14:8
15:24 16:1,2,
4 17:4 20:9,
19,24 21:17,
20,22 23:8,
11,22 24:18
25:8,9,19,23
26:3,6,16
27:12,16
29:4,7,21
30:2,9,10,15
32:14,15

33:3,7,14
35:3 38:1,2,
12 39:1,5
40:7,17,18,23
42:19 43:17,
18,20 44:3,10
46:24 50:25
51:3 53:21
56:9 57:8,17,
20,24 58:2
59:3,22 60:14
61:7,8,10,16,
25 62:5
63:15,18,20,
25 64:4,11,
12,24 65:9,25
66:4,9,22
67:6,8,11,21,
23 68:1,4,7,
11 70:5 71:4,
15 74:2,22
80:25 81:25
82:2,6,14,15
83:9,14 84:25
87:10,13,24
88:14,19
89:3,19,23
91:10,13
92:13 98:2,
10,11,25
99:12 100:8
101:11 105:4,
22 106:11,22
107:2 111:5
113:21
114:11,14
115:14
116:13,20
117:24 118:5
119:21,22
120:11 123:22
127:8,19

133:1,9,12,
14,15,22
134:6,7
135:3,5,23,25
136:4,6
137:5,11,21,
24 144:20
145:8 146:9
147:11
151:16,25
153:7,14
157:6,14
159:9 160:12
162:11,19
165:16,24
171:20 174:7
177:6,10
178:6,9,12
180:23
183:16,19
187:13 188:1,
4,6,16 189:5,
10 192:23
195:8,9,25
196:14,15
197:9,11,14,
15 198:7,8
199:22 200:1,
23 201:9,12
202:20,24
203:1 206:21,
22,23,24
207:5 208:17
215:23 216:15
221:1 226:5,
15,22 228:19
230:9,16
231:8,16,17,
23,24 233:14,
20 235:21
236:16,20
245:21 249:12

254:7 255:7,
10 256:8,23
258:13 259:9,
10 260:9
265:24 267:24
268:6,11,25
269:9,13
271:15
272:10,21,25
273:3,11,24
274:3,7,21,23
275:14 276:3,
15 279:8,25
280:8,19,20,
22,24 281:21
282:2 283:10,
22 284:8
285:14 286:11
287:2 288:10,
23 289:1
290:2 291:11

**Aleem's**
14:6 31:22
63:5 68:17
79:5 80:10
81:6 87:3
88:8 89:14
100:9 111:22
115:14 116:18
117:11 125:7
126:4,18,22
133:16 138:1
145:18·146:9
147:11 152:19
155:6 160:22
162:11 165:24
177:1 178:6
183:11 202:19
203:9 219:23
220:6 224:15
228:22 235:24
236:9 258:25

259:2,18
270:3 278:14
279:21 280:8,
19 284:7
286:22

**allegation**
35:2 36:20
74:23 120:10
177:4 187:12
259:21
264:10,15,17
265:22 272:3
275:11 276:8
283:24 284:5

**allegations**
7:12 16:6,13,
24 33:17
104:3 146:5
160:22
162:12,19,22
171:19 174:15
176:25 178:2,
4 179:17
180:25 181:5
183:6 185:11
194:17,18
195:13 202:19
203:8 215:18
216:12,22
249:11,14
259:17
262:15,18,19
264:19 272:1
274:24

**allege**
59:4 258:18
263:1 264:25
265:19 274:16

**alleged**
6:22 15:15,
17,22,25

81:20 84:25
94:3 116:14,
19 171:20
172:10 173:4
177:11 178:3
195:6,8 199:9
232:14 260:15
262:11,20,21
274:18 276:2
285:2 290:16

**allegedly**
30:16 38:2,6

**allowable**
15:10

**allowed**
92:12 94:16,
17,18

**alluded**
226:19

**alluding**
256:15

**altercation**
200:6

**ambiguous**
154:24

**ambitions**
157:17

**amended**
7:7 211:21,23

**amends**
12:22 20:13
29:4 35:18
38:12

**amount**
105:7 106:6
155:3 242:19

**and/or**
27:2 39:4
253:15

USPA Hearing Committee
August 06, 2021                                                                          5

anger
  78:9 227:11
angle
  220:16 230:16
  253:15 254:8
angles
  219:19 220:13
  253:12
angry
  41:12 42:10
  74:14,15
  187:24 258:17
animal
  252:19
animals
  252:16
animosity
  266:22
announce
  150:11
announced
  233:10
announcer
  233:8
announcer's
  110:22 230:22
  233:3,15
announcing
  86:6
annoying
  147:18
answering
  44:13 141:6
anticipate
  168:2
Antonio
  21:12 22:12
  48:7 269:9

anymore
  142:22 150:2
  209:23 219:4
  224:14 225:1
anyone's
  76:8
anytime
  33:23 186:5
apologetic
  187:24
apologies
  9:5 12:19
  38:8,16
  288:18
apologize
  16:1 20:19
  21:25 22:2,5,
  24,25 26:5,7,
  20 27:13
  32:14,16,21
  33:22 34:25
  35:11,25
  36:22 37:14
  38:2,7 39:4
  40:6,8 41:15
  42:13 46:2
  47:16,17
  53:11 57:9
  64:1,3 66:5,
  16 67:17,18
  68:8 74:7
  75:23,25
  81:7,9 83:3
  88:9 119:16
  123:16,18
  124:1,4,20
  136:4 186:14
  215:25 216:2
  264:9 265:13
  273:1,23
  274:4 275:6,

7,21 276:23
  283:19
apologized
  12:20 20:19
  22:2 33:7,10
  40:23 47:13,
  21 51:22
  54:16 60:1,
  16,23 71:14,
  15 74:8 76:4
  84:23 256:25
  260:4 264:4
  265:10 266:7,
  9,18 273:2
  274:21
apologizes
  257:10
apologizing
  16:2 73:19
  117:22 216:14
  264:3,6,10
  273:19
apology
  9:5 12:24
  20:11 28:23,
  25 29:6 33:5,
  21 37:16
  38:13,22
  40:21,24
  41:1,14
  56:18,21,25
  57:5,6,8,11,
  12 58:5,7,23
  70:7,13,15
  73:20,21
  76:6,8,9,10,
  12,15,16,17
  81:15 83:22
  84:22,24
  85:18,19,24
  86:10 119:14

257:12 260:6
  263:9 265:13,
  14 267:1
  273:6,21
  282:2,14
appalled
  275:2,3,16
appalling
  262:3,11
apparently
  132:20 143:18
  277:3
appeared
  28:10 85:11
appearing
  287:17
applicable
  9:15
appreciated
  14:10
appreciation
  192:6
approach
  276:23
approached
  99:11 100:14
  103:20
appropriately
  55:5
approximate
  30:20 230:18
  231:5
approximately
  30:23 242:25
  243:14
April
  7:7 169:11
  211:22,23

**Aragon**
257:23

**area**
116:8 169:1
180:3 186:7

**Arellano**
20:4

**arena**
15:20 16:25
20:23 22:6
25:20 29:14
33:6 39:13
44:23 47:13
50:9 52:4
56:11 59:4,15
60:1,15,18
63:12 66:23
67:8 88:5
94:12 97:15,
19,21 99:11
100:6,13,23
101:1,5
103:18 107:22
110:3,23
113:14 122:21
125:8 133:22
134:22 136:11
137:17 139:22
147:2 160:3
161:22,23
165:15 172:4,
21 183:9,16,
18 185:14
186:2,4,6
187:14 188:3
189:2 195:7,8
197:20 200:9
205:18 207:15
208:15 209:14
212:3,7,18
214:9 216:12

219:25 229:23
230:21,23
233:7,9
234:5,9,12
236:18 252:7,
9 254:2
255:24 256:1,
2,20 257:6,7,
15,16,19,20
258:12
259:11,15
260:3,21
266:2,6 272:9
274:10 281:22

**arenas**
214:5

**argue**
146:17 162:1

**argued**
205:4

**arguing**
55:13 153:16,
25

**argument**
146:10,12,14
147:1,11
153:7 226:17

**argumentative**
218:5 286:23

**arguments**
117:2 160:7

**arise**
7:9

**arm**
16:3 26:12
42:1 291:25

**arms**
246:20 247:2

**Army**

203:25

**arose**
6:25

**arrive**
81:3 272:19

**arrived**
272:18

**articulate**
27:11

**articulating**
287:4

**ascertained**
273:15

**ascribed**
266:14

**asks**
227:13

**aspect**
146:25 149:8

**assassination**
13:4

**assaulted**
115:9 226:22,
25

**assaulting**
286:16

**assert**
268:21 276:11

**asserts**
260:18

**assessments**
247:12

**assistant**
229:14

**association**
7:2,3,7 16:9
19:22 205:5,
7,9 206:8

207:3 208:5,
22 209:11
210:6,9
211:7,17
213:14

**Association's**
7:10 20:16

**assume**
61:11 96:5
138:24,25
144:10 225:9
270:2

**assumed**
135:1

**assumption**
109:24

**assure**
116:6 263:15
275:23 280:3

**assuring**
283:13

**athlete**
246:16

**attached**
93:1

**attachments**
93:7

**attack**
163:1

**attacked**
163:1

**attacking**
115:21 126:3
225:4 226:20
227:22

**attempt**
177:21

**attempting**

64:24 65:3

**attend**
284:22

**attention**
31:4 117:19
125:9 236:5
283:9 285:22,
25 287:6,13

**attest**
249:20 272:15
285:8

**attitude**
192:7

**attorney**
6:4 9:14
14:18 60:3
171:11
240:13,14,21,
22 243:15

**attribute**
262:22 269:3

**attributed**
45:18 69:1
81:20 115:2,
12 274:1,4

**atwitter**
203:13

**audio**
92:5 94:22
157:2 159:18
162:14 163:7
164:8,10

**August**
229:25

**auspices**
128:21 210:23

**author**
19:16

**authored**
103:4

**average**
35:6

**averred**
79:6

**avoidable**
87:19

**award**
135:15 136:16

**awards**
135:12 136:15

**aware**
11:1,2,10,15
25:7,12 30:3
35:23 50:11
176:25 180:25
183:6 194:17
195:6 202:18
215:18 275:11
290:11

**Awesome**
141:10

---

**B**

**back**
13:20 15:9
18:19 21:25
22:2,5 29:13
30:9,10,13
32:14,15,21
35:1 38:1,7
39:2,3 45:5,
23 46:2
47:12,17
48:8,15,17,19
49:9 51:3,15,
18,21 52:14
53:2,7,10

54:17 59:3
64:1 66:16
67:1,17 69:10
81:7 82:7,10,
14 83:10
85:18 88:9
91:9 94:25
95:3 98:11,
15,24 99:1,9,
19,21,24
100:11,17
101:1,7
105:12,20,21
106:2,9
108:20 109:19
111:6 118:1
119:14,20
123:1 126:16
133:16,17
158:2,24
160:6,7 168:4
170:11 171:14
175:13 177:7
180:2 218:25
221:14 223:6
227:4 228:23
230:17,22
233:14,20
235:6 238:8
245:24 246:2,
21 247:1,6
248:3,5
250:21 254:18
255:11,12
256:2 270:3
273:2 287:9
290:5

**back-and-forth**
231:7 232:2

**background**
45:25 209:4

**backs**
110:18 287:12

**bad**
54:15 125:25
145:23 176:21
188:14 196:1,
23 197:5
200:24 219:7,
19 221:21
223:18,19
230:16,24
246:18 247:12
248:12 266:22

**badgering**
12:2,3

**badly**
186:24 282:13

**baggage**
260:22

**ball**
45:3 51:12
63:19 82:6
91:25 117:3
122:22,25
126:14 158:1,
6 169:8
178:19 180:1,
6 207:20
212:16,22
234:20 235:4,
6 253:25
270:20
273:10,16
290:9,18
291:10,22,23

**ball's**
102:21

**Ballhaus**
205:20 225:17

balls
  161:13
bandwidth
  216:4
bar
  205:6
barely
  190:2
barn
  82:21 88:15
  149:21 153:1
  164:12 190:14
base
  214:2
based
  135:21 172:8
  173:6 178:14
  232:12 243:21
bases
  262:15
basic
  18:7,10
  207:19
basically
  66:7 81:8
  83:24 95:4
  110:19 128:25
  129:1 148:22
  239:20 256:12
  263:25 276:21
basis
  53:16 176:13
  179:4
battering
  251:21
battle
  115:23
battlefield
  15:20 97:18

107:21 113:15
142:13,16,17,
19 145:21
157:12
158:11,16
159:5,6
188:9,20
189:9,22
205:23 206:25
235:25 236:1,
9,11,13
251:10,12,21
252:2,9 253:1
268:5 269:4,
6,18 289:11
Beal
  8:4 9:9 43:11
  61:9,20 62:4
  78:20,22
  96:2,3,12
  107:11,16,18,
  23 108:5
  110:11,14,18
  111:1,7,17
  125:14 129:6,
  7,9,15,19
  140:8,11,13,
  15,19,23
  141:2,5
  154:8,12
  166:12,14
  175:2,3
  182:3,5 192:5
  199:13 201:19
  210:11 213:3,
  7 214:11
  232:18 235:15
  236:1,12,22
  242:6 244:20,
  22 280:13
  291:3,4,9

bears
  255:19
beat
  258:23 291:22
beaten
  252:1
began
  6:1 176:11
begin
  9:4 223:18
beginner
  196:7
beginning
  6:3 51:9
  235:18 258:15
  290:13
begins
  255:25
behalf
  69:22 70:4
  84:23 176:7
  208:5
behaves
  88:1
behavior
  17:6 33:10
  85:12,15
  114:25 173:11
  185:20 203:19
  262:21
behold
  238:22
beings
  35:21
belated
  132:11
belief
  59:10 83:17

94:2
believable
  162:9
believed
  73:20
belligerent
  269:17
bench
  14:16 15:1
bend
  228:13,17,23
bent
  228:8 233:18
  249:1,4,6
bickering
  117:2 153:16
big
  88:4 101:4
  123:2,5,6
  147:16 198:22
  221:18 223:7
  224:8 285:15
bigger
  78:5
bike
  81:3 86:20
Bill
  205:20 225:17
bills
  238:25
  239:14,15
  240:10
birthday
  132:11
bit
  10:8 25:17
  45:7 91:17
  92:6 105:11

106:2,4,8
108:20 120:14
149:20 152:18
162:15 167:17
178:16 179:18
183:22 194:13
198:10,19
220:9,23
222:10 223:21
234:24 235:17
247:1 248:8
256:21 266:11
282:5 289:3

**bite**
130:9 218:23

**black**
272:2

**blackball**
173:10

**blah-blah-blah**
120:25 204:5

**blame**
187:2

**blamed**
171:2

**blank**
281:5

**blatant**
239:4

**blew**
98:12 101:17
118:4 122:25
253:25

**blip**
120:15

**blow**
102:16 103:1
117:7 246:11

**blown**
101:4,16
103:2 226:15

**blows**
218:11

**blue**
238:10

**Bluebook**
209:23 211:10

**board**
11:11 17:22
169:2,5 171:1
211:25
222:11,17
291:1

**boarded**
171:4

**bodies**
220:15

**body**
31:22

**Bond**
257:17

**book**
94:14 208:4

**boot**
196:21 218:5

**borderline**
188:25

**borrowed**
213:20

**bothers**
272:1

**bought**
121:20,21
168:22 171:3
223:19

**bouncing**

246:12

**bounds**
212:16,21
234:20,21,23

**Bowl**
107:2

**box**
29:21 34:22
48:15 68:4,5
78:11 82:1
83:11,12,15
86:6 200:7
233:3,15
282:16 283:7,
8,18,25
284:1,10
285:4,21
287:1

**boxes**
216:13 232:8

**boxful**
285:17

**boy**
143:24 158:7

**boys**
157:22,25
159:19,24

**brag**
88:15

**Brandon**
159:18

**Bravo**
95:10

**break**
10:2,6 113:18
168:3 221:14
236:24

**breaking**
162:15 163:16

164:11 221:19

**breath**
160:10,16
228:18

**breathe**
61:15

**breeds**
219:20

**briefly**
70:1

**bring**
186:2 218:25
235:6 253:10
260:22

**brings**
161:8

**Brock**
10:11 21:14
131:8,11,15
132:1,6,13,20
135:3,11
140:11 141:9

**broke**
180:6 186:21
221:16 222:23

**Bromle**
131:12 132:1
136:23 138:7,
9,12,15,18,
21,24 139:1,
4,7,11,13,17,
20,23 140:2,
7,10,12,14,
18,22 141:1,
4,7,10,12

**Brook**
243:15

**brother**
206:24

**brought**
48:19 64:16
117:18 147:17
164:6,22,25
165:2 204:18
240:25 241:6

**brushed**
45:6 51:16
63:24

**brushing**
63:22 83:25
254:14,17,19

**buffering**
156:16

**bullied**
16:2 17:5
183:19 195:9

**bully**
172:20
177:18,21

**bullying**
28:11 162:5
187:13 203:21
216:15 286:16

**bump**
46:10 157:23
217:6 228:16
249:23

**bumping**
94:16 102:1,
20 143:21
189:1,7

**bunch**
159:7 180:2

**Burner**
7:1 8:14
12:6,12,18
13:5,9,15,19,
21 16:8

18:14,20
19:1,8,15,16
43:3,4,5,14
44:17 47:10
49:3 66:7,22
70:5 103:5
114:12 138:3
208:21 237:18
240:6 241:24
242:16 258:4,
12 274:14
276:6,13
277:5 279:23
280:8 281:8

**Burner's**
65:8 275:25

**burst**
77:18

**Burton**
209:5

**business**
221:22 226:4
239:7,23,24

**buyer**
238:4

**buying**
168:22

—————————
C
—————————

**cajole**
83:24

**call**
13:10 14:20
16:16 18:14
40:18 43:17
53:20 75:21
79:1,5 89:11
90:11,22
105:4 112:20

131:2,4
150:19 155:9,
16,24 225:14
247:24 253:23
254:2 263:5
265:14,18
266:15
267:11,14
269:16,17
277:7 284:23
288:15

**called**
13:20 15:24
17:18 23:11,
23 35:3,4
45:8 46:3,13
51:17,22
52:1,13 53:14
55:1 59:4
61:21 62:1
64:11,15,18,
19 66:25
67:12,15,18
98:20 101:9
105:5 120:10
127:15 143:24
144:20
146:11,12
147:8,12
149:24 152:19
153:12,20
169:11 183:16
206:10 207:6
209:6,12
219:22 238:9
253:24 255:7,
13 258:10,13
264:15 265:18
266:16 275:1,
15,20 290:2

**calling**

11:12 115:20
131:5 219:2
260:9 288:14

**calls**
109:3 201:10

**calm**
115:22

**camera**
216:5 278:7,
11

**camp**
222:21

**campaign**
203:11

**Campos**
21:12

**capable**
275:18

**car**
136:9 153:3
167:20 168:4

**card**
105:8

**care**
29:8 56:17,21
158:22 170:17
214:21 222:17
248:15

**career**
245:22 249:19
277:9

**career-ending**
271:12

**Carlucho**
20:4

**carpenter**
197:3

**carries**

66:14 161:21,
22

**carrots**
125:2 161:8

**carry**
124:15

**carrying**
207:19 291:9

**Carver**
209:5

**case**
33:10 138:11
139:3,15,19
140:1 154:21
155:12 184:22
192:17 200:8
205:3 240:11,
16,21

**catch**
272:11

**catching**
108:19

**categorically**
275:22

**caught**
123:12 222:6

**caused**
21:20 23:8
31:8 102:19

**causing**
177:7

**CC'D**
42:16

**center**
110:24 230:21

**cetera**
203:15 205:21

**chairman**

205:3 207:14

**chairs**
81:2

**chance**
95:25

**change**
128:15 234:6
274:19 281:11

**changed**
226:24

**channel**
121:9

**chaotic**
158:17,20

**character**
11:12 13:4
89:2 130:10
148:9 157:18
162:7 171:19
188:13 198:14
203:19 221:4
227:6,18
232:14 238:1

**characteristic**
104:5

**characterize**
28:1,3 126:22
176:14,16
274:25 275:25

**characters**
192:22

**charge**
222:15

**charges**
6:23 7:8
15:16

**charging**
222:16

**chat**
87:13 91:9
124:25 167:17
183:18 283:18

**chatted**
237:17

**cheaper**
222:11,17

**check**
123:1 168:4

**checking**
96:1

**cheered**
160:3

**chicken**
127:24

**child**
12:24 57:1
68:21 69:23
80:23 83:18
86:16,17 89:3
162:5 173:5
177:25
259:17,19,22
263:16,18
277:25 283:13
286:17

**childish**
126:12

**children**
20:15 64:9
88:17 150:20

**chip**
120:25

**choose**
154:25

**Chris**
8:3,19 14:7
20:5 43:2

57:15 58:18
76:20 107:11,
16 108:10
110:8 125:14,
16 138:9
154:8 166:5
174:20,24
181:10 191:24
192:3,6
200:16
210:11,17
211:24 225:8
232:18 233:22
242:6,9

**chronic**
247:13

**Chrys**
8:4 43:9
76:20 107:11
111:18 125:13
129:6,8
140:13 154:8
166:12 175:2,
3,4 182:5
192:5 201:19
210:11 213:3,
5 232:18
235:15 242:6
244:22

**chukker**
23:20,21
29:25 32:24
99:8 101:24
102:11,12
147:7 183:15
223:9 236:20
251:24

**chukkers**
97:23,25
149:12 206:14
212:7,11

235:20,23,24
236:2,4,13,
14,15,16
251:3 252:6
289:10

**circled**
52:14

**circumstances**
263:15 283:3

**claimed**
170:12,13
171:2

**claiming**
173:16

**Claire**
251:7

**clarification**
130:4

**clarify**
57:5 60:16
81:22 85:5
91:19 94:13,
21 96:3
112:16 120:13
281:25

**clarifying**
209:24

**class**
257:8

**clean**
148:19

**cleaning**
148:25

**clear**
24:8 67:3
93:14 119:15
126:17 205:25
261:6 276:10,
11 281:7

**client**
9:20 17:2
42:17 155:8

**clients**
34:18 42:19
221:11 222:3

**clipped**
73:7

**clock**
99:9 101:19,
23 102:9
212:20,23

**close**
28:23,24 31:4
52:2 90:25
92:24 109:1
111:12 126:25
140:20 159:11
168:16 271:19

**closed**
61:14

**closer**
110:22 163:21

**club**
15:19,21
16:20,21,22
18:3 44:14
63:8 81:1,3
97:19 98:19
105:3 107:21
113:15 119:19
128:9,10,13,
22 129:1,2
133:4 149:4
168:24
176:12,19
177:17 179:1
181:19,22
204:22 205:1,
10,12,13,14,

15,16,17,19
206:1,2
208:20 209:1,
8,9,10,13,17,
19,20,21,22,
23,25 210:3,
4,23 211:2,4,
5,7,10,11,12,
19 213:8,9,
10,25 214:1,
5,8,9 218:4,
6,7 221:22
222:13 224:21
229:9,12,20,
22 234:2
244:6 288:3,4

**clubs**
21:7 210:6
213:16,17,18,
20 234:11

**clue**
55:19

**CNN**
121:8

**co-manager**
229:15

**coach**
20:14,23
26:19 48:5,6,
12 49:22
64:6,22,25
70:4 100:8
159:23 160:4,
11 190:15
273:1 284:4
286:2

**coached**
44:17 157:19

**code**
7:10

**cold**
69:3 73:19,
21,22 74:16
76:5

**Coleman**
17:21 202:4,
13 210:14,19,
25 211:3,23
212:5,9,14
213:5,13
214:15,18
253:8

**colleague**
60:5

**collect**
242:22

**college**
160:20 238:18

**collide**
34:17 63:21
87:10

**collided**
44:24 66:1
230:9,20
270:15

**collision**
30:1,21 31:7,
8,20 34:14
39:5 45:11,19
51:5,25 53:4,
6,12,17,22
54:14,15
63:14 88:10
89:10,11
90:10 95:9
98:6,8,21
101:8 105:17
106:13,16
133:8,21
137:6,7,13,19

183:15 194:22
228:4 230:9,
13 231:25
268:25 269:20
270:6 271:20
272:23 273:11

**collisions**
88:4

**colloquy**
113:19

**comfortable**
50:8 163:5

**comment**
58:4 80:16
94:20,22
120:9,17
152:18
154:20,21
155:15 240:5
285:7

**commentary**
153:21

**commentating**
46:1

**commenting**
286:13

**comments**
34:24 56:2
67:5 81:19
86:11 95:4,8
101:9 124:5
159:9 172:16
173:16 174:15
177:14,15
188:4 217:11

**committee**
7:18 11:19
34:5 42:25
107:11 129:21
154:7 205:4

207:15

**committee's**
130:15

**commotion**
272:9

**communicate**
35:21 64:25
65:4

**communicated**
152:1 276:8

**communicates**
37:25

**communicating**
64:24

**communications**
116:13 174:7
280:7

**community**
185:2,4

**company**
90:4 159:13,
14

**compared**
110:20 250:19

**compelled**
20:12

**compelling**
17:15

**competitive**
107:3,5 108:2
158:2 160:25
169:9 170:6,
10 220:4

**competitively**
169:19 219:17
261:4

**competitor**
159:4 249:22

257:13
259:12,13
266:1 280:22,
25 281:23
282:11 289:1
290:10

**competitors**
255:22,23

**complain**
158:5

**complainant**
8:5,14 9:1
18:15

**complaining**
121:15

**complaint**
6:25 7:2,13
11:18 16:7
19:22 20:1,2,
7 23:2 26:25
33:16 69:17
70:18 76:25
103:4,8
120:13,18
162:22 179:17
183:12 190:7
204:19 208:21
217:24
218:10,13
224:14,15
254:21 280:9
283:16 285:3

**complaints**
138:19 203:14

**complete**
207:11 247:8
291:21

**completely**
77:16 144:4
201:5 218:11

**compliment**
217:4

**compliments**
217:6

**comports**
232:15

**compulsion**
275:20

**comrades**
255:25

**concern**
171:25

**concerned**
57:19 87:10,
20 154:2
260:5 266:4
280:5 283:11

**conclude**
231:22

**concluded**
48:11 200:10
232:4

**concludes**
67:9,11

**conclusion**
16:11 33:2
256:19 272:19
283:1

**conduct**
6:22 7:10
11:17 15:15,
17 16:7,13

**conducting**
239:24

**conducts**
172:1

**confident**
50:1

confirm
28:17 34:11
59:17,25 72:1
89:7 151:13,
23

confirmation
264:20 279:10

confirmed
223:10

confront
147:14 274:17

confrontation
226:18 232:10

confrontational
173:2

confronting
172:16

confusing
10:8

congratulatory
187:23

conjunction
92:5

connected
141:19

connection
156:3,17
201:13 234:12

connectivity
165:6

connotation
37:1,4

consciously
6:15

considerable
252:10

considered
13:18

consistent
115:4

consistently
117:5

constant
227:23

constantly
117:4 143:1
158:24 219:2
221:23 222:5

constitution
205:4

consummate
198:17

contact
196:20 197:2
254:16 256:8
259:4 265:25
279:4,5
281:15

contained
70:18

contemplate
171:8,9

contemplated
249:17

contemplating
170:22

contesting
58:7

context
92:2,7 95:2,
12 152:21
271:10

continuation
23:15,19

continue
47:24 73:11

98:14 256:5

continued
31:15 64:13
170:1 247:4
273:10,17

continues
67:9

continuous
206:15 256:7

continuous-play
212:3

contract
121:22 179:14
211:15 213:22
238:21

contractual
205:24 211:3

contrary
17:16

control
88:3 146:22
152:9,10
214:8 290:14

controlling
146:17 266:17

conversation
11:9 143:14
144:3 147:10
198:23 217:18
258:9 286:8

conversations
151:20 166:1
172:13
217:12,16
231:6 280:7

cool
115:22 135:11
256:12

cordial
172:25

corner
198:5,7
275:14

corners
198:5

correct
12:14 20:25
21:14,16
24:21 26:23
27:4,17,18
31:25 34:13
44:18,24
47:8,13 51:6
54:21 56:14
59:5 63:5
65:1,6 69:19,
20,21 94:4,11
96:7 97:9
98:3 129:1,22
137:24
151:16,17,22
157:12 165:20
174:9,11,12,
16,17 183:10
191:21 193:17
199:22 200:3,
13 206:4,14
208:18 213:12
216:24 229:9
230:6 232:16
234:17 235:21
241:22,24,25
242:14
243:10,22
269:22 270:4,
8 271:17
277:21 283:24
286:12 287:18

USPA Hearing Committee
August 06, 2021

15

correctly
27:3,21 50:1
63:3 215:25
229:21 232:12
269:21 278:4,
16
cost
149:9
counsel
7:21 9:2 10:1
11:21 13:17
56:3 57:14
58:9 79:8
167:25 180:10
290:22
counsel's
12:11
counselor
144:7 283:7
counselor's
285:12 287:10
counter-suit
241:1,5
countless
224:17 251:19
271:6
couple
9:18 22:19
34:5 49:7
59:2 81:17
86:7 88:25
99:8 103:12,
22 104:16
146:7 151:13
165:12 167:23
168:8 173:25
180:4 181:14
186:19 191:10
229:8 232:20
260:25 263:3

277:12 280:13
281:16 282:1
290:7 291:5
court
10:19 14:4
19:2 24:11
43:19,21
62:12 79:21
96:19 112:21
131:15,17
141:21 156:5,
9 163:12 ·
167:2 175:19
182:19 193:18
202:5,6
214:25 237:5
239:1,13
240:11 245:6
264:20 271:8
284:24
courteous
199:7
cover
197:16
covered
15:3
COVID
163:11
coworkers
227:8
Craig
6:4,20 8:2,
17,21 9:23
12:5 17:7
34:8 42:22
57:16 79:2
93:6 131:6
151:8 165:11
180:14 191:7,
9 199:16

208:10 210:15
229:5 241:15
267:14 281:25
crash
72:14 86:23
87:8,16 146:4
219:19 220:14
crashes
91:13
crashing
220:1,25
craziness
222:2
crazy
115:19
credence
14:10 264:10
credibility
57:23 58:24
123:13 225:13
285:11
cross
15:8
CROSS-
EXAMINATION
34:9 51:1
60:12 72:11
84:16 104:22
118:16 137:1
151:5 165:9
173:23 180:12
191:5 199:14
208:8 229:3
241:13 267:9
cross-examine
14:24
crossed
65:18 126:13
187:21

crossed-filed
238:24
crosses
186:7
crossing
244:8
crowd
103:16 285:16
crunch
235:2
cry-out
134:8
crying
77:17 125:23
280:24
Cultural
250:15
cumulative
193:2
curious
27:19 193:1
267:22 277:17
current
212:3,6
curse
30:17 37:13
38:10 64:10
176:23
cursed
64:12 194:20
cursing
33:11 40:20
250:9
cuss
114:2 123:24
140:25
cussed
74:22

cussing
17:3 260:9

cut
127:25 216:9
252:25

---

**D**

---

dad
81:6 153:24
158:12

daily
225:15

damage
170:24 248:13
265:6

damaging
264:17

Dan
17:20 202:3,
13,18 208:6,
10 210:13,17
213:3 214:13,
17 253:7,8

Dance
145:22

dangerous
53:18 98:16
105:5 115:7
118:5 201:12
207:21 218:5
219:20 226:15
251:18 254:4
266:16

dangerous-
riding
207:7 220:7

dangerously
219:18

Danielle
175:15,18
176:1,6
180:9,14
181:10 182:5,
9 209:16

Darrell
6:24 12:23
20:18 21:13,
20 23:7 24:6,
14 26:6,7,19
28:7,8,15
29:7 30:8,11,
16 31:13,23
32:3 33:3,8
36:11 37:18
38:6,17,19
40:7,9,16
41:2,20 44:20
48:19 51:5,
11,21 53:10,
25 60:22
63:18,19
67:12 68:3,6,
7,16 71:16,17
73:15 74:10,
15,16 76:12
81:9 83:14,
22,23 84:23,
25 89:15
93:25 94:3
98:1,9,12,14
100:1,3
104:9,15
105:11
106:17,22
107:3 108:15,
22 113:20
114:11,13,15,
16 115:3,4,5,
13,14,19
117:1,15,20,

21,24 118:1
119:5,9,16,
18,22 120:10
121:3,7
123:16,18,19,
23 124:1,6,7,
9,10,11,18,
20,24 125:1,
3,4,23 127:5
132:16,25
133:5,8,15,
17,22 134:4,
10,19 135:23,
25 136:4,7
137:5,7,11,
18,24 138:1,3
144:23,24
146:5 151:16,
25 157:6
160:17,22,23
161:4,11
162:12,20
165:16,23
171:20 172:6,
7,19,22 174:7
176:9,10,14
177:6,8,9,13
178:25 180:23
183:7,16,25
184:1,13,19,
20,23,25
185:11,13,20
186:1,5,18
187:17,20
190:7,23
193:10
194:14,16,18
195:7,14,15,
17,18,20,21
198:13,16,24
199:8,21
200:1,6

202:19,23,25
203:14,15,16,
21,24 204:8
208:17 215:22
216:14,17,24
217:22 224:19
226:6,16,19,
22 227:4
228:5,8
230:10,16
231:8,23,24
232:1,13
233:12,16
235:23 236:3,
6,8,15 240:1,
2,5 244:11
245:5,13,18
246:14 248:2
251:3 258:5,
7,21 262:2
267:2,11
275:1 276:17
280:18 284:19
285:1,6

Darrell's
9:13 11:1
30:13 31:22
42:17 63:23
74:10 89:15
104:19 111:3
118:1,13
133:16 134:13
176:7 179:23
186:21 187:18
198:14 203:18

Darryl
8:12

date
151:14

daughter
81:4 151:21

**David**
122:6,21,25
155:17,20
166:22,25
167:8,13
168:13
173:22,25
174:20 175:6,
9 222:7,11,16
223:2,3,8,24
224:2

**day**
8:24 13:7
19:18 20:24
33:22,23 36:5
43:6 55:9
70:23,24
71:2,4 79:7,
15 84:22
85:25 87:25
94:23 116:10,
11 126:5,18
130:1 132:21
152:1 153:1
154:17 175:6
176:17 180:23
182:10 186:22
192:12 195:11
203:11 214:20
227:14 237:17
238:9 252:24
267:16

**days**
103:23 104:16
115:15,18
121:5 125:24
203:11 204:12
259:20

**DC/VIRGINIA**
169:1

**deal**
69:16 78:5
93:3 147:16
148:11 171:6
173:15 269:25
291:5

**dealing**
171:6,24
179:21 248:2
286:1

**dealings**
115:4 130:11

**dealt**
85:17

**dear**
211:8

**debt**
238:23

**decades**
199:4

**decibel**
66:18

**decide**
13:12 17:9
107:25 132:18

**decided**
168:24 171:9

**deciding**
138:11

**decision**
150:19

**decorum**
78:6

**dedicated**
161:13

**deem**
192:18

**defeat**

88:18

**defensively**
198:2

**definition**
234:13

**defuse**
116:22

**degrees**
110:15

**delegate**
234:2

**deliver**
19:21,25 20:2

**delivered**
7:3 20:8
239:2

**Delora**
7:1 13:19
16:8 18:14,18
19:8,15 43:12
44:17 103:5
138:3 208:21

**demanded**
263:10

**demeanor**
124:25 125:7
134:13 268:22
276:1,20

**denial**
69:2,3,4
73:17

**denied**
48:24 68:24
117:18 170:12
171:5 280:2

**denies**
17:2,4

**Dennis**

34:3 50:24
51:2 54:2,3
56:5,7,8
58:12,22
59:1,17 60:8,
13 61:1
131:9,11,13,
14 132:5
136:21 139:6
141:8,14,17
155:17,22
156:7 166:22,
25 193:17
278:5

**deny**
35:13,15
37:11 40:5
41:12,19
73:25 75:10
123:4 265:2

**derogatory**
81:20 85:9
172:12 177:14
217:10 276:2

**describe**
54:6,13
134:13 135:22
237:24

**deserved**
187:2

**desire**
12:11

**desist**
130:19

**detail**
34:17

**details**
199:20 230:14

**deteriorating**
247:12

USPA Hearing Committee
August 06, 2021                                                          18

determine
130:15 210:22
269:1

dictating
9:6

died
242:1 243:12

difference
81:25

differently
33:14 74:7,9
88:1

difficult
8:24 14:3
49:21 171:5
173:14 272:7

diffuse
118:8 120:4
126:11

dinners
114:23

direct
14:21 15:8
19:11 44:6
56:3 62:21
80:5 97:4
113:5 132:4
142:6 156:21
167:11 176:4
183:4 194:4
202:16 215:10
226:3 237:15
245:16 249:1,
9 271:17

directed
16:4 57:8
111:4 137:20
249:18,21
250:1 261:9

directing
271:15 .

direction
110:15 121:3

directions
127:25

directly
17:3 52:7
59:8,11
105:22 226:1
274:3 276:3
282:7

disagree
155:11,15
160:23

disagreements
161:22 172:23
186:6

disappointing
120:22

disbelief
55:11 78:13

disc
247:22

disciplinary
7:6 16:10
211:21

discounting
25:8

discounts
149:12

discrimination
55:3

discriminatory
172:12 217:9

discs
247:9

discuss

9:24 130:6,10
197:18

discussed
12:18,21
19:17 117:12
150:21

discussing
98:6 130:8

discussion
25:22,25
30:15 39:16
56:11 66:21
67:24 89:22
100:7,22
101:1,2
103:24 113:19
114:10
117:11,21

discussions
100:20 115:13
116:12 151:24
165:23 179:19

disgusted
275:17

disheartening
160:5

dishonest
221:7,20

dishonesty
221:4 226:5

dismissed
241:6,8

displeased
86:14

displeasure
83:20

dispute
177:23

distance
30:20 230:18,
24 231:5,7,
11,14,21

distracted
35:24

distractions
32:9

disturbed
106:12 266:4
281:3

disturbing
35:2,5

divergence
273:5

diverse
177:16

diversity
250:14,15

DNA
119:11

Doble
141:18 142:3,
14,15 144:15
151:1,4,7
154:10,14,16,
18

doctor
248:14

document
19:25 89:25

documents
240:9,10,11,
13

dog's
213:6

donates
159:15

door
  168:16
Dorie
  22:9 42:21
  45:23 48:15,
  16 51:18 53:7
  56:17 62:2
  66:12 67:19,
  20 68:4,7
  78:16 83:14
  86:7 88:14
  99:7,11
  100:14 103:19
  114:12 115:3,
  11,14,15,17
  116:19
  117:17,20
  120:13,16,18,
  19,22 121:11
  122:11,16
  123:11,15
  124:25 125:4
  126:3 129:10,
  13 130:11
  147:24 148:1,
  2,10,11,14
  149:7,15,17,
  23 157:12
  158:13 159:1
  162:21,25
  163:6,9
  164:2,3,6,22
  165:2,24
  168:14,18,19
  169:1,24
  170:11
  171:20,22
  173:8 174:4
  179:10,11,12,
  17 183:11
  189:18,24
  190:1 202:19

  203:1,9
  217:20,21,24
  218:15,17
  219:5,19,24
  221:25
  222:11,18
  224:1,7,9,12,
  18 225:10,24
  226:4 227:24
  237:18 238:5,
  6,14 240:6
  241:24 258:4,
  12,23 259:1,8
  274:14,23
  275:13,14,19
  276:13 277:10
  279:23 280:8
  281:8,17
  283:10
Dorie's
  81:1 87:22
  88:15 120:21
  122:19
  125:19,20
  130:10
  162:22,24
  171:18 221:3
  222:25 226:12
  227:19 283:16
double-
chukkered
  170:8
doubled
  228:5 233:13
  246:7 248:20
  261:13,23,24
  270:23
doubling
  245:21 261:20
doubt
  88:25 264:18

dozen
  31:12
dragged
  107:22
dragging
  99:11 100:13
  103:18
drama
  123:15
drew
  283:1
drinking
  219:1
drive
  153:1 167:21
driving
  128:2
drop
  118:11 147:21
  235:3
dropped
  100:11 248:8
  253:25 258:14
  273:10,16
drove
  86:21
drug
  242:2
drugs
  219:1,7
duly
  19:9 44:4
  62:19 80:3
  97:2 113:3
  132:2 142:4
  156:19 167:9
  176:2 183:2
  194:2 202:14
  215:8 237:13

  245:14

  ───────────
          E
  ───────────

ear
  109:10 225:24
earlier
  16:6 25:18
  30:18 33:5
  36:10 50:4
  56:9,16 59:25
  63:15 65:8
  67:6 70:1
  80:15 94:22
  95:23 152:19
  167:22 200:20
  229:21 232:11
  234:23 236:13
  266:6 268:4
  272:24 278:4,
  17
early
  128:16
ears
  25:14 81:21
  165:14
earshot
  134:2
easier
  235:3
east
  207:4
easy
  33:22 38:8
easygoing
  176:24
EBERSBACH
  8:15 131:10
  141:19 155:20
  156:1,16

166:17 175:13

**echo**
192:6

**edge**
268:1,20

**effect**
26:14 29:2
36:13 75:13
84:9 100:2
278:20,21

**effectively**
38:5

**effort**
127:12

**eighth-grader**
164:6,22
165:2

**elaborate**
120:18

**elapsed**
39:5,13

**elbows**
94:18

**elected**
16:9

**elevated**
233:4

**eliciting**
271:22 279:9

**else's**
86:17 152:16

**email**
20:3,4 60:6
93:9 95:22

**emails**
284:22

**embark**
131:5

**embarrass**
147:22

**Emmy**
222:22 223:15

**emotion**
68:15 69:7,13
73:24 76:5
77:17 248:24
270:11

**emotional**
271:22

**emphasis**
189:1

**emphatic**
69:4 155:7
250:6

**emphatically**
17:2,4 24:4
35:13 37:15
259:4 264:12
265:14 272:17
279:6 280:2

**employed**
148:18

**employee**
149:2,6,17

**encounter**
23:17 76:23

**encountered**
55:2

**encounters**
50:19 158:8

**encouraged**
127:5 129:13

**encouraging**
91:11 92:15
129:11 196:18
197:24

**encroaching**
90:24

**end**
15:5 25:20
59:18 73:9
103:22 112:11
119:24 120:7
135:16 190:12
240:18,21
241:7 245:22,
23 256:23
273:7,21,24
282:4

**endanger**
252:17

**ended**
42:11 165:22
222:16,21
239:5 257:5
260:3 291:14

**ends**
256:1 257:1,
12 274:21
285:19

**energy**
252:15

**engage**
25:25 160:7
173:19 203:19
279:3,25
280:1 281:1

**engaged**
269:12 278:1,
13 279:8
282:25

**engagement**
291:22

**enjoy**
158:19 201:23
214:13

**enjoyed**
148:12 158:16
159:1

**enjoyment**
255:20,21

**ensure**
278:8

**enter**
88:5

**enthusiastic**
73:16,18

**entire**
29:24,25
60:20 63:11
117:6 137:17
152:25 230:5
249:3,18
250:16

**entitled**
192:17

**entry**
100:14 103:19

**envelope**
58:11

**environment**
84:6,7 85:16

**envision**
14:15

**episode**
145:22

**epithet**
17:3 52:1
119:17 123:17
185:11 194:20
264:16

**epithets**
250:11

**equation**

USPA Hearing Committee
August 06, 2021                                                    21

28:22

**essentially**
26:4 28:7
82:12 177:6,
24

**established**
12:6 289:2

**ethnic**
250:15

**evaded**
26:4

**evened**
52:12

**evening**
63:7 80:12
81:18 83:14
97:19 113:11,
16 116:12
117:10,21
137:18 177:6
180:23 191:14
194:25 198:9,
22 200:2
201:4,9
230:4,6
235:2,18
250:22

**event**
85:3,6
128:20,21
129:2 143:4
208:25 209:2,
9,18 210:22
211:2,18
213:12,18
216:14
229:17,18,19,
22 241:20,21
245:20 246:2
251:21 255:17

270:17 284:11

**events**
29:13 143:7,
16 209:25
213:19,21
245:18

**eventually**
239:1 246:25

**everyone's**
87:9

**evidence**
7:8,12 8:1
16:11 17:10

**evoke**
274:8

**evolving**
287:6

**exact**
47:3 53:20
75:4,15,19
102:25 152:15
154:1,3 196:4
230:14 270:14

**examination**
19:11 44:6
62:21 80:5
97:4 113:5
132:4 142:6
156:21 167:11
176:4 183:4
194:4 202:16
215:10 233:1
237:15 245:16
280:16 284:16

**examined**
19:9 44:4
62:19 80:3
97:2 113:3
132:2 142:4
156:19 167:9

176:2 183:2
194:2 202:14
215:8 237:13
245:14

**exception**
234:18

**exceptions**
6:12 234:17

**excessively**
102:2

**exchange**
274:8

**exchanged**
113:20 153:17
260:20

**exchanging**
283:21

**exclamation**
261:13,22
266:19 270:12

**exclude**
7:15 12:5

**excluded**
12:12 13:19

**excruciating**
177:7

**excuse**
13:5 50:17
54:23 59:23
71:18 90:12
105:23 232:20
241:4

**excused**
43:15 62:9
78:24 96:16
112:7 130:2
141:15 154:19
166:21 175:10
182:12 192:15

202:2 214:22
245:3

**executive**
11:18

**exhibition**
16:21 18:3
108:3 118:23,
24 204:25
206:13 211:18
214:7 226:9
235:1 255:19
256:13

**exist**
75:6

**exists**
41:18,19

**expect**
6:19 76:14
263:9,10
270:3

**expected**
76:13,16
269:10

**expeditiously**
7:24

**expensive**
8:24 149:11

**experience**
17:21 133:19
135:7,21
142:21 145:17
178:15 196:2
200:24 251:17
262:1

**experienced**
185:19 190:1
239:22

**experiences**
226:4

experiencing
261:21

explain
36:14 71:7
91:17 149:17
178:16 196:11
203:17 204:20
207:18 254:25
257:25

explained
55:14 145:4
149:5,15
194:13

express
248:23 250:7
270:10 271:2

expressing
252:19

expressions
281:12

extended
106:5 282:9
285:18

extensively
224:13

extent
7:19 192:23
240:6 277:7

extreme
122:15

extremely
35:4 68:11
106:12 126:3

eye
240:7 256:25
259:4 262:23
263:4,23
278:1 279:1,
4,5 281:2,9,

15

eyes
68:11 77:18
260:1 280:23

_____

F

face
106:19 111:3,
4 233:17,18
240:7 267:13

face-to-face
274:17,20

Facebook
181:23

faces
111:2,8
220:15

facial
281:12

facility
119:3 122:19
209:13 213:8,
9 218:24
220:22 221:2
226:9 229:10

facing
233:16

fact
17:24 18:6
31:8 33:3
55:12 69:9
73:23 74:19,
24 90:25
196:15 226:19
261:2 269:14
271:24 287:18

factor
274:16

facts
30:14 33:15

failed
240:22

fails
252:12

fair
24:5,13,16,
20,25 31:21
48:25 63:11
65:24 67:4
79:17 100:24
109:20,23
121:19
151:13,17,18
174:5 180:21
191:18 200:12
208:13 231:10
274:24 289:7,
8

fairly
11:8 177:16
188:7 290:17

fall
213:9

falling
220:25

false
178:5 240:10,
13

familiar
194:23 201:5
202:22 211:20
234:4

families
21:23

family
22:25 26:5
33:20 36:6

39:4 81:2
83:12 114:19,
22 155:6
158:9 162:12,
19 173:14,19
177:1 178:6,
10 183:11,19
188:6 203:9
206:22 238:19
258:22,24
275:5,10
276:18 277:1,
19,20 280:19
282:17
283:19,20
284:6,7
285:4,18
286:22

family's
224:15

farm
104:15 122:24
149:4 150:12
158:21,25
163:22 168:20
169:2,3
190:15 288:5

fast
46:10 159:20
160:25 238:15
289:18,24

faster
102:4 289:13,
21

father
7:17 55:24
79:5 80:10
126:4,18,23
142:14 274:14
277:22 278:2
282:20,21,22,

23,24

**fault**
189:3

**favor**
222:5 243:6

**fear**
253:19,20
264:23,24
265:7

**fearful**
252:21

**February**
128:18

**feel**
20:14 33:9
35:18,20 36:5
38:12,13,14,
22 40:23
47:15 50:7
74:14 93:25
102:15 130:17
133:20 162:11
163:4 173:9
184:13,24
185:10
186:22,24
190:4,19
193:6 195:12
196:5 220:18
225:2 246:19,
20 248:3
251:25 256:20
258:15 260:22
265:9,23
271:24 276:7
279:15 289:3

**feeling**
106:10
270:15,16
271:10

**feelings**
35:23 36:8
37:13 38:9
42:5 127:9
187:15
266:22,23
267:25 271:2
276:25

**feels**
91:14 163:1

**feet**
55:19 82:2,16
133:23 137:5
230:22,25
282:8

**felt**
20:12,18
33:14 38:22
45:13 49:5
54:15 74:11
98:17 142:24
145:21 164:6,
7 196:13
197:3 245:25
266:11
269:22,23,25
270:7 274:12
275:16,20

**feud**
164:9

**field**
12:20 16:5,25
20:20 23:9,
10,11,25
26:8,10
27:16,23
28:10,16 29:8
33:4 38:21
39:2,16 40:8,
10 41:24,25
48:3 49:20

50:9 57:10
68:9,18,19
74:2 76:8
77:2,12,14,20
81:25 92:19,
20 115:9
117:3 119:7,
11,13 124:15,
16,19 126:13
127:10 132:17
134:18 158:23
161:3,21
169:22
172:13,23,24
186:16 195:4,
23 196:25
200:9 203:23
204:3,8,10
205:18 206:20
209:15,16
210:1 212:17
213:11,12
214:6,8 217:8
220:10 227:10
229:21 257:15
273:12 279:12
281:24 285:25
289:5

**fields**
184:5 213:16,
20 214:4

**fieldside**
20:10 21:19
25:19

**fierce**
255:23 289:1

**fifteen**
230:25

**fight**
126:12 205:6

**fighting**
153:13,14,15

**figure**
25:9 48:9

**figured**
147:22 238:11
248:15

**file**
204:19 218:10
240:22

**filed**
120:18
138:14,19
162:21 179:17
190:7 203:15
217:24 238:23

**filing**
218:13

**filled**
68:12

**final**
143:5 210:2

**finally**
153:6

**finance**
238:20 243:8

**find**
64:4,20 88:11
115:3 127:17
159:8,22
162:9 187:21
212:22 232:13
249:19 284:5
285:23 286:2
287:10 288:25

**fine**
11:25 12:24
13:15,21
45:16 48:8

60:11 87:5
91:14 93:2
112:12 115:17
130:20,23
138:12 144:12
223:8 224:22
232:24 251:5

finger
  228:16

finish
  24:9,10 93:15

finished
  115:16 196:3
  214:15 236:17
  259:14 266:2
  286:5

fired
  240:23

fires
  117:4

firm
  164:4

firsthand
  100:25
  174:13,14
  181:3 191:19
  199:25 200:10
  208:16 241:19

fit
  222:20

five-dollar
  206:19

fixture
  240:3

flag
  98:13 119:8
  126:2

flared
  143:22

flaring
  254:18

flaw
  148:9 188:13

flew
  118:2

flexible
  228:11

Florida
  114:24 136:20
  179:5

flow
  178:17

flowing
  68:14

flying
  78:7

focus
  157:24 208:2
  277:23 283:9
  285:19,24

focused
  134:15

focusing
  46:16 230:4
  289:12

folks
  169:20

follow
  20:16 28:14
  82:6 128:23
  197:15

follow-up
  15:2 34:5
  43:1,3 154:9
  280:13

follow-ups
  125:14

foot
  180:4 291:16

forced
  40:11

forever
  15:11

forget
  116:24 122:20
  268:7

forgive
  270:13

forgiveness
  35:19

form
  9:4

formal
  11:8

formally
  128:12

formed
  209:12

forward
  14:15 78:18
  106:1 137:10
  228:23 273:15

foul
  15:23 23:24,
  25 53:12,14,
  16 66:25
  89:17,22 91:5
  101:9,17
  102:18 105:4
  134:21 186:11
  206:10 220:7,
  11 253:22,24
  254:3,6,7
  255:7,13
  290:2

fouls
  207:6,7
  227:12

found
  80:20 228:22

foundation
  35:19 127:16

frankly
  38:23 83:16
  185:7,12

Fred
  205:18 209:14

free
  234:22 238:8

frequently
  36:4 184:8
  207:5

fresh
  54:11

friend
  119:1 120:21
  125:19,20,22
  185:7 198:25
  199:1,3 211:8
  237:21

friendly
  86:8,19
  176:17 187:23
  198:21

friends
  78:11 83:16
  114:19,23
  117:6 118:7
  119:24 120:23
  145:12,13,15
  159:11 224:3,
  8 227:8
  283:20 284:7
  285:5

**front**
68:16 102:22
141:17 195:9
196:24 290:1

**frustrated**
177:9

**frustration**
186:3

**fuck**
177:10

**fucking**
152:10

**full**
14:1 57:11
62:24 78:11
80:7 122:10
123:3 283:8,
18,20

**fully**
146:19 148:17
149:14

**fun**
116:24 226:11
235:19 251:9,
13,14 268:10

**funny**
126:10

___

**G**

**G-A-E-B-E-L**
6:24

**G-O-B-I-N**
113:9

**GABEL**
288:13

**Gaebel**
6:24 7:15
8:12 10:15,

21,24 15:23
16:1 21:20
22:15 23:8
24:6,14 25:2,
14,24 27:2,5,
11,15 28:4,
15,19 30:2
31:9,16 33:3,
17 44:20,24
45:13,17
47:12 48:12
49:15,17,23
50:8 51:6
56:12 59:4
63:15 65:5
66:1,5 67:5
68:2,24 70:6
76:25 77:8
81:19 82:1
83:8 84:8
92:22 98:2,
10,20 99:4
100:1 101:10,
11 104:1
113:21 114:3,
11 132:16
139:22
151:16,25
171:20 181:15
192:23 240:1
243:24 244:2,
15 245:13
267:6 285:12
286:12,20
287:3,9,18,21
288:1,4,7,18,
21,25 289:8,
15,22 290:6,
23,25 291:4,
8,20

**Gaebel's**
7:16 50:19

**Galle**
6:2,4,20 8:9,
19 9:24
10:12,19,22
11:4,22 12:9
13:10,16,22
14:14 15:13
17:12 18:12
19:12 34:1
42:23 43:9,
16,19 44:7
47:1 50:22
56:9 61:3
62:5,10,22
72:8 76:20
78:25 79:3,
11,19 80:6
84:12,15 93:8
95:21 96:15,
17 97:5
104:18 107:10
111:20 112:3,
10,13,19
113:6 118:12
125:13
129:20,23
130:1 131:1
137:2 138:5
151:6,8
154:6,17
165:10,11
166:2 168:7
173:24 174:18
175:15
180:13,14
181:7 182:9
191:6,7,22
199:12,15,16
200:14 201:23
208:9,10
210:10,16
214:13,16,21

229:4,5
232:17
241:14,15
242:4 245:2
263:2 267:5,
10,12 272:1
274:6 278:12
280:11 281:5
284:16 290:22

**game**
15:20,22
16:21 18:4
19:17 21:11,
22 25:20
29:14,25
31:6,12 44:23
47:24 48:11,
14 49:11 50:6
59:4 60:20,21
63:12 64:5,
13,18,21
67:1,2,9,11,
23 69:18
71:4,5 76:24
80:14 81:1
83:5,7 90:17
91:20,23
92:12,15 95:6
96:9 97:19,
21,22 98:1,5
99:5,9,10,25
100:1,6,8,10,
20,22,23
102:3,13
103:7,14
113:14,20
114:9,12
124:20 126:5
127:5 132:25
134:16 135:9
136:6,12
137:10,17,22

146:25 154:1
165:15,21,22
174:10,11
190:12 197:25
200:9,22
201:1 204:22
206:17,18,25
207:18
208:15,23,25
214:6 215:23,
25 216:2
217:19 221:15
225:21 226:9,
21 232:4,10
233:10 235:1,
16 249:22
251:13,14,18
256:14 260:23
261:5 266:18
267:18,22
268:7,8,19,
20,24 269:19
271:20 273:7,
8,16,21,24
274:9,21
281:24 282:4
285:19 287:25
289:16,17,22,
23,24 290:18

game's
281:24

games
55:8 86:6
87:3 96:5,6,
10 97:11,15
103:12 122:24
150:12 178:14
206:23 210:2
253:1 255:19
268:5

gap

187:19

garbled
159:17 162:14
163:7 164:8,9

Gardiner
237:3,12,17
241:10,15

gate
100:14 103:19

gave
53:14 94:24
98:16,24
139:19 154:24
171:6 223:6
243:5 277:13

general
20:7 64:22
84:24 105:23
134:7 135:19
207:22 232:8

generally
90:11,21
111:23 117:12
123:12 163:1
164:4 170:15
171:5,19
184:9 195:3
213:13,15

generation
220:2

gentle
84:3

gentleman
119:13
124:13,14
143:23 144:4,
17,20 150:9
204:11 222:8
244:11

gentlemanly
206:18 217:15

gentlemen
196:14,18
197:23 198:6

genuine
70:13 185:5
282:10

George
22:10,11
24:20,23,25
39:19 48:17
53:13 79:1
96:17 97:1,8
104:24 107:19
108:6 110:7,
12 112:4
119:1 206:5
246:10 247:3
249:6 255:7
256:11 266:16

get along
119:23

gird
268:15

girls
231:18

gist
197:16

give
6:16 13:25
14:9 18:8
19:4 43:24
60:4 62:14
79:23 96:21
98:12 112:23
131:20 134:16
141:24 156:12
158:18 167:4
175:22 182:22

193:21 197:13
202:9 209:3
215:3 217:3
234:22 235:13
237:8 238:7
245:9

giving
125:2 139:25
217:6

Glacousky
222:22

go-to
187:1

goal
46:9 196:24
210:2 216:13
217:4 234:13

Gobin
17:19,20 18:2
25:23 27:2,12
41:17 42:15
48:18 71:1,6,
19 72:2,3
79:7 81:3,12
83:8 86:1
97:12 104:14
112:20 113:2,
9,10 118:15
125:12,17,21
126:7,19,24
127:2,7,13,
20,23 128:8,
11,14,17,23
129:3,8,13,
17,25 150:14
210:24 257:13
258:4 275:9
277:18 280:1
288:14

Gobin's

40:12 84:22
God
    55:8 268:14
good
    10:12,22,24
    19:13 20:15
    26:11,12
    28:12,13 ·
    43:5,17,18
    50:14 55:19
    62:23 82:2,15
    83:19 91:7,
    11,12 105:1
    108:10,12
    110:8,10
    111:18 112:6
    115:8 118:22
    125:1 126:2
    130:1 132:19
    133:19,20,24
    135:19,21,24
    142:10 151:7
    154:17 158:15
    161:15,16
    162:2 175:6,
    8,17 181:13
    182:9 185:1,7
    191:9 192:11
    198:25 199:3,
    5 201:4
    208:4,11
    210:14,17,19
    213:5 214:18
    217:4,5
    229:7,8
    233:6,11
    236:8 241:17
    245:2 248:15
    252:19,20
    253:11,13,18
    256:24 257:10

267:12 269:7
279:13 285:17
291:4
good-hearted
    134:18
gossip
    145:22 173:10
governor
    17:22
grab
    235:5
grabbed
    98:15 99:1,19
    101:7
grabbing
    105:20
grabs
    228:17
graceful
    88:17
gracious
    266:20
graciously
    257:11 258:6
    266:8,25
    282:14
graduated
    159:17 160:20
    164:8,23
    165:1
grandfather
    161:7
grandparents
    78:11 283:20
    284:7
grass
    81:1 126:5
    180:6 185:14

186:8,20
187:5 188:3
Gray
    237:22
great
    14:14 16:21
    50:15 93:5
    114:22,25
    115:1 118:21
    127:16 128:13
    131:13 134:21
    136:21 138:13
    148:11 157:4
    158:4 160:2,
    24 164:1
    166:8 168:13,
    23 169:3
    177:5 179:14
    188:19 191:10
    198:24 199:1
    204:14 205:1,
    9,12,13,19,20
    206:1,11
    208:19 209:6,
    10,11,18,20,
    25 210:3
    211:5,9
    212:10 213:25
    217:4 224:14
    226:12 229:22
    234:1 235:19
    240:4 244:7
    251:13 253:8
    269:25
    291:10,17
greater
    208:2
Green
    8:2,3,10,21
    9:22 11:16
    12:3 13:5,10

14:7 17:7,13,
24 18:5,8,11,
18,21 20:5
43:2,7 46:23
54:1 55:22
56:1,6 57:13
58:2,16,21
59:23 60:2,11·
61:5 76:22
77:5,7,23
78:3,19 79:2,
4,10,16
90:12,16,20,
24 91:3,7
93:14,18,21
94:9 95:13
96:1,13
107:11 108:6,
9,12,15,21
109:4,12,20
110:1,5,10
125:14,15,16
18 126:4,17,
21,25 127:4,
11,18,21
128:6,9,12,
15,19,25
129:4,22
130:13,23
138:8,9,13,
16,20,22,25
139:2,5,9,12,
16,18,21,24
140:3,8
141:11,16
144:7,10,13
154:8,11,20
155:2,12
166:5,8,12
174:20 175:1,
6 181:10,13,
18,25 182:3

184:21 191:24
192:6,9
193:11,14
199:13
200:16,17,19,
21 201:11,15
210:12,17,20
211:1,20
212:2,6,12
213:1 225:7,8
232:18,23
233:22 234:1,
4,9,16,19
235:8,11
236:23 242:6,
8,9,12,15,19,
22,24 243:3,
7,11,17,20,23
244:1,14,18
263:3 280:12
284:13 285:9,
12 286:4,13,
18,20 287:3,
8,16,20,23
288:2,6,8,16,
19,22 289:6,
9,19,25
290:19,25
291:2

**grooms**
196:3

**gross**
262:19

**ground**
9:24 248:25
261:10 271:1
282:18,19

**grounding**
89:7

**group**
8:6,7,11,17

172:13 236:5
285:14 287:11
289:11

**grudge**
106:25

**grudges**
120:7

**Guard**
204:1

**guess**
9:23 12:9,25
18:13 21:21
25:20 31:20
32:25 98:23
110:12 116:10
135:16,18,20
143:20,22
144:3,4 146:8
147:6 148:21
150:11 178:17
189:17 190:9
216:2 219:16
222:19 229:14
230:24 276:4

**guests**
83:13

**guide**
78:16

**guy**
37:25 121:21,
23,24 122:1
125:25 126:1,
3 145:6
160:24 176:24
197:25 198:25

**guys**
42:4 101:18,
22 102:9
112:5 117:23
125:12 138:25

182:15 192:11
197:12

---

### H

**half**
31:12 49:12
134:12 168:9
212:8,10

**Hall**
213:19

**hand**
19:3 43:23
62:13 77:10
79:22 81:14
96:20 106:1
112:22 131:19
141:23 156:11
167:3 175:21
180:5,6
182:21 186:22
190:13 193:20
194:10 202:8
208:3 215:2
237:7 245:8
256:24 257:11
266:7,10,20,
25

**handed**
201:3

**handful**
142:23 208:13

**hands**
46:12 68:22
92:23 103:16
118:7 119:23
123:20 135:16
257:3,4,19
282:7,9
291:16

**handshake**
198:22

**hang**
128:5 168:16
192:12

**hanging**
118:3 262:4
277:13

**happen**
10:4 16:25
40:25 67:14
69:12 78:14
82:8,13 83:2
88:4 89:12
92:14 105:15
114:25 124:16
136:11 141:3
155:7 166:1
224:6 240:18,
19 246:6
250:19 256:18
265:5

**happened**
24:3 30:22
33:20 39:14
45:24 48:7,
10,16 49:4
51:4,19 53:4,
5,6,8 54:22
58:14 61:24
67:21,25
71:14 79:14
80:19,21,25
82:3,12 83:5,
11 88:10
89:8,9 108:24
110:3 114:20
125:3 132:20
133:21,25
135:22 147:2,
8 153:2

169:17 170:16
171:13 195:4
196:24,25
198:8 212:17
216:14 218:12
223:11 224:11
227:2 236:21
241:1 246:6,
11 254:11
256:10
257:16,25
258:9,11
259:7 260:21
261:21 262:14
266:25 271:14
273:20 276:21
287:19

**happening**
13:2 68:6
195:24 233:7
262:15

**happy**
82:10 90:3
117:14 132:11
150:4,7
158:14

**happy-go-lucky**
176:24

**harbored**
266:21,22
267:25 268:8

**hard**
90:8,9 95:7
102:1,2,20
115:5,6,7
119:12 124:11
127:9 152:14
161:17,24
177:7 187:21
221:10 248:13
256:14,16

257:3,9
266:13 291:14

**hard-fought**
206:18

**hard-pressed**
206:10

**harder**
95:11 102:24
115:6 221:11

**hardest**
251:15

**harmful**
36:25

**hate**
64:12 65:17
70:11 185:1

**haunting**
262:10

**hawing**
238:17

**hazard**
187:1 249:24

**he-said**
55:10

**head**
30:13 45:6
51:16 52:10
53:1 87:6
98:15 127:24
133:15 144:22
211:13 233:20
246:15 262:4
270:20 279:24
291:24

**headache**
224:8

**heads**
158:19

**hear**
7:8,11 15:3
22:1,3,4,11,
13 23:24
24:6,14 25:1,
6 27:3,21
31:16 32:8,
10,19 33:11
34:12 35:3
36:4,10 39:21
45:24 49:21,
24 51:20
55:18 58:17,
19 65:8 66:3,
9,11,13,17,19
67:7,16 81:18
82:20 84:8
91:16 93:25
94:3 99:4,14
100:1,7
101:25 108:7
109:6,9,14
113:18,19,23,
25 114:2,6,7,
10 120:10
125:16 134:4
137:8,11,13
138:2,11,12
140:25 143:19
144:1 146:2
151:24 152:3,
4,17 153:2
155:10
156:23,24
157:1,3,8,9
159:9 160:14
162:16
163:14,18,23,
25 164:16
165:14 166:6
174:6 179:16
194:10,25

195:1,10
200:5,18
205:3 216:8
217:23 218:13
231:6,10,11,
13,14,16,18,
19,21,23
232:1,2
233:23 242:4,
10 244:9
265:20 272:7
284:17

**heard**
25:4,13,14
28:15 30:18
31:17 32:3
35:16 36:11,
16 38:5 39:14
49:17 50:1,
18,21 56:16
64:10 65:4
67:4 81:24
99:13,14,19
100:4,5,15,16
101:3,5,6
103:20,21,23
104:4,10,16
108:15 109:10
121:1 134:21
137:7,18
143:23 152:5,
7,11,14
162:12 172:11
173:12,15
176:22 177:13
179:10 181:1
185:10,15
190:6 194:24
195:4,17
203:8,10,20
217:13 218:9
225:3 232:1

236:14 240:4
244:10,12
254:13 260:14
261:2 262:16
263:4,18
264:2 265:20
267:16 271:6
272:6,16,24
273:3 274:5
284:8 285:13
291:17

**hearing**
6:14,23 7:5,
18 8:3 9:4
10:18 11:22
12:22 13:13
14:25 15:16
16:11 17:8
34:4 42:25
61:3 70:20
82:21 86:15,
24 90:5 93:13
107:10 129:21
130:15,19
138:10 154:7
160:21 167:25
174:21 180:9
181:13 191:25
195:13 200:17
210:12 233:23
267:4 287:17

**hearsay**
144:11 154:23
225:10 263:4

**heart-felt**
70:15

**heated**
116:1,4
120:20,23

**held**
160:2 211:18

279:5

**hell**
26:4 41:10

**helpful**
154:23 176:19
177:23 226:3

**hemming**
238:16

**herniation**
247:22

**herniations**
247:9,20

**hey**
18:18 28:8
68:17 69:4,
11,15 74:5,
12,19 76:7
81:6,9 84:4
85:11,20 86:4
118:10 124:22
125:2 182:15,
16,18 186:10
191:9 202:18
204:4 217:4
220:12 222:12
238:10 241:15
247:16 258:4
259:14 260:2
264:7 266:2
279:17 281:24

**high**
92:9 105:6
164:5,8,23

**hint**
217:13

**historical**
209:4

**history**
249:20 276:10

277:5

**hit**
30:13 52:10,
11,16 98:13,
15,18 105:9,
11 108:16,17
120:2 126:14
133:17 134:25
135:25 157:25
180:1,5
194:16
196:20,25
197:9 212:16
228:8,10,14,
15,22 230:16
233:13,16
234:22 235:4,
6 245:21,25
246:5,7,22
248:5,10,11,
13,17,20,21
249:23 251:15
252:23,24
253:22 254:4,
5 256:4,16
257:9 261:7,
14,15,18
266:12 270:3,
18,21,22
271:12 290:4,
18

**hits**
248:23

**hitting**
136:3 177:6
197:10 254:18
255:11,12
256:25 273:7
282:9

**hogged**
158:6

**hold**
59:24 76:1
107:10 111:20
118:23 125:13
167:19 231:4
278:5

**holding**
99:21 105:21
109:18

**Holy**
228:21

**home**
40:16,17,21
153:1 243:13
288:6

**honest**
121:19 152:12
211:24 291:20

**honestly**
87:2 162:13
173:17 176:20
187:8

**honesty**
123:12 221:4

**honor**
13:17 203:16

**hope**
282:12

**horrible**
218:21 224:20

**horse**
30:2,3,8
31:22 44:23
45:4,5 47:18
48:14 51:5,15
52:11,17
63:22 81:25
82:17 88:1,3
89:14,15

92:24 98:11,
24 99:10,22
100:11,12,17
103:17
105:13,24
117:25 122:7,
8,9,17,23
123:8 125:2
133:16 140:24
146:17,20
152:10 158:20
162:3 168:23
170:7,9,16,
17,18,25
171:2,13
173:9,17
185:2,4
194:22 217:5
220:13 221:19
222:20,21,25
223:2,4,5,14,
16,17,18,20,
25 224:4
228:22 230:9,
10 239:16,17,
18 242:12
246:22 247:18
252:13,22,24
253:2,15
254:14 257:23
261:23,25
266:17 270:3
290:11,14,16
291:24

**horse's**
30:13 45:5
46:11 52:9
53:1 98:15
99:22 105:25
118:2,4
220:15 233:19
254:18

291:15,23

**horses**
29:18,24 88:1
98:8 121:20,
21,22,23
122:3 128:2
146:21 148:25
158:22,24
161:8,12
165:21
168:14,22
218:22 220:17
221:14 236:18
238:2,5,11,
13,15,20
239:3,9
242:13 243:8
252:11,12,14,
21 253:20
269:7 277:11,
13 289:18

**hosting**
163:9 164:3

**hot**
120:5

**hour**
54:20

**hours**
262:6

**house**
82:20 234:11
235:8 242:2
288:5

**Howard**
243:15,21

**huge**
13:4 20:14
105:7 121:8
164:9

**human**
35:21,22

**Humera**
26:15 42:8,19
57:18 62:18,
25 72:13
149:24 183:12
280:20

**Humera's**
283:15,17

**hunched**
45:7,10,14
105:19,20,24
133:19

**hundred**
10:9 216:23
217:25 231:15
278:17

**hundred-decibel**
55:17

**hundreds**
85:14

**hurry**
174:1

**hurt**
35:22 36:8
37:13 38:9
52:24 53:2
118:1 186:25
196:22
228:13,21
247:17 252:24
253:2,12,16
256:16,17
257:2 261:4
266:13 270:9,
10 282:12

**hurts**
247:18 252:23

**husband**
71:7,9,15,20,
23 72:5 73:10
257:21

---

I

**I.I.**
222:21 223:5

**idea**
39:7,8 83:4
89:18 146:21
218:14 245:25

**identical**
77:2

**identically**
37:20

**ignore**
23:25 285:25

**ill**
187:7 267:25

**ill-advised**
186:20

**ill-informed**
154:24

**imagine**
172:7 173:3
280:12

**immediately**
39:15 48:17
49:22 64:2
67:2 216:2
261:16

**impact**
31:21 194:12
246:1,24,25

**important**
20:21 70:20
279:2

impossible
114:14,20

impression
84:21 105:10
106:11 160:21
189:23 203:7
228:7 268:23

improve
227:13,15

in-house
179:22

inactions
21:19

incident
19:16,21
24:21 33:8
49:18 51:9
55:21 82:3,8,
13 83:2,6,11
88:11 94:24
116:14 124:9
130:7 140:16,
21,23 146:4,9
151:15 172:3,
4 173:15
186:17 191:15
200:5 208:22
241:22

incidents
60:19 69:18
140:16 147:24

included
184:24

including
234:13

incorrect
92:6

incredible
246:20

incredibly
264:17

incurred
248:14

indicating
68:16

individual
189:15 251:8
268:13

individuals
25:12 155:9

informal
11:8

information
15:14 24:17
70:17 151:20
181:4

informed
11:20 114:13
169:25 170:1

initial
16:16 205:8

injured
35:22 36:5
42:6 45:13
122:9 169:21,
25 170:2,3,5,
13 171:2,15
186:18 198:10
248:6 269:21

injuries
177:8 179:23,
24 180:4
245:24 247:6
248:3,21

injury
31:9 246:17

insanely
121:7

insensitive
38:24

inside
94:15 238:16

insistent
211:1

inspected
238:13

instance
221:24

instances
189:4

instinct
62:1

instructor
116:2

integrity
265:7,8

intense
226:14 227:10

intent
265:24 266:14

intention
288:12,24

intentionally
65:16

interact
86:5 136:7
161:11

interacted
176:12

interacting
83:8 273:13

interaction
28:2,16 44:23
49:11,15
113:22,23
114:10 159:2

168:14 187:23
273:18 274:10
278:23

interactions
48:11 50:7
67:25 101:11
104:5 137:23
146:1 165:15,
23 168:18
172:9 176:21
178:7,10
185:4,14
188:6 193:6
199:21,25
200:11 226:6
232:5,13
237:24 241:24
249:20 267:23
276:6

intercollegiate
20:17 207:2

interest
9:11 96:11
155:8 179:15
239:6 242:23

interested
9:3,9 76:23
152:17 238:5

interesting
278:24 285:24

interject
11:16 90:13

intermittent
247:13

internet
156:17

interpretation
198:3 199:6

interpreted

272:15

**interpreting**
276:20

**interrupt**
8:2 13:6
90:13,16
130:14,21
225:8 260:13
278:6 284:13

**interscholastic**
20:17 21:6,7
163:9,10
164:3,4 207:1

**interval**
261:20

**intervene**
12:1 160:8

**intimate**
211:16

**intimidate**
48:22 49:6
119:7 172:19
177:19,21
259:16,23,24

**intimidated**
183:19 187:12
259:22 281:7,
8 288:10,23
289:3,5

**intimidating**
161:2 162:4
187:11 203:21
216:15 274:16
286:16

**intimidation**
92:19 274:12
281:6

**introduced**
258:2 282:22

**introduction**
6:3,8,18

**investment**
208:4

**involve**
203:22

**involved**
114:11 123:22
148:24 181:1
204:21 205:5
213:15

**IPC**
136:19

**irate**
115:19

**ironic**
288:25

**irrelevant**
277:8

**irrespective**
234:21

**issuance**
6:22 15:16

**issue**
14:13 38:16
94:3 121:8,17
122:3,10,11,
14,15 123:13
155:4 157:5
160:11 162:25
173:8 215:16
218:8 219:9

**issued**
38:13

**issues**
121:1,12,14,
19 124:16
156:17 158:3
161:21 165:6

174:4 218:17,
22,25 219:12
221:13 223:21
224:10
227:19,20,22

———————

**J**

**January**
128:18

**jest**
185:17

**Jim**
209:5

**job**
130:15,17
190:15 211:25
291:10

**Joe**
193:15 194:6
199:11 251:7,
23

**John**
17:19,20 18:2
21:9 22:14,23
25:23 26:2,
17,23 27:1
39:14,22,23
40:3 41:6
42:10 48:18
71:1,6,19
72:2,3 81:12
83:8 86:1,5,
11,13,18
104:14 113:2,
9 118:18
125:11,13,16
129:5,7,23
150:9,10,14
161:10 205:23
209:7,11

210:23 211:7,
8,9 221:22
224:1 229:13
255:18 257:13
258:4,10,21
263:11,13
268:7 274:25
275:2,9,14
276:16,17,19
277:1,18
280:1

**John's**
87:22 276:22

**join**
96:18

**joined**
203:25

**joining**
156:2 157:4
182:16 194:6

**joke**
126:9 185:17

**jolting**
77:13

**Joseph**
194:1 199:16
201:23

**judge**
15:1 239:13

**judged**
262:8

**judgment**
242:16,17,20,
25 277:9

**July**
7:2 14:20
15:14,18 16:8
19:17,25
20:24 44:15

51:4 63:7
80:12 81:18
97:14 113:12
116:11 130:7
132:21 152:2
165:15 174:8
180:16 183:13
191:14 200:2
203:5 208:14,
21,23 215:15
229:17 230:4
241:20 267:22
268:24

**jumped**
147:12

**June**
229:23

**Junior**
135:13

**jurisdiction**
9:16,21 16:19
17:1 18:1
58:8 284:20

**jurisdictional**
17:8

_____ **K** _____

**keeping**
168:23

**Ketan**
247:11

**kick**
218:23

**kicked**
196:6 224:19
252:1

**kicking**
225:18

**kid**
16:5 22:22
26:5,10
27:16,24 28:9
29:8 33:4
38:9 41:8,24,
25 68:18
69:15 76:7
77:3,12,20
84:4 219:3,7
257:7

**kids**
33:11 34:18
35:1 66:13
82:22 116:7
122:23 146:16
150:23 155:3,
10 158:5,14
159:12 160:7,
12 203:12,13
204:18
218:22,25
219:4,5,25
222:4,23,25
235:5 238:17

**killing**
206:19

**kind**
12:23 22:7,22
23:3 26:10
30:6 31:14
36:13 41:21
49:5 69:8,9,
10 71:17
73:13 80:22,
23 82:20 84:2
99:2,21
101:15,17,24
102:7,10
103:21 109:19
110:24 114:24

133:8,18
135:25 137:21
142:25 143:20
146:2,5
147:13 149:19
150:11 153:23
158:2,17
160:4,10,15
174:4 178:18
184:16 185:6,
16 190:4
196:18 197:23
200:6 203:19
204:14 207:8
217:18 224:6
228:13 230:16
238:8 248:24
263:7 278:24
279:2 285:23
286:2

**kindly**
18:25 19:13
44:8 62:23
79:19 80:7
113:7

**kiss**
117:23 123:21
127:5,8,12

**knee**
196:23 252:4

**knew**
48:23 56:13
68:12 82:23
153:4 157:19
275:7 282:24

**knock**
220:12 256:12

**knocked**
46:10 92:11

**knowing**

104:9 119:5
171:19 178:3
195:13,21,22
252:7,16

**knowledge**
89:16 100:25
173:3 174:13,
14 181:4
191:19 199:25
200:11 206:6
208:16 209:21
241:19 243:20

**Krabbe**
22:10 24:21,
23,25 25:4
39:18,19
48:17 53:13
79:1 96:18
97:1,6,8
104:21 107:8,
20,25 108:8,
10,14,18,23
109:7,15,23
110:2,8,13,
17,21 111:3,
11,18 112:5
119:2 206:5
246:10 249:6
253:22 255:7
256:5,11
266:16 273:8,
13,14

_____ **L** _____

**L1-12**
247:22

**lack**
14:17 16:12
56:11 83:22
207:11,22

lad
   287:12
lady
   121:16
laid
   246:16 275:1
lame
   123:2,6
   169:13 223:4,
   5,9 252:25
lameness
   223:20
language
   15:23 23:24
   24:1 30:17
   37:6 54:25
   69:8 70:12
   74:4 75:7
   80:22 82:20
   85:8,20 104:4
   105:23 115:2
   134:22 146:23
   152:10 177:14
   195:17 217:10
   234:11
   249:17,21
   250:5,8
   260:10
large
   17:22 85:13
late
   288:1,9
laughing
   55:4 226:11
lawsuit
   122:1 242:15
lawsuits
   227:23
lawyer

6:20 7:17
90:20 91:22
104:19 118:13
191:8 241:16
lawyers
   7:16 11:1
   139:3
lay
   15:6,13 262:5
laying
   68:22 105:25
leads
   264:20
leaning
   106:1
learn
   149:20
learned
   169:18 170:5
lease
   213:11,16
   230:2
leased
   214:5 252:12
leave
   8:5 9:10 91:6
   111:20 112:2
   127:10 141:12
   222:4 255:24
   257:14 260:17
   277:8
leaving
   158:1 256:20
left
   13:12 27:22
   39:13 41:23
   78:5 81:14
   99:8 101:19,
   22 102:9

169:9 172:24
209:11 222:17
236:18 254:1
256:2 257:16
259:10 261:24
273:9 276:16
283:11 291:11
leg
   223:7 228:16
legal
   17:25
legitimate
   47:15
legs
   123:5,6
   223:19 246:19
lend
   264:10
lesser
   192:23
lessons
   148:23 149:13
   158:18 222:20
   227:14
let alone
   84:6 187:17
   217:2 227:5
   249:17,21
letter
   13:1 14:20
   26:18,24
   38:24,25
   42:14 71:21
   127:14
   129:10,14,18
level
   121:17 178:15
   218:10 225:6
   247:22 249:8

268:25 269:3
270:10
levels
   207:23
lexicon
   250:8,13
   259:5 263:25
   265:16 278:19
liar
   239:4 262:24
   263:5 265:18,
   21
Liberty
   213:19
lie
   121:25 221:18
   239:4 240:7
   262:22
lied
   173:16 223:1,
   16 239:12,21
lies
   222:6 262:18
life
   88:6 146:20
   196:7 249:16
   250:3,4,16,17
ligament
   123:1
light
   13:16
likes
   82:6 159:12
limited
   6:11 15:8
Lindsey
   8:11 9:25
   10:10 12:14
   13:22 14:23

16:15 34:7
50:23 72:10
84:15 96:17
112:19 131:3
141:16 155:16
193:16

**lines**
85:23 88:25
177:11

**lingering**
245:24

**list**
15:7 131:3,7
141:17 193:2
251:19

**Listen**
41:17

**listening**
68:6 283:6

**literally**
103:15

**live**
31:18 139:13

**lived**
250:16

**livid**
80:20

**Livvie**
253:8

**lo**
238:22

**Load**
238:14

**local**
212:25

**located**
15:19

**location**

214:10

**lodged**
203:8 208:21
280:9

**log**
155:23 166:18

**loins**
268:15

**lollipop**
235:7

**long**
8:24 11:25
13:7 15:10
50:11 79:10
118:7 120:5
132:23 137:4
148:16,17
157:11 160:17
165:13 167:22
168:19 172:7
176:9 178:22
192:12 203:16
208:11 216:17
224:10 234:10
239:8 244:1
250:24 275:3

**longer**
16:22 125:20
198:20 205:13
209:21 211:25
216:18 217:21
246:8 278:7

**looked**
45:7 47:18
51:16 52:8
94:23 118:1
159:18 223:9
230:15 246:5
247:3 254:3
256:11,25

258:5,13
259:3,9 260:1
263:23
270:21,25
271:8 278:1
279:1,16,23
281:2,16,17
282:7,23
283:10 284:2

**loose**
284:24

**lose**
92:21 162:1

**loses**
161:25

**losing**
130:5

**loss**
88:6

**lost**
120:15 122:1

**lot**
29:18 35:1
53:2 55:6
61:18 70:3
82:3 83:12,13
104:12 106:8
116:1,5,7
118:6 121:1
135:1,18
142:25
145:20,25
146:1 163:16
168:2 172:24
179:6 195:19
196:19,24
197:17 201:7
202:23 203:25
204:1,4
207:17,21

210:4 212:23
221:1 251:9
252:7,14,15
264:2 267:16
283:5

**lots**
32:9 123:15
223:15

**loud**
52:4,5,6
55:13 66:12
82:17 231:14,
20 272:8
287:22

**louder**
231:19

**love**
121:8 159:1
211:8 247:16

**loves**
161:13

**low**
216:4

**lower**
246:21

**luck**
112:6 175:8
192:11

**lucky**
285:13

**lumbar**
247:8

**lumps**
187:6

**lunatic**
128:4

**lying**
89:6 125:6
260:19

---

**M**

---

**M-EFFER**
46:3,13 51:22
67:18

**M-EFFING**
45:8 51:17
54:17 67:13,
15 75:19,22

**mad**
119:8 135:17

**Madam**
18:25 43:19
62:10 79:19

**made**
7:1,12 16:7,
13 20:7,13
23:4 33:16
34:24 38:13,
23 40:24
45:21 63:19
69:17 105:21
106:14 108:19
115:11 119:15
120:9,17
127:11 171:1
186:24 192:24
239:2 259:4
275:12 276:1,
2 279:6
282:11

**maintain**
281:15

**make**
7:21,25 11:23
12:23 16:15
24:8 41:14
44:12 45:17
60:7 65:10
67:5 69:22

78:5 81:19
94:10 95:4
106:19 109:3,
11 117:14,23
118:7 121:8
123:20,21
124:5 127:6,
8,12 159:9
172:15 173:15
184:24 213:9
222:12
234:11,16
254:13
276:12,18,21,
25 277:8
279:4 288:3

**makes**
35:21 38:14
159:14 248:8

**making**
16:4 29:3
35:18 68:25
120:13 272:13

**malice**
266:14

**malicious**
88:7 187:24

**mallet**
46:11 120:2
140:24 228:15
291:14,23

**man**
72:20 126:2
194:19
203:16,24
217:5 218:20
259:12,21

**man's**
116:4

**manager**
190:16
229:12,14,15

**managers**
229:16

**Manley**
10:17,19
166:25

**manner**
6:6 31:23
77:1 173:14

**mantra**
188:22

**map**
234:14

**March**
179:4

**Marcus**
224:23

**Margaret**
257:17,20,23
258:6

**Marissa**
155:25 156:1,
7,18,23 157:4
163:8 164:11
165:11 166:5,
17,19 251:2

**mark**
108:25

**markings**
239:17

**marriage**
262:13

**match**
34:14 51:13
101:12 105:1,
2 106:24
118:22,23

135:17
143:15,17
147:1,4
157:5,8
161:23 167:18
169:20,21,25
170:3 173:2
177:5 183:13
185:8 186:18
187:14 189:3
194:8,11
196:4,5,6,17
201:9 203:5
205:17 215:16
228:5 245:19,
20 250:22,23
255:16 256:6,
19,24

**matches**
169:8,9,20
170:6,10,14,
15 195:19
204:14 206:13
253:17

**mate**
186:10

**Matt**
182:13,16
183:6 191:1,
7,24 192:5,9,
14

**matter**
6:18,23 16:8
20:12,13,21
25:19 33:24
55:12 69:9
73:23 74:19
102:13 114:5
115:21 130:12
138:14 165:19
208:17 231:12

263:10 265:1,
2,3 271:21
279:11

**MATTHEW**
183:1

max
45:4

Meadow
16:21 114:22,
25 115:1
127:16 128:13
160:3 168:23
169:3 177:5
179:14 184:21
204:15 205:1,
9,12,13,19,20
206:1,11
208:19 209:6,
10,12,19,20,
25 210:3
211:5 212:10
213:25 224:14
229:22 244:7
251:13

meaning
119:7 194:18
254:5

meaningful
35:20

means
74:4 188:13

meant
59:11 96:5
277:17

meantime
155:25

mechanism
19:24

media

170:10 264:19
272:3

mediator
177:24

meet
139:2 140:14,
15 151:10
174:24 175:4
176:7 182:6
258:1

meeting
141:13 142:10
155:23 225:23

member
7:1 69:21
128:10
161:15,16
205:14
209:10,22
211:6 212:1
229:9 239:23

members
20:25 21:2
34:5 42:25
107:11 154:7
159:16 204:23
205:6

membership
211:17

memberships
21:8

memory
96:9 111:14
250:25 273:6

men
36:3

mental
112:13 248:22

mentality

190:10

mention
48:2 129:9
149:25 236:14

mentioned
6:20 7:4,11
11:5 16:6
21:17 27:1,15
45:10 47:12
49:20 51:4
64:8 96:4
103:25 105:18
127:14 149:23
179:23 228:3
235:17 243:11
274:11 277:4

mentioning
129:11

mentor
20:15

mere
264:19

merits
17:11

Meschelle
202:6

Messenger
181:23

messes
123:12

met
139:5,10
176:10 244:3

method
20:2

MF
64:19 82:22

mid-field
233:4

mid-stair
259:1

middle
21:22 32:24
64:5,17,21
110:23 196:25

Middleburg
150:13 205:17
209:13 229:10
288:4

mild
169:7

military
204:2

mind
14:7 23:14
54:11 85:23
90:6 93:13
108:1 148:3
184:18 189:17
218:11 246:3
248:11 255:3
263:25 270:24
275:22 276:11
278:17

mind-set
189:15

mindful
57:13 290:15

minds
65:18

mine
40:21 168:9
211:9 237:21

minor
26:19 69:23
239:21 277:5

minorities
85:10

minute
39:10,11
45:15 49:12
90:13 246:8
284:14

minutes
49:10 99:8
101:18,22
102:9 103:11
167:23 168:3,
9 212:8,10
260:25 273:9
288:5

misheard
37:8 272:10

misinterpret
279:5

misrepresentati
on
262:20

missed
270:13

misses
104:13 161:18

mistake
60:8 282:12

mistaking
75:8

misunderstandin
g
264:7

misunderstood
272:11

mix
21:4,7

mixed
21:5

moderate
276:10

Mohammed
80:2,9

mom
45:24 48:7,16
51:19 52:15
53:7 62:2
67:12 139:24
147:11 153:12
158:12 163:7
164:3,5,21
165:1 258:25
259:2 282:25
286:2

moment
8:5 18:13
34:2 68:12
71:10 72:1
77:15,19 78:6
117:18 130:4
167:19 175:20
183:15 224:25
259:20
270:23,25
271:16 275:19

moments
186:3

Moms
145:22

money
222:14 238:7,
12,17,18
242:17 252:15

month
111:12 148:21
222:15

months
122:1 204:12
223:11
238:18,20,22
247:11

mood
125:1 281:11

morning
10:23,24
19:13 43:17,
18 62:23

Morven
224:22

mother
7:16 14:6
20:9,18
21:17,21 22:7
27:12 29:5,22
32:25 38:7,12
39:16,17
40:23 47:11
48:4,12 49:22
62:7 63:5
72:19 100:9
111:22 127:19
138:18,20
139:16 146:9
152:19 183:12
202:19 263:23
272:25 274:14
277:23,24
278:14
279:21,25
281:7,14,16
283:2,9,12
287:7

mother-in-law
82:10 87:11

motherfucker
23:23 46:17,
20,24 47:7
59:5 98:25
99:19 101:6,
10 105:23
108:16 134:5
137:8,19

260:19 271:9

motherfucking
15:25 23:12
24:1,14 25:15
35:4 47:4
52:2 74:23
99:5 120:11
183:17 194:21
249:13 258:14
262:23 275:15
284:11

mothers
277:25

mouth
61:14,17,18
68:13 70:11
100:4 104:10
109:17 258:14
271:21 272:22

mouth-breather
61:12

move
13:14 42:3
74:19 82:16
85:21 116:25
118:2 122:12
126:10,16
127:10 130:19
164:19 165:5
221:9 239:9
268:7

moved
78:18 103:12
128:18 169:2
239:9 247:1

moving
109:17 206:17

MRI
247:8

Mulford
  237:4,5,12
  241:12 242:9,
  11,14,18,21,
  23 243:1,4,
  10,15,19,22,
  25 244:3,17,
  20,22,25
multiple
  77:13,20,21,
  24,25 89:4
  107:3 169:20
  170:8 172:8
  189:4,20
muscles
  180:2
music
  32:9 45:25
mute
  108:6
mutual
  9:5

————————————
            N
————————————

nagging
  246:21
named
  150:9
names
  144:19 150:10
  251:19
narrow
  241:18
natural
  270:12
nature
  9:5
nearside

207:20
necessarily
  171:22 188:10
  199:24 269:16
neck
  46:11 105:25
  118:2,4
  233:19 247:2
  291:15
needed
  12:21 90:4
  102:16 105:8
  155:22 239:9
  276:12 281:1
negative
  145:14
  173:13,14
  188:8,16,17
  240:4 244:10,
  13
negatively
  186:1
newer
  234:7
news
  121:9
Newton
  97:1,8
nice
  81:10 125:25
  126:24 127:2
  140:14,15
  150:7 174:24
  175:4 182:6
  188:9 192:9
  203:24 205:18
  214:20 222:6
  238:21 291:18
nigger

15:25 23:12
24:2,15 25:1,
15 35:4 38:20
40:18 47:4
52:2 67:13
74:23 99:5
100:2 120:11
137:9 183:17
194:21 249:13
258:14 262:24
271:21 275:15
284:11
nigger'
  36:24
night
  21:13 80:20
  97:14 102:4,5
  104:13,14
  106:21 115:16
  117:9 119:4,
  25 139:22
  143:8,16
  157:5 167:18
  185:8 191:15,
  20 194:7,11
  196:3,14,23
  197:4,6,17
  203:4 204:16
  208:23
  215:15,24
  226:6,7
  229:24 245:19
  262:5
nights
  21:5 97:13
  127:24 206:13
  229:23
noise
  55:17 66:13
non-member
  211:19

non-uspa
  226:9,10
Noonan
  193:16,18
  194:1 200:16,
  19 201:2,14,
  18,22,25
  251:23
Noonan's
  251:7
normal
  54:7 106:24
  135:9 269:2
nose
  61:15
notable
  178:13
note
  57:15 112:13
  226:8
noted
  58:19 85:19
notes
  28:18 85:25
  86:1
nother
  219:17 225:6
notice
  6:21,23 7:4
  15:15,16
  278:6
noticed
  287:5
notified
  280:9
noting
  57:22
notwithstanding

288:11

November
179:5

number
7:23 192:25
193:4 254:13
272:6

numbers
197:2

numerous
177:8

─────────────
        O

oath
71:10,24
239:13

obey
212:18

objection
17:9 111:24

objectively
255:1

obligated
190:13

obligations
205:25 211:4

observation
173:3 254:13

observational
189:25

observe
30:11 63:14
78:6 113:14,
22 137:22
174:6

observed
31:6,21 63:11
68:1 100:5

171:25 178:12
283:21,25

observer
81:23

observing
45:14

obtuse
253:12

occasion
46:16,17,19
47:2,5,7,11
65:13 97:21
206:7

occasions
50:3 189:20

occupational
187:1 249:24

occurred
39:12 45:19
60:19 83:6
85:3,6 87:8
88:12 89:5
95:9 100:8,25
130:7 191:19
208:23 242:5
243:8 268:18
279:20 284:6

offended
33:24 57:7,12

offensive
30:17 61:21

offered
69:25 169:1
192:20 277:10

offering
176:19

officers
8:4 11:22
14:25 17:8

61:3 70:21
138:10 167:25
174:21 180:9
181:14 191:25
200:17 210:12
233:23 267:5

official
21:6 90:3
229:14

officially
149:16

oftentimes
214:4

older
159:16 196:18
198:5 222:23
223:21 228:9

open
61:17

opened
68:13

opening
7:21

openings
7:19

operated
205:20

operation
218:18,21
219:3 223:1
224:5 227:20

opine
17:20,25

opining
90:21

opinion
87:21,22,23
135:8 264:20
285:1

opinions
18:8

opportunity
14:22,23 15:1

opposed
57:11 188:23
252:20 260:18
271:15 272:13
285:23

opposing
44:20 91:24

opposite
177:22 232:7

option
9:19 212:3

order
131:8

ordinary
135:10

Ouch
31:14,16 32:4

outburst
59:8

outraged
258:15

outrageous
259:18 260:8

outright
26:3 35:16

overdose
242:2 243:13

overdoses
219:8

overhear
137:23

overheard
68:1 145:25

**overlook**
221:8

**overlooked**
116:2 228:1

**overly**
188:25 198:11

**overseas**
277:10,16

**owe**
260:6

**owed**
238:24

**owned**
71:6 205:20

**ownership**
170:18 213:18

**owns**
259:25

---

**P**

**p.m.**
94:7,8
175:11,12
208:23 237:1,
2

**pace**
102:22

**paid**
148:22 149:6,
17,18,20
206:8

**pain**
31:9 38:11
40:20 45:14
47:18 106:8
133:18 135:2
177:7 186:23
228:24 246:7,

21 247:14
248:11,20,23
261:11,14,15,
18,22 269:22,
23,25 270:6,
11,16,22
271:10

**painful**
105:15

**papers**
138:14,16
139:19,25

**paraphrase**
95:5

**paraphrasing**
276:19 282:13

**parcel**
64:14

**pardon**
85:20 152:9

**parent**
147:18

**parents**
6:12 8:13
25:24 34:18
52:14 57:25
99:12 115:14
116:13,16,19
117:8,11
136:2 138:1
142:25
145:18,20
165:24 195:9
206:25 219:2
258:25 259:18
263:14 273:20
274:23 275:23
280:3,8
284:10 285:18

**part**
7:5 11:3
13:12 16:24
21:20 28:3
64:14 109:8,9
149:3 162:24
189:2,25
203:10 205:14
210:3,6,8
211:25 232:5
234:8 249:7
268:14 273:24
285:3

**partakes**
185:20

**participant**
100:20

**participate**
100:7 115:13
137:23 165:22

**participating**
6:6

**particulars**
240:23 268:12

**parties**
6:12 9:2
77:25 122:13
193:7

**partner**
221:22

**party**
283:12

**pass**
239:14 240:13

**passion**
227:11 264:12

**passionate**
227:16

**passionately**
265:2 272:17

**past**
104:9 115:4
130:11 193:7
195:22 199:21
221:9 228:2,
15 241:23
267:24 268:6,
18

**Patel**
247:11

**patently**
178:4

**paths**
244:9

**patient**
62:8

**patted**
26:12 27:20,
21

**pattern**
121:11 207:8,
9

**patting**
28:2 41:20,22
42:1 49:2

**pause**
59:18 140:4
156:2,4
163:23 164:14
168:17 279:6
288:17

**pay**
21:8 121:23,
24 125:9
149:10 169:4
170:24
238:15,23

285:22

pay-to-play-
type
149:9

paying
31:4 236:4
239:5 287:5,
13

payments
170:25

peer
187:18

peers
262:9

pelham
99:23 105:12,
14

penalties
89:6 201:3,12
239:6

penalty
53:15 201:4,
8,10 219:22

people
6:5 31:1
33:22 35:7
36:3 49:21
76:2 78:10
85:14 86:7
107:4 121:12
126:12,24
127:3 148:24
155:4 161:9
169:5,23
170:9 177:24
184:22,23
185:1,3
190:14,16
202:25 203:17
204:7,22,24

207:18 218:6
219:19 220:1,
25 221:23,25
222:22 223:15
224:2,17,20
225:11,14
231:19 249:25
251:9,19
252:18 254:8
261:2 263:6
264:19 265:3,
6,19 279:3,5
283:5,21
287:11

people's
220:15 276:25

peppermints
161:8

perceived
186:13

perceives
186:12

percent
10:9 159:15
216:23 217:25
231:16 278:17

perception
259:25

perfectly
138:12 291:20

period
39:9 259:6

periphery
30:6,24
34:16,20

permanently
248:6

permitted
111:23

person
35:6 38:14
64:18,19
74:12 119:11
120:1 125:22
126:1 134:18
139:19
176:15,17
182:13
184:14,16,20
185:7 186:9,
11,14 198:15
217:3 218:15
221:18 226:21
227:9 232:15
243:12 263:7
264:25 265:20
274:18 287:5

personal
181:3 191:19
200:10 250:4

personality
162:7 176:15

personally
24:13 32:2
88:7 165:14
172:6 184:19
185:18 187:22
190:25 195:24
224:16 225:4

perspective
268:21 290:20

pertinent
33:16

Phil
209:5

phone
115:16,18
121:6 125:23
288:13

phonetic
222:22 224:24
225:20 257:24

photographs
95:22

photos
93:16 170:9,
14

phrase
25:15 99:16
187:1 271:1,
5,6,7 272:18,
20

physical
119:6 157:22
159:19 161:3
177:19,21
183:9 187:5
188:10 189:7,
8 197:20
203:21 256:8

physicality
189:2

physically
83:21 119:7
172:20 186:18
187:11,12
247:18 269:12
286:10,16

physicalness
177:20

pick
82:24 169:12,
16 238:11

picked
147:3 152:22

picture
227:5

pictures

23:21 93:3
123:8 222:24
223:14
254:20,22,23,
24 255:1

**piece**
80:23 206:19
239:10

**pissed**
39:24

**place**
15:17 19:17
20:12 30:21
31:21 33:5
37:24 128:15,
151:16 209:1,
2

**places**
143:3

**Plains**
15:19 19:18
44:14 63:8
80:13 97:16
113:11 180:17
208:24 209:3,
19 241:21

**planet**
35:20

**play**
21:8 35:7
61:13,18 64:9
66:24 73:11,
12 87:4 90:7
91:20 92:16
99:6 101:13,
17 109:2
110:14,16,23
111:9,14
116:24 118:6
119:25 120:6

123:22,23
124:17
140:20,21
142:18 143:3
145:10 149:10
159:4,5
161:18 171:17
178:9,15,17,
20 179:3,4
180:3 184:7,9
188:9,20
189:8,12,14,
17,21 198:2
201:13 203:2,
22 204:3
206:9,15
212:11 217:4
220:10 222:23
224:21 227:12
231:1 234:14
236:1 244:7
247:5,16
251:2,9,16
252:3,16
253:7,10,20
256:5,10
261:1,4
268:25 273:10
285:16,17
287:12
289:14,20,23
290:11,12,14
291:17

**played**
44:14 45:16
71:5 107:1,2
122:18 123:8
126:6 128:21
134:10 135:5
142:15,16,17
144:23,24
145:1,10

157:10 159:6,
9,10 168:19,
20 169:8,19,
23 170:2,6,
10,14,15
171:3 172:6,
23 178:8
179:6 188:1,
21 195:25
196:7 200:23,
24 202:23,24
206:21 210:22
221:15
223:15,16
235:21,23
236:6,9 244:4
251:12 252:8
253:7,17
257:3 268:5,
9,11

**player**
31:11 50:14
90:17 91:21,
24 94:19
115:8 149:4
165:3 184:14
188:5,14,19
207:3 217:1,
2,7 219:10,
14,21 220:19
227:7 261:3
269:15 284:3

**player's**
200:6

**players**
21:7,10 48:3
50:20 98:8,9
105:14 120:6
122:8 135:9,
17 159:19
178:21 181:19

197:10
205:21,22,23
206:16 207:10
218:3 219:20
220:24 221:2
230:20 252:8
253:9,11,18,
19 255:22,25
256:24 257:4
262:9 271:2

**players'**
110:18 111:2
232:7

**playing**
21:13 31:15
32:9 34:19
48:8 50:12,13
52:17 61:10
87:14 96:6
106:23 115:10
122:8,24
124:11 126:16
128:3 132:21,
23,25 133:7
134:11,19
135:12 142:22
147:7 148:12
157:10 160:1
168:21 176:11
177:20 178:8,
12,14,22
179:13 180:1
184:1 186:16
187:5 196:9,
15 197:6,19,
25 220:24
222:21,25
224:13 240:2
244:4,5
251:1,6,20
252:18 253:13

254:1 257:18
268:10 269:9
281:22

**plays**
106:8 115:5
119:12
124:11,12
134:14,15
142:15 157:18
188:20 189:11
218:3 220:3
223:8 269:6
280:23

**pleasant**
106:9 198:23

**pleasantly**
256:22

**pleased**
256:23

**pleasure**
18:23 151:10
210:16

**point**
7:14 11:19
12:1 17:15
18:21 30:16
31:20 47:25
54:20 66:20
67:1,19
68:19,22
80:18 84:4
94:21 96:3
100:12 103:9
109:18 137:10
155:21 185:22
196:21 209:24
231:23
247:15,23
248:19 256:11
259:3 266:19

272:23 274:7
275:9 277:9
278:22 281:5
285:13

**point-blank**
26:2 281:10

**pointed**
273:9

**pointers**
134:17

**points**
22:24 192:25

**pole**
175:3

**policies**
211:21

**policy**
7:6 16:10

**polite**
198:18

**politically**
179:19

**politics**
217:16

**polo**
15:18,20,21
16:20 19:18,
22 20:16,23
21:4 31:11
35:7 44:14,23
50:12 52:17
61:13 63:8
64:9 71:5
80:13 87:14
91:20,21
97:11,15,16,
19 98:19
102:4,6,20
104:2,3,5

105:14 106:8
107:21 108:2
113:11,14,15,
20 115:1,9
116:2,8,11,24
117:2 118:6
119:11 121:16
124:19
126:12,16
128:1,9,13,22
129:2 132:17,
21,23 133:4
135:12
142:12,13,16
143:3 145:10,
20 148:12,24
149:4 150:12
153:10
159:13,19
160:24,25
165:15
168:20,21,24
169:8 172:23,
24 173:2
174:8 176:11,
20 177:16,20
178:8 179:13
180:17
181:19,22,23
184:1,8,14
188:9,20,23
189:14 191:13
195:3 196:6,
9,22 197:7,19
198:2,19
199:2 200:2
203:22 204:6,
7,15,25
205:1,9,11,
12,13,15,16,
17,19,21,23
206:1,2,10,20

207:1,11,17,
23,24 208:1,
15,19,24
209:1,2,6,7,
9,10,12,17,
18,19,20,25
210:3,4,5,8,
23 211:2,4,5
212:20 213:25
214:1,9
215:24 217:13
219:14 220:3
222:1 224:13,
18 225:18
227:7 229:8,
12,20,21,22
234:2,12,17
237:21 240:2
241:20 244:4
245:22 247:16
248:16 249:23
253:1,13
255:24,25
257:18 267:18
270:19 276:23
280:23
289:12,13
291:18

**pony**
222:21

**ponying**
158:24

**portends**
8:23

**portion**
12:13

**position**
9:16,20 10:16
12:11 13:16
27:8 106:3
109:3 110:12

111:25
210:21,25
270:19

**positive**
148:9 188:7
192:7 221:6

**possibility**
9:1 290:1,3

**possibly**
17:20 120:1
188:3 283:22

**post-match**
187:22

**posted**
277:10

**potential**
188:18 226:4

**potentially**
57:10 257:8
264:17 272:3
286:8

**Potter**
182:14,15,18,
19 183:1
191:4 192:3,
8,11

**pounds**
119:9

**practice**
147:4,8
152:23 158:11
209:16

**practicing**
147:6

**prefer**
12:17

**preferred**
131:7

**prejudicial**
177:14 217:10

**premeditated**
266:15

**premises**
115:1

**prepared**
93:15 269:4

**presence**
27:12

**present**
8:1,19 13:25
14:9 15:7
63:7 80:12,14
83:7 113:10
127:18
143:10,11,12,
13 151:14
180:16 191:13
208:14 215:15
230:5 278:10

**presentation**
103:13

**presentations**
16:16

**presented**
11:18 16:9

**pressed**
153:5

**pressured**
147:18

**presume**
230:1 275:10

**presumed**
65:24

**pretty**
16:19 53:25
54:11 102:6
107:20 108:24

110:16 132:19
133:17 140:20
148:7 162:2
185:19 195:16
196:23 206:17
233:6 234:4
240:5 244:17
291:13

**prevalent**
23:16

**previous**
245:24

**price**
242:13 277:14

**prices**
222:12,14

**pride**
218:6

**primarily**
142:24 145:21
149:22

**primary**
88:11

**prior**
17:21,23 50:6
93:24 164:9
236:2

**private**
244:6

**Privilege**
115:20

**pro**
22:12 39:20
48:7 231:16

**probability**
92:9

**problem**
24:12 104:21
108:14 122:6

159:25 182:18
215:14 235:14

**problematic**
159:22

**procedure**
78:15 212:19

**procedures**
7:6 16:10
211:21

**proceed**
7:24 9:23
57:14 78:17

**proceeding**
6:11

**proceedings**
6:1,7,19,25
11:3 12:12
14:3 18:22
288:17

**proceeds**
159:15 269:19

**process**
11:8 32:25
262:14

**profanity**
64:8

**profession**
195:22

**professional**
84:6 85:15
87:22 198:16,
17 199:7
207:1 249:16,
19 250:3,14
253:19 262:10
279:3

**professionally**
250:19

program
  20:17 159:3,
  13,17,21
  189:5 203:12
  207:13 219:4,
  6 221:17
  222:22 223:5,
  13,22
programs
  222:25
projects
  85:13
promised
  169:6
promoter
  205:23,24
pronounced
  207:25
pronouncing
  63:3
propensity
  221:4
proper
  217:17 218:12
  278:8
properly
  73:3 146:17
property
  158:25 239:10
pros
  224:24
prosecuting
  14:18
protect
  190:13,16
  269:8
protecting-
your-own

190:10
protégé
  198:1
provide
  153:19
  199:20,24
proximity
  271:19
public
  239:25 264:20
pull
  92:3,6 93:8
  220:16 239:19
pulled
  105:8 291:15
pulling
  92:23
pure
  204:25 260:19
  262:24 265:16
  271:23
purport
  94:11
purpose
  46:10 214:6
purposely
  86:9 219:18
purposes
  20:1
pursuant
  7:4 230:2
push
  49:7 58:10
  90:7,8 91:24
  95:6,7 172:20
  254:10 286:9,
  11
pushed

17:5 26:10
27:22 41:23
77:22 92:11
95:11 183:19
195:9 259:17,
22
pushing
  16:3 68:17
  77:11 162:5
  187:13 216:15
  253:14 259:19
  265:23 283:22
put
  6:9 8:6,16
  28:24 46:11
  48:14 57:21
  79:14,16
  111:14 117:4
  154:21 155:13
  164:7 172:17
  186:20 188:15
  192:17 213:22
  222:1 224:4
  255:20,21
  262:13 263:25
  267:12 268:1
putting
  136:9 146:13
  289:9

_____

Q

_____

qualified
  178:14
question
  8:7,23,25 9:8
  10:10,25 12:8
  13:11,25 14:2
  17:25 24:9,11
  54:1 57:20
  58:4,23 59:20

61:20 69:19,
24 76:22
79:12 88:13
89:2 91:3,16
93:24 107:14,
16,17 110:11
111:22 129:6
130:4 136:14
143:24 144:8
151:14 152:1
181:25 182:3
192:16 194:7
200:21
208:15,25
209:1 211:14
213:4,8,10
214:12 228:3
235:16 236:12
248:11 251:14
268:3 276:4
280:15 286:5,
22 287:10
288:20 291:3
questioned
  11:6,21 27:1
  71:9
questioning
  10:2,7,14
  11:2,11,23
  34:3 50:24
  54:24 56:4
  60:3 70:2
  89:1 94:2
questions
  10:5 14:9,21
  15:2 18:6,7
  25:8 34:1,6
  38:25 42:24
  43:1,3,10,12
  44:12,13
  50:22 56:10

57:20,25
58:3,5 59:2
60:5 61:4,6
72:8,13
76:19,21
78:20,21,22
79:17 81:17
84:12,20
95:14,15
96:2,13
104:18,20
107:7,12
108:13 110:6
118:12,14
125:11,15
129:4,21
136:22 137:3
138:5,8
140:4,9 141:6
150:25 151:7,
12 154:6,9,
11,12 165:8,
12 166:2,9,
13,14 168:1,8
173:22,25
174:19,22
175:3 181:8,
14 182:7
191:2,10,22
192:1 199:12
200:15
201:16,20
208:7,13
210:11,13,20
212:13 213:2
229:1,8
232:17,19,21
235:12
241:10,11
242:5,8
244:19,20,23
267:3,5

280:11,13
286:21
290:21,23
291:5,7
quick
107:17 130:3
193:13
quickly
30:8 53:25
54:5 63:21
93:2 103:12
120:8 168:15
203:17 206:17
272:25 277:4
278:6
quiet
55:14 68:11
152:24
quieter
66:17
quietly
109:13
Quincy
21:12 268:9,
10 269:9,12
QUINN
175:16 176:1
180:11 181:9,
12,17,21
182:2,8,11
quote
15:24 120:11
183:16 194:21
197:13 249:12
263:2 283:19
284:10
quote/unquote
179:22
quoted

75:9
quoting
92:1

R

R-A-H-M-A-N
63:2
race
104:11
121:14,17
217:9
racial
15:23 17:3
52:1 68:25
100:4 101:5
104:10 109:5
119:17 123:17
127:7 143:25
144:21 152:4,
6 172:11,16
174:15 177:11
185:11,16
194:20 215:23
217:2,14
250:10,11
264:15
raciest
177:13
racist
121:2 146:12
147:12 149:24
152:20
153:12,20
154:5 172:12
177:15 227:9
Rahman
10:25 62:18,
25 63:3 76:22
77:4,6,10

78:2,4 107:13
112:8,12,15
rail
32:17
rained
214:7.
raise
12:7 19:2
43:22 62:13
79:21 96:19
112:22 131:18
141:22 156:10
167:3 175:21
182:20 193:19
202:8 215:1
237:7 245:7
285:6
ran
22:23 32:20,
22 33:8 45:5
51:15 89:14
98:11,24
111:5 117:24,
25 119:22
123:22 229:18
range
109:10
ranges
185:2
rarely
86:5
reach
16:11 33:2
reached
51:12 180:2
react
47:20
reacting
31:23 108:17

reaction
  32:12,13
  52:19 54:13
  98:24 99:2,20
  101:7 105:16,
  21 162:22
  187:9 228:14,
  17,23
reactions
  50:18
read
  23:1 90:6
  103:4 118:10,
  11 122:2
  138:13 139:20
  283:15
reader
  211:9
reading
  85:22 208:20
  211:24
readout
  247:8,25
ready
  13:3 81:2
  115:23 156:5,
  7 175:18
  178:20 193:17
  290:9
reaffirm
  263:6
real
  38:16 211:9
  277:4
realization
  246:5 271:11
realize
  111:13 246:11
  261:15

realized
  261:12
reason
  6:13 12:25
  17:15 33:2
  47:16 180:24
  207:21 246:9
  275:7 285:20
reasons
  17:18 142:23
recall
  11:5 21:10
  29:10 86:25
  89:23 117:12
  157:16,19
  198:4 201:11
  242:24 245:19
  250:22 273:6,
  8 279:7
receive
  13:3 95:22
received
  89:19,22
recent
  143:4
recently
  54:8 203:25
recess
  94:7 175:11
  237:1
reckless
  87:23 189:7,
  11
recklessly
  92:16
Recklessness
  189:8
recognize
  10:15 282:22

recognized
  266:12
recognizes
  257:8
recognizing
  246:12
recollection
  21:15 112:18
  116:18
  194:11,15
  246:4 271:4
  273:23 291:21
record
  19:14 24:9
  43:22 44:9
  55:22 57:22
  62:24 67:4
  80:8 87:3
  89:1 95:1
  97:7 112:9
  113:8 130:22
  131:18 141:22
  156:10 182:20
  193:19 202:7
  215:1 237:6
  245:7 247:10
recreating
  270:24
red
  77:18
redirect
  15:10 232:21
  233:1 280:14,
  16 284:14
redneck
  126:2
reduced
  20:8
Reese

159:18
refer
  19:25
reference
  23:4
referenced
  49:21 95:23
referred
  86:2
referring
  71:3,4 98:9
  144:18
Refresh
  271:4
refused
  171:1 265:13
regard
  252:18
register
  31:13 246:10
regularity
  36:2
regularly
  36:4 176:12
regulations
  201:6
reimburse
  170:25
reins
  46:12 92:23
  291:15
reiterate
  93:23 119:15
related
  181:4
relation
  133:22 142:12
  289:20

relationship
  10:17 126:22
  181:18
relative
  67:25 196:7
relayed
  273:6
relevance
  55:3 58:5
  130:12
relevant
  56:4 57:22
  58:10 130:16
religion
  35:19
relive
  248:8
remainder
  102:10,12,13
  271:20
remained
  260:25
remaining
  193:1
remarkable
  186:5
remarks
  81:20
remember
  31:19 41:25
  53:20 77:5
  81:8 92:18
  108:22 111:11
  114:21 117:13
  121:22 126:7,
  8,18,19,20
  129:11 144:21
  154:1 158:4
  242:20 244:12

248:17 250:24
  266:2 268:12,
  13
remembered
  267:25 268:19
remind
  268:4
rent
  119:2,3
  226:10
  229:23,25
rental
  230:1
rented
  229:21
rents
  213:8
repays
  222:5
repeat
  65:12 162:17
  271:7 275:6
repeatedly
  221:10,23
  251:13 255:18
repeating
  163:24
repercussions
  36:21
repetition
  255:19
repetitious
  267:7
rephrase
  91:3
report
  19:16,21

reporter
  10:19 14:4
  18:25 24:11
  43:19 62:10
  79:19 131:15
  202:6 271:8
represent
  151:8
represented
  240:19,20
reprimand
  102:16
reputation
  240:4 242:3
request
  274:3 278:10
requested
  8:18 274:22
  284:21
requesting
  277:19
require
  214:8
required
  212:6 247:10
  248:1 250:14
residual
  266:23
resolution
  57:2,11
resolve
  20:10 21:18
  25:18 170:22
resolved
  276:25
  279:11,18
  283:14
resources

252:15
respect
  116:6 174:15
  284:17
respected
  121:15
respectful
  91:12
respective
  9:2
respects
  120:24
respond
  29:7 86:18
  278:22,25
respondent
  7:15,20 9:1
  10:1 11:21
respondent's
  12:11 13:17
response
  28:20 73:21,
  22 74:11
  147:9 162:17
  271:22 274:8
  279:7,9,21,22
responsibility
  20:14 88:19
responsible
  290:10
rest
  10:13 13:13
  137:10 193:13
  255:5 256:6
  257:4,25
  258:1,2
  260:23 263:25
result
  95:13 98:21

151:19 177:9
224:14 269:20
270:2,6,11

**resulting**
101:8

**retaliation**
92:20 187:7

**returned**
66:22

**returns**
67:8

**revenge**
225:4

**review**
82:11 92:4

**ridden**
123:4

**ride**
53:24 87:24,
25 94:17
122:22 159:3
169:5 170:4
171:14 217:5
247:16,17
257:7

**ride-off**
255:9

**ride-offs**
207:21

**Ride-to-work**
159:23

**rider**
87:24 157:23

**riders**
92:14 220:22

**rides**
119:12 169:7
221:1 257:9

**ridiculous**
277:15

**riding**
53:18 87:13
88:14 91:10,
11 98:16
101:15 105:5
106:21,22
118:5 153:18
157:17,24
196:8 201:13
219:20 226:15
245:23 247:18
248:16 253:13
254:4,9
266:16 269:1

**right-of-way**
206:16 207:19

**ringing**
288:13

**rip**
220:16

**risk**
88:6 105:7

**road**
158:23,25
205:19 209:14

**robin**
97:24 107:18,
21 226:8,11
235:18 236:17

**rode**
57:24 103:15
169:10 223:3,
4 246:13
249:6 256:23
257:5,17,20
266:6,9,18,23
282:7,8

**roll**
193:14 269:5

**rolls**
263:13

**rooftops**
35:13

**room**
6:10 8:6,16
9:10 155:21

**rose**
246:25

**Ross**
214:25 215:7
225:7,14
229:2 233:25
234:3,6,15,
18,24 235:10,
14,22 236:3,
19

**rough**
198:11 200:23

**roughness**
289:10

**round**
97:24 107:18,
20 226:7,11
235:17 236:16

**route**
179:21

**Ruckersville**
244:6

**rude**
130:14

**ruin**
83:13 227:17

**ruined**
262:3

**rule**

13:19,24
94:14 208:4
212:14,18
234:10 235:9
254:9

**rules**
9:24 17:23
20:16 60:7
89:13 94:12
124:12 128:24
201:5 206:9
207:11,12,14,
15,16,19,22
208:3 211:17
212:4,7,15,
18,25 213:10
214:7 234:5,
12,25 255:9
284:25 290:17

**rules-related**
212:24

**run**
15:11 21:25
31:11,12
85:12,13 96:9
111:5 119:21
124:18,22
127:8 140:25
149:20 203:12
209:7 213:11,
19 219:4
224:10,24,25
229:19 232:7

**running**
20:20 47:17
51:24 54:16
115:16 117:25
127:25 128:1,
4 222:1
291:25

runs
219:5

_____

S

_____

saddle
31:15 246:25

safe
20:15

sale
242:12

Sam
205:18 209:14

sanction
240:12

sanctioning
250:18

sat
73:3 258:24

satisfied
29:5 127:11

Saturday
15:18 21:5
97:12 104:13,
14 119:3
127:24 177:5
204:16 206:13
229:23,25

scale
247:22

scary
119:10 121:10
126:3

scene
197:6

schedule
158:18

scheduling
108:1

scholastic
170:6

school
164:8,24

school-age
164:5

scope
241:18 284:15

Scott
237:22 238:3,
9,14,21 239:8

scream
99:2

screamed
186:23

screaming
219:24 220:1
221:1

screws
161:18

season
163:10

secondhand
154:23

seconds
39:10 49:10
106:6 118:3
261:17

Section
7:6

seldom
104:13

self-assessment
246:18

sell
243:7 277:11

selling
238:2

send
32:15 93:2,4
222:3,4 247:9

sense
14:17 277:13

sensitive
172:15

sentence
208:20

September
229:24

sequestered
155:6

sequestration
13:18 278:9

seriousness
185:17

service
163:22

servitude
37:2

set
15:14 230:22

setting
81:2,5 174:5

settled
16:5 26:8,9
27:16,23 28:9
33:4 38:21
40:9 41:23,24
49:7 68:9,18
76:7 77:2,11,
14,19 84:4,5

settlement
9:4,19 12:7

seventies
228:10

severe

245:23 247:20

severity
246:1 247:9

sex
239:17

sexist
217:14

shake
118:7 119:23
123:20 197:22
257:11 282:6

shakes
257:11

shaking
103:16 135:16
257:19

shame
207:24

shamed
275:17

shameless
239:4

shanks
99:23 105:12

shape
169:6

share
33:18 70:20
100:24 143:14
158:6 226:3
247:7 267:4
274:7

sharing
163:5

sharp
63:20 110:16

sharply
290:1

she'll
    148:8 238:18

she-said
    55:10

shipped
    122:7

shirt
    159:14

shit
    85:21 196:5
    220:23 228:21
    252:1

shock
    22:7 23:3
    26:16 29:12
    37:7 42:9
    55:6,11
    68:20,21
    162:24 246:4
    248:22 261:22
    270:22

shocked
    11:15 42:9
    83:16 114:17
    117:16 125:5
    127:17 144:5
    162:13,18
    185:12,19
    195:16

shook
    81:14 256:24
    257:3 266:7,
    9,20,25
    279:23

shoot
    14:1

short
    73:8 90:6
    117:11

shortly
    137:6 171:14
    272:23

shot
    53:15 186:20

shoulder
    16:3 26:11
    27:20,21,22,
    24 41:21,23
    45:6 49:3
    51:16 63:23,
    24 68:17
    77:22 121:1
    246:22
    253:13,14
    254:10,15,17,
    19 255:9,10,
    11 259:12
    260:2 266:1
    279:17

shoulders
    136:1

shout
    35:13

shouting
    66:15

shove
    84:3

show
    61:13 68:15
    77:7 220:23
    249:3 250:25
    258:24 285:5
    286:9,10

showed
    76:4 170:9,15
    287:6

showing
    77:17 78:9
    119:8

shown
    83:20

shows
    141:2 254:12
    256:9

shrivel
    61:22

shrugged
    54:21 57:21
    136:1

shut
    13:6

sic
    132:17 159:23

Siddiqui
    11:10,25
    12:16 43:18
    44:3,10 46:24
    54:23 55:24,
    25 56:1,24
    61:8,16,25
    72:21 80:2,9
    84:14 94:6,9,
    13 95:17
    96:4,8 98:2
    113:21 130:3,
    13,20,25
    258:24

Siddiquis
    254:14 278:7

side
    55:15 88:8
    110:21,22
    197:1,2,9
    232:6,7,9
    246:21
    261:24,25
    285:21 291:12

sideline
    219:24

sides
    28:22 89:22,
    24 102:8

sign
    88:4 205:25

signed
    121:22 238:21

silent
    77:16

silly
    120:3 126:14

silver
    206:19

similar
    37:19 77:1
    122:3 147:24

simple
    16:19 18:10
    44:12 132:7
    260:20 262:25
    265:16 271:23

simplicity
    20:1

simply
    267:7 273:13

sincere
    56:22,23,25
    57:5,6 70:7
    185:6 282:10,
    14

single
    189:9,10
    218:20 262:5

singular
    100:2 245:20
    246:2

sir
    10:23 43:21
    49:19 55:22

57:13 80:7
84:13 95:15
96:15 97:17,
20 98:4 99:6
100:3,21
108:8,11,18
113:7 125:17
128:11 130:24
131:17 141:21
167:2 199:18,
23 200:4,14,
19 208:11
210:19 212:5
245:6 267:18
268:3,4,16,21
269:3,24
270:1 271:6,
17 272:12,17
274:2 275:13
277:8,21
278:15,21,24
279:2,13
280:10,12
286:3 287:21
288:7,25
289:15,17
290:6,15
sit
    55:16 116:17
sit-down
    225:23
sitting
    17:22 230:19
    257:21 291:1
situation
    28:21 55:10
    57:2 62:3
    74:9,10 76:3
    83:19 101:3
    116:22 118:8,
    9 122:17

149:19
158:14,20
162:13 163:6
164:2 219:17
277:25
situations
    120:4 126:11
    163:4
six-minute
    206:14 212:11
six-month
    243:5
skills
    227:15
skinny
    218:23
slapping
    16:3
slavery
    37:1
slightest
    217:13
slightly
    51:16
slow
    102:6,19
    156:3 254:16
slower
    289:13,16,21,
    22
slowly
    135:25
slur
    100:4 104:10
    109:5 127:7
    143:25 144:21
    152:5,6
    177:12 183:8
    185:16 215:23

217:14
slurs
    101:6 172:11
small
    84:2 117:4
smaller
    239:10
smiled
    54:21 57:21
    136:1
smiling
    55:4 135:17
    236:7
smooth
    71:20 258:22
    263:8,11
soaking
    119:9
social
    170:10 264:18
    272:3
society
    264:24
soft
    91:23
sold
    223:18,19
solely
    214:8
son
    55:1,14 57:3,
    19 70:4 76:25
    77:9 83:24
    92:15,23
    94:1,2 96:6
    192:19 203:25
    206:6
son's

70:4 96:10
Sophia
    142:15,18
    143:7,10,12,
    25 144:5,15,
    23,24 145:8
    146:8,9,12,13
    147:10,14,23
    148:4,14
    149:5,15,23
    150:16
    151:21,23
    153:14
Sophia's
    152:18
sorry'
    , 36:19
sorry.'
    42:12
sort
    11:13 13:23
    14:5 15:5,13
    64:16 66:15
    67:1 68:15
    69:2,3,16
    71:18,20
    74:12,17,19
    77:13 78:8,16
    143:1,4 145:2
    147:7 149:7
    153:2 186:15
    190:10 220:14
    231:22 247:1
sorts
    30:2 64:10
    82:20 230:2
sought
    86:9
sound
    15:11 114:7

sounds
10:12 38:16
85:2,4 86:23
100:19 104:6
129:20

source
24:17

sources
25:13

Spagnoli
224:23

span
184:10

spats
148:1

speak
39:7 48:4
57:4 64:21
65:25 69:18
70:22 71:1
86:16,24
87:11 103:7
143:7 185:18,
21,22,23
190:19 208:11
211:5 258:5
260:10 272:25
274:23 276:16
277:1,19,22

speaking
52:7 59:12
72:15,17
86:23 116:18
277:18

speaks
86:15 95:18

specific
46:15 152:20
212:19 230:14

specifically
11:4 23:5
57:8 75:21
145:5 189:5
198:4 201:7

specifics
153:19

spectator
21:4 94:19
217:1

spectators
255:20

spectrum
185:3

speculate
190:21

speculation
190:20

speech
64:12 65:17
70:12

speeches
13:8

speed
105:6 254:10
255:10
289:12,13

spell
63:1

spend
70:3 203:25
204:1

spent
252:14

split
251:3

spoke
11:17 24:20

86:1 114:16
115:11,15,18
117:20 121:6
127:18,21
277:20 280:19

spoken
47:10 116:15
117:8 121:5
273:20

sponsor
205:12

sport
116:4 120:24
160:25 161:14
204:3,7 208:3
220:4 227:16

sporting
84:6

sports
246:17 248:21

sportsman
83:3 257:10
259:14 260:1,
2 265:25
270:10 280:22

sportsmanship
91:12 135:13,
19,22,24
162:2 195:23

sportsmen
255:24
279:14,17

sportswear
159:14

spot
98:14,18
105:9 212:16
235:4

spreadsheets

239:14,18
240:15

spring
123:2 223:7
243:2,3

stage
229:22

stairs
259:1 277:24
283:1

stalls
148:19,25

stand
33:19 61:23
164:18 165:5
230:22

standing
21:23 23:3
26:16 29:22
30:21 33:1
36:13,15
37:23 39:20
69:10 100:13
109:15 230:19
258:3 259:8,9
282:18 285:20
286:1

standpoint
153:20 187:6
190:17

stands
233:8

start
6:17 7:19
8:23 14:4,17
18:22 70:25
77:17 78:8
132:6 148:21
163:24 175:14
245:18

started
110:14 131:14
135:25 143:3
148:20 153:6
158:1 164:9
168:21 209:5
238:16 240:2
244:3,5 254:1
257:17,22

starts
208:22

starving
239:3

state
19:13 44:8
62:23 68:20,
21 80:7 84:8
95:1 97:6
113:7 264:12
287:4

stated
116:20

statement
16:4 24:2
48:25 54:4
89:21 108:19
200:12 214:2
264:14 274:24
276:1 279:6
283:16,17

statements
16:16 28:2
45:18,21 67:5
68:25 81:19
115:12 183:12
232:14 260:15
275:12 276:3
283:15

States
19:22

stating
77:24 265:14

staunch
289:1

stay
12:17 13:2
101:19,20
102:10,14
103:3 106:3
145:19 151:3
163:17,20
232:8 251:16

stayed
145:25 146:3

staying
117:6

STENOGRAPHER
19:2 43:21
62:12 79:21
96:19 112:21
131:17 141:21
156:5,9
163:12 167:2
175:19 182:19
193:18 202:5
214:25 237:5
245:6

step
164:13 250:21

stepped
67:20

stepping
56:24

steps
218:12

stick
60:7 122:21,
25 169:7

stickler

207:14

sticks
23:14 161:13
246:2 268:17

stills
92:22,25

stirrup
196:21 291:16

stirrups
220:2

stood
36:15 40:24

stooped
226:16

stop
163:8 165:7
207:18
212:20,22
266:21

stopped
82:15 171:6
211:24 221:18
222:8 259:1

stops
73:11,12

stories
274:19

story
183:23 226:24
281:10

straight
39:19 51:14
61:24 251:2
276:13

strain
262:13

strange
36:14 284:5

strap
46:10

straw
143:5 146:6

streamline
44:11

stress
106:15

stretched
31:14

strict
218:3

strike
115:24 134:24

string
258:1,3

strong
164:6 165:3
228:11 269:7

struck
101:12 137:14
179:20

stuck
187:10 196:21

student
24:4 160:11
164:23

students
29:19 157:15
158:3 164:5
169:19 276:12

stuff
38:8 40:8
69:14 82:21
117:4 126:14
127:17 136:8
146:2 149:12
153:3,10,18
207:21 211:24

USPA Hearing Committee
August 06, 2021                                                                57

stunned
  258:15
stupid
  239:19
style
  188:11,22,24
  189:17,21
subconsciously
  6:15
submit
  247:10 248:1
submitted
  17:10 72:14
  86:22 89:21,
  25 183:12
  240:11 254:20
  285:2
Subparagraphs
  7:9
sudden
  226:25 248:11
  261:19 270:22
  287:12
sue
  121:24 122:14
  221:19 224:1,
  7
suffers
  246:17
suffices
  90:5
sufficient
  58:6 231:5
suggest
  248:22 258:16
suggested
  248:14 275:4
suggesting

9:6
suing
  171:8,9
  221:18 222:8
  224:9
suit
  240:25
sum
  89:16
summer
  117:6 118:6,
  24 120:5,6
  121:20 160:19
  161:10 179:25
  203:2
summers
  121:21
Sunday
  80:25 206:20
super
  226:11
support
  26:24 222:3
  228:1
supportive
  285:14
suppose
  15:9
supposed
  130:8 149:2
  164:5
supposedly
  143:24
surely
  264:21
surgery
  180:7 247:24
surprise

116:9 121:4
  227:19,24,25
  270:4
surprised
  114:17 120:9,
  12,17 125:5
  144:18 153:23
  162:21 169:15
  170:11
  179:16,18
  187:8,20
  217:23 256:22
  263:17
surprising
  286:3 287:10
surrounding
  218:17
suspensory
  123:1,2
  222:24
  223:10,20
sustain
  247:13
swear
  18:25 19:5
  43:20,22,25
  62:10,15
  79:20,24
  96:22 112:21,
  24 131:15,17,
  21,23 134:25
  141:21,25
  156:10,13
  167:5 175:23
  182:20,23
  193:19,22
  195:18 202:7,
  10 215:1,4
  237:6,9
  245:6,10

249:25
swearing
  92:24
sweet
  161:6
sweetest
  161:9
swing
  86:6
switching
  207:20
sworn
  19:9 44:4
  62:19 80:3
  97:2 113:3
  132:2 142:4
  156:6,8,19
  167:1,9
  175:18 176:2
  183:2 194:2
  202:14 215:8
  237:13 245:14
synopsis
  132:19
system
  114:7

_____
        T
_____

T-BONE
  63:21 90:11
  94:18 120:2
  254:7
T-BONED
  92:13,14
  133:15 177:6
  254:11
T-BONING
  92:12

tacking
128:2

Tafuri
122:6 155:18
166:23,24
167:8 168:10
174:24 175:4,
7 222:7

tag-team
10:7

Taha
54:23 55:24
56:24 57:18
72:21 80:2,9
84:18 93:23
94:6,13 95:17
96:8 130:3,
20,25 282:20

tail
112:11

takes
7:5 73:10
187:6 211:11
228:18 264:25

taking
10:20 13:17
19:17 24:12
136:8 142:11
167:13 174:22
176:6 182:17
215:12 225:18
227:14 235:13

talk
9:17 12:9
14:2 22:15
23:5 25:17
32:24 39:18,
25 48:20 64:5
71:2 80:19
86:10 88:14

92:4 98:5
114:15,18
120:14 126:4
153:4 158:2
159:20 160:6
181:22 189:24
190:1,2,3
194:14 217:16
225:23 255:6
258:7,12,22
261:2 263:14
275:5,10
276:18 277:4
280:18

talked
39:14,16,17
50:3 63:15
129:10 139:5,
9,15,25
189:20,21
192:22 195:10
224:9 226:1
227:2 238:6
251:18,23
281:6

talking
9:9 31:1,2
32:19 34:18
41:10 80:15
81:23 82:9
92:16 100:18
119:22 120:22
126:18 145:23
146:22 151:15
160:6 181:2
185:15 197:8,
9 204:1,2
222:7 224:12
225:24 238:3
248:7,25
250:9,10

253:4 257:22
258:3 261:9
271:1 284:9

talks
217:17

tap
266:1

tapped
259:11 260:2
279:16

targeted
196:13 197:4,
8 269:14

taught
88:17,18
189:14 207:12
257:13

Taylor
8:11 9:13
10:9,13 12:15
14:12 15:12
16:18 17:16,
17 18:2,7,9,
16 34:2,8,10
42:21 57:15
58:13,17
59:20,24 60:9
72:12,22,23
76:18 79:9,
12,18 84:17
90:15,17,19,
23 91:2,4,8
93:6,10,17,
19,22 94:5
95:8,14,18,24
104:23 107:6,
9,15 112:1
118:17 125:10
131:6 139:10
142:7 144:9,

12,14 150:24
151:2 154:14,
22 155:2,14,
19,24 156:22
163:15 166:19
167:12 168:5,
12 173:21
175:9,17
176:5 180:8
182:13,16
183:5 191:1
192:14,16
193:8,12,15
194:5 199:11
202:3,17
208:6 214:17,
23 215:11
225:9,12,16
228:25
232:20,25
233:2,21
237:3,16
241:9 245:1,
4,17 267:2
280:14,17
284:13,17
285:10 286:5,
6,14,15,19

teach
207:15

teaching
148:24 158:19
159:1 198:1

team
20:24,25
21:3,11
44:17,20 48:3
53:14 98:3
133:3 139:21
161:15,16
188:15 226:12

234:22 235:5,
23,25 236:6,
9,13 251:7
268:10

teammate
158:4 257:14

teammates
161:17 227:8

teams
21:4,9 29:19
98:2 159:6
236:11 251:12

tears
68:12,14
280:23,25

teary-eyed
280:20 281:18
284:9

technically
148:18 229:13

teenage
203:11

teenager
242:1

teeth
61:13 254:18

telling
38:4 65:14
151:19 152:19
190:21 197:15
198:8 204:18
219:3 221:24
224:18 278:13

tempers
143:22

ten
82:16 103:11
106:6 115:10
119:5 127:25

168:21 231:2
261:17 282:8

ten-minute
236:23

tend
61:17 145:19

Teresa
8:11 9:13,25
12:14 13:22
14:16 16:15
18:12 21:13
34:6 50:23
72:10 84:15
95:21 104:25
107:8 111:23
131:2 141:16
142:8 156:24
192:16 196:20
253:6

term
56:12 243:5

terms
9:7 48:11
85:9 86:8,20
263:19 289:9

terrible
144:19 150:10

terribly
186:22

testified
19:10 28:18
41:21 44:5
50:2 59:25
62:20 67:6
75:12 80:4
84:10 97:3
113:4 132:3
139:3 142:5
156:20 167:10
176:3 183:3

194:3 202:15
215:9 230:8
233:12 237:14
245:15 288:24
289:11

testifies
12:13

testify
6:10 13:20
36:10 56:17
79:5 91:5
121:25 150:16
155:5 174:23
193:10 287:20

testifying
57:17 58:1

testimony
6:14,16 7:11
15:7 18:23
19:4 43:4,24
61:7 62:6,14
65:7,8 68:24
69:25 79:6,23
80:16 93:24
95:16 96:21
110:7 112:23
128:20 129:5
130:9 131:20
140:6 141:24
154:25 156:12
166:10 167:4
174:3 175:22
182:1,22
192:2,20
193:21
199:19,20
201:17 202:9
212:13 215:3
225:10 229:21
232:11 235:12
237:8 241:19

244:19 245:9
260:14 264:2
271:13 272:6,
24 278:3,16
279:20 290:24

text
60:6

texted
60:9

texts
181:23

thing
14:5 28:14
29:21 40:3,11
42:2,16 66:7
71:16 98:22
99:18 101:6
102:25 103:6
148:10,22
149:9 184:18
186:25
189:16,17
190:5 220:21
244:11 246:17
248:9 251:20
252:17 262:4
263:22 271:25

things
6:12 26:13
28:16 36:11
41:2,4,5
68:10 71:20
72:2,3 76:7
84:9 87:18,19
114:23 132:17
143:5 146:8,
18,22 148:4
149:1,7,9,10
151:13 171:21
173:4,13,17
189:11 193:5

200:20 204:2,
17 210:5
212:23 213:17
218:16,22
220:18 221:6,
21,24 228:1
231:15,18
236:9 249:25
263:9,11
279:4 291:17

**thinking**
116:1,5,23
148:3,6
197:25 228:6
245:21 262:6
268:1

**thinks**
116:3 265:20

**thought**
11:4 12:18
37:5 38:23
55:20 60:2
65:16,19
75:5,12 83:1
88:9 103:22
114:14 115:17
119:21 126:15
127:13 165:2
167:21 197:24
198:11 236:20
248:4 257:1
273:3,25
277:14

**thoughts**
8:20

**threatening**
284:15

**threshold**
186:7

**throw**

94:17

**throw-in**
235:3

**throw-ins**
206:15

**throwing**
153:3 214:2

**thrown**
220:11 241:2

**tight**
45:3

**time**
7:25 11:20
13:8,20 23:24
27:5 33:11
34:25 36:3,
14,15 39:4,9,
13 42:5 43:8
45:18 46:7,8
55:2 61:14,25
64:9,25 70:3,
6 72:9 73:2
74:21,24
80:18 84:8
85:3 97:10
99:13,25
101:14 103:9
106:6 119:25
124:13 128:5
129:24 134:16
137:6 139:7
142:11 145:3,
11 146:20
149:1,15
154:15 158:16
160:1 167:13,
16 168:2,19
170:18 172:7
174:23 176:7,
13 181:7

182:1,17
183:20 187:4
192:2,13
196:22
201:16,21
203:16 204:1,
2 208:11
214:14 215:13
216:19 219:8,
9,14,23
220:11 225:15
226:12 231:24
234:10 235:1,
13,19 236:8
239:8 244:24
247:15,23
248:19,25
249:1,3
254:25 261:9,
10,20 268:22
271:16,17,19
273:22 274:7
275:3 276:1
278:23 280:19
281:18 291:11

**times**
22:19 24:1
31:12 34:12
46:6 49:8
52:18 59:5
77:13,21,24,
25 82:4 86:7
89:4 107:3
123:14 135:6
158:17 169:10
170:8 178:21
183:24 184:7
196:20 198:4,
9 207:18
221:5,6,8
254:14 256:11
263:3 271:7

281:16 282:1
290:7

**tips**
176:19

**today**
6:7,11,18
7:9,23 8:1
9:18 18:24
33:18 40:16,
17 67:6 70:19
116:17 131:2
132:13 137:4
139:3,6 140:1
142:8 150:17
151:9,19
167:14 174:5
176:7 180:15
183:7 194:7
208:12 215:13
253:7 257:13
265:1 284:19

**Tognini's**
209:16

**told**
24:2,25 25:13
35:12 39:3
46:1 48:7,17,
18 49:23
51:19 55:18
67:19,20,24
68:20 72:5
81:9 83:2
86:4,13 99:14
100:15,21
103:3,13,21
104:8 117:16
123:20 125:2,
3 137:7
143:23 144:6
147:10
169:12,15,16,

24 177:10
215:24 222:14
223:1,15,16
224:4,23
234:23
243:16,21
273:1 290:13

**tolerate**
85:15

**Tolito**
225:20,22

**tomorrow**
257:14

**ton**
188:18

**tongue**
61:17 130:9

**top**
27:23 87:6
144:22 211:12

**tore**
180:2

**total**
89:16 204:11
242:13

**totally**
42:20 114:17
134:20 224:22

**totem**
175:2

**touch**
68:21

**touched**
76:25 77:8
105:10

**touching**
28:3

**tournament**

118:24,25
160:2 163:10
164:4,7,24
165:1 244:8

**tournaments**
122:24 123:9

**town**
78:12 122:20

**toxic**
219:6

**track**
92:21 130:5

**tracking**
238:19

**trail**
169:7

**trailer**
41:9 48:15
99:9 100:11
165:20 238:10

**trailers**
128:3

**training**
158:14 250:15

**transaction**
42:8

**transcends**
186:15

**translate**
82:11 87:5

**translated**
90:1 95:5

**translation**
90:4 92:2

**transpired**
67:22

**trash-talking**
224:18

**traumatic**
272:4

**traumatize**
263:18

**treat**
171:16

**treated**
135:9

**trepidation**
252:10 268:5
269:7

**trial**
14:16 15:1

**trips**
114:24

**trophies**
108:3

**trophy**
103:13

**trot**
102:22 136:1

**trouble**
143:2

**trucks**
128:2

**true**
42:20 56:20
96:8 132:18
171:3 187:2
203:18 207:24
213:14

**truncated**
249:5,8

**trust**
57:3 170:20
239:21

**trusted**
170:17 171:23

**trustworthy**
239:25

**truth**
16:12 19:5,6
41:18,19
43:25 44:1
62:15,16
79:24,25
96:22,23
112:24,25
131:21,22,24
141:25 142:1
156:13,14
167:5,6
175:23,24
182:23,24
190:22
193:22,23
202:10,11
215:4,5
237:9,10
245:10,11

**truthful**
171:23

**tunnel**
36:16

**turn**
6:10 34:6
45:4 51:13
63:20 72:9
110:16 122:9
123:3 131:4
132:9 216:5
233:14,20
278:10 285:21
290:9 291:13

**turned**
26:16 30:8
51:14,18
63:22 64:2,11
110:15 111:7,

9 183:16
223:2,25
246:14 249:11
259:3,8
266:23 279:8,
23 280:6
284:2 290:1,
16 291:23

**turning**
261:19 270:20
290:12,18
291:10

**turns**
186:21 277:15
290:14

**Twilight**
15:18 16:20
19:18 21:8
44:14 63:8
64:8 71:5
80:13 96:5
97:15 113:11
115:1 128:9,
22 129:2
142:12,17
150:12 160:3
174:8 176:11
177:5 178:9,
23 180:17
184:3,4
191:13 195:3
198:18 200:2
204:15
205:15,16,17,
21 206:1,20
208:19,24
209:1,2,6,7,
9,12,17,18,20
210:23 211:2,
4 212:20
214:1,9

215:24 222:1
224:13,18,24
225:18 229:8,
12,20 234:2,
17 241:20

**twist**
75:15

**twisted**
196:23

**type**
55:2 57:12
85:8,9 89:10,
17 90:10
105:17 173:11
176:15 188:23
195:16 197:19
220:19 232:15
239:16 253:4

**typical**
146:16 158:7
236:11 269:4,
17

**typically**
6:13 13:18
106:23 126:11
127:23 207:6
246:13
289:14,20

---

**U**

**U.S.**
20:16 205:11

**Uh-huh**
90:2 137:20
138:21 230:11

**ultimately**
171:16

**umpire**
22:11 24:23

25:23 39:19
53:13 91:4
97:10,15,18,
22 99:10
100:11,12,17
103:17 105:3
118:4 119:1
200:25 206:5,
9 207:1,2,17
216:25 235:3
255:14

**umpired**
118:25 119:1
206:7,23

**umpires**
128:3 200:25
206:3,6

**umpiring**
100:18,23

**unavoidable**
87:20

**unbelievable**
240:8 243:6

**uncertain**
263:19

**uncharacteristi
c**
104:11

**unclear**
154:25

**uncomfortable**
46:15

**uncommon**
247:19 248:23

**underage**
218:25

**underneath**
291:25

**understand**
10:17 16:24
17:8 23:7,13
25:11,24 30:1
38:4,15 42:18
44:22 46:15
50:14 57:18
65:3,7 76:24
91:11,21,22
93:25 94:11
97:9 128:19
130:17 137:4
146:19,21
149:14 154:21
174:3 190:9,
11,17 193:8
204:15
215:21,22
229:18 234:19
237:18 246:23
249:14 253:5
254:6 255:13,
16 261:21
269:21 271:9
274:22 276:4,
19,22 283:3
286:18,21,24
290:2

**understanding**
30:14,16
76:23 207:11,
22 246:24
255:8,9
256:18 263:13
290:9

**understatement**
269:23

**understood**
29:13 30:25
32:11,15
33:15 45:17

USPA Hearing Committee
August 06, 2021                                                                63

66:20 69:24
83:5 94:9
108:17 149:5,
16 152:17
183:21 210:7
229:20 232:11
270:13 271:4
272:5 278:3,
16 279:11

unequivocally
265:12

unfold
6:19

unfolding
287:14 290:12

unglued
259:19

unhappy
86:14

unhealthy
219:6

unintentional
98:18 105:6

unique
64:8

unison
66:15

United
19:22 210:1,4

unpleasant
50:18 196:10
241:24

unquote
74:23 183:17
249:13

unrelated
174:4

untacking

165:21

untenable
28:22

untruthful
170:16

unusual
50:7 64:4,20
101:12 104:7,
8 106:12
115:3,24
137:14 152:24

upper
42:1

upset
20:9,10
21:18,21,24
22:14 23:8
32:18,20
41:12 57:23
82:24 106:12,
16,20 148:8
152:24 153:4,
11 154:3
161:25 190:18
223:24 266:10
281:4,19
284:9

Urdu
72:17,24
86:24 87:12
90:1 95:4

USPA
6:4,21,22,24
7:17 9:21
13:1 15:16
16:20,22 18:3
20:2,8 26:18
69:19,21
71:21 73:4
89:13 94:11

105:1,2,3
118:22,25
119:1 127:15
128:10,20,23
136:16 139:1
151:9 168:1
180:10 183:13
190:8 191:8
204:19,20,22,
23 205:1,2,5,
9,11,14
206:3,9
209:21 212:3,
7,24 213:18
229:9 234:1,
5,25 239:23
241:16 250:18
255:17 285:2

USPA's
17:1

USPA-ACCREDITED
255:14

USPA-CERTIFIED
105:3 206:5

usual
197:19

utter
32:3 55:11
100:1

uttered
30:17 47:12
101:10 109:5,
21 114:2
137:11,14
231:7 250:20
270:7,15,25
271:8,14,25
272:18,20
274:11

_____
       V
_____

vacations
262:3

vehemently
265:2

venue
119:2

verbal
33:10 113:22,
23 270:11

verbalized
103:10

verbalizing
103:8

verbally
31:23 83:21
115:9

verbatim
7:5 21:6
33:22 47:8
52:13 98:16
107:24 111:9
116:12 121:9
122:18,22
133:4 150:6
159:3,15
219:21 223:10
238:24 246:6
270:16 274:18
283:22 284:12

verbiage
101:25

verge
280:25

versa
114:5,6

version
29:3

USPA Hearing Committee
August 06, 2021                                                              64

versus
    97:19 123:12

vested
    96:10

vet
    223:10 238:25
    239:16 240:9

veteran
    203:16

veterinarian
    171:16
    239:14,15

vice
    114:5,6

Victoria
    193:10,12

video
    23:21,22
    30:12 31:3,7,
    18 32:3 34:21
    39:6 53:21,24
    54:9,14,20
    55:7,8 72:14,
    15,18,25
    73:1,4,7,10,
    11 79:13
    82:11 86:22,
    25 92:3,4,5,
    8,10,21 94:22
    95:3,18 96:4
    110:19
    112:16,17
    140:16,19
    141:3 156:25
    249:3,7
    254:12,16,25
    255:5,6 256:9
    261:7 289:17
    290:7 291:6,7

videoed
    55:8

videoing
    82:4,13

videos
    61:10 73:10
    82:7 140:17
    246:23

view
    57:13 133:24
    193:3 233:7,
    9,11 265:11
    269:1 273:12
    286:24 288:11

violate
    13:23

violations
    6:22 11:17
    15:15,17
    16:7,13
    206:16

Virginia
    15:19 19:19
    44:15 63:9
    80:13 97:16
    113:11 120:5
    160:19 180:17
    205:17
    207:10,12
    208:4,24
    209:3,14,15,
    19 210:1,4,8
    229:11 241:21

visible
    106:18

visibly
    106:19

vocabulary
    35:15 37:4
    41:11 48:21

76:9 250:7
263:24 265:15
278:19

voice
    66:14

volume
    51:20 109:7

vouched
    239:8

vulgar
    70:12

vulnerable
    270:19

_____

            W

wait
    24:10 232:22
    252:24

waited
    258:24
    259:20,23
    266:3

waiting
    6:10 8:6,16
    103:19 155:21

wake
    262:5

walk
    77:25 205:6
    270:17 289:4

walked
    23:1 26:6,15,
    17 40:2,6
    48:15 124:24
    258:2,7 259:1
    260:4 263:11
    266:5 279:24
    280:6 283:8

wall
    234:14

wanted
    20:10 21:18
    25:18 34:11
    59:24 70:8,9,
    13,16,22
    78:6,14,16
    108:12 121:24
    122:21 130:21
    147:21 155:1,
    5 167:17
    168:24 179:14
    221:19 222:11
    224:1 258:12
    260:22
    263:14,19
    290:19

wanting
    80:16,17
    115:19 147:13
    153:3

warned
    239:7

warning
    252:5

Warrington
    242:1 243:16

washing
    148:25

Washington
    168:25

watch
    73:1 82:7
    83:23 251:15
    285:15,18
    287:11 290:6

watched
    29:14,20,24,
    25 34:14

54:10,19
73:2,3 94:25
95:3 127:8
161:11 220:10
233:10 246:23
290:7

**watching**
31:1,6 61:10
68:6 78:13
83:15 84:1
143:17 230:15
273:13 283:6
285:16 286:8
287:1

**ways**
102:23 274:13
282:1

**weak**
57:6

**weapon**
220:14

**wedding**
181:24

**week**
21:9 104:16
119:3 169:22
184:5,8,9,10,
12 204:12
223:3

**weekend**
192:10 201:24
203:2 214:13
245:2

**weekly**
176:13 179:4

**weeks**
177:4 226:23,
25

**welcomed**

119:20 179:1

**welcoming**
176:16

**well-behaved**
88:16

**Wellington**
136:20

**wells**
156:18 163:14
166:4,7,11,
16,20 238:19
251:3

**west**
208:2

**wet**
119:10

**whatsoever**
17:3 58:14
99:15 217:3
275:20 281:13

**whisper**
203:11

**whispered**
249:12

**whistle**
98:12 101:9,
16,18 102:16
103:1,2 118:4
226:14 246:12
253:25

**whistles**
98:20

**white**
115:20 272:2

**Whitney**
214:24 215:7,
12 226:2
228:25 229:5
233:22 235:15

**wide**
185:3

**wife**
80:15 82:10,
19 83:14 86:4
89:24 94:24
194:12 195:1
198:18

**wife's**
79:6

**wild**
220:9

**win**
135:14

**winner/winners**
107:23

**winter**
122:7,21,22
169:1,10
203:3

**wintertime**
222:4,18

**witnessed**
143:15 144:2,
6 160:9
185:18

**witnesses**
6:9,14 7:22,
23 9:18 10:3,
4 11:12 13:25
14:2,19,24
15:5,6 17:14,
25 25:10
84:10 131:1,
3,5 155:5
168:6 192:19,
25 193:5
267:17 272:6
284:21 285:4
286:3 287:15,

17

**witnessing**
32:2

**woman**
116:3,6
120:24 121:16
283:2

**women**
36:3 85:10

**won**
135:11 136:15
239:1 240:16,
24 242:15

**wondered**
248:9

**wondering**
12:5 79:4
87:8 178:19
287:21

**word**
14:18 23:16
25:1,14 29:10
32:3 35:14,
15,17 36:23,
24,25 37:2,3,
8,9,10,11
38:19 41:7,9,
11,16 45:9
46:16,20
51:17 54:18
64:15 65:17
67:16 70:9
74:18,25
75:19,22
82:21,22
99:15 100:1
114:13 115:25
117:1 118:9
123:19,20,25
124:2,4

134:6,25
137:9 152:13,
15 176:23
250:12,13
259:2,5,6
260:20 261:8
263:24
271:21,23,24
272:4 274:11
275:17 279:19

**words**
22:21 23:4,6,
13 24:14 25:5
27:3,6,19
28:20 29:1
30:17 36:17
37:4,13,18,21
38:10,20
46:15 47:3,6,
7,11 48:25
49:4 57:9
59:8 64:10
69:7 70:11
74:2 75:3,4,
6,10,15,16,
18,22 77:1
78:7 92:1,7,9
94:3 95:1,11
99:4 113:20
114:2 127:6
137:11,14,18
140:25
153:17,21
154:2,3 196:4
250:20 270:8,
14 271:13,18
274:1,4,8,25
276:14 278:18

**work**
9:3 148:14,
18,20 149:3,

10,11 157:12
159:3 239:20
246:19 247:2

**work-study**
149:19

**Work-to-ride**
159:12,17,21

**worked**
11:7 121:12
158:13
181:20,21
276:7

**working**
8:12 85:14
148:21 150:2
156:25 159:1
161:10 165:20
230:15 237:22
247:2 252:15

**works**
150:9 246:19
251:5 274:12

**world**
104:5 116:4
252:17

**worries**
210:14

**worry**
10:10 147:15
255:4

**worse**
38:14 247:13
253:2

**worst**
196:6 197:6
247:21

**wow**
87:7 92:10

**wrenched**
252:4

**write**
26:18,21
129:13 259:21

**writing**
17:23 20:8
42:13 129:10,
18

**written**
69:17 230:2
285:2

**wrong**
97:10 118:11
147:17 152:23
186:13 187:3
188:10 189:16
275:22 276:24

**wrongdoing**
171:5

**wronged**
74:11,14
276:11

**wrote**
28:18 38:24

---

**Y**

---

**y'all**
21:18 156:5,
15

**Yacht**
15:21 97:19
98:19 107:21
113:15 133:4

**yank**
220:16

**yanked**
46:12

**yanking**
92:23

**yards**
109:1 231:2

**year**
16:23 122:4,
10 123:3
134:12 135:13
171:4,17
204:13 205:2,
13 209:11
219:11 223:25
242:25 243:1
244:5

**years**
14:8 15:24
20:13 24:3
50:13 100:3
104:1,6,9
115:10 119:5
132:24 160:18
162:6 164:8
168:21,22
177:8 179:13
180:5 181:16,
17 184:2,11
186:19 195:16
196:8,9
198:19,20
199:4,5 203:1
207:15 209:5,
8 216:18
218:8 220:10
227:21 232:13
243:4,8
244:15 277:12

**yell**
31:17 32:5
82:18 99:20
134:4 160:14
217:1 231:16

USPA Hearing Committee
August 06, 2021

| | |
|---|---|
| **yelled** | **Zoom** |
| 133:18 134:5, | 14:3 41:5 |
| 24 219:10 | |
| 231:19 249:11 | |
| 257:19 261:11 | |
| **yelling** | |
| 105:18 197:14 | |
| 204:7 219:25 | |
| 220:1 249:10 | |
| **yellow** | |
| 98:13,17 | |
| 105:8 | |
| **yells** | |
| 161:17 | |
| **yesterday** | |
| 11:5 54:10 | |
| **you-all** | |
| 25:18 76:11 | |
| 194:24 | |
| **you-guys** | |
| 118:21 133:7 | |
| 138:24 175:7 | |
| 197:5 201:25 | |
| 207:13 214:18 | |
| 221:17 | |
| **young** | |
| 87:24 157:21 | |
| 194:19 243:12 | |
| 259:17 287:12 | |
| **younger** | |
| 206:24 220:2 | |
| **youth** | |
| 158:19 207:3, | |
| 10,17,24,25 | |

**Z**

**Zach**
253:8

# EXHIBIT F

UNITED STATES POLO ASSOCIATION
BEFORE THE EXECUTIVE COMMITTEE OF THE USPA
MEMBERSHIP-RELATED CONDUCT VIOLATION PROCEEDING

IN THE MATTER OF:                                    CASE NO. 2021-EC/BG-002

UNITED STATES POLO ASSOCIATION,

      Charging Party/Petitioner,

vs.

DARRELL GAEBEL,

      Charged Party/Respondent.

_____/

## FINAL ORDER

This matter has come before the Executive Committee ("EC") acting on behalf of the Board of Governors ("BoG") of the United States Polo Association ("Association") pursuant to Part I: Membership-Related Conduct Violations Procedures of the Association's Disciplinary Procedures Policy ("DPP").

### I.    Factual & Procedural Background

This Conduct Violation Proceeding was initiated when USPA Member Delora Burner of the Battlefield Park Polo Club filed a Conduct Violation Complaint ("CVC") against USPA member Darrell Gaebel for allegedly directing a racial slur against one of her students, Aleem Siddiqui, immediately following a collision during an exhibition arena polo game. (*See* **Exhibit** 1). The game was played on July 10, 2021, at the Great Meadow Polo facility in The Plains, Virginia, under the auspices of USPA member club Twilight Polo Club, which leased the facility for that purpose. The USPA also received a similar complaint from Aleem's mother, Humera Rahman, who is not a USPA Member. At the time of the incident, Aleem Siddiqui was fourteen years old. (*See* **Exhibit 2**)

As required by the DPP, the USPA provided a copy of the CVC to Mr. Gaebel within 72 hours of receiving it. Mr. Gaebel vehemently denied that he used the slur, and he retained counsel, Ms. Teresa Taylor, a USPA Member and one of his teammates during the game. Because USPA staff members who processed the CVC did not expect Mr. Gaebel to agree to settle any charges if they were issued, before bringing the matter to the attention of the EC, they confirmed in writing and orally with Ms. Rahman that Aleem was indeed prepared and willing to testify at a hearing that Mr. Gaebel used the slur against him and be questioned by both the USPA Hearing Officers and Ms. Taylor. The EC, taking the allegations in the CVC at face value, issued charges against Mr. Gaebel for violating the USPA Code of Conduct and notified him that it would schedule a hearing. (*See* **Exhibit**

3). Mr. Gaebel submitted a written statement denying the allegations of the CVC. (*See* **Exhibit 4**).

The implicated provisions of the Code of Conduct are as follows:

(2) Always respect your teammates, opponents, officials, and fellow Members.

(3) Always demonstrate good sportsmanship.
......

(8) Always demonstrate respect and good citizenship toward other Association Members in all Association-related communications, including, but not limited to, discourse at Association meetings.

(9) Always adhere to and comport yourself in accordance with the Articles of Incorporation, By-laws, Constitution, Rules, terms and conditions of the Membership Application, Code of Conduct, and other policies of the Association, all as in effect from time to time.

(10) Always act in a manner that is in the best interests of the Association and the sport of polo. An Individual Member shall be deemed to have not acted in the best interests of the Association and the sport of polo where such Individual Member:

A. Acts, or incites any other Member to act, in a manner contrary to the Articles of Incorporation, By-laws, Constitution, Rules, terms and conditions of the Membership Application, or this Code of Conduct;

B. Acts, or incites any other Member to act, in a manner deemed to be improper, unethical, dishonest, unsportsmanlike, intemperate, or prejudicial to the best interests of the sport or the Association;

D. Publishes, or incites any other Member to publish, in social media or elsewhere, statements, comments, or remarks considered to be offensive or made with the intent to influence or cast aspersions on the character or integrity of the Association, an Individual Member, a Member Club, or an official of the sport;

A Zoom hearing was held at 10:00 AM EDT on Friday, August 6, 2021, during which the USPA was represented by Craig T. Galle, Esq. The USPA Hearing Officers were Chrys Beal, a Governor-at-Large of the USPA and a member of the USPA Executive Committee, and Chris Green, USPA Chief Operating Officer and In-House Counsel. The USPA presented five witnesses: Ms. Burner; Aleem Siddiqui; Ms. Rahman; Taha Rahman, Aleem's father; and George Krabbe, a USPA Member who umpired the game. Mr. Gaebel testified and, through counsel, presented eleven witnesses: John Gobin, a USPA Member

who is the manager of Twilight Polo Club, Brock Bromley, a USPA Member who is Ms. Taylor's son and played with her on Mr. Gaebel's team in the game; Adam Doble, the parent of a student of Ms. Burner's; Marissa Wells, a USPA Member who was formerly an instructor at Battlefield Park Polo Club; David Tafuri, a former USPA Member who was formerly a client of Ms. Burner; Danielle Quinn, a USPA Member and friend of Mr. Gaebel; Matthew Potter, a USPA Member and friend of Mr. Gaebel; Joseph Noonan, a USPA Member and friend of Mr. Gaebel; Dan Coleman, a USPA Member who was formerly a USPA Circuit Governor and the Chairman of the USPA Constitution Committee; Whitney Ross, a USPA Member and the USPA Delegate for Twilight Polo Club; and Gardiner Mulford, a former polo player who had a business relationship with Ms. Burner. The hearing lasted approximately eight hours.

Of the seventeen witnesses who testified, only four - Aleem Siddiqui, Darrell Gaebel, George Krabbe, and Brock Bromley - were physically present and able to hear with their own ears whether Mr. Gaebel used a racial slur.

## II.    The Decision on Jurisdiction

At the hearing, Mr. Gaebel contested the USPA's jurisdiction.  Through counsel and the testimony of Mr. Coleman, he contended that the DPP does not apply because the game was an exhibition game, not a USPA Event as that term is used in the USPA Arena Rules and Tournament Conditions; it was played at the Great Meadow polo facility, which is not a USPA member club; it was not umpired by a Professional or Certified USPA Umpire; and it was not played under the USPA Arena Rules.

The Hearing Officers have considered these arguments and their factual bases and conclude that they are unavailing. The DPP governs USPA Member conduct "relative to the sport of polo," whether or not that conduct occurs in a USPA Event, or at a USPA Member Club, or while a game is being umpired by a Professional or Certified USPA Umpire, or being played under USPA Rules:

> These Sport-Related Conduct Violation Procedures are intended to provide a disciplinary procedures process through which the Association may regulate Member and Member Club conduct relative to the sport of polo or at any Event, whether on or off the field.

> Any Member Club or Individual Member will be deemed to have committed a "Conduct Violation" for a violation of the Association's Code of Conduct (whether on or off the polo field), Rules (as defined in the By-laws), Constitution, By-laws, Board-approved policies, directives or Terms and Conditions of Membership, or for a failure to obey a penalty imposed under the Rules or these Sport-Related Conduct Violation Procedures, to the extent such violation or failure relates to the Member Club's or Individual Member's conduct relative to the sport of polo, including, but not limited to, player or umpire conduct or any equine welfare issues.

3

(*See* **Exhibit 5**).

Although the above excerpt from the DPP is a complete response to Mr. Gaebel's jurisdictional objection, the Hearing Officers note also that many of the bases for Mr. Gaebel's objection are factually inaccurate or inapposite. Even though described as an "exhibition," the game was in fact a Club Event as that term is defined in the USPA Tournament Conditions. By its terms, the DPP – which Mr. Coleman conceded he had not read - applies to all Events, both USPA Events and Club Events. According to Mr. Gobin's testimony, the game was also played under the auspices of Twilight Polo Club, which leased the Great Meadow polo facility. Thus, the game was in fact played at a USPA Member Club. Also, the two parties involved were both USPA Members at the time of the game – an independent basis for applicability of the DPP. And, as Ms. Ross agreed in her testimony, any deviations from the USPA Arena Rules can be fairly characterized as allowable "house rules" under USPA Arena Rule 1.d, so it is fair to say that the game was played under the USPA Arena Rules. Finally, those rules do not require that the Umpire in a Club Event be either a Professional or a Certified USPA Umpire.

## III.    The Decision on the Merits

After hearing all the testimony and considering all of the evidence in this matter, which they and the EC take very seriously, the Hearing Officers have concluded that there is not sufficient evidence to find that Mr. Gaebel directed a racial slur at Aleem Siddiqui. In reaching this decision, the Hearing Officers do not reject Aleem's testimony. Rather, as the appointed representatives of the EC, they are obligated to apply the DPP's requirement that "[t]he burden of proof necessary to sustain a charge against a charged party shall be met if the Executive Committee reasonably believes, after hearing the evidence presented, that a Conduct Violation has occurred." Here, although Aleem testified that Mr. Gaebel directed the slur at him, Mr. Gaebel firmly denied doing so. Notably, the Umpire, Mr. Krabbe, testified that he heard Mr. Gaebel utter a vulgarity immediately after the collision, but he did not hear Mr. Gaebel use the racial slur. Additionally, Brock Bromley testified that he too heard Mr. Gaebel utter a vulgarity immediately after the collision, but he did not hear Mr. Gaebel use the racial slur. Given the contradictory testimony of the parties, and the presumably unbiased testimony of Mr. Krabbe, the Hearing Officers, acting for the EC, do not have a basis to reasonably believe that Mr. Gaebel directed a racial slur at Aleem Siddiqui, and therefore that a Conduct Violation occurred.

Ordered and Adjudged by the Executive Committee, on behalf of the Board of Governors, on August 18, 2021.

By:    Chris Green
       USPA COO & In-House Counsel
On Behalf of the Executive Committee
Date: August 20, 2021

4

copies to:

Darrell Gaebel
24182 Audubon Trail Drive
Aldie, Virginia 20105
Email: cdrdjg2000@yahoo.com
(Respondent)

Delora Burner
5704 Pageland Ln
Gainesville, VA 20155
delorab@hotmail.com
(Complainant)

Humera Rahman
13345 Regal Crest Drive
Clifton, VA 20124
hum3rarahman@gmail.com

Craig T. Galle, Esq.
The Galle Law Group, P.A.
13501 South Shore Blvd., Suite 103
Wellington, Florida 33414
Email: pololawyer@aol.com
(USPA Legal Counsel)