IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DARRELL GAEBEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:22-cv-141 (LMB/JFA) |
| ) | |
| UNITED STATES POLO ASSOCIATION, ) | |
| ) | |
| Defendant. ) | |

<u>MEMORANDUM OPINION</u>

Before the Court is Defendant United States Polo Association's Motion to Dismiss Plaintiff's Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss"). [Dkt. No. 21]. The Amended Complaint ("Complaint") alleges that the United States Polo Association ("defendant" or "USPA") defamed plaintiff Darrell Gaebel ("plaintiff" or "Gaebel"), breached its contract with him by not following its bylaws, and intentionally caused him emotional distress when it (1) brought disciplinary charges against him based on a complaint that he had called 14-year-old Aleem Siddiqui ("Siddiqui") a racial slur during a polo match and bullied Siddiqui afterwards, (2) held an eight-hour hearing to determine whether there was a reasonable basis to believe the allegations, and (3) issued a final order stating that there was no reasonable basis to find that Gaebel used a racial slur. For the reasons stated in open court and more fully elaborated in this opinion, defendant's Motion to Dismiss has been granted.

I. BACKGROUND

A. **Factual Background**[1]

Gaebel is a 73-year-old retired United States Naval Commander and a senior level executive with a federal government contractor. [Dkt. No. 13] at 2. He is a registered member of the USPA. Id. On the evening of July 10, 2021, Gaebel was playing in a series of exhibition polo matches. Id. at ¶10. Although the polo matches were not organized by the USPA or held at a USPA member club, a USPA member club—Twilight Polo Club—organized the event and rented a location for it. Id.; [Dkt. No. 13-6] at 1. A large "U.S. Polo Assn." banner was displayed on at least one side of the polo field. [Dkt. No. 13-7].

During the match, Siddiqui, a 14-year-old who played for a team opposing Gaebel's team, caused his horse to collide with—or as the Complaint states, "T-boned"—Gaebel and his horse, hurting plaintiff. [Dkt. No. 13] at ¶11. Gaebel claimed that he bent over in pain and exclaimed "motherfucker" at the ground, but Siddiqui claimed that Gaebel called him a "motherfucking nigger." Id. at ¶¶11-12. After the match, Siddiqui immediately told his coach, Delora Burner, and his mother what he claimed Gaebel said. [Dkt. No. 13-3] at Ex. 2, Ex. 3. Burner then told the event's manager, John Gobin, who walked over to Gaebel and asked Gaebel to apologize to Siddiqui. Id. at Ex. 2. Gaebel claims that he approached Siddiqui and his family, "vehemently denied the accusation," and told plaintiff that he has never used a racial slur. [Dkt. No. 13] at ¶12. Burner and Siddiqui's mother claim that instead of apologizing, Gaebel bullied

---

[1] Unless otherwise noted, the following facts are taken from the Amended Complaint and its many attachments, which included the Notice, a transcript of the disciplinary hearing, the Final Order, and videos of the in-game collision. The Court may consider these documents without converting the motion to dismiss into a motion for summary judgment. Lokhova v. Halper, 441 F. Supp. 3d 238, 252 (E.D. Va. 2020).

2

Siddiqui by pushing his shoulder and repeatedly saying, "Didn't we already settle this kid?" [Dkt. No. 13-3] at Ex. 2, Ex. 3.

The next day, July 11, 2021, Burner and Siddiqui's mother each emailed the USPA to complain about the in-game and post-game incidents. [Dkt. No. 13-3] at Ex. 2, Ex. 3. Burner is a USPA member; Siddiqui's mother is not. [Dkt. No. 13] at ¶¶13-14. On July 14, 2021, the USPA informed Gaebel that Burner filed what the USPA Disciplinary Procedures Policy ("DPP") refers to as a "Conduct Violation Complaint" against him. [Dkt. No. 13-3] at 2. On July 23, 2021, the USPA emailed plaintiff a formal "Notice of Alleged Conduct Violations, Issuance of USPA Charges and Notice of Hearing" ("Notice"). [Dkt. No. 13] at ¶17; [Dkt. No. 13-3] at 1. The Notice charged Gaebel with violations of the USPA's Code of Conduct, informed him of "The Alleged Conduct Violations," and stated that a hearing would take place on Friday, August 6, 2021, over Zoom, during which plaintiff "will be entitled to present evidence, defend against the charges, and cross-examine witnesses." [Dkt. No. 13-3] at 1-2. The Notice also informed plaintiff of the evidence that may be used against him. Id. at 3-4.

Before the hearing, Gaebel's counsel—Teresa Taylor, who played on plaintiff's team during the polo match in question—asked USPA outside counsel Craig Galle to clarify the procedures and rules for the hearing, including whether testifying witnesses would be sequestered. [Dkt. No. 13] at ¶¶26-27; [Dkt. No. 13-5] at 90:16-19. Galle responded that although witnesses generally would be sequestered, Siddiqui and his mother would not be, to which Taylor objected. [Dkt. No. 13-4] at 4, 8.

The hearing, which occurred on August 6, 2021, over Zoom, lasted eight hours and was judged by two USPA Hearing Officers. [Dkt. No. 13-6] at 2. At the outset, plaintiff's counsel objected to the USPA's jurisdiction on the ground that the DPP did not apply because the alleged

3

incident did not occur at a USPA event or club. Id. at 3; [Dkt. No. 13-5] at 16:18-17:6. The USPA noted the objection and stated that it would decide the issue after the hearing. [Dkt. No. 13-5] at 17:7-11. After that, the USPA presented five witnesses, and Gaebel's counsel presented 12 witnesses, including Gaebel. [Dkt. No. 13-6] at 2-3. "Of the seventeen witnesses who testified, only four—Aleem Siddiqui, Darrell Gaebel, George Krabbe [the umpire], and Brock Bromley [a 13-year-old player]— were physically present and able to hear with their own ears whether Mr. Gaebel used a racial slur." Id. at 3. Of those four, only one—Siddiqui—testified that he heard Mr. Gaebel use a racial slur. Id. at 4.

The USPA issued a Final Order on August 20, 2021, in which, after finding that it had jurisdiction to consider Burner's Conduct Violation Complaint for at least two reasons, it found in favor of Gaebel. Id. at 3-4. In concluding that it had jurisdiction, defendant found that the DPP governs USPA member conduct "relative to the sport of polo," whether on or off the field, and that it therefore encompassed the alleged conduct. Id. at 3. It also found that "many of the bases for Mr. Gaebel's objection are factually inaccurate or inapposite," and that "the game was in fact a Club Event" because it was "played under the auspices of Twilight Polo Club, which leased the Great Meadow polo facility." Id. at 4. On the Merits, the Final Order stated in full:

> After hearing all the testimony and considering all of the evidence in this matter, which they and the [Executive Committee] take very seriously, the Hearing Officers have concluded that there is not sufficient evidence to find that Mr. Gaebel directed a racial slur at Aleem Siddiqui. In reaching this decision, the Hearing Officers do not reject Aleem's testimony. Rather, as the appointed representatives of the EC, they are obligated to apply the DPP's requirement that "[t]he burden of proof necessary to sustain a charge against a charged party shall be met if the [EC] reasonably believes, after hearing the evidence presented, that a Conduct Violation has occurred." Here, although Aleem testified that Mr. Gaebel directed the slur at him, Mr. Gaebel firmly denied doing so. Notably, the Umpire, Mr. Krabbe, testified that he heard Mr. Gaebel utter a vulgarity immediately after the collision, but he did not hear Mr. Gaebel use the racial slur. Additionally, Brock Bromley testified that he too heard Mr. Gaebel utter a vulgarity immediately after the collision, but he did not hear Mr. Gaebel use the racial slur. Given the contradictory testimony of the parties, and the presumably

4

unbiased testimony of Mr. Krabbe, the Hearing Officers, acting for the EC, do not have a basis to reasonably believe that Mr. Gaebel directed a racial slur at Aleem Siddiqui, and therefore that a Conduct Violation occurred."

Id. Accordingly, the UPSA dismissed the complaint against Gaebel. [Dkt. No. 22-3].[2]

### B. Procedural History

Plaintiff filed a complaint, dated September 29, 2021, in a Virginia circuit court against Burner, Siddiqui, and Siddiqui's parents for defamation and intentional infliction of emotional distress, seeking roughly $8 million in damages and fees. [Dkt. No. 22-4]. On December 15, 2021, plaintiff separately filed suit in a Virginia circuit court against the USPA for defamation, breach of contract, and intentional infliction of emotional distress, seeking over $2,000,000 in damages and fees. [Dkt. No. 1-1]. The USPA was served on January 11, 2022, and it timely removed the Complaint to this court on February 9, 2022, asserting federal jurisdiction based on diversity. [Dkt. No. 1]. After the USPA filed a motion to dismiss, plaintiff filed an Amended Complaint on March 2, 2022. [Dkt. No. 13]. On March 11, 2022, the USPA filed the pending Motion to Dismiss [Dkt. No. 21]. It has been fully briefed and oral argument has been held.

## II. DISCUSSION

### A. Standard of Review

Defendant's renewed Motion to Dismiss challenges the sufficiency of the Complaint under Rule 12(b)(6), which requires that a complaint be dismissed when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive this challenge, a

---

[2] This document, which was a summary of the charges and ultimate outcome that was published by the USPA, was not attached as an exhibit to the Complaint. It was attached to defendant's Motion to Dismiss. Nonetheless, the Court can consider it because it is integral to the Complaint, given that it is referenced in the Complaint as one of the means by which defendant defamed plaintiff. [Dkt. No. 13] at ¶9. Moreover, plaintiff has not disputed its authenticity. Lokhova, 441 F. Supp. 3d at 252.

5

complaint must "contain [sufficient] factual matter, accepted as true, to state a claim to relief that is plausible on its face." Edley-Worford v. Va. Conf. of United Methodist Church, 430 F. Supp. 3d 132, 139 (E.D. Va. 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). When analyzing a complaint's sufficiency, a court assumes the truth of all well-pled facts and draws all reasonable inferences in plaintiff's favor; however, a court "need not accept the legal conclusions drawn from the facts, and [it] need not accept as true unwarranted inferences, unreasonable conclusions or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009) (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008)).

### B. Analysis

The Complaint asserts five causes of action, each of which is addressed in turn.

#### 1. Count 1 (Defamation)

Count I alleges that defendant defamed plaintiff in three ways: (1) by republishing the allegation that plaintiff used a racial slur in the Notice, which informed plaintiff of the charges and evidence against him; (2) by conducting a public disciplinary hearing without jurisdiction and with "reckless disregard" for the veracity of the charges; and (3) by issuing a public Final Order implying that, based on the evidence presented during the hearing, defendant considered the allegation of plaintiff's use of a racial slur to be true. Plaintiff alleges this conduct harmed his reputation, caused him mental anguish, and forced him to incur attorney's fees to defend himself at the USPA hearing.

Under Virginia law, defamation by publication requires the publication of an actionable statement with the requisite intent. Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015). "A statement is actionable if it contains a false assertion of fact that 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" Fairfax v. CBS Broad. Inc., 534 F. Supp. 3d 581, 591 (E.D.

6

Va. 2020) (quoting Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993)). A statement can be defamatory by "inference, implication or insinuation." Hatfill v. N.Y. Times Co., 416 F.3d 320, 331 (4th Cir. 2005) (quoting Carwile v. Richmond Newspapers, Inc., 82 S.E.2d 588, 591 (Va. 1954)). "Any alleged implication must be reasonably drawn from the words actually used." Webb v. Virginian-Pilot Media Cos., LLC, 752 S.E.2d 808, 811 (Va. 2014).

First, as discussed in court, the Notice does not create any liability for defamation, regardless of whether it was published or not, because it does not contain any actionable statements. It neither stated nor implied that Gaebel actually used a racial epithet or actually bullied Sidiqqui; it only stated that it was alleged that he had done so. All the Notice does is give the plaintiff very clear notice of the charges he faced, the names of witnesses who might testify, and copies of Burner's and Siddiqui's mother's complaints. Although plaintiff argues that the Notice adopted Burner's allegations as true, no plausible reading of the Notice supports that conclusion. For example, the subject line states, "Notice of Alleged Conduct Violations," the first section is called "the Alleged Conduct Violations," and the Notice explicitly states that Gaebel's conduct would amount to violations only "if proven to be true." Nonetheless, plaintiff argues that the Notice mischaracterized the evidence against him by implying that there were multiple witnesses with "first-hand knowledge of the incident at issue"; however, that is not a mischaracterization, because multiple witnesses observed the in-game collision, and Burner and Siddiqui's mother claimed that they observed plaintiff bully Siddiqui first-hand. What the Notice shows was defendant's effort to ensure that plaintiff was fully advised of the charges against him. To hold this type of notice defamatory would deter private adjudicatory bodies from advising people of the allegations which they need to resolve.

Second, plaintiff argues that the hearing itself defamed him because it "contributed to, furthered, perpetuated and gave credence to the defamatory statements against [p]laintiff"; however, the USPA never made any actionable statements during the hearing. None of defendant's officials ever said or implied that the allegations were true, and the hearing actually gave defendant the opportunity to show that they were false. Moreover, plaintiff has not cited any caselaw supporting his claim that holding a hearing to determine whether allegations are true is tantamount to stating that those allegations are, in fact, true. And although plaintiff argues that defendant adopted the allegations by calling the minor and his family and allowing them to state their allegations, plaintiff does not offer any caselaw to support that argument.

Third, plaintiff argues that defendant defamed him in its Final Order by implying that it believed the allegations when it stated, "In reaching [its] decision, the Hearing Officers do not reject Aleem's testimony." Defendant argues that plaintiff ignores the end-result, which is an exoneration of plaintiff. In fact, the Final Order clearly states, "Given the contradictory testimony of the parties, and the presumably unbiased testimony of Mr. Krabbe [the umpire], the Hearing Officers . . . do not have a basis to reasonably believe that Mr. Gaebel directed a racial slur at Aleem Siddiqui, and therefore that a Conduct Violation occurred." From these words, a reasonable person could not interpret the Final Order as implying that Gaebel actually directed a racial slur at Siddiqui. A far more likely interpretation was reluctance by the hearing officers to label a 14-year-old as a liar. This common-sense reading is reinforced by a summary that was published and made publicly available after the hearing. The summary states, in full:

> The USPA received a Conduct Violation Complaint on July 11, 2021, alleging that USPA member Darrell Gaebel used offensive language when addressing a minor USPA member during a game played at the Great Meadow polo facility under the auspices of Twilight Polo Club on July 10, 2021. On July 20, 2021, the USPA Executive Committee issued charges against Mr. Gaebel for violating the USPA Code of Conduct. A hearing was held on August 6, during which Mr. Gaebel, the minor

8

> USPA member, and fifteen other witnesses testified. The Hearing Officers rejected Mr. Gaebel's jurisdictional objections, but concluded that there was not sufficient evidence to find that Mr. Gaebel used the offensive language alleged in the Complaint. Accordingly, the Conduct Violation Complaint was dismissed in a Final Order dated August 20, 2021.

[Dkt. No. 22-3]. This published summary clearly shows that defendant did not find that Gaebel used the alleged slur.

Finally, Count I does not state a claim for defamation per se. Virginia law recognizes four defamatory statements that are actionable per se: those that (1) impute to a person the commission of a criminal offense involving moral turpitude, (2) impute that a person is infected with a contagious disease, (3) impute to a person unfitness to perform the duties of employment, and (4) which prejudice a person in his profession or trade. Tronfeld v. Nationwide Mut. Ins. Co., 636 S.E.2d 447, 449-50 (Va. 2006). Plaintiff relies on the first and fourth types, arguing that defendant made statements that imply that he committed crimes of moral turpitude and that prejudice him in his profession by impacting his ability to obtain a security clearance; however, because defendant did not make any false statements, there is no basis to consider whether they were defamatory per se. See Dangerfield v. WAVY Broad., LLC, 228 F. Supp. 3d 696, 704 n.6 (E.D. Va. 2017) (concluding that the court did not need to address whether a report constituted defamation per se "in light of the [c]ourt's holding that the report . . . is substantially accurate, and thus not an actionable statement of defamation"); see also Fairfax, 534 F. Supp. 3d at 592-94. Accordingly, Count I fails to allege a plausible claim of defamation.[3]

---

[3] Because Count I fails for lack of actionable statements, the Court has not addressed defendant's alternative argument that its statements were privileged because they were made in furtherance of a common interest in resolving a dispute, cf. Larimore v. Blaylock, 528 S.E.2d 119, 121 (Va. 2000); however, that argument also provides a separate meritorious basis for dismissal of the defamation claim.

2. Count II (Breach of Contract)

Count II alleges that defendant breached its Disciplinary Procedures Policy by (1) charging plaintiff with conduct violations based on an improper Conduct Violation Complaint and (2) holding a hearing without jurisdiction.

According to the DPP, the USPA "will not prosecute alleged Conduct Violations in the absence of a Conduct Violation Complaint that complies in all material respects with the provisions set forth in these Sport-Related Conduct Violation Procedures." [Dkt. No. 13-2] at I.B.1.a. Those procedures provide, in relevant part, that a Conduct Violation Complaint is properly brought only when it is (1) made by a USPA member (2) who is a witness to the alleged violation. See id. at I.B.1. ("A complaint of a Conduct Violation . . . may be made by any Registered Player Member, Affiliate Player Member, Officer, Governor, employee of the Association, or Official (i.e., umpire, referee, timekeeper, scorekeeper, goal judge, or Host Tournament Committee member) of the Event who is a witness to an alleged Conduct Violation or by the Chairman or Chief Executive Officer of the Association."). Here, both Siddiqui's coach, Burner, who was a USPA member, and Siddiqui's mother, who is not a USPA member, contacted the USPA about the incident. Accordingly, the USPA only considered Burner's email to be a formal complaint. This is evident from the face of the Notice, which stated that Siddiqui's mother filed a "written statement," whereas it stated that the allegations against Gaebel "were made in a Conduct Violation Complaint made by Delora Burner, an Association member." [Dkt. No. 13-3] at 1, 4. As long as Burner was a "witness" to the alleged violation, then, the Conduct Violation Complaint was proper.

The DPP defines "witness" as a complaining party who "observes [an alleged Conduct Violation] in person or via video, livestream, or similar technology, either contemporaneously or after it occurs." [Dkt. No. 13-2] at I.B.1. Burner's complaint and the Notice alleged two

10

conduct violations: one during the match, when Gaebel allegedly used a racial slur, and one after the match, when Gaebel allegedly "bullied [Siddiqui] by pushing his shoulder" and "slapping his upper arm." [Dkt. No. 13-3] at 1. Plaintiff argues that Burner was not a witness to either violation, while defendant argues that Burner was a witness to both. Plaintiff's position is clearly wrong, because it ignores the undisputed fact that Burner personally witnessed the in-game collision and Gaebel's post-match interaction with Siddiqui.

Although Burner did not actually hear Gaebel use a racial slur, defendant was justified in considering Burner a "witness" to that alleged violation for the purpose of bringing a complaint because the USPA indicated that it took "the allegations in the [complaint] at face value" when deciding to bring charges, and those allegations suggested that Gaebel used a racial slur. [Dkt. No. 13-6] at 2. Burner's complaint states, in relevant part:

> An incident occured [sic] during a 6:30 pm game last night July 10, 2021 at Twilight Polo in the Plains Virginia. Battlefield was playing a game against the Polo Yacht Club and a player from each team collided midfield. Darrell Gaebel from Polo Yacht Club and Aleem Siddiqui from Battlefield resulting [sic] in foul and racial language (motherfucking nigger) by the adult Darrell Gaebel towards my fourteen year old student Aleem.
>
> I walked directly to the umpire George Crabb after the game and asked if he heard the comments on the field, he had not, then I went to the manager John Gobin to report this incident. I stated I was beyond angry and that this is unacceptable, John was in 100% agreement and said he would not tolerate this behavior. John accompanied me to speak to his player Gaebel and asked him directly did he say these things to Siddiqui? Gaebel responded, "Now John when have you heard me say that word?" John said again did you say this to the kid? Gaebel evaded . . . John told Gaebel to go over there and apologize to the player and his family.
>
> I accompanied Gaebel to speak to my student and his family and Gaebel [w]as not happy. When we arrived Aleem's mother, father, uncle, grandparents, and friends as well as all our families and kids were nearby. I said Darell [sic] has come to apologize to you Aleem. Gaebel said well no, I looked at him and watched as he totally evaded an apology, Gaebel with his teeth gritting said, "No we settled this on the field, didn't we kid?" Gaebel pushed Aleem's shoulder and said, "Didn't we already settle this kid?" He actually stood there and bullied my student by pushing his shoulder, never acknowledged my student by name. It was "kid."

11

[Dkt. No. 13-3] at Ex. 2. Based on this information, which defendant took "at face value," defendant had sufficient facts to conclude that Burner contemporaneously observed both alleged violations and therefore was a "witness" under the DPP.

Second, plaintiff alleges that the USPA lacked jurisdiction to hold a hearing because its jurisdiction is limited to USPA matches and clubs. Although plaintiff made this objection at the hearing as well, it was overruled. As the USPA explained in its Final Order, the DPP governs USPA member conduct "relative to the sport of polo or at any Event, whether on or off the field," and it cannot be disputed that Gaebel's conduct occurred "relative to the sport of polo." [Dkt. No. 13-6] at 3. The USPA also rejected Gaebel's argument that the event did not occur at a USPA club, concluding that "the game was in fact played at a USPA Member Club," because it was "played under the auspices of Twilight Polo Club, which leased the Great Meadow polo facility." Id. at 4.

Gaebel argues that the USPA relied on a "strained" reading of the DPP, and that it was unreasonable to interpret the phrase "relative to the sport of polo or at any Event, whether on or off the field" to allow the USPA to "police" its members "anywhere, everywhere, and at any given time for any conduct whatsoever." As the USPA correctly argues, plaintiffs' slippery slope argument is inapposite, because the alleged violation here was quintessentially related to the sport of polo. Indeed, it concerned one USPA member allegedly directing foul language and bullying another USPA member on the polo field during a game. Moreover, there are no facts alleged in this record from which to find that the USPA erred in concluding that "the game was in fact played at a USPA Member Club," given that a giant banner emblazoned with "U.S. Polo Assn." was hanging above the field. Accordingly, the USPA had jurisdiction over Gaebel's conduct, which occurred "relative to the sport of polo," and at an event hosted under the literal

banner of the USPA by a USPA member team. Accordingly, Count II fails to allege a plausible cause of action.

### 3. Count III (Breach of Contract & "Common Law Due Process")

Count III alleges that defendant breached the DPP and violated "common law due process" during the hearing by applying the DPP in an arbitrary manner. For example, plaintiff alleges that a court reporter swore in witnesses even though this was not a judicial proceeding and there were no repercussions for violating the oath; that rules of evidence were applied randomly and prejudicially towards him; that defendant allowed the minor's parents to testify on his behalf and interfere with plaintiff's cross-examination of him; that defendant tried to cajole plaintiff into ending his defense without presenting his full case; that the hearing was scheduled without consultation and did not have sufficient procedural safeguards such as witness sequestration; and that before the hearing, the USPA failed to give notice of the rules to be applied at the hearing. Count III alleges that these breaches caused plaintiff mental anguish, a missed day of work, and payment of attorney's fees.

The USPA argues that Count III must be dismissed because any breach of the DPP during the proceeding did not result in cognizable damages. In particular, the USPA argues that emotional damages generally are not recoverable through breach of contract claims, and that attorney's fees are not recoverable because there are no statutory or contractual provisions providing for them. The USPA relies on Illinois law for these propositions. See, e.g., Maere v. Churchill, 452 N.E.2d 694, 697 (Ill. App. Ct. 1983).[4] In response, plaintiff argues that Virginia law applies, that Virginia law—based on a case from the Western District of Virginia—allows

---

[4] Although the parties dispute whether Virginia or Illinois law applied, resolving their choice of law dispute was unnecessary to resolving Counts II and III.

13

plaintiffs to recover for emotional damages when they are "particularly likely" to result from a breach, and that his mental anguish and attorney fees "can reasonably be expected to result" from the USPA not following the DPP during the hearing. See Moorehead v. State Farm Fire & Cas. Co., 123 F. Supp. 2d 1004, 1006-07 (W.D. Va. 2000).

Plaintiff's arguments are meritless. Plaintiff cannot show any prejudice caused by the USPA's allegedly arbitrary application of the DPP during the hearing. After all, plaintiff received a favorable decision with all charges being dismissed.[5] Even if plaintiff had somehow been prejudiced by the proceeding, he cannot recover emotional damages or attorney's fees under Virginia law, which is the law upon which he relies. Fifteen years after the Moorehead decision, the Supreme Court of Virginia explicitly rejected Moorehead's approach, holding that "'tort damages'—including non-pecuniary damages such as mental anguish, emotional distress, and humiliation—'are not recoverable for breach of contract,'" regardless of how foreseeable they may be. Smith v. McLaughlin, 769 S.E.2d 7, 20-21 (Va. 2015) (quoting Isle of Wight Cnty. v. Nogiec, 704 S.E.2d 83, 86 (Va. 2011)). As for attorney's fees, "Virginia follows the American rule . . . , under which '[g]enerally, absent a specific contractual or statutory provision to the contrary, attorney's fees are not recoverable by a prevailing litigant from the losing litigant.'" Bolton v. McKinney, 855 S.E.2d 853, 855 (Va. 2021) (REVI, LLC v. Chicago Title Ins. Co., 776 S.E.2d 808 (Va. 2015)). Plaintiff has not identified either a contractual or statutory basis for awarding attorney's fees.

---

[5] Moreover, Gaebel's claim that the hearing rules were consistently applied to his detriment is contradicted by the transcript. For example, although plaintiff bemoans the use of hearsay against him, plaintiff's lawyer presented testimony from a father who testified about what his daughter told him about the match in question. [Dkt. No. 13-5] at 142. When a hearing officer asked plaintiff's lawyer, "I assume you would agree that this is all hearsay," plaintiff's lawyer responded, "Yes. It's fine." Id. at 144:10-12. The hearing officer simply responded, "Okay," and there is no indication that the hearing officers excluded that testimony. Id. at 144:13.

This leaves plaintiff's "common law due process" claim. Plaintiff argues that the USPA was obligated to give him reasonable notice of the hearing and the charges against him, an opportunity to be heard, and a hearing conducted in good faith—and that it did not do so. Interestingly, the case plaintiff cites for this proposition, Gottlieb v. Economy Stores, Inc., 102 S.E.2d 345 (Va. 1958), never mentions due process. Moreover, it does not appear that any Virginia case has formally recognized a "common law due process" claim, and to the extent the Fourth Circuit discussed a "common law duty," it does not appear such a duty would extend to the USPA, because "this common law duty . . . was meant to operate as a 'check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing,'" and the USPA is not that type of an organization. Pro. Massage Training Center, Inc. v. Accreditation All. of Career Schs. & Colleges, 781 F.3d 161, 169-70 (4th Cir. 2015) (quoting Thomas M. Cooley Law Sch. v. Am. Bar Ass'n, 459 F.3d 705, 712 (6th Cir. 2006)). Even if the USPA had a common law duty to provide fair procedures, the Complaint does not allege facts supporting a claim of due process violation. Plaintiff clearly received fair notice and had a full opportunity to be heard, particularly given that he presented 12 witnesses. Moreover, as defendant argues, due process protects against wrongful deprivations of life, liberty, or property, but the hearing did not deprive plaintiff of any of those things because plaintiff prevailed. Accordingly, Count III fails to allege a plausible cause of action.

    4. Count IV (Breach of Duty of Fair Dealing)

Count IV alleges that defendant violated the implied duty of good faith and fair dealing by interpreting the Disciplinary Procedures Policy to intentionally benefit Siddiqui and hamstring plaintiff's defense. This claim repackages the breach of contract claims, as both are contract-based claims that focus on how the USPA conducted the hearing. Cf. Frank Brunckhorst CO., L.L.C. v. Coastal Atlantic, Inc., 542 F. Supp. 2d 452, 463 (E.D. Va. 2008)

15

("Under Virginia law, . . . a breach of [the implied covenant of good faith and fair dealing] only gives rise to a breach of contract claim, not a separate cause of action."). And, again, because the proceeding ended in plaintiff's favor, Count IV fails for the same reasons as Counts II and III.

### 5. Count V (Intentional Infliction of Emotional Distress)

Count V alleges that defendant committed the tort of intentional infliction of emotional distress ("IIED") by knowingly holding a disciplinary hearing that lacked jurisdiction and was based on false allegations, causing plaintiff "severe anxiety, paranoia, marital stress, and sleeplessness." This cause of action is disfavored by Virginia courts. Dao v. Faustin, 402 F. Supp. 3d 308, 320 (E.D. Va. 2019). It can go forward only if a plaintiff alleges sufficient facts to make out a plausible claim that "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." Viers v. Baker, 841 S.E.2d 857, 863 (Va. 2020) (quoting Almy v. Grisham, 639 S.E.2d 182, 187 (Va. 2007)).

Although Count V fails to allege sufficient facts to support any element of an IIED claim, the simplest element to focus on is the element of outrageousness. The Supreme Court of Virginia has held that to satisfy this element, a defendant's alleged behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quoting Almy, 639 S.E.2d at 182). The behavior plaintiff claims was outrageous was (1) holding a hearing without jurisdiction and (2) holding a hearing based on false allegations. Plaintiff offers no caselaw to suggest that such conduct exceeds "all possible bounds of decency." Moreover, as discussed above, the USPA had jurisdiction to charge plaintiff and

16

conduct the hearing, and the hearing afforded plaintiff full fair process, resulting in his favor. When defendant held the hearing, there was no indication whatsoever that the USPA knew or had reason to know the allegations against plaintiff were false. What the USPA did in this case was not outrageous. To the contrary, it was responsible: upon receiving allegations that one of its members used a racial slur against a minor, it held a hearing to get to the bottom of the allegations, and after finding insufficient evidence for the charges, dismissed them. To find such conduct outrageous would deter the USPA and any other private organization from investigating complaints made against its members. Accordingly, Count V fails to state a plausible claim.

### III. CONCLUSION

For the foregoing reasons and those stated in open court, defendant's Motion to Dismiss [Dkt. No. 21] has been GRANTED and plaintiff's Complaint will be dismissed by an Order to be issued with this Memorandum Opinion.

Entered this 12 day of May, 2022.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge